1  LAW OFFICES OF CARLIN &
   BUCHSBAUM, LLP
2   Brent S. Buchsbaum
    Email:  brent@ carlinbuchsbaum.com
3  555 E. Ocean Blvd. Suite 818
   Long Beach, CA.  90802
4  Telephone:  (562)432-8933
   Facsimile:   (562)435-1656
5
   BERGER & MONTAGUE, P.C.
6   Daniel R. Miller, Esq.
    (PA Bar No. 68141)
7   E-mail: dmiller@bm.net
    Roslyn G. Pollack, Esq.
8   (PA Bar No. 17487)
    E-mail:  rpollack@bm.net
9  1622 Locust Street
   Philadelphia, PA  19103
10  Telephone:  (215) 875-3000
    Facsimile:  (215) 875-4604
11
12  *Attorneys for Relators*

FILED
CLERK, U.S. DISTRICT COURT

SEP 3 0 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

ORIGINAL

CLERK, U.S. DISTRICT COURT

SEP 3 0 2013

CENTRAL DISTRICT OF CALIFORNIA
                    DEPUTY

13         **UNITED STATES DISTRICT COURT**

14        **CENTRAL DISTRICT OF CALIFORNIA**

15  United States of America and The State     | Case No. CV13-3772 DMG-MAN
    of California *ex. rel.* [UNDER SEAL],      |
16                                              | **FIRST AMENDED COMPLAINT**
                                                | **PURSUANT TO THE FEDERAL**
17                              Plaintiffs,     | **FALSE CLAIMS ACT, 31 U.S.C.**
                                                | **§§3729 *ET SEQ.***
18        vs.                                   |
19                                              |
    [UNDER SEAL]                                | **FILED IN CAMERA AND UNDER**
20                              Defendants.     | **SEAL**
21                                              | **DO NOT PLACE ON PACER**
22                                              |
23                                              | **JURY TRIAL DEMANDED**
24
25             **DOCUMENT TO BE KEPT UNDER SEAL**
26
27
28
                                                                          022

ORIGINAL

1   LAW OFFICES OF CARLIN &
    BUCHSBAUM, LLP
2    Brent S. Buchsbaum
     Email: brent@carlinbuchsbaum.com
3   555 E. Ocean Blvd. Suite 818
    Long Beach, CA. 90802
4   Telephone: (562)432-8933
    Facsimile:   (562)435-1656

5   BERGER & MONTAGUE, P.C.
6    Daniel R. Miller, Esq.
     (PA Bar No. 68141)
7    E-mail: dmiller@bm.net
     Roslyn G. Pollack, Esq.
8    (PA Bar No. 17487)
     E-mail: rpollack@bm.net
9   1622 Locust Street
    Philadelphia, PA  19103
10  Telephone: (215) 875-3000
     Facsimile: (215) 875-4604
11
    *Attorneys for Relators*
12

13            **UNITED STATES DISTRICT COURT**

14           **CENTRAL DISTRICT OF CALIFORNIA**

15  | United States of America and The State | Case No.  CV13-3772 DMG-MAN
16  | of California *ex. rel.* [UNDER SEAL], |

17                                           **FIRST AMENDED COMPLAINT**
                                Plaintiffs,  **PURSUANT TO THE FEDERAL**
                                             **FALSE CLAIMS ACT, 31 U.S.C.**
18       vs.                                 **§§3729 *ET SEQ.***

19
20  [UNDER SEAL]                             **FILED IN CAMERA AND UNDER**
                                Defendants.  **SEAL**

21                                           **DO NOT PLACE ON PACER**

22
23                                           JURY TRIAL DEMANDED

24

25                   **DOCUMENT TO BE KEPT UNDER SEAL**

26

27

28

LAW OFFICES OF CARLIN & BUCHSBAUM, LLP
  Brent S. Buchsbaum
  brent@ carlinbuchsbaum.com
555 E. Ocean Blvd. Suite 818
Long Beach, CA. 90802
Telephone: (562)432-8933
Facsimile:   (562)435-1656

BERGER & MONTAGUE, P.C.
  Daniel R. Miller, Esq.
  (PA Bar No. 68141)
  E-mail: dmiller@bm.net
  Roslyn G. Pollack, Esq.
  (PA Bar No. 17487)
  E-mail: rpollack@bm.net
1622 Locust Street
Philadelphia, PA  19103
Telephone: (215) 875-3000
Facsimile:  (215) 875-4604

*Attorneys for Relators*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America and the State of California *ex. rel.* Bobbette A. Smith and Susan C. Rogers, <br><br> Plaintiffs, <br><br> vs. <br><br> Tom S. Chang, M.D., Tom S. Chang, M.D., Inc., Michael A. Samuel, M.D. Michael J. Davis, M.D., t/a Retina Institute of California Medical Group, a California medical partnership, California Eye and Ear Specialists a/k/a Ocular Institute of California, Brett Braun and San Gabriel Ambulatory Surgery Center LP <br><br> Defendants. | Case No.  CV13-3772 <br><br> **RELATORS' FIRST AMENDED COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§3729 *ET SEQ.*** <br><br> **FILED IN CAMERA AND UNDER SEAL** <br><br> **DO NOT PLACE ON PACER** <br><br> **JURY TRIAL DEMANDED** |

## I.   <u>THE PARTIES</u>

1.   Defendant Tom S. Chang, M.D. is an ophthalmologist licensed by the State of California who maintains an office for the practice of medicine at 301 West Huntington Drive, Ste. 107, Arcadia, CA 91007.

2.     Tom S. Chang, M.D., Inc. is an entity owned by Dr. Tom S. Chang with an office at 301 West Huntington Drive, Ste. 107, Arcadia, CA 91007.

3.     Defendant Michael A. Samuel, M.D. is an ophthalmologist licensed by the State of California who maintains an office for the practice of medicine at 301 West Huntington Drive, Ste. 107, Arcadia, CA 91007.

4.     Defendant Michael J. Davis, M.D. is an ophthalmologist licensed by the State of California who maintains an office for the practice of medicine at 301 West Huntington Drive, Ste. 107, Arcadia, CA 91007.

5.     Defendant Retina Institute of California Medical Group a/k/a The Retina Institute of California ("RIC") is a California medical partnership owned and operated by Defendants Chang, Samuel and Davis and Tom S. Chang, M.D., Inc., who are its partners.  RIC has a place of business at 301 West Huntington Drive, Ste. 107, Arcadia, CA 91007.  RIC was founded by Dr. Chang in or around 2006.

6.     California Eye and Ear Specialists a/k/a/ Ocular Institute of California (CEES) is an ophthalmology practice which is owned by Dr. Chang.  CEES includes a practice known as Ocular Institute of California ("OIC") formerly owned by Dr. Stephen Ma that was purchased by Dr. Chang in 2011. For a time, CEES continued to bill Medicare for some patients using the tax identification number of Dr. Ma.

7.     Brett Braun is a California resident who is the CEO of Retina Institute. His principal place of business is at 301 West Huntington Drive, Ste. 107, Arcadia, CA 91007.

8.     San Gabriel Ambulatory Surgery Center LP. is a limited partnership organized under the laws of the State of California with an address at 207 S. Santa Anita Ave. Ste. G16, San Gabriel, CA.

9.     The United States is a plaintiff in this action. The United States brings this action on behalf of the Department of Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS") and federally-funded programs

including Medicare and Medicaid.

10.   The State of California is a plaintiff in this action.   The State of California brings this action on behalf of the California Department of Health Care Services Medicaid program, Medi-Cal.

11.   Relator Bobbette A. Smith is a resident of Nevada.   She has a B.A. in Business Administration from the University of North Florida, a Master of Science in Logistics Management from the Florida Institute of Technology, and a Master of Health Care Administration from Baylor University.   She has over thirty years of experience in health care, including more than fifteen years of experience in the operation of multi-physician medical practices.   Ms. Smith was hired as the Chief Operating Officer of the Retina Institute of California (RIC) in June of 2012 and served in that position until January, 2013.

12.   Relator Susan C. Rogers is a resident of Arizona. She has over twenty years of experience in the area of medical billing and coding.   She has received numerous certifications in CPT Coding and Billing and Ophthalmic Coding and Reimbursement.   She was hired in June, 2012, to be the Billing Department Manager of RIC.   Ms. Rogers served in that position until January 2013.   The allegations of this complaint are based on information the Relators discovered through their employment at RIC as well as through their observations, efforts and investigation.

## II.   JURISDICTION AND VENUE

13.   Jurisdiction is founded upon the Federal False Claims Act (the Act or the False Claims Act), 31 U.S.C. § 3729 *et seq.*, specifically 31 U.S.C. § 3732(a) and (b) and also 28 U.S.C. §§ 1331 and 1345.

14.   Venue in the Central District of California is appropriate under 31 U.S.C. § 3732(a) in that, at all times material to this civil action, the Defendants transacted business in the Central District of California or submitted or caused the submission of false claims in the Central District of California.

## III.   SUMMARY OF THE ACTION

15.   The individual physician defendants own and operate a chain of ophthalmology offices known as the Retina Institute of California.  At present RIC has twenty-five offices located throughout southern California.   Except as specifically noted herein, the allegations of the Complaint apply to the period July 2006 to the present ("relevant time period").

16.   Drs. Chang, Samuel and Davis ("Physician Defendants") and the ophthalmology practices they control specialize in vitreo-retinal diseases of the retina of the eye including diabetic retinopathy, uveitis, vascular occlusions, retina detachment/tears, macular degeneration and macular holes.  Defendants provide medical services to thousands of patients whose treatments are covered by federally-funded healthcare programs such as Medicare and Medicaid.

