Mark Hardiman (SBN 136602)
Salvatore Zimmitti (SBN 245678)
**NELSON HARDIMAN LLP**
11835 West Olympic Boulevard, Suite 900
Los Angeles, CA 90064
Telephone:   (310) 203-2800
Facsimile:   (310) 203-2727
mhardiman@nelsonhardiman.com
szimmitti@nelsonhardiman.com

Attorneys for Defendants

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and STATE OF CALIFORINA, *ex rel* BOBBETTE A. SMITH and SUSAN C. ROGERS, <br><br> Plaintiffs, <br><br> v. <br><br> TOM S. CHANG, M.D., TOM S. CHANG, M.D., INC., MICHAEL A. SAMUEL, M.D., MICHAEL J. DAVIS, M.D., RETINA INSTITUTE OF CALIFORNIA MEDICAL GROUP, CALIFORNIA EYE AND EAR SPECIALISTS, BRETT BRAUN and SAN GABRIEL AMBULATORY SURGERY CENTER LP, <br><br> Defendants. | CASE NO.:  2:13-cv-3772-DMG (MRWx) <br><br> (Assigned to Judge Dolly M. Gee) <br><br> **DEFENDANTS' NOTICE OF CONSOLIDATED MOTION AND MOTION TO DISMISS RELATORS' FIRST AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF PROCEDURE 12(B)(6) AND 9(B); MEMORANDUM OIF POINTS AND AUTHORITIES** <br><br> Date:   February 3, 2017 <br> Time:   9:30 a.m. <br> Place:  Courtroom 8C, 8th Floor |

**TO THE HONORABLE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on February 3, 2017, at 9:30 a.m., or as soon thereafter as the matter shall be heard, before the Honorable Dolly M. Gee, United States District Judge, in Courtroom 8C of the United States Courthouse, located at 350 West 1st Street, Los Angeles, CA, 90012,  Defendants Tom S. Chang, M.D.,

1

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

Tom S. Chang, M.D., Inc., Michael A. Samuel, M.D., Michael J. Davis, M.D., Brett Braun, Retina Institute of California Medical Group,  California Eye and Ear Specialists, and San Gabriel Ambulatory Surgery Center LP, by and through their attorneys of record, will and hereby do move the Court for an order dismissing the First Amended Complaint of Relators Bobbette A. Smith and Susan C. Rogers, alleging violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, ("FCA"), the California False Claims Act, Cal. Gov. Code §§ 12650 *et seq.* ("CA-FCA"), and the California Insurance Frauds Prevention Act, Cal. Insurance Code § 1871.7 ("CA-IFPA"), for failure to state a claim and to allege fraud with sufficient particularity pursuant to Federal Rules of Civil Procedure Rule 12(b)(6) and 9(b).

This motion is based on the accompanying memorandum of points and authorities, the files and records in this case, upon such matters as the Court may take judicial notice, and on such further evidence and argument as may be presented at any hearing of this motion.

This motion is made following discussions by counsel for the parties, pursuant to Local Rule 7-3, which took place via telephone and email on November 10 and December 16, 2016.

DATED: December 19, 2016

Respectfully submitted,

NELSON HARDIMAN LLP

/S/ *M.S. Hardiman*
MARK S. HARDIMAN

Attorneys for Defendants

# **TABLE OF CONTENTS**

**Page(s)**

I.    **INTRODUCTION** ...................................................................................... 1

II.   **STATEMENT OF FACTS AS ALLEGED** .......................................... 1

    A.    RIC's Alleged Improper Waivers of Medicare Part B Deductibles and Co-Payments ............................................................ 1

    B.    RIC's Alleged Improper Co-Marketing Agreement With RIC Diagnostics ................................................................................... 4

    C.    The RIC and CEES Physicians' Alleged Improper Referrals to the San Gabriel Ambulatory Surgery Center .................................. 5

    D.    RIC's Medicare Claims For Allegedly Unnecessary and Worthless ICG Tests .................................................................... 5

    E.    Dr. Samuels' And Dr. Davis' Medicare Claims for Alleged "Upcoded" Office Visits ................................................................ 6

    F.    RIC's Alleged Duplicate Medicare Claims for Dr. Bhattio's Services at Dr. Kislinger's Clinic ..................................................... 7

    G.    CEES' Alleged Medicare Claims For Assistant Surgeon Services Not Performed ........................................................................... 7

    H.    RIC's Alleged Submission of Incomplete Data to the Medicare Physician Quality Reporting System .............................................. 7

    I.    RIC's Alleged Failure to Charge Medi-Cal the Same Prices Charged to Patients Without Insurance Who Paid in Cash ................ 9

    J.    The RIC Partners' Alleged Failure to Advise Medi-Cal Patients of Their Ownership Interest in SG-ASC ........................................ 10

    K.    RIC'S Alleged Waiver of Deductibles and Co-Payments for Commercial Insurance Patients ................................................... 10

    L.    Relators' FCA, CA-FCA and CA-IFPA Causes of Action ............. 10

III.  **STANDARDS OF REVIEW** .............................................................. 11

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD SUITE 900
LOS ANGELES, CALIFORNIA 90064

# **TABLE OF CONTENTS**

**Page(s)**

IV.   **ARGUMENT** ......................................................................................... 13

    A.   THE COMPLAINT FAILS TO STATE A VALID FEDERAL
        FCA CLAIM AGAINST DEFENDANTS ......................................... 13

    1.   The Federal FCA ................................................................... 13

    2.   The Complaint Fails to State a Federal FCA Claim Based on
        RIC's Alleged Waiver of Medicare Patients' Deductibles and
        Co-Payments .......................................................................... 16

    3.   The Complaint Fails to State a Federal FCA Claim Based On
        RIC's Co-Marketing Agreement With RICX ..................................... 20

    4.   The Complaint Fails to State A Federal FCA Claim Based On
        the RIC Physicians' Patient Referrals To The SG-ASC In
        Which They Allegedly Have Investment Interests ............................. 21

    5.   The Complaint Fails to State a Federal FCA Claim Based On
        RIC's Medicare Claims For Allegedly Unnecessary or
        Worthless ICGs ...................................................................... 23

    6.   The Complaint Fails to State a Federal FCA Claim Based on
        Dr. Davis' and Dr. Samuels' Alleged "Upcoding" of Office
        Visits .................................................................................... 25

    7.   The Complaint Fails to State a Federal FCA Claim Based on
        RIC's Alleged Duplicate Medicare Claims for Dr. Bhattio's
        Services at Dr. Kislinger's Clinic ................................................. 28

    8.   The Complaint Fails to State a Federal FCA Claim Based on
        CEES' Alleged Medicare Claims For Assistant Surgeon
        Services Not Performed ............................................................. 29

    9.   The Complaint Fails to State a Federal FCA Claim Based on
        Submission of Incomplete Data to the Medicare Physician
        Quality Reporting System .......................................................... 29

    B.   THE COMPLAINT FAILS TO STATE A VALID
        CALIFORNIA FCA CLAIM AGAINST DEFENDANTS ............... 30

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

# **TABLE OF CONTENTS**

**Page(s)**

1.  The Complaint Fails to State a Valid California FCA Claim
    Against Defendants Based on Alleged Violations of the Medi-
    Cal Discriminatory Billing Rule ........................................................... 30

2.  The Complaint Fails to State a California FCA Claim Based on
    Violations of Business & Professions Code § 654.2 .......................... 32

C.  RELATOR'S COMPLAINT FAILS TO STATE A CA-IFPA
    CLAIM BASED ON WAIVER OF CO-PAYS AND
    DEDUCTIBLES ..................................................................................... 33

D.  THE COMPLAINT MUST BE DISMISSED BECAUSE IT
    CHARGES ALL DEFENDANTS IN EACH CAUSE OF
    ACTION ................................................................................................. 34

V.  **CONCLUSION** ............................................................................................. 35

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD SUITE 900
LOS ANGELES, CALIFORNIA 90064

## <u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Advanced Rehabilitation, LLC v. UnitedHealthgroup, Inc.,*
   498 Fed. Appx. 173 (3d Cir. 2012)..................................................................24

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)........................................................................................11

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)...................................................................................11, 12

*Cafasso U.S. ex rel. v. General Dynamics C4 Systems, Inc.,*
   637 F.3d 1047, 1054 (9th Cir. 2011) ........................................................12, 14

*Chesbrough v. VPA, P.C.,*
   655 F.3d 461 (6th Cir. 2011) .........................................................................23

*County of Santa Clara v. Astra U.S., Inc.,*
   428 F.Supp.2d 1029 (N.D. Cal. 2006)......................................................13, 25

*Epstein v. Wash. Energy Co.,*
   83 F.3d 1136 (9th Cir. 1996) .........................................................................11

*Frazier ex rel. U.S. v. Iasis Healthcare Corp.,*
   392 Fed. Appx. 535, 2010 WL 3190641 .........................................................24

*Gonzalez v. Fresenius Medical Care North America,*
   689 F.3d 470 (5th Cir. 2012) .........................................................................14

*Hanlester Network v. Shalala,*
   51 F.3d 1390 (9th Cir. 1995)..........................................................................22

*Hericks v. Lincare Inc.,*
   2014 WL 1225660 (E.D. Pa. Mar. 25, 2014) .................................................13

*Hopper v. Solvay Pharmaceuticals*, Inc.,
   588 F.3d 1318, 1328 (11th Cir. 2009) ............................................................14

*Illinois Farmers Ins. Co. v. Mobile Diagnostic Imaging, Inc.,*
   2014 WL 4104789 (D. Minn. Aug. 19, 2014).................................................24

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD SUITE 900
LOS ANGELES, CALIFORNIA 90064

iv

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Klaczak v. Consolidated Medical Transport,*
   458 F.Supp.2d 622 (N.D. Ill. 2006) ................................................................. 22

*Lubin v. Sybedon Corp.,*
   688 F. Supp. 1425 (S.D. Cal. 1988) ................................................................. 35

*Magluta v. Samples,*
   256 F.3d 1282 (11th Cir. 2001) ....................................................................... 35

*Mikes v. Straus,*
   274 F.3d 687 (2d Cir. 2001) ..................................................................... 15, 23

*Neubronner v. Milken,*
   6 F.3d 666 (9th Cir. 1993) ............................................................................... 12

*Physicians & Surgeons Laboratories, Inc. v. Department of Health Service,*
   6 Cal.App.4th 968 (1992) ................................................................................... 9

*Remmes v. Internat'l Flavors & Fragrances, Inc.,*
   389 F.Supp. 2d 1080 (N.D. Iowa 2005) .......................................................... 35

*Resnick v. Hayes,*
   213 F.3d 443 (9th Cir. 2000) ........................................................................... 11