17.   The payments Physician Defendants receive for providing medical services to participants in federal health care programs are divided into three elements:   (1) the allowable cost that is paid by federally-funded healthcare programs including Medicare Part B; (2) a deductible that is paid by the beneficiary; and (3) a co-pay that is paid for by the beneficiary.  For Medicare Part B, the deductible is approximately $140 per year, and the co-payment cost division is 80%-20%, meaning Medicare Part B pays $80 of a $100 charge and the beneficiary pays the remaining $20.  The amount paid by Medicare, on average, to providers in California for the medical services and procedures most commonly billed by RIC to Medicare is in the range of $360 to $400.

18.   The primary purpose of Medicare co-pays is cost control:  people are more careful with their own money than they are with someone else's.  Requiring beneficiaries to pay for part of the cost of the services they receive helps ensure beneficiaries will not seek medical services unless they really need them, thus saving dollars that can be used for other medically necessary procedures and supplies.

19.    Physicians are required to bill for and collect co-pays and deductibles directly from Medicare patients except in cases of documented financial hardship. From at least 2006 to the present, in an effort to induce beneficiaries to use the services of RIC physicians and to induce non-retinal ophthalmologists and optometrists to refer patients for retinal care, the Physician Defendants routinely and knowingly waived, and/or subsequently failed to collect, co-payments and deductibles owed by Medicare Part B beneficiaries. Consequently, referrals were made and beneficiaries used the services of the Physician Defendants because they offered an inducement, instead of choosing the physician who best served their needs. Based on this illegal business model, the Physician Defendants' patient population and billings to Medicare grew exponentially.

20.    The waiving of co-payments and deductibles has been specifically addressed in a host of government program Guidances and Bulletins. These authorities uniformly hold that such waivers violate the Anti-Kickback Statute ("AKS") and result in false statements on claim forms submitted to government healthcare programs such as Medicare and California Medicaid ("Medi-Cal")

21.    The Physician Defendants have also provided free goods and services to optometrists to generate referrals, in violation of the AKS. In addition, they have billed for medically unnecessary tests, billed for services not performed and knowingly retained payments from the government which constitute double billing.

22.    The Physician Defendants have submitted false and fraudulent claims to Medi-Cal in violation of state regulations by submitting claims for reimbursement for the rendering of health care services to Medi-Cal beneficiaries in amounts greater or higher than the usual fee they charged to the general public for the same service. In addition, they have violated the California Insurance Frauds Prevention Act by making claims to commercial carriers in which they falsely represented that they were collecting co-payments and deductibles. They further violated the California Business and Professions Code by not advising patients

referred to San Gabriel Ambulatory Surgery Center that they had a financial interest in that facility.

23. By these actions, the Physician Defendants have submitted and have caused the submission of false claims to the government and have made, used, or caused to be made and used false records or statements to get false or fraudulent claims paid by the government plaintiffs.

## IV. THE MEDICARE AND MEDICAID PROGRAMS

### A. Overview of Medicare Part B

24. In 1965 Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395, *et seq.*, known as the Medicare Program, as part of Title XVIII of the Social Security Act to pay for the costs of certain health care services. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426-1. The regulations implementing the Medicare Program are found at 42 C.F.R. § 409, *et seq.*

25. HHS is responsible for the administration and supervision of the Medicare Program. CMS is a component of HHS and is directly responsible for the administration of the Medicare Program. Medicare Part B covers physician services as well as a variety of "medical and other health services." *See* 43 U.S.C. §§1395j-1395w-4. The allegations herein involve Part B services billed by the Defendants to Medicare.

26. Part B of the Medicare Program covers certain facility use and medical services provided to qualified patients/beneficiaries, including outpatient services such as the services rendered by Defendants.

27. To participate in the Medicare program, a provider of services must file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc. The provider certifies that he is knowledgeable of Medicare requirements on his Medicare provider enrollment form. The provider agreement requires compliance with the requirements that the HHS Secretary deems necessary for participation in

1    the program. *Id.*

2        28.    In submitting Medicare claim forms, providers must certify that they

3    are knowledgeable of Medicare requirements; that the information included on the

4    form presents an accurate description of the services rendered; and that the services

5    were medically indicated and necessary for the health of the patient.

6        29.    Part B of the Medicare Program is funded by insurance premiums paid

7    by enrolled Medicare beneficiaries and contributions from the federal treasury.

8    Eligible individuals who are age 65 or older or disabled may enroll in Part B to

9    obtain benefits in return for payments of monthly premiums as established by HHS.

10   Payments under the Medicare Program are often made directly to service providers

11   such as physicians, rather than to the patient/beneficiary.  This occurs when the

12   provider accepts assignment of the right to payment from the beneficiary.  In that

13   case, the provider bills the Medicare Program.

14       30.    The United States provides reimbursement for Medicare claims from

15   the Medicare Trust Fund through CMS.  To assist in the administration of Part B of

16   the Medicare Program, CMS contracts with Medicare Administrative Contractors

17   (MACs).  Under the old system, the claims payment contractors were referred to as

18   carriers.  MACs process the reimbursement of claims for Part B services submitted

19   by Defendants on Form 1500 to Medicare.

20       31.    Defendants were required to comply with all the applicable statutes,

21   regulations and guidelines in order to be reimbursed by Medicare Part B, and had a

22   duty to be knowledgeable of the statutes, regulations and guidelines regarding

23   coverage and payment for Medicare services.  Defendants certified that they were

24   knowledgeable of Medicare requirements on their Medicare provider enrollment

25   forms and on each CMS Form 1500 they submitted to Medicare.

26   **B.    The Medicaid Program**

27       32.    Medicaid was created on July 30, 1965, through Title XIX of the

28   Social Security Act.  Medicaid is a cooperative federal-state program through

which the federal government provides financial assistance to states so that they may furnish medical care to needy individuals. 42 U.S.C.S. § 1396 *et seq*.

33.    Each state administers its own Medicaid Program.  However, each state program is governed by federal statutes, regulations and guidelines.  The federal portion of a state's Medicaid payments—the Federal Medical Assistance Percentage—is based on the state's per capita income compared to the national average.  During the relevant time period, the Federal Medicaid Assistance Percentage for California was in the range of 50% to 65%.

34.    The law requires state Medicaid plans to execute written agreements between the Medicaid agency and each provider furnishing services under the plan ("provider agreements").  42 C.F.R. § 431.107(b).

35.    Doctors Chang, Samuel and David ("RIC principals") are "providers" who signed provider agreements with the California Medicaid program, Medi-Cal.

### C.    The California Medicaid Program:  "Medi-Cal"

36.    The California Department of Health Care Services ("DHCS") (formerly the California Department of Health Services ("DHS")) enacts regulations for California's State Medicaid program, Medi-Cal.  As participating Medi-Cal providers, the Physician Defendants were and are subject to DHCS regulations that require them to provide services to Medi-Cal patients at their most favorable rates.  California Code of Regulations, title 22, section 51480 (a) requires as follows:

> (a)  No provider shall bill or submit a claim for reimbursement for the rendering of health care services to a Medi-Cal beneficiary in any amount greater or higher than the usual fee charged by the provider to the general public for the same service.

37.    Defendant Physicians Medi-Cal Provider Agreements also make clear their duty, consistent with the program's public purposes, to charge their lowest fees to DHCS and refrain from conduct that would harm the Medi-Cal program or

its beneficiaries.  Among other commitments, Defendants agreed to do all of the following:

**Compliance with Laws and Regulations**.  Provider agrees to comply with all applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code (commencing with Sections 14000 and 14200), and any applicable rules or regulations promulgated by DHS pursuant to these chapters....

**Forbidden Conduct**.  Provider agrees that it shall not engage in conduct inimical to the public health, morals, welfare and safety of any Medi-Cal beneficiary, or the fiscal integrity of the Medi-Cal program.

. . .

**Provider Fraud and Abuse**.  Provider agrees that it shall not engage in fraud or abuse.

. . .

**Prohibition of Rebate, Refund or Discount**.  Provider agrees that it shall not offer, give, furnish, or deliver any rebate, refund, commission, preference, patronage dividend, discount, or any other gratuitous consideration, in connection with the rendering of health care services to any Medi-Cal beneficiary.  Provider further agrees that it shall not solicit, request, accept, or receive, any rebate, refund, commission, preference, patronage dividend, discount, or any other gratuitous consideration, in connection with the rendering of health care services to any Medi-Cal beneficiary.  Provider further agrees that it shall not take any other action or receive any other benefit prohibited by state or federal law.

38.    In other words, Defendants agreed to bill Medi-Cal at their lowest rates, not to give or take kickbacks, and to conduct their business relationship with DHCS with a view to the program's public purpose and the welfare of California's

1    medically indigent citizens.

2         39.    To seek reimbursement for treatment of a patient, a physician

3    participating in Medi-Cal submits a claim to the contractor that administers the

4    Medi-Cal program.  In seeking reimbursement the physician must state his charge

5    for the particular service provided.

6         40.    Using state funds, Medi-Cal pays a claim if the beneficiary is eligible,

7    the provider is authorized to bill Medi-Cal, the service is covered by Medi-Cal, and

8    no information known to the Medi-Cal program indicates the claim is otherwise

9    improper or in violation of billing rules.  Medi-Cal receives reimbursement from

10   the federal government for the federal share of the Medi-Cal expenditures.  The

11   claims that have been submitted to Medi-Cal are used to support the physician's

12   reimbursement request.  In this way, if a physician submits a fraudulent claim to

13   Medi-Cal, he has caused a false claim to be submitted to both California and the

14   federal government.