*State ex rel. Wilson v. Superior Court,*
   227 Cal.App.4th 579 (2014) ............................................................................ 33

*Swartz v. KPMG LLP,*
   476 F.3d 756 (9th Cir. 2007) ..................................................................... 11, 35

*U.S. v. Bollinger Shipyards, Inc.,*
   775 F.3d 255 (5th Cir. 2014) ........................................................................... 11

*U.S. v. Bornstein,*
   423 U.S. 303 (1976) ......................................................................................... 13

*U.S. v. Bourseau,*
   531 F.3d 1159 (9th Cir. 2008) ......................................................................... 14

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*U.S. v. Corinthian Colleges,*
  655 F.3d 984 (9th Cir. 2011) ........................................................................11, 35

*U.S. v. Kitsap Physicians Service,*
  314 F.3d 995 (9th Cir. 2002) ...................................................................................14

*U.S. v. Mackby,*
  261 F.3d 821 (9th Cir. 2001) ...................................................................................13

*U.S. v. Mousavi,*
  604 F.3d 1084 (9th Cir. 2010) .................................................................................16

*U.S. v. Singh,*
  390 F.3d 168 (2d Cir. 2004) ....................................................................................26

*U.S. v. Starks,*
  157 F.3d 833 (11th Cir.1998) ..................................................................................16

*U.S. ex rel. Absher v. Momence Meadows Nursing Center, Inc.,*
  764 F.3d 699 (7th Cir. 2014) ...................................................................................23

*U.S. ex rel. Academy Health Center, Inc. v. Hyperion Foundation,*
  *Inc.,*
  2014 WL 3385189 (S.D. Miss. July 9, 2014)...........................................................18

*U.S. ex rel. Ebeid v. Lungwitz,*
  616 F.3d 993 (9th Cir. 2010) ...........................................................................*passim*

*U.S. ex rel. Bennett v. Boston Scientific Corp.,*
  No. H-07-2467, 2011 WL 1231577 (S.D. Tex. 2011) ..............................................28

*U.S. ex rel. Bogina v. Medline Industries, Inc.,*
  809 F.3d 365 (7th Cir. 2016) ............................................................................12, 25

*U.S. ex rel. Clausen v. Laboratory Corp. of America, Inc.,*
  290 F.3d 1301, 1312 (2002) ....................................................................................14

*U.S. ex rel. Gonzalez v. Fresenius Medical Care North America,*
  2010 WL 1645969 (W.D. Tex. Jan. 21, 2010)..........................................................18

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

4
*U.S. ex rel. Grayson v. Genoa Healthcare,*
   2011 WL 2670079 (W.D. Wa, July 6, 2011) ...................................................... 18

5

6
*U.S. ex rel. Grubbs v. Ravikumar Kanneganti,*
   565 F.3d 180 (5th Cir. 2009) ...................................................................... 12, 35

7

8
*U.S. ex rel. Harris v. Bernad,*
   275 F. Supp. 2d 1 (D.D.C. 2003) ...................................................................... 25

9

10
*U.S. ex rel. Hendow v. Univ. of Phoenix,*
   461 F.3d 1166 (9th Cir. 2006) ........................................................................ 15

11

12
*U.S. ex rel. Lam v. Tenet Healthcare Corp.,*
   481 F. Supp. 2d 673 (W.D. Tex. 2006) ............................................................. 19

13

14
*U.S. ex rel. Landis v. Hospice Care of Kansas, LLC,*
   2010 WL 5067614 (D. Kan. Dec. 7, 2010) ...................................................... 23

15
*U.S. ex rel. Lee v. Corinthian Colleges*
   665 F. 3d 984 (9th Cir. 2011) ..................................................................... 29, 35

16

17
*U.S. ex rel. Lee v. SmithKline Beecham, Inc.,*
   245 F.3d 1048 (9th Cir. 2001) ........................................................................ 23

18

19
*U.S. ex rel. Morton v. A Plus Benefits, Inc.,*
   139 Fed. Appx. 980 (10th Cir. 2005) ............................................................... 23

20

21
*U.S. ex rel. Nunnally v. West Calcasieu Cameron Hosp.,*
   519 F. App'x 890 (5th Cir. 2013) ............................................................... 12, 19

22

23
*U.S. ex rel. Obert-Hong v. Advocate Health Care,*
   211 F. Supp. 2d 1045 (S.D. Fl. 2012) ......................................................... 25, 28

24

25
*U.S. ex rel. Riley v. St. Luke's Episcopal Hospital,*
   355 F.3d 370 (5th Cir. 2004) .......................................................................... 23

26
*U.S. ex rel. Stewart v. The Louisiana Clinic,*
   2002 WL 106674 (E.D. La. 2002) .................................................................... 28

27

28
*U.S. ex rel. Thayer v. Planned Parenthood of the Heartland,*
   765 F.3d 914 (8th Cir. 2014) .......................................................................... 26

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

# TABLE OF AUTHORITIES

**Page(s)**

*US. ex rel. Thompson v. Columbia/ HCA Healthcare Corp.,*
  125 F.3d 899 (5th Cir. 1997) ............................................................... 24

*Universal Health Services v. U.S. ex rel. Escobar,*
  136 S. Ct. 1989 (2016) ................................................................... 15, 23

*Vess v. Giba-Ceigy Corp.,*
  317 F.3d 1097 (9th Cir. 2003) ......................................................... 12, 13

## Statutes, Regulations and Rules

31 U.S.C. § 3729 ............................................................................... *passim*

31 U.S.C. § 3730 ................................................................................... 14

42 U.S.C. § l395 ................................................................................ *passim*

42 U.S.C. § 100 l.952 .............................................................................. 22

42 U.S.C. § 1320 ......................................................................... 16, 17, 18

42 U.S.C. §§ 1396-1396v ........................................................................... 9

Cal. Bus. & Prof. Code § 654.2 .............................................................. 32, 33

Cal. Bus. & Prof. Code § 657 ..................................................................... 31

Cal. Gov. Code § 12651 ............................................................................ 10

Cal. Gov. Code § 1871.7 ....................................................................... 11, 33

Cal. Gov. Code §§ 12650 *et seq.* ............................................................ *passim*

Cal. Penal Code § 550 .......................................................................... 10, 33

Cal. Welf. & Inst. Code, §§ 14000 *et seq.* ....................................................... 9

22 CCR §§ 50000 *et seq.* ........................................................................... 9

42 C.F.R. 411.353 .................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

22 CCR § 51450(a) ..................................................................................9, 31

Federal Rules of Civil Procedure Rule 8 ........................................................11

Federal Rules of Civil Procedure Rule 9(b) ...........................................*passim*

Federal Rules of Civil Procedure Rule 12(b)(6)......................................*passim*

## Other Authorities

56 FR 59502 (Nov. 25, 1991)..........................................................................20

63 FR 58814, (Nov. 2, 1998)...........................................................................20

64 FR 63518, (Nov. 19, 1999)..........................................................................22

66 FR 40372, (Aug. 2, 2001)............................................................................20

AMA, *CPT 2014* (2014).................................................................................27

CMS, *1997 Documentation Guidelines for Evaluation and
Management Services*, (1997) ..........................................................................26

CMS, *Physician Quality Reporting System (Physician Quality
Reporting) Measure Specifications Manual for Claims and Registry*
(2011)..................................................................................................................8

CMS, *2011 Physician Quality Reporting System (Physician Quality
Reporting) Implementation Guide*3 (2011) ......................................................8

*Medicare Claims Processing Manual*, Pub. 100-04, Ch. 12, § 30 .........................25

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.  INTRODUCTION

By their instant motion, defendants Defendants Tom S. Chang, M.D., Tom S. Chang, M.D., Inc.,   Michael A. Samuel, M.D., Michael J. Davis, M.D. (collectively the "RIC Partners"), Brett Braun, Retina Institute of California Medical Group ("RIC"), California Eye and Ear Specialists ("CEES"), and San Gabriel Ambulatory Surgery Center LP ("SG-ASC"), seek an order dismissing the First Amended Complaint ("Complaint" or "FAC") of relators Bobbette A. Smith and Susan C. Rogers ("Relators"), alleging FCA, CA-FCA, and CA-IFPA violations, for failure to state a claim and to allege fraud with particularity pursuant to Federal Rules of Civil Procedure ("Rule") 12(b)(6) and 9(b).

## II.  STATEMENT OF FACTS AS ALLEGED

On September 30, 2013, Relators filed their Complaint on behalf of the United States and the State of California, alleging that RIC, an ophthalmology group specializing in retina diseases, the RIC Partners, who owned and operated RIC, Braun, RIC's CEO, CEES, an ophthalmology practice owned by Dr. Chang, and SG-ASC, an ambulatory surgery center in which the RIC Partners allegedly have investment interests, submitted false claims to the Medicare and Medi-Cal programs and to commercial plans for treating patients with various vitreo-retinal diseases.  (Clerk's Record ("CR") 8; FAC ¶¶ 5-6, 16, 19-23, 166, 103).   In accordance with the FCA and CA-FCA, the United States and the State of California investigated Relators' allegations and declined to intervene.  (CR 36, 38).

### A.   RIC's Alleged Improper Waivers of Medicare Part B Deductibles and Co-Payments

According to Complaint, two thirds of RIC's patients are covered by Part B of the Medicare program, a federally funded health care program providing health insurance coverage to people who are aged 65 and over or who have certain

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

1

physical disabilities.  (*See* FAC ¶ 62; 42 U.S.C. §§ 1395 *et seq.*).[1]  Under Medicare Part B, patients are required to pay an annual deductible of approximately $140 and are also responsible for a co-payment generally consisting of 20% of the reasonable charges for physician services as established by the Medicare physician fee schedule.  (FAC ¶ 17; 42 U.S.C. § 1395(a)(1)).[2]  The Medicare program only reimburses health care services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." (42 U.S.C. § 1395y(a)(1)(A)).

Between 2006 and the present, RIC and the RIC Partners allegedly routinely waived their Medicare patients' deductible and co-payment obligations without complying with Medicare requirements for writing these obligations off based on financial hardship.  (FAC ¶¶ 61-88).  The RIC Partners aggressively marketed this routine waiver to referring physicians in order to "induce" their Medicare patients to choose RIC physicians based on the improper elimination of their out-of-pocket expense, rather than on whether RIC physicians were best qualified to meet their medical needs.  (FAC ¶¶ 73, 87).  RIC's marketing efforts were overseen by Braun, RIC's CEO.  (FAC ¶ 66).[3]

---

[1] Medicare Part A covers hospital inpatient services and Medicare Part B, a voluntary supplementary insurance program, covers outpatient services, including medical care in physicians' offices. (42 U.S.C. §§ 1395C-1395i).