**D.    Applicable Regulatory Requirements Mandate That Each Service
Meet Medical Necessity Before Submission of a Claim to a
Government Payor like Medicare or Medicaid**

15
16
17
         41.    Medicare and other government programs pay only for those services

18   that meet appropriate medical necessity standards and providers may not bill for

19   services that do not meet the applicable standards set by Medicare for medical

20   necessity.  *See* 42 U.S.C. § 1395y(a)(l)(A); 42 C.F.R. § 411.15(k)(l ); Medicare

21   Carrier's Manual § 2049 (Medicare and other federal healthcare programs only

22   cover medical services that are "reasonable and necessary for the diagnosis or

23   treatment of illness or injury."); *see*, California Welfare and Institutions Code Sec.

24   14133.3.

25
         42.    Accordingly, providers may only submit claims for Medicare

26   reimbursement for "reasonable and necessary" medical services.  In submitting

27   claims, providers make certain express certifications, including an assurance that

28

the services were "provided economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a)(l); *see also* 42 U.S.C. § 1395n(a)(2)(B) (to receive payment for claims providers must certify that services were "medically required"). Additionally, each time a provider submits a claim, the provider impliedly certifies that the service was provided in accordance with Federal and State statutes, regulations, and program rules.

43. Similarly, a claim for "worthless" medical care violates the Federal False Claims Act ("FCA") because the government believes it is paying for services or items that have medical value when, in fact, the services or items are essentially worthless. *See Mikes v. Straus*, 274 F.3d 687, 702-4 (2d Cir. 2001); *US v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001).

## V.   **APPLICABLE LAW**

### A.   **The Federal False Claims Act**

44. The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

45. The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

46. The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or

agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

47.     The term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

**B.     The Federal Anti-Kickback Statute**

48.     The federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that remuneration provided to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or harmful to a vulnerable patient population.  To protect the Medicare and Medicaid programs from these harms, Congress enacted a prohibition against the payment of kickbacks in any form.  First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

49.     The AKS prohibits any person or entity from offering, making, soliciting, or accepting remuneration, in cash or in kind, directly or indirectly, to induce or reward any person for purchasing, ordering, or recommending or arranging for the purchasing or ordering of federally-funded medical goods or services:

whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both. 42 U.S.C. § 1320a-7b(b). Violation of the statute also can subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

**C.    Applicable Government Guidance**

50.    Providers are required to collect co-pays except in the case of financial hardship. Although "financial hardship" is not precisely defined, it is commonly understood to require some true inability or hardship to pay, likely in relation to the federal poverty level, and based on some documentation or substantiation.

51.    The routine waiver of co-payments, deductibles, and other payments owed by Medicare beneficiaries has been directly and consistently addressed in government program guidance and advisory opinions for more than 15 years. The authorities, without exception, hold that these waivers violate the AKS.

52.    Three main issues have been identified:  1) routinely waiving a co-pay

but not adjusting one's actual charge leads to false claims based on that actual charge; 2) violations of the AKS by inducing referrals of patients; and 3) over-utilization.

53.    In 1994, the Office of Inspector General ("OIG") issued a Special Fraud Alert on Routine Waiver of Copayments or Deductibles under Medicare Part B. In this fraud alert, the OIG advised that:

> Routine waiver of deductibles and copayments by charge-based providers, practitioners or suppliers is unlawful because it results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and services paid for by Medicare.

> A "charge-based" provider, practitioner or supplier is one who is paid by Medicare on the basis of the "reasonable charge" for the item or service provided. 42 U.S.C. 1395u(b)(3); 42 CFR 405.501. Medicare typically pays 80 percent of the reasonable charge. 42 U.S.C. 1395l(a)(1). The criteria for determining what charges are reasonable are contained in regulations, and include an examination of (1) the actual charge for the item or service, (2) the customary charge for the item or service, (3) the prevailing charge in the same locality for similar items or services. The Medicare reasonable charge cannot exceed the actual charge for the item or service, and may generally not exceed the customary charge or the highest prevailing charge for the item or service. In some cases, the provider, practitioner or supplier will be paid the lesser of his [or her] actual charge or an amount established by a fee schedule.

> A provider, practitioner or supplier who routinely waives Medicare copayments or deductibles is misstating its actual charge. For example, if a supplier claims that its charge for a piece of equipment is $100, but routinely waives the copayment, the actual

charge is $80. Medicare should be paying 80 percent of $80 (or $64), rather than 80 percent of $100 (or $80). As a result of the supplier's misrepresentation, the Medicare program is paying $16 more than it should for this item.

In certain cases, a provider, practitioner or supplier who routinely waives Medicare copayments or deductibles also could be held liable under the Medicare and Medicaid anti-kickback statute. 42 U.S.C. 1320a-7b(b). The statute makes it illegal to offer, pay, solicit or receive anything of value as an inducement to generate business payable by Medicare or Medicaid. When providers, practitioners or suppliers forgive financial obligations for reasons other than genuine financial hardship of the particular patient, they may be unlawfully inducing that patient to purchase items or services from them.

At first glance, it may appear that routine waiver of copayments and deductibles helps Medicare beneficiaries. By waiving Medicare copayments and deductibles, the provider of services may claim that the beneficiary incurs no costs. In fact, this is not true. Studies have shown that if patients are required to pay even a small portion of their care, they will be better health care consumers, and select items or services because they are medically needed, rather than simply because they are free. Ultimately, if Medicare pays more for an item or service than it should, or if it pays for unnecessary items or services, there are less Medicare funds available to pay for truly needed services.

OIG Special Fraud Alert. 59 F.R. 242 (December 19, 1994).

54.    In June 2000, the OIG published a report entitled, "Blood Glucose Test Strips: Marketing to Medicare Beneficiaries." The OIG re-emphasized its concern with routine waiver of co-payments and deductibles in language equally applicable

to the provision of medical services, stating:

> Medicare beneficiaries who utilize medical supplies on a repeated basis, such as blood glucose test strips, may be strongly influenced by marketing practices. Manufacturers' rebates, special dealer sales, coupons, discounts, and similar financial inducements are all designed to sway consumer product choice. Entities interested in reaching diabetics who use testing supplies resort to a variety of media to promote their products, including radio, television, specialized periodicals, and newspapers.

> Advertising incentives which indicate or imply a routine waiver of coinsurance or deductible could be in violation of 42 U.S.C. 1320a-7b(b), the Medicare and Medicaid anti-kickback statute. According to an Office of Inspector General Medicare Fraud Alert (94-04), such routine waivers of coinsurance or deductibles are unlawful because they could result in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and services paid for by Medicare. Anyone who routinely waives copayments or deductibles can be criminally prosecuted and excluded from participating in Medicare and State health care programs.

> In addition, 42 U.S.C. 1320a-7a(a) (5) prohibits a person from offering or transferring remuneration to a beneficiary that such person knows or should know is likely to influence the beneficiary to order items or services from a particular provider or supplier for which payment may be made under a Federal health care program. "Remuneration" is defined as including a waiver of coinsurance and deductible amounts, with exceptions for certain financial hardship waivers, which are not prohibited.

1   OIG Report: Blood Glucose Test Strips: Marketing to Medicare
2   Beneficiaries. OEI-03-98-00231 (June 2000).

3       55.   In August 2002, the OIG issued a Special Advisory Bulletin entitled,
4   "Offering Gifts and Other Inducements to Beneficiaries," which stated:

5           Under section 1128A(a)(5) of the Social Security Act (the Act),
6           enacted as part of Health Insurance Portability and Accountability Act
7           of 1996 (HIPAA), a person who offers or transfers to a Medicare or
8           Medicaid beneficiary any remuneration that the person knows or
9           should know is likely to influence the beneficiary's selection of a
10          particular provider, practitioner, or supplier of Medicare or Medicaid
11          payable items or services may be liable for civil money penalties
12          (CMPs) of up to $10,000 for each wrongful act. For purposes of
13          section 1128A(a)(5) of the Act, the statute defines "remuneration" to
14          include, without limitation, waivers of copayments and deductible
15          amounts (or any part thereof) and transfers of items or services for
16          free or for other than fair market value. (*See* section 1128A(i)(6) of
17          the Act.) The "should know" standard is met if a provider acts with
18          deliberate ignorance or reckless disregard. No proof of specific intent
19          is required.(see 42 C.F.R. 1003.101.)

20          Further, the inducement element is met by an offer of valuable
21          services as part of marketing activity regardless of whether the
22          marketing is active or passive. " For example, even if a provider does not
23          directly advertise or promote the availability of a benefit to beneficiaries,
24          there may be indirect marketing or promotional efforts or informal channels
25          of information dissemination, such as "word of mouth" promotion by
26          practitioners. . . ."

27

28

OIG Special Advisory Bulletin: Offering Gifts and Other Inducements to Beneficiaries (August 2002).

56.     These Advisories and Alerts continue to be posted on the CMS website and are regularly and currently quoted in industry and media coverage of Medicare fraud.