[2] The Medicare program is administered by the U.S. Department of Health & Humans Services through its agency, the Center for Medicare and Medicaid Services ("CMS").  CMS in turn contracts with private organizations to act as Medicare Administrative Contractors ("MACs") to review and process Medicare claims submitted by hospitals and physicians for treatment of Medicare patients. (*See* 42 U.S.C. §§ 1395ff(a)(1), 1395kk-1(a)(3)-(4)).

[3] The Complaint specifically identifies only one referring physician – Dr. Michael Rose, an ophthalmologist – who allegedly required RIC to waive co-payments for his patients.  (FAC ¶ 74).  Both Dr. Chang and another RIC employee (Dr. Kristy Lin) told Relator Smith that Dr. Rose would only refer his Medicare patients to RIC if their co-payments were waived.  (*Id.*)  Based on their review of records

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

With respect to RIC's Medicare patients, Dr. Chang allegedly informed RIC physicians that they could waive deductibles and co-payments "if they were asked to do so" by the patients.  (FAC ¶¶ 75-76).  According to Relators, RIC physicians would always agree to do so and made no effort to collect the deductible or co-payments or determine whether the Medicare patients qualified for a financial hardship waiver.  (FAC ¶¶ 76-77).[4]

The RIC physicians allegedly would also sometimes use a financial hardship form to support a waiver of the patient's co-insurance obligations, but would use justifications (e.g. "retired, fixed income") that would qualify virtually every Medicare patient and would also sign the forms even if the patient provided no financial hardship information.  (FAC ¶¶ 79-80).[5]  Through their own investigation, Relators allegedly discovered that certain unidentified RIC patients,

relating to certain unidentified Rose patients that showed only 80% of allowable Medicare charges were collected, Relators conclude that "[t]hese patients had their co-payments waived, without regard to financial hardship criteria or documentation."  (*Id.*)  In addition, on information and belief, Relators allege that unidentified physicians who attended Okularfest, a RIC continuing medical education event, were told that RIC would waive co-payments and deductibles for the patients that they referred.  (FAC ¶¶ 71-72).

[4] According to the Complaint, Relator Rogers was specifically told by someone that she should not send collection letters to patients reminding them of an unpaid deductible or co-payment balance.  (FAC ¶ 77).  At RIC's Garden Grove office, Dr. Suk, a RIC physician, would allegedly waive Medicare co-payments and deductibles almost 100% of the time and insisted that such waivers continue in order to obtain patients from referring physicians despite being told by Relator Rogers that such routine waivers were improper.  (FAC ¶ 83).

[5] The Complaint includes a list of 24 RIC Medicare patients (identified by patient, date, coinsurance amount and, in some cases, RIC physician) who allegedly had their copayments and/or deductibles waived "without proper verification of financial hardship," and a list of 8 RIC Medicare patients (identified by patient and date of financial hardship approval) whose copayments were allegedly waived by RIC "without any reason or basis for the waiver being indicated on a financial hardship form."  (FAC ¶¶ 78, 80).

who had their coinsurance obligations waived, "resided in expensive homes, including one worth millions of dollars." (FAC ¶ 82). In addition, RIC allegedly submitted Medicare claims for the physicians' "full" charges for their services to patients who had their deductibles and co-payments waived, rather than subtracting the waived payment amounts from their "full" charges" to properly bill their "true" charges. (FAC ¶¶ 110-111).[6]

### B.   RIC's Alleged Improper Co-Marketing Agreement With RIC Diagnostics

The Complaint also alleges that RIC entered into an improper co-marketing agreement and/or made a loan to RIC Diagnostics ("RICX"), a company that provided mobile optical coherence tomography ("OCT") testing for optometrists to screen for and diagnose various retina diseases. (FAC ¶¶ 89-90). According to Relators, RIC advertised and encouraged optometrists to use RICX's mobile OCT service, including by offering free workshops to optometrists on how to interpret OCT images and free interpretations of such images by RIC physicians if optometrists requested them. (FAC ¶¶ 92-95). CEO Braun would also allegedly offer free RICX tests to optometrists, tell them that they could bill the free OCT tests, and encourage the optometrists to refer their patients to RIC. (FAC ¶ 100). RICX would also actively encourage optometrists to refer their patients to RIC. (FAC ¶ 91).[7]

---

[6] According to Relators, they advised the RIC Partners and CEO Braun orally (including at a September 25, 2012 meeting) and in writing that the RIC policy of routinely waiving payment of Medicare co-payments and deductibles without any proper verification of financial hardship did not comply with Medicare regulations. (FAC ¶¶ 84-86). Dr. Chang allegedly responded that he wanted to continue the financial hardship waivers to ensure that RIC would not lose patient referrals and patients and would just pay the fines if Medicare discovered what was occurring with the waivers. (FAC ¶¶ 84, 86).

[7] At a January 15, 2013 meeting, apparently regarding RICX, Dr. Chang allegedly stated, "If he did increase our referrals, I'll give him another $15,000, but don't put

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' FIRST AMENDED COMPLAINT

C.   The RIC and CEES Physicians' Alleged Improper Referrals to the San Gabriel Ambulatory Surgery Center

According to Relators, the RIC Partners, other RIC physicians, and CEES physicians, also made improper patient referrals to SG-ASC, an ambulatory surgery center in which the RIC Partners have "investment interests," without advising the referred patients of such interests.   (FAC ¶¶ 103-109).  Patients were allegedly provided with a brochure that informed them that the ownership of SG-ASC could be verified by calling the center.  (FAC ¶ 107).   At Relator Smith's request, an RIC employee called SG-ASC to determine who owned the center, but no one at the center could provide that employee with any ownership information. (FAC ¶ 108).

D.   RIC's Medicare Claims For Allegedly Unnecessary and Worthless ICG Tests

The Complaint further alleges that RIC submitted Medicare and Medi-Cal claims for unnecessary or worthless indocyanine green angiography ("ICG"), a diagnostic test that analyzes intraretinal circulation or blood flow in the eye, using Common Procedural Terminology ("CPT") Code 92240.  (FAC ¶¶ 113-114, 116).

According to Relators, Dr. Rizwan Bhattio, a RIC physician, expressed concern to Relator Smith about RIC's high utilization of ICGs, stating that he had confirmed that other retina specialty groups only performed "a handful" of ICGs each year.  (FAC ¶¶ 116).[8]   The Complaint alleges that "[m]any of the ICG angiographies performed at RIC were not medically necessary," but only identifies one general category of patients – those with diabetes – for whom the test was

---

that in the minutes." (FAC ¶ 101).

[8] By contrast, in 2012, RIC allegedly billed Medicare for 7,325 ICGs and was paid $1,506,503. 71, amounting to over 10% of the practice's total revenue that year. (FAC ¶¶ 116, 120).   RIC also allegedly ordered more ICGs for Medicare patients than for patients enrolled in commercial health plans that, unlike Medicare, required prior authorization for this test.   (FAC ¶ 117).

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' FIRST AMENDED COMPLAINT

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

supposedly unnecessary.  (FAC ¶ 118).  In addition, Relators allege that RIC was only using half of the amount of ICG dye recommended by the manufacturer of the Heidelberg machine used to perform the test, which Dr. Bhattio complained resulted in poor quality images. (FAC ¶ 121).  According to Relators, RIC patients were therefore treated based on ICG images that "might fail to properly show the condition of the eye," and, on information and belief, made the ICGs "essentially worthless."  (*Id.*)   The ICG dye was also allegedly "administered by unlicensed technicians not properly trained to administer the dye."  (*Id.*)

E.   Dr. Samuels' And Dr. Davis' Medicare Claims for Alleged "Upcoded" Office Visits

Relators next allege that RIC physicians regularly billed Medicare for office visits using higher levels of evaluation and management services than actually provided, thereby increasing reimbursement.   (FAC ¶ 124).  The Complaint alleges that RIC billed a Level 4 office visit for almost all patients, which supposedly required the physician to perform a slit lamp examination of the eye. (FAC ¶ 125).  However, Dr. Samuels allegedly billed a Level 4 visit for office visits at RIC's Pasadena Office during the fall of 2012 even though the slit lamp at that location was broken, and, according to RIC technicians (e.g., Talin Balin), generally billed Level 4 office visits even though he did not use a slit lamp to examine the patients' eyes, but instead relied on eye photos.   (FAC ¶¶ 125-126). Dr. Samuels also allegedly saw 40-50 patients a day, most of whom were billed as Level 4 visits, but almost always had the lowest average time spent per patient visit.  (FAC ¶¶ 127-128).  Dr. Chang's average time spent per patient was also allegedly usually amongst the lowest of the RIC physicians.  (FAC ¶ 127).

Dr. Davis allegedly told other RIC physicians that a Level 5 office visit – supposedly only appropriate for emergencies and when surgery is imminent – should rarely be billed, but himself billed 428 Level 5 visits in 2012, amounting to 87% of all Level 5 visits billed by RIC that year.   (FAC ¶ 129).  Dr. Davis also

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' FIRST AMENDED COMPLAINT

allegedly told RIC physicians that they could not bill for an office visit if they documented that the patient was only coming back for an intravenous injection and that they should instead document that a patient was returning for a "possible" injection.   (FAC ¶ 130).

F.   RIC's Alleged Duplicate Medicare Claims for Dr. Bhattio's Services at Dr. Kislinger's Clinic

According to the Complaint, RIC had an agreement with Dr. Mark Klisinger under which Dr. Bhattio, a RIC physician, would provide services at Dr. Klisinger's Glendora clinic and Dr. Klisinger would bill Dr. Bhattio's services and pay half of the fees collected to RIC.  (FAC ¶ 132).  Between as least April through June of 2012, RIC allegedly billed Medicare for the services Dr. Bhatti had performed in Dr. Kislinger's clinic as though the services had been provided at a RIC facility.   (FAC ¶ 133).  Dr. Chang was allegedly informed by Dr. Klisinger and Relator Smith that this double billing needed to be corrected, but RIC failed to return the Medicare overpayments that it received for Dr. Bhattio's services.  (FAC ¶ 134).

G.   CEES' Alleged Medicare Claims For Assistant Surgeon Services Not Performed

Relators also allege that CEES, an ophthalmology practice owned by Dr. Chang, billed Medicare for the assistant surgeon services of Dr. Lily Lee, Dr. Chang's spouse, during retinal surgeries even though she was not present and did not participate in the surgeries.  (FAC ¶¶ 139-142).   The Complaint identifies seven CEES retinal surgeries (by patient, date of service, and claim amount) in 2012 and 2013 for which Dr. Lee's assistant surgeon services were allegedly billed even though she was not present during the surgeries.   (FAC ¶¶ 140-142).