**D.     Violations of the Anti-Kickback Statute Form the Basis of FCA Liability**

57.     Congress has long viewed the elimination of kickbacks as central to any efforts to combat Medicare fraud and abuse. *See United States v. Greber*, 760 F.2d 68, 70-71 (3d Cir. 1985). Because kickback schemes negatively affect the integrity of federal health care programs, the United States has a strong interest in ensuring the continued viability of False Claims Act actions to deter and redress health care fraud predicated upon kickbacks. *United States ex rel. Charles Wilkins and Daryl Willis v. United Health Group, Inc. et al.* (3d Cir., No. 10-2747 (Oct. 2010) (Brief for the United States as Amicus Curie Supporting Appellant) ("Amicus Brief").

58.     To protect against the erosion of patient care and patient safety, courts uniformly agree that compliance with the AKS is a material condition of payment under the Medicare program. *See United States ex rel. Schmidt v. Zimmer, Inc.,* 386 F.3d 235, 243 (3d Cir. 2004); *United States ex rel. Conner v. Salina Regional Health Ctr.*, 543 F.3d 1211, 1223 n.8 (10th Cir. 2008); *United States ex rel. McNutt v. Haleyville Medical Supplies*, 423 F.3d 1256, 1259-1260 (11th Cir. 2005); and *United States v. Rogan*, 459 F. Supp. 2d 692, 717 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008).59. These and other courts have held that a person or entity who violates the AKS and submits a claim or causes another to do so has violated the False Claims Act regardless of what form the claim or statement takes. Many of these courts have reasoned that the claims are false, and thus violate the FCA, because there is a false certification – either express or implied – as to compliance

with the AKS each time a claim is submitted.

59.    The AKS was amended in 2010 to expressly state what these courts had already held, namely, that a violation of the AKS constitutes a "false or fraudulent" claim under the FCA.  42 U.S.C. § 1320(a)-7b(g).  Moreover, specific intent is not required to establish a violation of the AKS.  That is, "a person need not have actual knowledge [of the AKS] or specific intent to commit a violation [of the AKS]."  42 U.S.C. § 1320a-7(b)(h).

### E.    The California False Claims Act

60.    The California False Claims Act, Ca. Gov't Code Sec. 12650 *et seq.*, is modeled after the federal FCA and contains provisions similar to those quoted in paragraphs 44 to 47 above.  Relators assert claims under the California FCA for Defendants' false and fraudulent claims made to the California Medicaid program as alleged herein.

## VI.    THE DEFENDANTS DEFRAUD MEDICARE THROUGH WAIVER OF CO-PAYMENTS

### A.    Defendants Routinely Offer or Provide Kickbacks by Waiving Payment of Medicare Co-Payments and Deductibles

61.    The Physician Defendants' business model is based upon aggressively increasing the number of patients they treat, continually opening new offices and systematic marketing of their services to other eye care professionals.  Defendants' marketing efforts have been very successful.

62.    Over two-thirds of the RIC's patients are covered by Medicare Part B.  The Physician Defendants bill Medicare for services they provide to Medicare beneficiaries, including all beneficiaries who have had their co-pays and deductibles waived.  Between 2010 and 2012, RIC's payments from Medicare increased from $4.2 million dollars to $11.8 million dollars.  RIC and the Physician Defendants expect to receive $19 million in Medicare payments in 2013.

63.    It is the Physician Defendants' policy and practice to routinely waive or write off Medicare deductibles and co-payments without complying with the

Medicare statute and regulations governing write-offs for financial hardship.  Since 2006, the percentage of RIC patients whose co-pays and deductibles have been waived has steadily increased.

64.     In order to obtain referrals for specialized retina procedures from optometrists and other ophthalmologists who do not perform the same types of retina procedures performed by RIC physicians, RIC physicians, including its principals, routinely advise those other professionals that RIC will "accept what insurance pays" and will waive co-pays and deductibles, even for Medicare patients.  RIC is willing to accept the Medicare payment alone in order to obtain referrals and to increase its patient volume.

65.     The RIC principals employ approximately twelve additional ophthalmologists.  They regularly look to hire additional doctors.  All RIC doctors are required to market the practice and to generate referrals.   The employee physicians must generate referrals in order to meet their revenue targets and earn bonuses.

66.     Although his title is CEO, Brett Braun's primary duty is to market RIC to physicians.  He also oversees and tracks the marketing efforts of RIC physicians.

67.     RIC's marketing was very successful.  In his 2012 Year in Review Report to the RIC Executive Committee, Braun noted that for 2012 there were 3,937 new patients, 2,568 of whom came from new referring doctors.

68.     In order to generate referrals, the RIC doctors are expected to and do tell actual and potential referral sources that RIC will freely waive co-pays and deductibles, including for Medicare patients.  The referring doctors in turn advise the patients they will not have to pay anything out of pocket.

69.     Each doctor receives a target list of doctors in their geographical area to whom they should market.  They are supposed to schedule at least one lunch and one dinner per month with doctors on their target list.  As Braun told the doctors on August 9, 2012, the "Goal is to have everyone to have one day/week to schedule

lunches." He also advised the Executive Committee "each doctor will be given a list of 20 other doctors to call each month." Fifty-six lunches and dinners occurred in September, 2012, alone.

70.     These meetings and their results are carefully recorded via a program called salesforce.com which as Braun noted at the June 21, 2012 doctors' meeting made the visits "easier to track." RIC also hosted large dinners as a way to market to other doctors. Some of these events were paid for with money provided by drug companies such as Alcon. For example, RIC selected 20 doctors to attend a purely social "dinner in the desert" in August, 2012.

71.     RIC sponsored a large CME program called Okularfest held in October, 2012. The program was underwritten in part by vendors who made donations directly to RIC or through Retina Research Foundation of California, Inc., a non-profit entity under Sec. 501(c)(3) of the Internal Revenue Code established and run by the RIC principals.

72.     Relators have a copy of the list of attendees at the Okularfest. The names of the attendees at the Okularfest were divided geographically by Brett Braun and given to the RIC doctors to contact for referrals. Upon information and belief, the doctors on the list were told that RIC would waive co-payments and deductibles for the patients referred.

73.     Referring physicians are more likely to make a referral to a practice that waives co-pays and deductibles, because they believe their patients will be more likely to follow up with the referral. The patients are induced to go to Defendants' practice because they will not have any out-of-pocket expense instead of choosing a physician who best serves their needs based on medical factors.

74.     One doctor who advised of the willingness of RIC to waive co-payments and deductibles is Dr. Michael R. Rose. Dr. Rose maintained a general ophthalmology practice located across the street from the Lincoln Heights RIC location. When Relator Smith began work at RIC, she was told by Dr. Kristy Lin,

an RIC employee, that Dr. Rose expected co-pays for Medicare patients to be waived and that he would not refer patients if co-pays were not waived. When she raised concerns about this practice with Dr. Chang, he confirmed to Ms. Smith that Dr. Rose would not make referrals if co-pays were not waived. Relators have records identifying many patients who Dr. Rose referred to RIC. These records show total receipts for the patients referred by Dr. Rose were only 80% of the Medicare allowable amount. These patients had their co-payments waived, without regard to financial hardship criteria or documentation. RIC purchased Dr. Rose's practice in 2012 when he became an employee of CEES. In that role, he continued to make referrals to RIC.

75.    Dr. Chang advised physicians employed by RIC that they could always waive the payment of co-pays and deductibles if they were asked to do so.

76.    The average Medicare co-payment that would be due for a patient encounter at RIC would be $90-100 per visit. When a patient complains about a co-pay or requests that payment of a co-pay or deductible be waived, which they often do because they have been led to believe no co-pay or deductible will be required, the RIC physicians always agree to waive them. The physicians make no attempt to determine if the patient has the ability to make these payments and often the subject of financial hardship is not even raised.

77.    When co-pays and deductibles are waived they are posted on RIC's accounting records as "financial hardship" or "balance write off" often with notations such as "w/o [written off] per doctor" or "per Dr. Chang." These notations by themselves are illustrative of the lack of any good-faith effort to verify financial condition as they show the physician simply decides to approve the waiver. The billing staff is not involved and no specific information or documentation is requested. RIC makes no effort to collect co-pays or deductibles before writing them off for financial hardship. Indeed, Relator Rogers was specifically told she could not attempt collection by sending out letters to patients

1    reminding them of an unpaid balance.

2        78.    Relators have copies of records containing many examples of these

3    waivers. Medicare patients who received a routine financial hardship waiver of

4    their co-payments and deductibles, without proper verification of financial hardship

5    include:

| DATE | PATIENT | AMOUNT | NOTATION |
|------|---------|--------|----------|
| 9/21/2008 | LN | $392.64 | Per Dr. Chang, no charge for co-insurance |
| 10/5/2009 | JB | $198.56 | Per Dr. Chang, no charge |
| 11/24/2009 | LN | $32.71 | Per Dr. Chang, no charge for co-insurance |
| 4/8/2010 | RM | $170.00 | |
| 4/21/2010 | DO | $570.61 | Per Steph email per Dr. Chang |
| 4/27/2011 | SD | $210.00 | Balance write off per doctor |
| 8/2/2011 | SF | $98.00 | Balance write off per doctor |
| 3/5/2012 | CY | $45.64 | |
| 3/21/2012 | HR | $145.63 | |
| 5/11/2012 | LA | $260.01 | |
| 5/21/2012 | MJ | $639.90 | Write off per Dr. Chang |
| 6/19/2012 | LK | $432.92 | Per Dr. Suk |
| 8/8/2012 | JY | $157.62 | |
| 8/28/2012 | MP | $64.18 | Financial hardship write off per doctor |
| 8/31/2012 | NS | $206.50 | |
| 9/5/2012 | HJJ | $64.18 | Dr. write-off |
| 10/8/2012 | DC | $274.18 | |
| 10/11/2012 | SL | $333.41 | |
| 10/21/2012 | DK | $150.24 | |
| 11/28/2012 | JP | $280.93 | Doctor write-off |
| 12/4/2012 | JA | $407.57 | |
| 12/5/2012 | JG | $307.43 | |
| 12/10/2012 | PG | $1,573.26 | |
| 12/20/2012 | GS | $278.52 | |

Claims for payment were made to Medicare for services provided to each of these

patients whose co-pay was waived.