H.   RIC's Alleged Submission of Incomplete Data to the Medicare Physician Quality Reporting System

As a voluntary participant in Medicare's Physician Quality Reporting

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' FIRST AMENDED COMPLAINT

System ("PQRS") for 2011,[9] RIC was allegedly required to submit 12 months of data on quality measures in order to qualify for incentive patients.   (FAC ¶¶ 143-144).   According to Relators, RIC "purported to provide information for the entire year," but only submitted data on quality measures to Medicare for the last four months of 2011.   (FAC ¶ 145).   RIC also allegedly provided PQRS data in 2012 that included information "for activities that had not actually occurred." (*Id.*)   In October 2012, Medicare allegedly paid $60,000 to RIC based on the incomplete data submitted by RIC for the 2011 PQRS.   (FAC ¶ 146). Although Relator Smith allegedly advised the RIC Partners that this payment needed to be returned because RIC had submitted insufficient PQRS data for 2011, they refused to refund the overpayment.   (FAC ¶¶ 147-148).

---

[9] The PQRS is "a voluntary individual reporting program that provides an incentive payment to identified eligible professionals who satisfactorily report data on quality measures for covered Physician Fee Schedule (PFS) services furnished to Medicare Part B beneficiaries." *See* CMS, *2011 Physician Quality Reporting System (Physician Quality Reporting) Implementation Guide*, at 3 (2011) available at https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-instruments/PQRS/Downloads/2011_PhysQualRptg_Implementation Guide_03312011.pdf.  Reporting physicians are required to select and report data for various care measures, including "prevention, chronic-and acute-care management, procedure-related care, resource utilization, and care coordination," applicable to their practice. *Id*. at 3-4. The physicians' reporting of such data depends on which of the various authorized reporting methods (claims-based, registry-based, electronic health record-based, and group practice reporting options-based) is selected, and, depending on the reporting method, the reporting period is either 6 months (July 1, 2011 through December 31, 2011) or 12 months (January 1, 2011 through December 31, 2011). *Id*. at 12-13, 18-25.  Within the applicable reporting period, PQRS requires different quality measures to be reported with different frequencies for patients with specified medical conditions. *See* CMS, *Physician Quality Reporting System (Physician Quality Reporting) Measure Specifications Manual for Claims and Registry*, at 1(2011), available at https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/PQRS/2011-Physician-Quality-Reporting-System-Items/ CMS125 4515.html?DLPage=1&DLEntries=10&DLSort=0&DLSortDir=ascending.

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' FIRST AMENDED COMPLAINT

I.   RIC's Alleged Failure to Charge Medi-Cal the Same Prices
Charged to Patients Without Insurance Who Paid in Cash

Between 2006 and the present, RIC, the RIC Partners, CEES and SG-ASC also allegedly "charged patients without any insurance, who paid for medical services in cash, fees that were lower than the rate Medi-Cal was billed for the same services," in supposed violation of the Medi-Cal Program's Discriminatory Billing Rule, Title 22, California Code of Regulations ("CCR"), Section 51480(a). (FAC ¶¶ 151, 155).[10]

According to the Complaint, the CPT codes for which RIC charged uninsured self-pay patients less than the price charged to Medi-Cal included CPT codes 67028 and CPT 67105.   (FAC ¶ 151).  Self-pay patients allegedly paid on average 36.8% of RIC's usual charges in 2011 and 23.1% of RIC's usual charges in 2012.  (*Id.*)  CEES physicians allegedly charged patients "who paid cash $35.00 for CPT 92250, but Medi-Cal paid $42.11."  (FAC ¶ 155).  Relators also allege that RIC's usual charge for CPT code 67028 was $370.00, just over Medi-Cal's $364.11 reimbursement rate, even though RIC typically calculated its usual charge at 200% of the Medicare reimbursement rate, which would have been $250 for this code.   (FAC ¶ 152).[11]

---

[10] The Medi-Cal program, administered by the California Department of Health Care Services, is California's implementation of the Medicaid program, a joint federal-state health care program through which the federal government provides financial assistance to states furnishing medical services to qualified indigent persons.  (*See* 42 U.S.C. §§ 1396-1396v; Cal. Welf. & Inst. Code, §§ 14000 *et seq.*; 22 CCR §§ 50000 *et seq.*; *Physicians & Surgeons Laboratories, Inc. v. Department of Health Service*, 6 Cal.App.4th 968, 973 (1992)).

[11] The Complaint also lists four examples (by patient and date of something) of RIC patients who were allegedly charged less than the usual rates charged to Medi-Cal.  (FAC ¶ 151).

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' FIRST AMENDED COMPLAINT

J.    The RIC Partners' Alleged Failure to Advise Medi-Cal Patients of Their Ownership Interest in SG-ASC

According to the Complaint, RIC, the RIC Partners, CEES and SG-ASC all submitted Medi-Cal claims for services to patients who were referred to SG-ASC by RIC Partners without being advised of the physicians' ownership interest in the ambulatory surgery center and the patients' right to obtain services at a facility of their choosing.  (FAC ¶¶ 165-169).  Instead, the patients were allegedly provided with a brochure that informed them that the ownership of SG-ASC could be verified by calling the center, but, when Relators called the center, no one there could provide them with any ownership information.  (FAC ¶¶ 166-167).

K.    RIC's Alleged Waiver of Deductibles and Co-Payments For Commercial Insurance Patients

Relators also allege that RIC, the RIC Partners, CEES and SG-ASC routinely waived the deductible and co-payments amounts that they were obligated to charge patients covered by commercial health plans (e.g., Empire BlueCross/ Blue Shield, Cigna and United Healthcare) pursuant to the terms of their provider agreements with those plans.  (FAC ¶¶ 158-159).  In addition, these defendants allegedly failed to disclose their usual charges to these plans because they charged lower prices to uninsured patients who paid in cash.  (FAC ¶ 160).

L.    Relators' FCA, CA-FCA and CA-IFPA Causes of Action

Based on these allegations, the Complaint charges that, between July 2006 and the present, defendants presented false claims to the Medicare program, in violation of 31 U.S.C. § 3729(a)(1)(A) (Count I), made false statements material to Medicare false claims, in violation of  31 U.S.C. § 3729(a)(1)(B) (Count II), retained Medicare overpayments, in violation of  31 U.S.C. § 3729(a)(1)(G) (Count III), submitted false claims to the Medi-Cal program and made false statements to obtain payment for such false claims, in violation of Cal. Gov. Code § 1265l(a)(l)

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

and (a)(2) (Count IV), and made false insurance claims for healthcare benefits to insurance plans and false statements supporting such claims, in violation of Cal. Gov. Code § 1871.7(b) and Cal. Penal Code § 550 (Count V).   (FAC ¶¶ 15, 172-188).

## III.   STANDARDS OF REVIEW

A complaint will survive a motion to dismiss pursuant to Rule 12(b)(6) if it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   A claim is facially plausible under Rule 8 when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *U.S. v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 260 (5th Cir. 2014).   When considering a motion to dismiss, this Court must accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff.   *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000); *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).[12]   However, conclusory allegations or allegations that are no more than a statement of a legal conclusion "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. *Id*. at 679.   In other words, relators must support their claim with more than a formulaic recitation of the elements, labels and conclusions, and naked assertions of fact.   *Id*. at 678.   Instead, relators must allege sufficient facts such that a court

---

[12] "In ruling on a 12(b)(6) motion, a court may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).   A district court can also consider documents referenced by the complaint, *U.S. v. Corinthian Colleges*, 655 F.3d 984, 993 n.4 (9th Cir. 2011), and "need not accept as true allegations contradicting documents that are referenced in the complaint or that are properly subject to judicial notice." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' FIRST AMENDED COMPLAINT

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

has "plausible grounds to infer" that their claims rise "above the speculative level." *Twombly*, 550 U.S. at 555-56.

Since Relators' Complaint is brought under the FCA, CA-FCA and CA-IFPA, it must also fulfill the requirements of Rule 9(b). *See Cafasso, U.S. ex rel.v. General Dynamics C4 Systems, Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011); *Vess v. Giba-Ceigy Corp.*, 317 F.3d 1097, 1103 (9th Cir. 2003) (Rule 9(b) applies to state-law causes of action). Rule 9(b) requires that the details constituting the alleged fraud must "give defendants notice of the particular misconduct which is alleged fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993). This requires that the particular facts supporting a fraud cause of action include the "who, what, when, where and how" of the misconduct charged, as well as "what is false or misleading about a statement and why it is false." *United States ex rel. Ebeid v. Lungwitz,* 616 F.3d 993, 998 (9th Cir. 2010) (citing *Vess,* 317 F.3d at 1106). [13] Allegations on information and belief do not satisfy Rule 9(b). *U.S. ex rel. Bogina v. Medline Industries, Inc.*, 809 F.3d 365, 370 (7th Cir.

---

[13] In the context of an FCA action, Rule 9(b) can be satisfied without detailed allegations regarding the false claims – such as the exact dollar amounts, billing numbers, or dates – if the complaint alleges "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid,* 616 F.3d at 998-999 (quoting *U.S. ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)). However, "[t]his does not absolve [a relator] of the burden of otherwise sufficiently pleading the time, place, or identity details of the traditional standard, in order to effectuate Rule 9(b)'s function of fair notice and protection from frivolous suits." *U.S. ex rel. Nunnally v. West Calcasieu Cameron Hosp.*, 519 F. App'x 890, 895 (5th Cir. 2013); *Ebeid,* 616 F.3d at 999. Rule 9(b)'s "heightened pleading standard for fraud claims supplies defendants with the information they need to prepare responses, prevents discovery intended as a mere fishing expedition, and protects the defendants' reputations from baseless allegations." *Nunnally*, 519 F. App'x at 892 n.2.

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' FIRST AMENDED COMPLAINT

2016); *County of Santa Clara v. Astra U.S., Inc.*, 428 F.Supp.2d 1029, 1036-37 (N.D. Cal. 2006).  Rule 9(b)'s particularity requirement applies to FCA claims based on alleged kickbacks.  *Nunnally*, 519 F. App'x at 894; *Hericks v. Lincare Inc.*, 2014 WL 1225660, at *12 (E.D. Pa. Mar. 25, 2014).  A dismissal for failure to plead fraud with particularity pursuant to Rule 9(b) is treated the same as a Rule 12(b)(6) dismissal for failure to state a claim.  *Vess,* 317 F.3d at 1107.