        79.    In order to make it appear that co-payments are not routinely waived,

RIC sometimes provides a Financial Hardship form to be used by patients seeking

waivers of co-pays and deductibles.  One of the grounds of hardship indicated on

1   the form is "retired, fixed income." This category by itself would apply to the

2   majority of RIC's patients given that most are Medicare beneficiaries.

3       80.    Most deductible and co-payment waivers are granted by RIC without

4   the completion of any financial hardship form. On the few occasions when it is

5   used, the patient often signs the form without providing any information about

6   his/her financial status. Nevertheless, the waiver is then signed by a physician.

7   Relators have examples of these incomplete forms in their possession. No financial

8   review is made by anyone in order to determine the beneficiary's financial

9   condition and whether they are able to pay the co-payment or deductible. Examples

10   of waivers of Medicare co-payments without any reason or basis for the waiver

11   being indicated on a financial hardship form are:

| PATIENT | Financial Hardship<br>Date of Approval |
|---------|------------------------|
| JA | 4/11/2012 |
| MS | 8/13/2012 |
| LS | 9/28/2012 |
| WC | 10/12/2012 |
| HN | 11/13/2012 |
| YY | 11/14/2012 |
| PR | 11/21/2012 |
| JQ | 12/13/2012 |

19       81.    Claims for payment were made to Medicare for services provided to

20   each of these patients whose co-pay was waived.

21       82.    Relators performed their own investigations concerning several

22   patients, whose records indicate a financial hardship waiver and discovered that

23   these patients resided in expensive homes, including one worth millions of dollars.

24       83.    The RIC Garden Grove office waives Medicare co-pays and

25   deductibles almost 100% of the time. Relator Rogers told the physician at that

26   location, Dr. Suk, that he should not be routinely waiving payment of the co-pays,

27   but he insisted that the waivers continue so that referrals would continue to be

28   received from the referring doctors. Examples of waivers of co-pays and

deductibles by the Garden Grove office are contained in the billing records in the possession of the Relators.

84.    Relators each explained to Dr. Chang that the RIC policy and practices regarding the routine waiver payment of Medicare co-pays and deductibles did not comply with Medicare regulations.  On at least two occasions, Dr. Chang told Ms. Smith and Ms. Rogers that he would rather keep on doing what he was doing with financial hardship waivers to ensure that RIC would not lose the referrals and patients.  He stated that he would just pay the fines if Medicare discovered what was occurring.  Dr. Chang's lack of concern is surprising given that he had served as Medicare compliance officer for the Department of Ophthalmology at the University of Southern California School of Medicine.  Further, the prohibition against routine waiver of co-pays is regularly discussed in industry coverage, medical, ophthalmology and billing publications.

85.    When she had been at RIC for three months, in September 2012, Ms. Smith advised RIC's partners in writing that changing the way financial hardship was treated needed to be a priority.  She wrote "We do not need to be in the business of writing-off deductibles and co-insurance as there are many adverse consequences to those actions."  Her concerns were ignored.

86.    On September 25, 2012, Relator Smith made a Billing Report presentation at the weekly meeting of the RIC senior management team, the Executive Committee, attended by Drs. Chang, Samuels and Davis, Mr. Braun and three other physicians.  At this meeting, Relators Smith and Rogers again stressed the need to stop the practice of doctors routinely waiving and writing off Medicare co-pays and deductibles without any proper verification of financial hardship.  At this meeting, Dr. Chang again stated he would just pay the fines if Medicare found out about the waivers.  Other physicians present at this meeting were less cavalier and stated they wanted to find out more about the topic.  It was agreed to continue the discussion at the next week's Executive Committee.  However, as reflected in

the minutes of the Executive Committee, immediately following this meeting, the periodic Billing Report was removed to a separate weekly or bi-weekly meeting where Drs. Chang and Davis were the only doctors present.

87.     In sum, from at least 2006 and continuing to the present, in violation of the AKS, Defendants knowingly and routinely failed to collect or illegally waived co-payments and deductibles owed by beneficiaries of Medicare Part B for medical services in order to unlawfully induce them to use the services of the Defendants and in order to continue to receive referrals from other eye care physicians and attract new patients.

88.     Defendants submitted, or caused to be submitted, claims for payment to Medicare for services rendered to each of the Medicare beneficiaries who had their co-pays or deductibles waived which were accompanied by an express or implied certification that the transaction was not in violation of federal or state statutes, regulations, or program rules.   Each of those certifications was false, because each claim for payment was tainted by the kickbacks detailed in this complaint.

**B.     Defendants Obtain Referrals That Violate the Anti-Kickback Statute and the Anti-Self-Referral Laws**

89.     In or about June, 2012, RIC entered into a co-marketing agreement with and/or made a loan to a business known as RIC Diagnostics ("RICX") whose president is Dan Bienenfeld.  In return, RICX is expected to funnel referrals from optometrists to RIC.  RIC is aware that payments for services rendered to some of the referred patients will be made by Medicare.

90.     RICX was a regular topic at the weekly Senior Management meetings which are attended by the RIC Principals and the senior managers of the practice. Dr. Chang was very focused on the referrals to be received from this venture.  On June 26, 2012, he asked for an update; he said he wanted to see "specific referrals from RD 2020 DX [RICX]."  On July 24, 2012, he requested a report of how many

patients had been referred by RICX.  He repeated these comments on August 7, 2012.  He stated he wanted a written summary from Dan of "how many patients seen and how many referral [sic]" to RIC.  RICX operates a mobile optical coherence tomography ("OCT") device used to diagnose various conditions of the retina.  RICX brings the equipment to the optometrist's office, charging him/her a per use fee.  In turn, the optometrist bills the patient or the patient's insurer a higher fee for the test that uses the OCT equipment.

91.    RICX actively encourages optometrists to refer patients to RIC.  The optometrists are provided with a referral form to complete when they send the patient to RIC after the OCT with the RICX equipment.

92.    RIC physicians train optometrists, at no charge, how to read the OCT images at 2-3 hour workshops for optometrists.

93.    The optometrists are also told that RIC ophthalmologists will interpret the image free of charge if requested to do so by the optometrists.  Obviously, the expectation is that once an RIC doctor has looked at the image, he would handle any retina condition that was discovered.

94.    RICX received considerable attention as part of RIC's overall marketing efforts.  The minutes of the weekly doctors' telephone meeting of July 28, 2012 state "Plan for webinar with Dan [Bienenfield] July 10[th] to learn about OCT diagnostics, also plan for OCT workshops after."  The webinar was attended by all the doctors.  The doctors were also given RICX brochures to hand out to optometrists.

95.    RIC advertised the services of RICX by a blast email sent to over 1700 people in August 2012.

96.    At the meeting of August 9, 2012, Brett Braun told the doctors "RIC has had large financial and [sic] Commitment to this project—everyone should strongly promote this service."  In other words, the RIC doctors are supposed to contact optometrists and encourage them to use the RICX service which will in turn

1   generate referrals to RIC.

2       97.   At the August 19, 2012 Executive Committee meeting, Dr. Samuels

3   wanted the doctors "to focus on all referrals from Dan."

4       98.   At the meeting of September 20, 2012, Mr. Braun stated to the doctors

5   RICX "still growing.  Need to help Dan identify potential users.  SK [Dr. Kamjoo]

6   has been proactive by targeting current users of the service as an introduction:  Will

7   do an iPad giveaway for potential referrals during October CE.  Will also speak

8   about OCT/Diagnostics during CE event."

9       99.   At the November 15 and December 13, 2012 doctors meetings, Mr.

10  Braun stated "Diagnostics needs to be embraced further.  Try to get more leads for

11  Dan." and, importantly, "Referrals are starting to be sent."

12      100.  Brett Braun also calls optometrists directly and tells them they have

13  won 10 free OCTs from RICX.  Over fifty leads for Mr. Braun's calls were

14  generated at the very well-attended CME called "Okularfest" that was sponsored by

15  RIC in 2012.  He tells the optometrists that they can bill for each of the free OCT

16  tests.  He also asks them to send patients to RIC.  Brett Braun reports on the

17  progress made by RICX at each RIC Executive Committee meeting.  Mr. Braun

18  tracks the names of RIC patients resulting from referrals from RICX.  Relators have

19  in their possession a list of the names of optometrists signed up to use the RICX

20  service who have made referrals to RIC, the names of patients referred, the date of

21  service and the amount charged by RIC to the patients.

22      101.  The target for referrals from RICX is 20 patients per month.  Relator

23  Smith's handwritten notes from the January 15, 2013 Executive Committee

24  Meeting record that Dr. Chang stated "If he did increase our referrals, I'll give him

25  another $15,000, but don't put that in the minutes."

26      102.  Each claim made to Medicare for services for a patient referred to RIC

27  through or on account of RICX violates the federal Anti- Kickback Statute, 42

28  U.S.C. Sec. 1320a-7(b)(7) and 42 U.S.C. Sec. 1320a-7a(a)(7) and is not

1    reimbursable under Medicare Part B.