## IV.  ARGUMENT

### A.   THE COMPLAINT FAILS TO STATE A VALID FEDERAL FCA CLAIM AGAINST DEFENDANTS

As detailed below, the Complaint alleges eight different theories of liability under the federal FCA against some or all of the eight defendants.  However, Relators' various allegations fail to state a valid FCA claim against any of the defendants, either as a matter of law or because they do not allege fraud with the required factual particularity pursuant to Rules 12(b)(6) and 9(b).

#### 1.   The Federal FCA

The federal FCA is designed to punish and deter fraud against the federal government. *See U.S. v. Bornstein*, 423 U.S. 303, 309 & n.5 (1976).  To establish FCA liability for presenting false claims, a relator must allege (1) a false or fraudulent claim, (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval, (3) with knowledge that the claim was false. *See* 31 U.S.C. § 3729(a)(1)(A); *U.S. v. Mackby*, 261 F.3d 821, 826 (9th Cir. 2001).[14]  To establish a valid FCA claim for making false statements,

---

[14] Relators' Complaint is brought under FCA provisions that permit a private litigant to bring a *qui tam* action on behalf of the federal government against anyone who submits a false claim to the government. *See* 31 U.S.C. §§ 3729(a), 3730(b) (2016) (authorizing private individual, the relator, to "bring a civil action for a violation of section 3729 . . . for the United States Government.").  The government may intervene in the action, but if it chooses not to do so, the relator bringing the action may proceed on his own. *See* 31 U.S.C. § 3730(b)(2) (2016).

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

a relator must allege that (1) there was a false statement, (2) made knowingly, (3) that was material, and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim).   31 U.S.C. § 3729(a)(1)(B); *Gonzalez v. Fresenius Medical Care North America*, 689 F.3d 470, 475 (5th Cir. 2012).[15]   In order to state a valid FCA "reverse false claim" for retaining overpayments, a relators must allege that defendants either (1) knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay money to the government or (2) knowingly made or used a false statement material to an obligation to pay money to the government. 31 U.S.C. § 3729(a)(1)(G).

Under the FCA, a person acts "knowingly" when that person (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.   31 U.S.C. § 3729(b).   No proof of specific intent to defraud is required to establish knowledge. *Id.*

The FCA is not a catchall anti-fraud provision, but expressly "'attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment.'" *Cafasso*, 637 F.3d at 1055 (quoting *U. S. v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995)).   "Evidence of an actual false claim is 'the *sine qua non* of a False Claims Act violation.'" *U.S. v. Kitsap Physicians Service*, 314 F.3d 995, 1002 (9th Cir. 2002), quoting *U.S. ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1312 (2002).

A claim can be "false" within the meaning of the FCA under a variety of

---

[15] Stated differently, a relator "must show that the government paid a false claim to prove a violation" of the FCA's false statement provision. *Hopper v. Solvay Pharmaceuticals*, Inc., 588 F.3d 1318, 1328 (11th Cir. 2009).   In addition, Relators "must demonstrate that [the government] was owed a specific, legal obligation at the time that the alleged false record or statement was made [.]" *U.S. v. Bourseau*, 531 F.3d 1159, 1169 (9th Cir. 2008).   The obligation "cannot be merely a potential liability." *Id.*

theories.   Most simply, a claim is facially or factually false if "the claim for payment is itself literally false or fraudulent." *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006).   Alternatively, a claim can be "false" under an express certification theory if (1) the defendant knowingly makes a false certification or statement of compliance with a government regulation, (2) that is "material to the government's decision to pay out moneys to the claimant" and (4) the claim asks for government payment. *Id*. at 1171-1173.

Finally, under an implied certification theory, the U.S. Supreme Court has recently held that a claim can be a "false" misrepresentation (1) if the claim "does not merely request payment, but also makes specific representations about the goods or services provided," (2) "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths," and (3) these misrepresentations are material to the government's payment decision. *Universal Health Services v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2001-2002 (2016).   While the Supreme Court declined to decide whether the submission of claim impliedly represents that the billing party is legally entitled to payment, *id*. at 2000, the Ninth Circuit has held that the implied certification theory is "'based on the notion that  the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment.'" *Ebeid,* 616 F.3d at 996 (quoting *Mikes v. Straus*, 274 F.3d 687, 699 (2d Cir. 2001)).

Under the FCA's "demanding" materiality standard, it is not sufficient for relators to simply allege that the government "designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment" or "would have the option to decline to pay if it knew of the defendant's noncompliance." *Escobar*, 136 S. Ct at 2003.   In addition, materiality "cannot be found where noncompliance is minor or insubstantial." *Id*. at 2003.

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

2.   The Complaint Fails to State a Federal FCA Claim Based
on RIC's Alleged Waiver of Medicare Patients'
Deductibles and Co-Payments

Relators' primary theory of FCA liability is that RIC and the RIC Partners violated the FCA by submitting Medicare claims that were false and non-reimbursable because their "routine" waivers of the patients' deductibles and co-payments without adequately verifying that they qualified for a financial hardship allegedly (a) violated the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, and (b) misrepresented the true charges for RIC services by failing to subtract the waived deductible or copayment amount from RIC's billed charges. *See* FAC ¶¶ 88, 110-112.

Under the AKS, it is illegal to knowingly and willfully offer or pay "remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person" to either (a) "refer an individual to a person for the furnishing or arranging for the furnishing of any item or services" or (b) "purchase, lease, order . . . any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a–7b(b)(2). The AKS includes various "safe harbor" provisions that exclude certain types of payments from being considered illegal remuneration. *See* 42 U.S.C. § 1320a–7b(b)(3). In order to establish a willful violation of the AKS, the government must prove that the defendant acted with knowledge that his conduct was unlawful, but need not prove that he had actual knowledge of or a specific intent to violate the AKS. *See* 42 U.S.C. § 1320a-7b(h); *U.S. v. Starks,* 157 F.3d 833, 838 (11th Cir.1998); *U.S. v. Mousavi*, 604 F.3d 1084, 1092-1093 (9th Cir. 2010). As of 2010, any Medicare claim that includes services delivered in violation of the AKS constitutes a false claim within the meaning of the FCA. 42 U.S.C. § 1320a-7b(g) (2010).

In this case, the Complaint's allegations fail to legally and factually establish

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

that RIC's alleged "routine" waivers of their Medicare patients' deductible and co-payment obligations violated the AKS.  Contrary to Relators' legal conclusion that such routine waivers necessarily violate the AKS, *see* FAC ¶ 51, the Office of Inspector General ("OIG") guidance recited in the Complaint only states that providers who provide such waivers "**could be** held liable" under the AKS because when they "forgive financial obligations for reasons other than genuine financial hardship of the particular patient, they **may be** unlawfully **inducing** that patient to purchase items or services from them."  *See* FAC ¶ 51(quoting *OIG Special Fraud Alert*. 59 FR 242 (December 19, 1994) (emphasis added)).  Thus, merely alleging that a Medicare provider routinely waives deductible and co-payment obligations does not excuse Relators' obligation to sufficiently allege all elements of an AKS violation underlying an FCA claim.

In addition, Relators mistakenly rely on OIG guidance regarding the Civil Monetary Penalties Statute ("CMPS"), 42 U.S.C. § 1320a-7a (Section 1128A(a)(5) of the Social Security Act), *see* FAC ¶¶ 54-55, an entirely different statute that imposes civil monetary penalties on anyone who, among other prohibited acts, "transfers remuneration" to a Medicare beneficiary that such "person knows or should know is likely to **influence** such individual to order or receive" Medicare services from a particular provider and, unlike the AKS, specifically defines "remuneration" to include "waiver of coinsurance and deductible amounts (or any part thereof), and transfers of items or services for free or for other than fair market value," unless (i) the waiver is not offered as part of any advertisement or solicitation; (ii) the provider "does not routinely waive coinsurance or deductible amounts;" and (iii) the provider waives the coinsurance and deductible amounts after determining in good faith that "the individual is in financial need" or fails to collect coinsurance or deductible amounts after making reasonable collection efforts.  42 U.S.C. § 1320a-7a(a)(5) and (i)(6) (emphasis added).  Unlike the AKS, however, the CMPS does not require a "willful" intent to "induce" patient referrals

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

1   and a CMPS violation does **not** create FCA liability.   *See U.S. ex rel. Academy*

2   *Health Center, Inc. v. Hyperion Foundation, Inc.*, 2014 WL 3385189, at *39 (S.D.

3   Miss. July 9, 2014) (dismissing FCA claim based on CMPS violations); *U.S. ex rel.*

4   *Gonzalez v. Fresenius Medical Care North America*, 2010 WL 1645969, at *8-9

5   (W.D. Tex. Jan. 21, 2010) (same); *U.S. ex rel. Grayson v. Genoa Healthcare*, 2011

6   WL 2670079, at *5 (W.D. Wa. July 6, 2011) (same).   Accordingly, Relators'

7   reliance on the CMPS as a basis for FCA liability is legally unsupportable and fails

8   to state a valid FCA claim.

9          In addition, the Complaint fails to sufficiently allege the requisite elements

10   of an AKS violation with the particularity required by Rule 9(b).   While Relators

11   allege that RIC physicians and the RIC Partners routinely informed potential

12   referring physicians that their patients' Medicare co-payment or deductible

13   obligations would be waived, this solicitation by itself does not plausibly constitute

14   "remuneration" to "induce" the referring physician to refer such patients to RIC

15   because such a waiver provides nothing of value to the referring physician.

16   Moreover, even if RIC's alleged waiver offer to referring physicians did constitute

17   "remuneration" within the meaning of the AKS, Rule 9(b) requires that Relators

18   provide factual specifics regarding the identity of referring physicians who were

19   solicited in this fashion, who at RIC made the waiver offers, when such offers were

20   made, which Medicare patients of the referring physicians were referred as a result,

21   and whether the co-payment and deductible obligations of those Medicare patients

22   were in fact waived by identified RIC physicians.

23          Here, however, the Complaint only identifies one referring physician (Dr.

24   Michael Rose) who allegedly required such a waiver as a condition of his referrals,

25   *see* FAC ¶ 74, but fails to specifically identify any Medicare patients who were

26   referred by that physician to RIC, had their co-payment and deductible obligations

27   improperly waived without regard to "financial hardship," and received RIC

28   services that were billed to the Medicare program.   Such bare-boned factual

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' FIRST AMENDED COMPLAINT

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

1     allegations are insufficient to establish that RIC and the RIC Partners routinely

2     offered illegal remuneration to referring physicians as an inducement for patient

3     referrals in violation of the AKS and that Medicare false claims resulted.