2    **C.     Defendants' Violation of the Anti-Kickback Act Relating to the**
3           **San Gabriel Ambulatory Surgery Center**

4           103.   The individual Physician Defendants own investment interests in an

5    ambulatory surgery center known as the San Gabriel Surgery Center ("SGASC")

6    which is located at 207 Santa Anita Ave. Ste. G-16, San Gabriel, CA.

7           104.   Drs. Chang, Samuels, and Davis routinely refer patients of RIC who

8    require surgery to SGASC for the performance of that surgery.   Physicians

9    employed by RIC and CEES also refer patients to SGASC.   Relators are in

10   possession of a list of patients referred by RIC and CEES doctors to SGASC

11   between 2010 and 2012.

12          105.   Referrals for medical services to an entity in which the referring

13   physician has a financial interest violate the AKA rules unless they fall within the

14   requirements of "safe harbor" regulations promulgated by CMS.   A referral of a

15   patient to an ambulatory surgery center in which a physician has an investment

16   interest does not meet the "safe harbor" regulations of the AKA unless the patient is

17   fully informed of the investor's investment interest, 42 C.F.R. 1001.952(r).

18          106.   Strict compliance with all elements is required for safe harbor

19   protection, *see* 56 Fed. Reg. 35952, 35954 (July 29, 1991).

20          107.   RIC and CEES physicians do not advise their patients that RIC

21   principals have an investment interest in SGASC.   Rather, patients are given a

22   brochure which states "The ownership for San Gabriel Ambulatory Surgery Center

23   may be obtained by contacting the center at (626) 300-5300."

24          108.   At the request of Relator Smith, the RIC scheduler, Krystal Ramirez,

25   called (626) 300-5300 to learn who owned SGASC.   However, as she reported to

26   Smith, the individuals at the center who responded to the call could not provide any

27   information about the ownership of that facility nor could they find anyone who

28   could do so.

---

**UNDER SEAL** FIRST AMENDED COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT

109.  The Physician Defendants' failure to comply with the requirements of 42 U.S.C. 1001.952(r) results in remuneration prohibited by 42 U.S.C. 1395nn and 42 C.F.R. 411.353.  Accordingly, any claim submitted by the Defendants to Medicare for physician services provided at SGASC is false and fraudulent.

## VII.  DEFENDANTS' FALSE CLAIMS BASED ON FALSE STATEMENTS ON THEIR FORM 1500s

110.  Defendants submitted or caused to be submitted CMS Form 1500s for reimbursement for the services they provided to Medicare Part B and Medi-Cal beneficiaries.  The Form 1500 requests information about the patient, insurance coverage, the diagnoses, and the services provided for which reimbursement is requested.  Entry 24F contains a blank title "$ charges" with a space for a separate entry for each supply/procedure.  Entry 28 contains a blank titled "Total Charge."  The Medicare Carriers Manual and government pronouncements point out that providers are paid based on "actual charges" which is defined as "the amount the physician or supplier actually expects to receive from the patient and/or the third party payer."

111.  Thus, Defendants submitted or caused to be submitted a false statement to the government in their CMS Form 1500s when they submitted claims seeking reimbursement based on the full charge, without revealing that the charge contained a waived co-pay element.  Specifically, the "charge" entry on the provider's claim forms requires that the provider state the total amount, including the co-payment, it expects to collect.  When the provider routinely waives the 20% co-pay on a $100 procedure, however, the true charge is not $100, but 80% or $80.

112.  Knowingly submitting false claims to the government for reimbursement creates liability under the FCA.  Thus, each of the claims submitted to the government by Defendants constituted a violation of section 3729 of the FCA.

## VIII. DEFENDANTS DEFRAUD MEDICARE AND MEDICAID BY UPCODING AND WORTHLESS PROCEDURES

### A. Defendants Perform Procedures That Are Medically Unnecessary or Worthless and Engage in Upcoding

#### 1. Defendants Perform Procedures That Are Medically Unnecessary or Worthless

113.   Dr. Vince Hau, an RIC doctor, provided Relator Smith with materials from a presentation at the 2012 annual meeting of the American Academy of Ophthalmology.   In this presentation, it was noted that the national average net collection per patient visit for a retina practice is $250.00 to $350.00 per visit.  RIC averages net collections of $450.00 to $550.00 per visit.  This difference is largely accounted for by RIC's over-utilization of expensive tests, such as ICG angiography.

114.   ICG angiography is a test performed to analyze intraretinal circulation or blood flow in the eye.   ICG refers to a fluorescent dye used in performing this test.

115.   Current Procedural Terminology ("CPT") codes are numbers assigned to every task and service a medical practitioner may provide to a patient including medical, surgical and diagnostic services.   The CPT codes are then used by insurers, including Medicare, to determine the amount of reimbursement that a provider will receive.

116.   ICG angiography is billed to Medicare using CPT 92240.  This code is rarely used at most retina practices, but RIC uses it consistently.   Dr. Rizwan Bhatti, while employed at RIC, advised Ms. Smith that he was concerned about the high utilization of this test and code.  He further stated that in checking with retina physicians in two other practices, he was told they used this code only a handful of times each year. RIC, however, performed this test on a vast number of patients. RIC made claims for payment to Medicare listing this code 7,325 times in 2012 and was paid $1,506,503.71 on account of these claims.   Depending on the carrier,

Medicare pays in the range of $183.82 for each claim submitted under CPT 92240. California Medi-Cal pays $54.93 for CPT 92240. RIC and its physicians submitted and received payment for at least 600 claims for CPT 92240 to Medi-Cal in the first 11 months of 2011.

117. Unlike Medicare, many private payers require pre-approval before they will reimburse a provider for the test billed under CPT 99240. Thus, it is more likely that Medicare will pay for the test than it is that a private insurer will pay for it. Relators' analysis shows that this code was billed by RIC for a far higher percentage of patients who were Medicare beneficiaries than it was for patients covered by an HMO, suggesting a deliberate overuse in Medicare.

118. Many of the ICG angiographies performed at RIC were not medically necessary. For example, this test was performed on patients with diabetes, patients where it is never medically indicated. ICG angiographies were performed to increase RIC billings, including billings to Medicare and Medicaid. Another reason why this test was performed so frequently is that the principals of RIC were looking for patients with certain conditions who could be enrolled in clinical trials in which the doctors participated. The RIC doctors were being paid for their work on the trials by various pharmaceutical and biotechnology companies. Because of the overuse of ICG angiography at RIC, Medicare is in effect helping to subsidize Defendants' participation in the trials.

119. Relators have documentation showing the total numbers of CPT 92240 billed as well as records identifying by physician and patient all Medicare patients on whom ICG angiography was performed in 2012. Examples are shown in the chart below:

| PATIENT | MEDICARE PAYMENT |
|---|---|
| DR. T. CHANG | |
| RA | $236.52 |
| AB | $147.98 |
| GA | $459.56 |
| NL | $229.78 |
| BA | $367.64 |

| | |
|---|---|
| TA | $352.54 |
| PH | $435.66 |
| JD | $528.82 |
| DG | $352.54 |
| **DR. M. DAVIS** | |
| NC | $459.56 |
| PG | $367.65 |
| AA | $735.28 |
| MR | $367.65 |
| SA | $459.56 |
| DB | $554.76 |
| JC | $367.64 |
| CW | $459.56 |
| **DR. M. SAMUEL** | |
| SB | $352.34 |
| BA | $435.66 |
| LM | $348.52 |
| LC | $459.56 |
| YD | $459.56 |
| EF | $435.66 |
| MR | $367.65 |
| EA | $435.66 |
| DW | $348.52 |

120.    The accounting records of RIC reflect that this code alone represented over 10% of the total revenue to RIC in 2012.

121.    RIC used a Heidelberg retinal tomograph machine to perform the ICG angiography test billed under CPT 92240.  Dr. Bhatti complained to the Heidelberg Engineering sales representative about the poor quality of the pictures he obtained from the machine at RIC.  The representative advised that RIC was using only one-half of the amount of ICG dye that the manufacturer recommends be injected in connection with performance of the test.  As a result, the quality of the pictures taken was poor. Patients were treated based on these photos that might fail to properly show the condition of the eye.  The owners of RIC required that only half the recommended amount of ICG dye be used in order to save money.  Nevertheless Medicare was billed for inadequate tests which could, on information and belief, compromise patient care and were essentially worthless.  Further, the dye for the tests was administered by unlicensed technicians not properly trained to administer the dye.

122.   These test results are stored on the hard drives of the Heidelberg machine and they should be available for review.

123.   Claims submitted to Medicare by Defendants for ICG angiography were false because the CPT codes listed were for procedures that were not medically necessary or that were worthless.

## 2.    Defendants Engage in Upcoding

124.   RIC and its physicians regularly submit claims to Medicare for examinations or procedures different from those actually performed.   Stated differently, RIC and its physicians engage in upcoding to increase profits.

125.   Levels of examination are supposed to be billed based on the number and type of examination elements that are performed.  The last digit of the CPT Code is the Level of visit charged.  Almost all RIC patients are billed for a Level 4 visit which requires that certain examination elements be performed and is the second highest office visit code.  On September 27, 2012, Dr. Davis advised the RIC physicians that "most of our patients should be Level 4 exams." In order for a visit to be a Level 4, the examination by the physician must include a slit lamp examination of the eye.  RIC frequently billed for Level 4 exams even when they did not perform the requisite services.  For example, during the fall of 2012, a slit lamp located in the RIC office in Pasadena was broken.  The room containing that slit lamp was still used to examine patients.  Even though the slit lamp in that room could not be used, Dr. Samuel continued to bill Medicare for Level 4 comprehensive evaluation and management visits for which they would be paid between $115.52 and $178.27 by Medicare instead of a less costly Level 3 visit that does not include a slit lamp examination for which they would be paid between $78.92 and $116.72.