4          Likewise, Relators' conclusory allegations that RIC and the RIC Partners

5     "routinely" waived the copayment and deductible obligations of Medicare are

6     insufficient under Rules 12(b)(6) and  9(b) to show an AKS violation absent any

7     factual allegations establishing that such waivers were improper because the

8     Medicare patients did not have a "financial hardship" or "financial need"

9     supporting such waivers and that such waivers were to "induce" the Medicare

10    patients to receive services from RIC versus some other provider.   In this case, the

11    Complaint itself indicates that RIC only waived the copayment and deductible

12    obligations if asked to do so by patients, *see* FAC ¶ 75, and, while Relators allege

13    in conclusory fashion that RIC did not appropriately determine or document

14    whether patients had a "financial hardship" before providing a waiver or writing

15    off the debt, the Complaint fails to identify what "financial hardship" standard RIC

16    was required to satisfy for Medicare patients and the only factual allegation

17    indicating that RIC patients did not have such a "financial  hardship" is Relators'

18    allegation that they "investigated" certain unidentified patients who allegedly

19    received waivers and "discovered that these patients resided in expensive homes,

20    including one worth millions of dollars." FAC ¶ 82. Under Rule 9(b), such vague

21    allegations are factually insufficient to establish that the RIC physicians' "routine"

22    waivers of the deductible and co-payment obligations of certain Medicare patients

23    when asked to do so constituted a willful criminal violation of the AKS or resulted

24    in Medicare false claims. *See Nunnally*, 519 F. App'x 890, 895 (5th Cir. 2013)

25    (FCA complaint properly dismissed where Relator's conclusory allegations failed

26    to plausibly establish existence of kickback scheme or describe fraud with

27    particularity); *U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673,

28    687-688 (W.D. Tex. 2006) (dismissing FCA kickback claim for failure to satisfy

1    Rule 9(b) particularity requirement).

2           In a similar vein, Relators' allegation that such routine waivers also caused

3    RIC's resulting claims to be false because the claims mispresented RIC's charges

4    by failing to subtract the amount of the waived deductible or co-payment fails to

5    state a valid FCA claim under Rules 12(b)(6) and 9(b).  While such a waiver might

6    have impacted proper Medicare reimbursement prior to 1991 when services were

7    based on the provider's "reasonable charge," *see* 42 U.S.C. §§ 1395l, 1395u(o),

8    CMS now reimburses Medicare Part B physician services based on a Medicare

9    physician fee schedule – which sets reimbursement for such services at fixed

10   amounts – and under which Medicare pays 80 percent of the fee schedule amount

11   and the patient is responsible for paying the remaining 20 percent.  66 FR 40372,

12   40394 (Aug. 2, 2001); 63 FR 58814, 58882 (Nov. 2, 1998); 56 FR 59502 (Nov. 25,

13   1991).   Thus, Medicare's payments to RIC for office visit or other physician

14   service claims would be the same regardless of whether RIC allegedly improperly

15   waived   the   patient's   deductible   or   co-payment   obligations.   Under   such

16   circumstances, Relators have failed to allege any facts establishing that RIC's

17   charges for Medicare services were material to Medicare's payment decision.

18          3.    The Complaint Fails to State a Federal FCA Claim Based
                  On RIC's Co-Marketing Agreement With RICX
19

20          The Complaint also alleges that defendants RIC, the RIC Partners, and

21   Barnes somehow violated the FCA by having an "improper" co-marketing

22   agreement and/or making a "loan" to RIC Diagnostics ("RICX"), a mobile optical

23   coherence tomography ("OCT") company, under which RIC and RICX each

24   allegedly encouraged optometrists to refer their patients to the other, including by

25   variously offering free workshops and OCT tests and interpretations, and Dr.

26   Chang suggested that RIC would pay RICX more if referrals increased.  FAC ¶¶

27   89-90, 92-100.

28          Without any factual allegations about the specific nature of the financial

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' FIRST AMENDED COMPLAINT

relationship between RIC and RICX – whether through marketing agreement or loan – the Complaint fails to describe any "improper" relationship or any illegal between the two entities violating the AKS with the factual particularity required by Rule 9(b). Nor does the Complaint identify any illegal payment (whether by date or amount) by RIC or Dr. Chang to RICX for Medicare patient referrals. Similarly, Relators' generic allegations fail to establish that the defendants paid any illegal remuneration to optometrists in exchange for Medicare referrals.

In particular, Relators' allegations fail to identify any of the optometrists who allegedly received free workshops or free OCT tests or interpretations, any Medicare patients referred by such optometrists to RIC, or any RIC services that were provided to such patients and billed to the Medicare program. As such, under Rules 12(b)(6) and 9(b), Relators have failed to state a valid FCA claim predicated on alleged AKS violations arising from RIC's relationship with RICX.

4. The Complaint Fails to State A Federal FCA Claim Based On the RIC Physicians' Patient Referrals To The SG-ASC In Which They Allegedly Have Investment Interests

Next, the Complaint alleges that the RIC Partners' Medicare claims for services provided at the defendant SG-ASC were false because they resulted from referrals of patients who were not informed of the physicians' investment interest in the ambulatory surgery center, in supposed violation of the federal AKS. *See* FAC ¶¶ 61-88. Under the Medicare AKS safe harbor for investments in ambulatory surgery centers, 42 U.S.C. § 1001.952(r), "remuneration" does not include any payment that is a return on an investment interest made to a physician investor in an ambulatory surgical center if various standards are met, including that "patients referred to the investment entity by an investor are fully informed of the investor's investment interest." 42 U.S.C. § 1001.952( r). Relators allege that the RIC Partners' "failure to comply with the requirements" of this safe harbor "results in remuneration prohibited by 42 U.S.C. l 395nn and 42 C.F.R. 411.353."

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' FIRST AMENDED COMPLAINT

However, the RIC Partners' alleged failure to comply with one element of the safe harbor for ASC investments does not establish an AKS violation. In particular, "the various Medicare 'safe harbors' define a subset of clearly legal conduct, but that does not mean that anything outside of the 'safe harbors' violates the AKS." *Klaczak v. Consolidated Medical Transport*, 458 F.Supp.2d 622, 686 (N.D. Ill. 2006). Rather, CMS has confirmed that "it is not true that every arrangement that does not comply with a safe harbor is suspect under the anti-kickback statute, though such arrangements may be suspect in particular circumstances." 64 FR 63518, 63521 (Nov. 19, 1999). In addition, Relators have failed to plausibly allege that the RIC Partners did not satisfy the safe harbor.[16]

In addition, Relators have failed to allege any facts specifically describing the nature of the RIC Partners' investment interests in defendant SG-ASC, how they received any returns on such investment interests, and the financial relationship between such returns and their referrals of unidentified patients to the center. Without such particular allegations, the Complaint provides no factual basis for inferring that the RIC Partners' investment interest violated the AKS by "inducing" them to refer patients to the center and caused any resulting Medicare claims for such patients to be false. *See Hanlester Network v. Shalala*, 51 F.3d 1390, 1399 (9th Cir. 1995) (joint venture laboratories did not violate AKS by merely encouraging physician investors to refer patients to them). Accordingly, under Rules 12(b)(6) and 9(b), the Complaint fails to state a valid FCA claim predicated on the RIC Partners' investment interests in defendant SG-ASC.

---

[16] In particular, Relators' allegation that RIC informed patients via brochure that they could verify defendant SG-ASC's ownership by calling the center, but that center staff were unable to do so when Relator had someone call the center on a **single** occasion is insufficient to plausibly establish that all patients were never fully informed of the RIC Partners' investment interests. As a result, the Complaint fails to establish that the RIC Partners' investment interests were not protected by the federal AKS safe harbor for investments.

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

5. The Complaint Fails to State a Federal FCA Claim Based
On RIC's Medicare Claims For Allegedly Unnecessary
or Worthless ICGs

In support of their fifth theory of FCA liability, Relators allege that RIC submitted Medicare (and Medi-Cal) claims for unnecessary or worthless indocyanine green angiography ("ICG") tests.  FAC ¶¶ 113-114, 116.

Medicare claims for medically unnecessary services can be actionable under the FCA, but "must be based on an objectively verifiable fact." *U.S. ex rel. Landis v. Hospice Care of Kansas, LLC*, 2010 WL 5067614, *4 (D. Kan. Dec. 7, 2010); *U.S. ex rel. Riley v. St. Luke's Episcopal Hospital*, 355 F.3d 370, 376 (5th Cir. 2004); *U.S. ex rel. Morton v. A Plus Benefits, Inc.*, 139 Fed. Appx. 980, 982 (10th Cir. 2005).  In addition, FCA liability may arise if a Medicare provider submits claims for "medically worthless tests," *see U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001), but this theory requires a relator to allege not merely that a service was of poor quality or could have been performed better, but that "the performance of the service is so deficient that for all practical purposes it is the equivalent of no performance at all." *Mikes*, 274 F.3d at 697, *abrogated on other grounds*, *Universal Health Services v. U.S. ex rel. Escobar*, 136 S. Ct. 1989 (2016); *U.S. ex rel. Absher v. Momence Meadows Nursing Center, Inc.*, 764 F.3d 699, 709-710 (7th Cir. 2014); *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468-469 (6th Cir. 2011).

In this case, Relators' broad allegation that many of the RIC ICGs were "medically unnecessary" is entirely conclusory.  Their allegations that the number of tests performed was of concern to one RIC physician and was higher than other retinal practices, or that RIC made money from the tests and ordered more ICGs for Medicare patients that for commercial plan patients do not plausibly establish that any of the tests were objectively unnecessary when the Complaint contains no information about when an ICG is medically appropriate.  While the Complaint

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

does baldly allege that ICGs provided to RIC patients with diabetes were not medically indicated, Relators do not allege how and why such ICGs were unnecessary for this or any other category of Medicare patients nor identify any Medicare patient with diabetes for whom an ICG claim was actually submitted to the Medicare program. Without such specific factual support, Relators have failed to state an FCA claim based on "medically unnecessary" services. *See Frazier ex rel. U S. v. Iasis Healthcare Corp.,* 392 Fed. Appx. 535, 2010 WL 3190641, at *1 (9th Cir. 2010) (FCA complaint properly dismissed where relator's "allegations regarding medically unnecessary procedures were conclusory at best"); *US. ex rel. Thompson v. Columbia/ HCA Healthcare Corp.,* 125 F.3d 899, 903 (5th Cir. 1997) (FCA claim properly dismissed where relator failed to provide factual basis for allegation that hospital chain submitted claims for medically unnecessary services).[17]

Relators' "worthless services" theory of FCA liability fares no better. While Relators allege that RIC's failure to use the correct amount of dye for ICGs resulted in poor images, they fail to allege any facts establishing that these lower quality images rendered the ICGS so deficient as to be the equivalent of not performing them at all. Instead, Relators simply speculate that such poor images "**might** fail to properly show the condition of the eye," and, on information and belief, "**could**" have made the ICGs "essentially worthless." *See* FAC ¶ 121 (emphasis added). However, mere conjecture that RIC's allegedly deficient performance of the ICGs may have affected the quality of test results is insufficient

---

[17] *See also Advanced Rehabilitation, LLC v. UnitedHealthgroup, Inc.,* 498 Fed. Appx. 173, 177 (3d Cir. 2012) (complaint dismissed where plaintiffs alleged no facts to demonstrate that therapy procedures were "medically necessary" for the particular patients who received them); *Illinois Farmers Ins. Co. v. Mobile Diagnostic Imaging, Inc.,* 2014 WL 4104789, at *12 (D. Minn. Aug. 19, 2014) ("Of course, the conclusory statement that the [MRI] scans were medically unnecessary is not entitled to the assumption of truth.")