126.   Technicians at RIC, including Talin Balin, advised Ms. Smith that Dr. Samuels regularly bills for a Level 4 visit even though he only looks at the photos taken of the eye rather than examining the patient's eye with a slit lamp.

127.   RIC produced a monthly time tracker report that charted the average time for a patient visit by RIC physicians based on times recorded daily.   Dr. Samuels' average time per patient visit was almost always the lowest.  For example, in December 2012, his time was nine minutes below the physician with the next lowest average time.   Dr. Chang's average time per visit was also usually amongst the lowest.

128.   Dr. Samuels averaged 40 to 50 patients per day.   Nevertheless, most of these visits were billed as a Level 4.

129.   Dr. Davis regularly told the other doctors not to bill at a Level 5 as that code would rarely be appropriate. Level 5 is only supposed to be billed by an ophthalmologist if there is an emergency and imminent surgery is involved. Nevertheless, Dr. Davis frequently billed at a Level 5.  RIC records show that in 2012 Dr. Davis billed 428 patient visits at Level 5, 87% of all Level 5 visits billed by RIC.

130.   At a doctors meeting on June 21, 2012, Dr. Davis told the doctors they could not bill Medicare for the office visit if their last chart note states the patient is coming back for an  intravenous injection (IVA).   He advised the doctors to note that the patient is to come back for a "possible" injection," so the second office visit could be billed.

131.   Claims submitted to Medicare by Dr. Samuel and Dr. Davis were false because the CPT codes listed were for procedures and examinations that were not performed and/or necessary.

**B.     Defendants Engage in Double Billing**

132.   RIC entered into an arrangement with Dr. Mark B. Kislinger whereby Dr. Bhatti of RIC would staff Dr. Kislinger's Glendora, California clinic several times per week.   Dr. Kislinger was supposed to and did bill Medicare and other payors for Dr. Bhatti's services performed at the Glendora clinic.   RIC was to and did receive from Dr. Kislinger one-half of the fees collected for Dr. Bhatti's

1   services.

2       133.   Between at least April through June of 2012, RIC also billed Medicare

3   for the services Dr. Bhatti had performed in Dr. Kislinger's clinic as though the

4   services had been provided at RIC.

5       134.   The claims submitted to Medicare by Defendants for work performed

6   by Dr. Bhatti at Glendora, which had already been billed by Dr. Kislinger, were

7   false and fraudulent.

8       135.   Relator Smith advised Dr. Chang that this double billing was improper

9   and "would need to be reconciled."  Dr. Kislinger advised Dr. Chang the double

10   billing to Medicare was fraudulent.   Nevertheless, RIC knowingly failed and

11   refused to report and return the amounts it had double billed to Medicare in

12   violation of 42 U.S.C. § 1320(a)-7(k)(d).

13       **C.**    **The Compensation Structure Encourages Unnecessary Tests and**
14               **Upcoding**

15       136.   In January, 2013, RIC announced that, in order to become a partner, an

16   employed doctor would have to exceed the average charges (minus charges paid by

17   J Code) of the three partners, for two quarters.

18       137.   Because the partners of RIC were billing for unnecessary ICG tests

19   and upcoding, the only way an employed doctor could meet this requirement would

20   be to order unnecessary ICG tests or also to upcode.

21       138.   Indeed, when informed of this change, Doctor Camille Harrison stated

22   she could never meet the requirement because she did not order ICG tests as often

23   as the RIC principals.  She has since left the practice.

24       **D.**    **RIC Through CEES Bills Medicare For Services Not Performed**

25       139.   Lily Lee, Dr. Chang's wife, is a plastic surgeon licensed to practice

26   medicine in California.  She is also an approved Medicare provider.

27       140.   CEES billed Medicare for Dr. Lee's services for assisting in retinal

28   surgeries where she was not present and in which she did not actually participate.

For example, Medicare was billed for retinal surgery performed on patient NEG on December 13, 2012, under CPT 67113. This surgery does not require an assistant.

141. Other surgeries where Dr. Lee's assistance was billed to Medicare but she was not present include but are not limited to:

| Patient | Date of Service | Amount |
|---------|-----------------|--------|
| JB | 11/21/2012 | $340.00 |
| NP | 12/13/2012 | $500.00 |
| SK | 01/03/2013 | $560.00 |
| DWW | 01/03/2013 | $500.00 |
| BH | 01/03/2013 | $400.00 |
| MA | 01/03/2013 | $400.00 |

142. Relators have learned that CEES continues to bill Medicare for Dr. Lee's services in connection with surgeries where she is not present and in which she does not participate.

## IX.  DEFENDANTS KNOWINGLY RETAIN AN OVERPAYMENT FROM THE PHYSICIAN QUALITY REPORTING SYSTEM

143. RIC is a voluntary participant in the Physician Quality Reporting System (PQRS). Under the PQRS, eligible professionals who satisfactorily report data on quality measures for covered Physician Fee Schedule Services provided to Medicare Part B Fee for Service beneficiaries receive specified incentive payments, 42 U.S.C. § 1395w-4(k), (m).

144. In order to receive the payments provided under the PQRS program for 2011, RIC was required to provide data for a twelve-month period or the period January 1, 2011 to December 31, 2011, 75 Fed. Reg. § 5 (Aug. 26, 2010), pp. 40168-40178; *see* 76 Fed. Reg. 42772 (July 19) at p. 42842; 42 CFR 414.90.

145. When RIC provided its data on quality measures, although it purported to provide information for the entire year, only information for the four months

September through December of 2011 was reported.  For 2012, certain of the information reported was for activities that had not actually occurred.  Each of the RIC principals attested to the accuracy of the information submitted.

146.   In October, 2012, RIC received $60,000 from CMS as a result of the information it provided to PQRS for 2011.

147.   Relator Smith advised the RIC principals that RIC was not entitled to receive these funds and that they should be returned because RIC had not complied with the PQRS program by providing the required amount of data.

148.   The RIC physicians knowingly failed and refused to report and return to CMS these funds to which they were not entitled  in violation of the requirements of 42 U.S.C. § 3120a-7k(d).

## X.   ADDITIONAL FALSE CLAIMS TO THE STATE OF CALIFORNIA

### A.   Violations of the Discriminatory Billing Rules

149.   The California False Claims Act, codified in the California Government Code sections 12650, *et seq.*, states that it is a violation to: (a) Knowingly present or cause to be presented false claims for payment or approval of claims for Medi-Cal reimbursement; and/or, (b) Knowingly make, use, or cause to be made or used false records or statements to get false claims paid or approved by California for Medi-Cal reimbursement.

150.   Under Title 22, Section 51480(a) of the California Code of Regulations, "no provider shall bill or submit a claim for reimbursement for the rendering of health care services to a Medi-Cal beneficiary in any amount greater or higher than the usual fee charged by the provider to the general public for the same service" (the "Discriminatory Billing Rule").

151.   During the time period relevant to this complaint, RIC and its principals charged patients without any insurance, who paid for medical services in cash, fees that were lower than the rate Medi-Cal was billed for the same services. Examples include Patients AD 8/27/2012, MG 10/25/2011 and AG 7/9/2012.  The

CPT codes for which cash patients paid less than paid by Medi-Cal included, but were not limited to, CPT 67028 and CPT 67105. An RIC Comparison of Self-Pay Payments analysis shows that self-pay patients paid on average 36.8% of RIC's stated charges in 2011 and 23.1% of RIC's stated charges in 2012. Accordingly, each claim submitted by the RIC principals to Medi-Cal as a primary payer was in violation of the Discriminatory Billing Rule.

152.   For almost all CPT codes, RIC based its supposed usual fee or chargemaster on 200% of the Medicare reimbursement rate. The rate Medicare reimburses for CPT 67028 in Southern California is $124.28. If RIC followed its usual procedure, the usual charge rate would have been $250.00. However, because Medi-Cal reimburses $364.11 for this code, RIC's usual charge was listed as $370.00.

153.   In submitting claims for payment to Medi-Cal, each RIC principal certified that their services complied with California statutes and regulations. Those certifications were false, in that the RIC principals were in fact charging far lower fees to the general public than the amounts they claimed for reimbursement for the rendering of the same services to Medi-Cal beneficiaries.

154.   Consequently, each claim for payment was a false claim in violation of California's False Claims Act (Gov. Code § 12650 *et seq.*). The payments received by RIC and its principals on account of such false claims from 2006 through 2012 total $1,233,356. 78. Defendants continue to receive payments from Medi-Cal for false claims.

155.   Similarly, as directed by RIC, cash pay CEES patients and RIC patients at SGASC paid lower amounts than than paid by Medi-Cal. For example, CEES doctors charged patients who paid cash $35.00 for CPT 92250, but Medi-Cal paid $42.11. Accordingly, each claim submitted by CEES doctors and by SGASC to Medi-Cal as a primary payer was in violation of the Discriminatory Billing Rule.