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' FIRST AMENDED COMPLAINT

to factually establish that the ICGs were medically worthless. *See Medline Industries, Inc.*, 809 F.3d at 370 ("Allegations based on 'information and belief' . . . won't do in a fraud case"); *County of Santa Clara* , 428 F.Supp.2d at 1036-1037 (same). As such, the Complaint also fails to state a valid "worthless services" FCA claim under Rules 12(b)(6) and 9(b).[18]

> 6. The Complaint Fails to State a Federal FCA Claim Based on Dr. Davis' and Dr. Samuels' Alleged "Upcoding" of Office Visits

Relators next allege that RIC physicians regularly billed Medicare for office visits using billing codes for higher levels of evaluation and management ("E/M") services than actually provided, thereby fraudulently increasing reimbursement. FAC ¶ 124. Such a billing practice (known as "upcoding") can be actionable under the FCA. *U.S. ex rel. Obert-Hong v. Advocate Health Care*, 211 F. Supp. 2d 1045, 1051 (S.D. Fl. 2012); *U.S. ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 6 (D.D.C. 2003).

The Medicare program requires physicians to bill Medicare Part B services, including office visits, using the American Medical Association's Current Procedural Terminology ("CPT-4") numeric codes to describe the services provided. *See* Medicare Claims Processing Manual ("MCPM"), Pub. 100-04, Ch.

---

[18] In passing, Relators also allege that the dye for the ICGs was administered by "unlicensed technicians not properly trained to administer the dye." *See* FAC ¶ 121. Once again, however, this allegation alone is insufficient to state a valid FCA claim where the Complaint otherwise fails to allege what technician licensing or training was required by the Medicare program as a condition of ICG claim payment or how this alleged lack of technician licensing and training affected the quality of the ICGs or the reimbursability of Medicare ICG claims. Absent such essential factual allegations, the dye technicians' alleged lack of licensing or training does not establish that RIC's Medicare ICG claims were factually false or legally false under an express or implied theory of FCA liability or that licensing or training of dye technicians was material to Medicare's payment of ICG claims.

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' FIRST AMENDED COMPLAINT

12, § 30.[19]   In the case of office visits, a physician's E/M services are typically billed using a five-level series of CPT codes for either a new patient (CPT-4 Codes 99201 through 99205) or an established patient (CPT-4 Codes 99211 through 99215), with the higher code or "Level" numbers (e.g., Level 1 being the lowest and Level 5 being the highest) corresponding with the increased "complexity of the physician's decision-making, the comprehensiveness of both the physical examination and the patient history, the severity of the presenting medical problem, and the amount of face-to-face time that the physician spends with the patient and the patient's family." *U.S. v. Singh*, 390 F.3d 168, 177 (2d Cir. 2004); *U.S. ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 920 (8th Cir. 2014).   In guidance, CMS has explained that history, examination, and medical decision making – and **not** time spent with the patient – are generally "the key components in selecting the level of E/M services" unless the office visit consists "predominantly of counseling or coordination of care" in which case "time is the key or controlling factor to qualify for a particular level of E/M service." *See* CMS, *1997 Documentation Guidelines for Evaluation and Management Services*, at 4 (1997).[20]   By way of example, an office visit qualifying for E/M CPT Code 99214 (Level 4) is described by the AMA as follows:

> Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 key components:
>
> - A detailed history;
> - A detailed examination;
> - Medical decision making of moderate complexity.
>
> Counseling and/or coordination of care with other physicians, other qualified healthcare professionals, or agencies are provided consistent

---

[19] CMS's Medicare manuals are available on the Internet at https://www.cms.gov/regulations-and-guidance/guidance/manuals/internet-only-manuals-ioms.html.

[20] Available at https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNEdWebGuide/Downloads/97Docguidelines.pdf.

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

with the nature of the problem(s) and the patient's and/or family's needs.

Usually, the presenting problem(s) are of moderate to high severity. Typically, 25 minutes are spent face-to-face with the patient and/or family.

AMA, *CPT 2014*, at 9 (2014).

In this case, even assuming the Complaint's allegations regarding Level 4 and 5 office codes refer to E/M CPT codes, Relators fail to state an FCA "upcoding" claim because they include no factual allegations regarding what those codes actually required, and how the claimed RIC visits failed to meet those coding requirements. In particular, as described above, a slit lamp examination is **not** required to bill E/M CPT Code 99214 (Level 4) and Relators' allegations fail to otherwise explain how Dr. Samuels' use of eye photos rather than a slit lamp exam precluded the billing of this E/M code if two of the three key components were satisfied.[21]

In addition, Relators' allegations that RIC typically billed "Level 4" exams for office visits, Dr. Davis also "frequently billed at Level 5," Dr. Davis and Dr. Chang spent less time with patients during office visits than other RIC physicians, or Dr. Davis instructed RIC physicians about the proper billing of office visits involving "possible" injections does not remotely establish that incorrect office visit codes were billed when the time spent with patients typically does not control E/M code selection and the Complaint alleges no facts establishing that the RIC office visits did not satisfy the unidentified requirements of the codes billed. Accordingly, Relator's allegations fail to state an FCA claim based on alleged

---

[21] Relators may be confusing the E/M codes used by RIC with the separate set of eye exam CPT codes that can also be used by ophthalmologists to bill office visits, although those do not mandate the use of a slit lamp either. *See CPT 2014*, at 368 (describing  CPT Codes for intermediate (CPT-4 Codes 92002 and 92012) and comprehensive ophthalmological services (CPT-4 Codes 92004 and 92014) 92020 for new and established patients.)

308363.1

27

"upcoding" of office visits under Rule 12(b)(6) and do not describe any fraud with the particularity required by Rule 9(b).  *See Advocate Health Care*, 211 F. Supp. 2d at 1051 (Rule 9(b) required dismissal of complaint where relator failed to provide factual basis for allegation that provider upcoded services); *U.S. ex rel. Stewart v. The Louisiana Clinic*, 2002 WL 106674, *2, 4 (E.D. La. 2002) (same as to claims for unnecessary and upcoded services against clinic versus various ordering physicians); see *also U.S. ex rel. Bennett v. Boston Scientific Corp.*, No. H-07-2467, 2011 WL 1231577, at *30 (S.D. Tex. 2011) (dismissing FCA upcoding claim pursuant to Rule 9(b)).

7.   The Complaint Fails to State a Federal FCA Claim Based on RIC's Alleged Duplicate Medicare Claims for Dr. Bhattio's Services at Dr. Kislinger's Clinic

According to the Complaint, between at least April through June of 2012, RIC also submitted duplicate Medicare claims for the services of Dr. Bhattio, a RIC physician, "as though the services had been provided at RIC," when in fact they had been provided at Dr. Mark Klisinger's Glendora clinic under an agreement whereby Dr. Klisinger billed Dr. Bhattio's services and paid half of the fees collected to RIC.  *See* FAC ¶¶ 132-133.

While Relators' allegations state a valid theory of FCA liability based on double billing or failure to return an overpayment, they fall far short of satisfying Rule 9(b)'s particularity requirement.  In particular, the Complaint contains no factual allegations about how RIC billed Dr. Bhattio's services "as though the services had been provided at RIC," or otherwise establishing that such duplicate billings were "fraudulent" as opposed to being a simple billing error.  In addition, the Complaint fails to identify any Medicare claims (whether by patient, service, or payment amount) submitted by both Dr. Klisinger and RIC for the same services of Dr. Bhattio and otherwise allege no facts plausibly establishing that duplicate claims were submitted for Medicare patients versus patients covered by Medi-Cal

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' FIRST AMENDED COMPLAINT

or a commercial plan.   Accordingly, Relators' FCA claim based on alleged duplicate Medicare claims for Dr. Bhattio's services fails to satisfy Rule 9(b).

### 8.   The Complaint Fails to State a Federal FCA Claim Based on CEES' Alleged Medicare Claims For Assistant Surgeon Services Not Performed

Relators also allege that CEES, an ophthalmology practice owned by Dr. Chang, billed Medicare for the assistant surgeon services of Dr. Lily Lee, Dr. Chang's spouse, during retinal surgeries even though she was not present and did not participate in the surgeries, and identifies seven CEES retinal surgery claims in 2012 and 2013 for which Dr. Lee's services were billed.  (FAC ¶¶ 139-142).

While these allegations come closest to stating a valid FCA claim, the Complaint contains no factual allegations establishing that such allegedly false claims were "knowingly" made within the meaning of the FCA.  While CEES's intent may be generally pleaded under Rule 9(b), Relators must still allege "sufficient facts to support an inference or render plausible" that CEES submitted claims that it knew were non-reimbursable and not simply the result of mere negligence or innocent billing error.  *U.S. ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984, 996-997 (9th Cir. 2011).   Here, the Complaint contains no factual allegations establishing that CEES had any knowledge or should have known that Dr. Lee did not participate as an assistant in the billed surgeries.  Absent any such allegations, Relators' FCA claim against CEES based on the billing of Dr. Lee's services fails to satisfy Rule 9(b).

### 9.   The Complaint Fails to State a Federal FCA Claim Based on Submission of Incomplete Data to the Medicare Physician Quality Reporting System

According to the Complaint, Defendants RIC and the RIC Partners also allegedly violated the FCA by retaining a supposed overpayment of $60,000 from CMS that was based on 4 months of supposedly incomplete data submitted by RIC to the Medicare PQRS in 2011 when RIC "purported to provide information for the

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' FIRST AMENDED COMPLAINT

entire year," and also allegedly provided PQRS data in 2012 that included information "for activities that had not actually occurred." *See* FAC ¶¶ 143-148.