**B.      Violations of the California Insurance Frauds Prevention Act**

156.   The California Insurance Frauds Prevention Act ("CIFPA") creates civil liability for any person who violates sections 549, 550, or 551 of the California Penal Code. Cal. Ins. Code § 1872.7(b).  This statute was intended, in particular, to reach health insurance fraud, Cal. Ins. Code Sec. 1871(h).  Any person may bring a civil action under the Act on behalf of themselves and the State of California so long as the action is brought in the name of the state, Cal. Ins. Code. § 1871.7(e)(1).

157.   The California Penal Code Sec. 550 provides, in relevant part:

(a) It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:

(1)   Knowingly present or cause to be presented any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance.

* * *

(6)   Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.

* * *

(9)   Knowingly present for payment any undercharges for health care benefits on behalf of a specific claimant unless any known overcharges for health care benefits for that claimant are presented for reconciliation at that same time.

(10)  For purposes of paragraphs (6) to (9), inclusive, a claim or a claim for payment of a health care benefit also means a claim or claim for payment submitted by or on the behalf of a provider of any workers' compensation health benefits under the Labor Code.

(b)  It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:

(1)   Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(2)   Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

158.   Approximately one-third of the RIC patients had commercial insurance coverage for the services provided by RIC.  The contracts between RIC, the Physician Defendants and commercial insurance carriers, including but not limited to Empire BlueCross/Blue Shield, Cigna and United Healthcare, require that the patient be charged and pay a deductible and/or a co-payment before a benefit is payable under the plan.

159.   However, as stated in paragraphs 62 to 88 which are incorporated herein by reference, Defendants routinely waived co-pays and deductibles. Waivers of co-pays and deductibles were regularly and commonly made for patients who had commercial insurance coverage.   When submitting claims to commercial carriers for these patients, RIC and the Physician Defendants listed the co-pay amounts and actually or impliedly represented that they were charging the required co-payments or deductibles, when they were not.

160.   Further, because RIC, the Physician Defendants, CEES, CEES doctors and San Gabriel Ambulatory Surgery Center accepted lower payments from patients who paid cash, the Defendants failed to disclose their actual usual prices when making claims for benefits to commercial carriers.

161.   Each of the claims for payment that RIC, the Physician Defendants, CEES, CEES doctors and San Gabriel Ambulatory Surgery Center presented or caused to be presented to insurers that failed to reveal the waiver of co-payments and deductibles, or that failed to disclose their true usual charges for the services listed, contained false and misleading information about material facts.

**C.   Violation of the California Business and Professions Code Sec. 654.2**

162.   The allegations of paragraphs 103-109 are incorporated herein by reference as if fully set forth.

163.   Section 654.2 of the California Professions and Business Code states:

It is unlawful for any person licensed under this division or under any initiative act referred to in this division to charge, bill, or otherwise solicit payment from a patient on behalf of, or refer a patient to, an organization in which the licensee, or the licensee's immediate family, has a significant beneficial interest, unless the licensee first discloses in writing to the patient, that there is such an interest and advises the patient that the patient may choose any organization for the purpose of obtaining the services ordered or requested by the licensee.

164.   The Attorney General of California, in opining on this section, noted that "what is absolutely essential to their fulfilling the statute's requirement, however, is that they alert the patient to the practitioner's interest in a comprehensible way and at a time before the actual referral takes place." 68 Ops Calif. Atty. Gen. 140.

165.   There is no sign posted at an RIC office which reveals that the Defendant Physicians have an ownership interest in the San Gabriel Surgery Center.

166.   Patients are given a brochure which states "The ownership for San

Gabriel Ambulatory Surgery Center may be obtained by contacting the center at (626) 300-5300."

167.   Relators called (626) 300-5300 to learn who owned SGASC. However, the individuals at the center who responded to the call could not provide any information about the ownership of that facility nor could they find anyone who could do so.

168.   Patients at RIC who require surgery are not advised that they may have services performed at another facility nor are they given the names of specific alternative facilities or information as to where a listing of them might be obtained.

169.   RIC physicians submit claims to Medi-Cal for services they perform at the San Gabriel Surgery Center.  San Gabriel Surgery Center also submits claims to Medi-Cal for the use of its facilities and nursing services by patients referred by RIC, CEES and the Defendant physicians.

170.   In submitting their claims, RIC, CEES, the Defendant Physicians and San Gabriel Surgery Center expressly and impliedly certify that they have complied with state law and that the information on the claim is accurate, complete and does not conceal a material fact.

171.   As a result of the failure of RIC and the Defendant Physicians to comply with Sec. 654.2 of the California Professions and Business Code, each claim submitted to Medi-Cal by those Defendants and by CEES and San Gabriel Surgery Center is false and fraudulent.

## COUNT I

### Federal False Claims Act
### 31 U.S.C. §3729(a)(1)[1986) and
### 31 U.S.C. §3729(a)(1)(A)[2009)

172.   Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth herein.

173.   Defendants knowingly submitted and caused the submission of false or fraudulent claims for payment or approval for medical services to officials of the

United States Government in violation of 31 U.S.C. §3729(a)(I)[1986], and 31 U.S.C. §3729(a)(I)(A)[2009].

174.   By virtue of the false or fraudulent claims that Defendant presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

**COUNT II**
**Federal False Claims Act**
**31 U.S.C. §3729(a)(1)(B)[2009]**

175.   Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth herein.

176.   Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the United States Government in violation of 31 U.S.C. §3729(a)(l)(B)[2009].

177.   By virtue of the false or fraudulent claims that Defendants made, used or caused to be made or used, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

**COUNT III**

178.   Relators repeat and reallege each and every allegation contained in the paragraphs above as if fully set forth.

179.   Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the United States in violation of 31 U.S.C. § 3729(a)(1)(G).

**COUNT IV**
**California False Claims Act**
**Cal. Gov't Code § 12651(a)(1) and (a)(2)**

180.   Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth herein.

181.   By virtue of the acts described above, Defendants knowingly submitted to officers, employees or agents of the State of California, false or

1   fraudulent claims for payment or approval.

2        182.  By virtue of the acts described above, Defendants knowingly made,

3   used, or caused to be made or used, false records or statements to the California

4   State Government to obtain payment from the State of California for false or

5   fraudulent claims.

6        183.  By reason of the acts of Defendants, the State of California has

7   suffered actual damages and is entitled to recover treble damages and a civil penalty

8   for each false or fraudulent claim.

**COUNT V**
**California Insurance Code Sec. 1872.7(b)**
9
**and California Penal Code Sec. 550**
10

11        184.  Relators repeat and re-allege each and every allegation contained in the

12   paragraphs above as though fully set forth herein.

13        185.  By virtue of the acts described above, Defendants knowingly made or

14   caused to be made false or fraudulent claims for payment of a health care benefit.

15        186.  By virtue of the acts described above, Defendants knowingly make or

16   assist or cause to be presented written statements in support of claims for payment

17   pursuant to an insurance policy, knowing that the statements contain false or

18   misleading information concerning material facts.

19        187.  By virtue of the acts described above, Defendants knowingly make or

20   assist in the preparation or making of written statements that are intended to be

21   presented to an insurer in connection with or in support of claims and payments

22   pursuant to an insurance policy, knowing that such statements contain false or

23   misleading information concerning material facts.

24        188.  By virtue of the acts of Defendants, the State of California has suffered

25   actual damages and is entitled to recover treble damages as well as civil penalties

26   for each claim for compensation.

27

28

1

## **PRAYER FOR RELIEF**

2      WHEREFORE, Relators, on behalf of the United States, demands that

3 judgment be entered in their favor and against Defendants for the maximum amount

4 of damages and such other relief as the Court may deem appropriate on each Count.

5 This includes, with respect to the Federal False Claims Act, three times the amount

6 of damages to the Federal Government plus civil penalties of no more than Eleven

7 Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred

8 Dollars ($5,500.00) for each false claim, and any other recoveries or relief provided

9 for under the Federal False Claims Act.

10     Relators request that this Court enter judgment against Defendants in an

11 amount equal to three times the amount of damages the State of California has

12 sustained because of Defendants' actions, plus a civil penalty of $10,000 for each

13 violation of Cal. Govt. Code § 12651(a).

14     Relators request that this Court enter judgment against Defendants for a civil

15 penalty of not less than $5000 nor more than $10,000, plus an assessment of not

16 more than three times the amount of each claim for compensation submitted in

17 violation of the California Insurance Frauds Prevention Act, Cal. Ins. Code Sec.

18 1872.7(b).

19     Further, Relators request that they receive the maximum amount permitted

20 by law of the proceeds of this action or settlement of this action collected by the

21 United States, plus reasonable expenses necessarily incurred, and reasonable

22 attorneys' fees and costs. Relators request that their award be based upon the total

23 value recovered, both tangible and intangible, including any amounts received from

24 individuals or entities not parties to this action.

25

26

27

28

---

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  September 26, 2013

Respectfully submitted,

**LAW OFFICES OF CARLIN &
BUCHSBAUM, LLP**

By: _____
Brent S. Buchsbaum
E-mail:  brent@ carlinbuchsbaum.com
555 E. Ocean Blvd. Suite 818
Long Beach, CA.  90802
Telephone: (562)432-8933
Facsimile:   (562)435-1656

**BERGER & MONTAGUE, P.C.**
Daniel R. Miller, Esq.
(PA Bar No. 68141)
E-mail:  dmiller@bm.net
Roslyn G. Pollack, Esq.
(PA Bar No. 17487)
E-mail:  rpollack@bm.net
1622 Locust Street
Philadelphia, PA  19103
Telephone:  (215) 875-3000
Telefacsimile:  (215) 875-4604

*Attorneys for Relators*