Relator's allegations are insufficient to establish an FCA claim predicated on PQRS data reporting under Rule 12(b)(6) or Rule 9(b). The Complaint fails to include any factual allegations establishing that the 4 months of data submitted by RIC did not satisfy the reporting frequencies required for quality measures during the 12-month reporting period allegedly used, or how RIC "purported to provide" 12 months of data, but only provided four months of data to CMS, and why the $60,000 incentive payment received was an overpayment (versus a reduced payment) even if only 4 months of data was submitted. Nor does the Complaint explain how RIC's submission of incomplete data constituted a factually or legally false claim for the incentive payment received. Likewise, with respect to 2012 PQRS data, Relators fail to provide any factual specifics regarding which data allegedly submitted by RIC was for "activities that had not actually occurred." Such vague and conclusory allegations are insufficient to state a valid FCA claim.

B.   THE COMPLAINT FAILS TO STATE A VALID CALIFORNIA FCA CLAIM AGAINST DEFENDANTS

In addition to alleged violations of federal FCA, the Complaint also alleges two theories of liability under the California False Claims Act against various defendants. Once again, however, Relators' allegations fail to state a valid California FCA claim against any of the defendants under Rules 12(b)(6) and 9(b).

1.   The Complaint Fails to State A Valid California FCA Claim Against Defendants Based on Alleged Violations of the Medi-Cal Discriminatory Billing Rule

According to the Complaint, defendants RIC, SG-ASC, and CEES violated the California False Claims Act ("CA-FCA") by submitting Medi-Cal claims that violated Medi-Cal's discriminatory billing rule because defendants charged fees for cash-paying patients without insurance that were lower than the Medi-Cal reimbursement rates for those services. *See* FAC ¶¶ 143-155.

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

Under the Medi-Cal program, Title 22, California Code of Regulations ("C.C.R."), § 51450(a) provides that "[n]o provider shall bill or submit a claim for reimbursement for the rendering of health care services to a Medi-Cal beneficiary in any amount greater or higher than the usual fee charged by the provider to the general public for the same service." 22 C.C.R. § 51480(a). However, California Business & Professions Code § 657 expressly provides that California physicians may "grant discounts for health or medical care provided to any patient the health care provider has reasonable cause to believe is not eligible for, or is not entitled to, insurance reimbursement, coverage under the Medi-Cal program, or coverage by a health care service plan for the health or medical care provided" and that such discounted fees "shall not be deemed to be the health care provider's usual, customary, or reasonable fee for any other purposes, including, but not limited to, any health care service plan contract or insurance contract." Cal. Bus. & Prof. Code § 657(c).

In this case, Relators' CA-FCA claims for Medi-Cal discriminatory billing fail as a matter of law because defendants are expressly authorized to charge discounted fees (which may not be considered their usual fees) for uninsured patients who are not eligible for Medi-Cal and Relators allege no facts establishing that defendants' lower fees for "patients without any insurance, who paid for medical services in cash" were not so authorized. *See* FAC ¶ 151. Further, Relators' theory of liability assumes that that RIC's lower fee for uninsured cash paying patients is "the usual fee charged by the provider to the general public for the same service" without any factual allegations explaining why this counter-intuitive proposition is correct. Instead, the Complaint indicates that RIC treats a wide range of patients – including those covered by the Medi-Cal and Medicare programs and by private insurance plans with contractually negotiated rates, as well as uninsured self-paying and non-paying patients – and Relators have alleged no factual basis for simply concluding that RIC's lower fee for uninsured cash-

308363.1

31

paying patients is the usual fee charged to the general public.   Accordingly, Relators' CA-FCA claim based on alleged violations of the Medi-Cal discriminatory rule must be dismissed pursuant to Rules 12(b)(6) and 9(b).[22]

2. The Complaint Fails to State a California FCA Claim Based on Violations of Business & Professions Code § 654.2

Relators also allege that the RIC, the RIC Partners, CEES and SG-ASC violated the CA-FCA by submitting Medi-Cal claims when they supposedly failed to disclose the RIC Partners' investment interest in SG-ASC in violation of California Business & Professions Code § 654.2.   FAC ¶¶ 162-171.[23]

Relators' allegations fail to state a valid CA-FCA claim based on

---

[22] Relators also allege that RIC's usual charge for CPT code 67028 was $370.00, just over Medi-Cal's $364.11 reimbursement rate, even though RIC typically calculated its usual charge at 200% of the Medicare reimbursement rate, which would have been $250 for this code.   (FAC ¶ 152).   Even if true, the Complaint contains no allegations establishing that this RIC usual charge for this CPT code violates the Medi-Cal discriminatory billing rule when it is higher the Medi-Cal reimbursement rate or identifying any law or rule requiring RIC to calculate its usual charge in a particular manner for this or any other code.

[23] Section 654.2 provides that is unlawful for a physician "to charge, bill, or otherwise solicit payment from a patient on behalf of, or refer a patient to, an organization in which the licensee, or the licensee's immediate family, has a significant beneficial interest, unless the licensee first discloses in writing to the patient, that there is such an interest and advises the patient that the patient may choose any organization for the purpose of obtaining the services ordered or requested by the licensee." Cal. Bus. & Prof. Code § 654.2. The statute provides that disclosure may be provided by "a conspicuous sign in an area which is likely to be seen by all patients who use the facility or by providing those patients with a written disclosure statement." *Id.* In addition, the statute expressly provides that "[n]othing in this section shall be construed to serve as the sole basis for the denial or delay of payment of claims by third party payers," including "any health care service plan." *Id.*

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' FIRST AMENDED COMPLAINT

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

1  alleged violations of Section 654.2 because the statute expressly provides
2  that a violation cannot serve as "the sole basis" for the denial of a claim by a
3  health care service plan, which would include the Medi-Cal program, and
4  such violations are therefore not material to Medi-Cal's payment of claims
5  as a matter of law.  *See* Cal. Bus. & Prof. Code § 654.2.  In addition, as
6  previously discussed, the Complaint also violates Rule 9(b) by not including
7  any factual allegations establishing the nature of the RIC Partners'
8  "significant beneficial interest" in the SG-ASC center or that the brochure
9  advising patients to call the center to obtain ownership information did not
10 serve to fully disclose such interest.

   C.    RELATOR'S COMPLAINT FAILS TO STATE A CA-IFPA
         CLAIM BASED ON WAIVER OF CO-PAYS AND DEDUCTIBLES

12        The Complaint also alleges that RIC, the RIC Partners, CEES and SG-ASC
13 submitted false and fraudulent claims for patients covered by commercial health
14 plans (e.g., Empire BlueCross/ Blue Shield, Cigna and United Healthcare) in
15 violation of California Penal Code § 550 because defendants routinely waived the
16 deductible and co-payments amounts that they were obligated to charge patients
17 pursuant to the terms of their provider agreements and failed to disclose their usual
18 charges to these commercial health plans because they charged lower prices to
19 uninsured patients who paid in cash.  According to Relators, the State of California
20 is therefore entitled to civil penalties plus treble damages for each fraudulent claim
21 under Insurance Code § 1871.7.  FAC ¶¶ 158-160, 184-188.[24]

---

[24] Under CIFPA, Section 1871.7 of the Insurance Code authorizes Relators to bring
a *qui tam* action on behalf of the State of California to recover civil penalties (
$5,000 to $10,000) and an assessment of no more than three times the claimed
compensation against anyone who knowingly submits a false or fraudulent claim
for a health care benefit to an insurance company or knowingly makes a false or
misleading statement in support of such a claim in violation of Penal Code § 550.
Cal. Insurance Code § 1871.7; *see State ex rel. Wilson v. Superior Court*, 227
Cal.App.4th 579 (2014).

In this case, Relators' fraud allegations are woefully deficient under Rule 9(b). The Complaint alleges no facts establishing the specific provisions of RIC's alleged provider contracts with any commercial plans regarding co-payments and deductibles, and only lists four examples of plans that supposedly required payment of obligations as a condition of claim payment. Nor do Relators allege any facts establishing that RIC was not permitted to waive such commercial plan deductibles and co-payments for financial hardship or other circumstances. In addition, as previously discussed, RIC did not misrepresent their charges to any commercial plan because California law provides that discounts may be provided to uninsured patients and shall not be considered the provider's usual charge. Cal. Bus. & Prof. Code § 657(c). Most critically, the Complaint does not identify a single RIC claim to a commercial plan (whether by date, patient, service, amount or plan) where the patient's deductible or co-payment amount was improperly waived. Accordingly, under Rules 12(b)(6) and 9(b), Relator's CIFPA claim must also be dismissed for failure to state a claim or to allege fraud with particularity.

D.  THE COMPLAINT MUST BE DISMISSED BECAUSE IT CHARGES ALL DEFENDANTS IN EACH CAUSE OF ACTION

The Complaint must also be dismissed because its five causes of action impermissibly charge all defendants with violations of the FCA, CA-FCA and CA-IFPA without distinguishing between the eight theories of FCA liability and two theories of CA-FCA liability alleged or the alleged involvement or lack of involvement of each defendant in each different category of false claims.[25] Such indiscriminate grouping of defendants in a fraud case is impermissible and

---

[25] By way examples, (1) defendant Braun is charged in all five counts even though the factual allegations indicate that he was only supposedly involved in RIC's waiver of co-payments and deductibles and marketing activities, and (2) defendants SG-ASC and CEES are charged in the CA-IFPA count without any allegations that they had provider agreements with or submitted any claims to commercial plans.

308363.1                            34

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

independently run afoul of Rule 9(b).  *See Lubin v. Sybedon Corp.,* 688 F. Supp. 1425, 1443 (S.D. Cal. 1988).  Instead, where multiple defendants sued under the FCA, the complaint must *separately identify* the fraudulent conduct of each defendant.  *See Corinthian Colleges*, 665 F. 3d at 997-98; *Ebeid,* 630 F. 3d at 999; *Swartz*, 476 F. 3d at 764-65; *Grubbs*, 565 F. 3d at 190; *Remmes v. Internat'l Flavors & Fragrances, Inc.,* 389 F. Supp. 2d 1080, 1088 (N.D. Iowa 2005).  Here, the defendants are left to puzzle through the Complaint's factual allegations in order to try to figure out which of those allegations tie to their individual involvement in one or more of the five counts charged.  Such a "shotgun" complaint is impermissible under Rule 9(b).  *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001).

## V.   CONCLUSION

For the foregoing reasons, Relators' First Amended Complaint should be dismissed pursuant to Rules 12(b)(6) and 9(b) for failure to state a claim and to allege fraud with particularity.

DATED: December 19, 2016

Respectfully submitted,

NELSON HARDIMAN LLP


/S/ *M.S. Hardiman*
MARK S. HARDIMAN
Attorneys for Defendants

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064