1  Kolin C. Tang (SBN 279834)
   Shepherd, Finkelman, Miller & Shah, LLP
2  11755 Wilshire Boulevard, 15th Floor
   Los Angeles, CA 90025
3  Phone: (323) 510-4060
   Fax: (866) 300-7367
4  Email: ktang@sfmslaw.com

5  Attorneys for Plaintiffs-Relators

6  [Additional Counsel Listed On Signature Page]

7

8  **IN THE UNITED STATES DISTRICT COURT**

   **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
9

10 UNITED STATES OF AMERICA,      )
   and STATE OF CALIFORINA, *ex rel*  )    CIVIL ACTION NO.:
   BOBBETTE A. SMITH and          )    2:13-cv-3772-DMG (MRWx)
11 SUSAN C. ROGERS,               )
                                  )    (Assigned to the Honorable Dolly M. Gee)
12         Plaintiffs-Relators,   )
                                  )    **SECOND AMENDED COMPLAINT**
13 vs.                            )    **PURSUANT TO THE FEDERAL**
                                  )    **FALSE CLAIMS ACT, 31 U.S.C.**
14 TOM S. CHANG, M.D.,            )    **§§ 3729, *ET SEQ.*, THE**
   TOM S. CHANG, M.D., INC.,      )    **CALIFORNIA FALSE CLAIMS ACT,**
15 MICHAEL A. SAMUEL, M.D.,       )    **CAL. GOVT. CODE §§ 12650, *ET SEQ.***
   MICHAEL J. DAVIS, M.D.,        )    **AND THE CALIFORNIA INSURANCE**
16 RETINA INSTITUTE OF CALIFORNIA )    **FRAUDS PREVENTION ACT, CAL.**
   MEDICAL GROUP, CALIFORNIA EYE  )    **INSURANCE CODE § 1871.7**
17 AND EAR SPECIALISTS, a/k/a     )
   OCULAR INSTITUTE OF CALIFORNIA, )
18 BRETT BRAUN and SAN GABRIEL    )    **JURY TRIAL DEMANDED**
   AMBULATORY SURGERY CENTER LP,  )
19                                )
                                  )
20         Defendants.            )
   _____)

21        On behalf of the United States of America ("United States") and the State of

22  California ("California"),  Plaintiffs-Relators, Bobbette A. Smith ("Plaintiff-Relator Smith") and

23 Susan C. Rogers ("Plaintiff-Relator Rogers") (collectively, "Plaintiffs-Relators" or "Plaintiffs"),

24 file this Second Amended Complaint ("Complaint") against Defendants and allege as follows:

25

26

27 CIVIL ACTION NO.:
   2:13-cv-3772-DMG (MRWx)
28 SECOND AMENDED COMPLAINT

## I.   PRELIMINARY STATEMENT

1.      The Plaintiffs-Relators bring this Complaint seeking damages and civil penalties against Tom S. Chang, M.D. ("Dr. Chang"), Tom S. Chang, M.D., Inc. ("Dr. Chang Inc."), Michael A. Samuel, M.D. ("Dr. Samuel"), Michael J. Davis, M.D. ("Dr. Davis") (collectively "RIC Partners"), Brett Braun ("Braun"), Retina Institute of California Medical Group, ("RIC", and with RIC Partners, the "RIC Defendants"), California Eye and Ear Specialists ("CEES" or "California Eye and Ear") and San Gabriel Ambulatory Surgery Center LP, ("SG-ASC" or "San Gabriel Surgery Center")(collectively "Defendants"), for violations of the United States False Claims Act ("FCA" or "Federal FCA"), 31 U.S.C. §§ 3729, *et seq.*, the Anti-Kickback Statute (the "AKS"), 42 U.S.C. § 1320a-7b, the California False Claims Act ("CA-FCA" or "State FCA"), Cal. Gov. Code §§12650, *et seq.*, and the California Insurance Frauds Prevention Act, Cal. Insurance Code §1871.7 ("CA-IFPA" or "State Insurance Fraud Law"), based on schemes to defraud the United States and California in connection with government-funded health care programs, namely the federal Medicare Program, Title XVIII of the Social Security Act ("Medicare"), 42 U.S.C. §§ 1395, *et seq.*, and the federal Medicaid Program ("Medicaid"), 42 U.S.C. §§ 1396, *et seq.*, and California's corresponding Medicaid Program ("Medi-Cal").

2.      As set forth more fully below, Plaintiffs-Relators allege in this action that Defendants engaged in multiple fraudulent schemes, each resulting in the submission of false and fraudulent claims for reimbursements from Medicaid, Medicare and/or Medi-Cal.

3.      In the one scheme, RIC Defendants provided kickbacks to Medicare beneficiaries by routinely waiving their co-payments, which is the amount the beneficiaries were required to pay for services rendered, without an individualized determination of financial hardship or exhaustion of reasonable collection efforts.  In addition, even though Defendants

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -2-

waived the co-payments, it included the co-payment amounts in billings submitted to Medicare for reimbursement, thereby falsely inflating its bills to Medicare for those services.

4.      In the another scheme, RIC Defendants submitted claims for Medicare, Medicaid and Medi-Cal reimbursements for Current Procedural Terminology ("CPT") billing codes 99204, 99214, 99215 and 92240, even though these services (i) were not medically necessary, (ii) were not actually performed, (iii) were not documented in the medical record, and/or (iv) failed to otherwise comply with Medicare, Medicaid and Medi-Cal rules and regulations.  RIC submitted thousands of fraudulent claims to Medicare, Medicaid and Medi-Cal, and was paid based on each of those claims.

5.      As described more fully below, Defendants engaged in multiple acts of additional fraud, all of which they utilized to aggressively build their business (quadrupling in size in four short years from 2009 to 2012) in a highly competitive market.  The secret to Defendants' success is simple: engaging in multiple and consistent acts of fraudulent and unscrupulous business practices centered upon submitting false claims to the United States government and the State of California, as well as private insurers.

## II.    JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.  This Court has supplemental jurisdiction over the counts relating to the CA-FCA and CA- IFPA pursuant to 28 U.S.C. § 1367.

7.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in, reside, or transact business in this District. Additionally, this Court has personal jurisdiction over Defendants because acts prohibited by 31 U.S.C. § 3729 occurred in this District.

8.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT            -3-

Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

9.      Plaintiffs-Relators have complied with all procedural requirements of the laws under which this case is brought.

10.     Plaintiffs-Relators' claims and this Complaint are not based upon allegations or transactions that are the subject of a civil suit or an administrative civil monetary penalty proceeding in which the Government is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

11.     Plaintiffs-Relators are the original source of the information upon which this Complaint is based and the facts alleged herein, as that phrase is used in the FCA and other laws at issue in this Complaint.

12.     Plaintiffs-Relators bring this action based on their direct knowledge and, where indicated, on information and belief.  None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. §3730(e)(4).

### III.    PARTIES

13.     Plaintiff-Relator Smith is a resident of the State of Nevada.  She has a B.A. in Business Administration from the University of North Florida, a Master of Science in Logistics Management from the Florida Institute of Technology, and a Master of Health Care Administration from Baylor University.  She has over thirty years of experience in the health care industry, including experience with federal and state funded healthcare programs in multi-physician medical practices.  Plaintiff-Relator Smith was recruited and hired by Dr. Chang in June of 2012 to serve as the Chief Operating Officer ("COO") of RIC.  Plaintiff-Relator Smith served as RIC's COO for six months until she resigned in January, 2013.

14.     Plaintiff-Relator Rogers is a resident of the State of Arizona.  She has over twenty years of experience in the area of medical billing and coding, including for federal and state funded healthcare programs in multi-physician offices.  She has received numerous certifications

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -4-

in CPT Coding and Billing and Ophthalmic Coding and Reimbursement and was hired by RIC in June, 2012, at the recommendation of Plaintiff-Relator Smith, to be the Billing Department Manager of RIC.  Plaintiff-Relator Rogers served in that position for six months until she resigned in January 2013.

15.     Plaintiffs-Relators bring this action on behalf of the United States as plaintiff, which seeks relief on behalf of the Department of Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS") and federally-funded programs including Medicare and Medicaid.

16.     Plaintiffs-Relators also bring this action on behalf of the State of California as plaintiff, which seeks relief on behalf of the California Department of Health Care Services and its Medi-Cal program.

17.     Defendant, RIC, is a retina sub-specialty ophthalmology practice with 35 offices and approximately 20 Medicare Provider Physicians ("Provider Physicians") licensed to practice medicine in California.  RIC is registered as medical partnership owned by its partners Defendants Chang, Samuel and Davis and Tom S. Chang, M.D., Inc.  RIC was founded by Dr. Chang in or around 2006 and  has a current place of business at 100 E. California Boulevard, Pasadena, CA 91105.

18.     Defendant, Dr. Chang, is a Canadian-trained ophthalmologist licensed to practice medicine by the State of California whose clinical interests include macular degeneration and diabetic retinopathy.  At all pertinent times, Dr. Chang was the majority owner and controlling partner at RIC and received the vast majority of the partnership distributions from RIC, as well as the majority of the compensation derived by all physicians employed by RIC.  Dr. Chang controls, directs and supervises the day to day practice of medicine at RIC.  Dr. Chang maintains an office at 100 E. California Boulevard, Pasadena, CA 91105.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -5-

19.     Defendant, Dr. Chang Inc., is a management company owned by Dr. Chang with an office at 100 E. California Boulevard, Pasadena, CA 91105.  Dr. Chang receives 10% of all of RIC's collectibles as his management fee through Chang Inc.  Chang, Inc. earns in excess of $1 million per year in such management fees for Dr. Chang.

20.     Defendant, Dr. Samuel, is RIC's Chief Medical Director and is an ophthalmologist licensed by the State of California who maintains an office at 100 E. California Boulevard, Pasadena, CA 91105.

21.     Defendant, Dr. Davis, is RIC's Fellowship and Educational Director and is an ophthalmologist licensed by the State of California who maintains an office at 100 E. California Boulevard, Pasadena, CA 91105.

22.     Defendant, CEES, is an ophthalmology practice owned by Dr. Chang.  CEES includes a practice known as Ocular Institute of California ("OIC"), which was formerly owned by Dr. Stephen Ma that was purchased by Dr. Chang in 2011.  For a time, CEES continued to bill Medicare for some patients using the tax identification number of Dr. Ma and/or OIC.  In 2012, CEES was carried on RIC's balance sheet as owing RIC receivables of $674,078.44.  CEES has the same current place of business as RIC, 100 E. California Boulevard, Pasadena, CA 91105.  At all pertinent times, CEES acted and functioned as the alter ego of and as an integrated enterprise with RIC.

23.     Defendant, Braun, is a former California resident and the former CEO of Retina Institute.  His principal place of business was 301 West Huntington Drive, Suite 107, Arcadia, California 91007.  Braun is currently a resident of the Commonwealth of Pennsylvania.  Braun's principal task at RIC was to increase patient referrals, including Medicare Part B patient referrals.

24.     Defendant, SG-ASC, is a limited partnership organized under the laws of the State of California with an address at 207 S. Santa Anita Avenue, Suite G16, San Gabriel, California.  SG-ASC provides multi-speciality outpatient surgical services, including ophthalmology

services, and receives Medicare patient referrals from CEES.  In 2012, SG-ASC was carried on RIC's balance sheet as owing RIC receivables of $593,247.27.  At all pertinent times, SG-ASC acted and functioned as the alter ego of and as an integrated enterprise with RIC.

## IV.   GOVERNMENT-FUNDED HEALTHCARE PROGRAMS

### A.   Overview of Medicare

25.     In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. §1395, *et seq.*, known as the Medicare Program, as part of Title XVIII of the Social Security Act, to pay for the costs of certain health care services.  Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease.  *See* 42 U.S.C. §§426, 426-1. The regulations implementing the Medicare Program are found at 42 C.F.R. §409, *et seq*.

26.     HHS is responsible for the administration and supervision of the Medicare Program.  CMS is a component of HHS and is directly responsible for the administration of the Medicare Program.  Medicare Part B covers physician services as well as a variety of "medical and other health services."  *See* 43 U.S.C. §§1395j-1395w-4.  The allegations herein involve Part B services billed by the Defendants to Medicare.

27.     To participate in the Medicare program, a provider of services must file a provider agreement with the Secretary of HHS.  42 U.S.C. §1395cc.  The provider certifies that he is knowledgeable of Medicare requirements on his Medicare provider enrollment form.  The provider agreement requires compliance with the requirements that the HHS Secretary deems necessary for participation in the program.  *Id.*

28.     In submitting Medicare claim forms, providers must certify: (1) that they are knowledgeable of Medicare requirements; (2) that the information included on the form presents an accurate description of the services rendered; and (3) that the services were medically indicated and necessary for the health of the patient.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -7-

29.     Part B of the Medicare Program is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury.  Eligible individuals who are aged 65 or older or disabled may enroll in Part B to obtain benefits in return for payments of monthly premiums as established by HHS.  Payments under the Medicare Program are often made directly to service providers such as physicians, rather than to the patient/beneficiary.  This occurs when the provider accepts assignment of the right to payment from the beneficiary.  In that case, the provider bills the Medicare Program.

30.     Part B of the Medicare Program covers certain facility use and medical services provided to qualified patients/beneficiaries, including outpatient services such as the services rendered by Defendants.

31.     The United States provides reimbursement for Medicare claims from the Medicare Trust Fund through CMS.  To assist in the administration of Part B of the Medicare Program, CMS contracts with Medicare Administrative Contractors (MACs).   MACs process the reimbursement of claims for Part B services submitted by Defendants on Form 1500 to Medicare.

32.     Medicare and other government-funded healthcare programs pay only for those services that meet appropriate medical necessity standards, and providers may not bill for services that do not meet the applicable standards set by Medicare for medical necessity.  *See* 42 U.S.C. §1395y(a)(1)(A); 42 C.F.R. §411.15(k)(1); Medicare Carrier's Manual §2049 (Medicare and other federal healthcare programs only cover medical services that are "reasonable and necessary for the diagnosis or treatment of illness or injury"); *see* California Welfare and Institutions Code Sec. 14133.3.

33.     Accordingly, providers may only submit claims for Medicare reimbursement for "reasonable and necessary" medical services.  In submitting claims, providers make certain express certifications, including any assurance that the services were "provided economically and

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -8-

only when, and to the extent, medically necessary."  42 U.S.C. §1320c-5(a)(1); *see also* 42 U.S.C. §1395n(a)(2)(B) (to receive payment for claims providers must certify that services were "medically required").  Additionally, each time a provider submits a claim, the provider impliedly certifies that the service was provided in accordance with Federal and State statutes, regulations, and program rules.

34.    Similarly, a claim for "worthless" medical care violates the federal False Claims Act ("FCA") because the government believes it is paying for services or items that have medical value when, in fact, the services or items are essentially worthless.  *See Mikes v. Straus*, 274 F.3d 687, 702-4 (2d Cir. 2001); *US v. Smithkline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001).

35.    Defendants were required to comply with all the applicable statutes, regulations and guidelines in order to be reimbursed by Medicare Part B, and had a duty to be knowledgeable of the statutes, regulations and guidelines regarding coverage and payment for Medicare services. Defendants certified that they were knowledgeable of Medicare requirements on their Medicare provider enrollment forms and on each CMS Form 1500 they submitted to Medicare.

### B.    The Medicaid Program

36.    Medicaid was created on July 30, 2965, through Title XIX of the Social Security Act.  Medicaid is a cooperative federal-state program through which the federal government provides financial assistance to states so that they may furnish medical care to needy individuals. 42 U.S.C. § 1396, *et seq.*

37.    Each state administers its own Medicaid Program.  However, each state program is governed by federal statutes, regulations and guidelines.  The federal portion of a state's Medicaid payments -- the Federal Medical Assistance Percentage -- is based on the state's per capita income compared to the national average.  During the relevant time period, the Federal Medicaid Assistance Percentage for California was in the range of 50% to 65%.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -9-

38.     The law requires state Medicaid plans to execute written agreements between the Medicaid agency and each provider furnishing services under the plan ("provider agreements"). 42 C.F.R. §431.107(b).

39.     Doctors Chang, Samuel and Davis and the Provider Physicians (collectively, "Providers"), all of whom are employed by RIC as "providers," signed provider agreements (the "Medi-Cal Provider Agreements") with the California Medicaid program, Medi-Cal.

## C.     The California Medicaid Program: "Medi-Cal"

40.     The California Department of Health Care Services ("DHCS") (formerly the California Department of Health Services ("DHS")) enacts regulations for California's State Medicaid program, Medi-Cal.  As participating Medi-Cal providers, the Providers were and are subject to DHCS regulations that require them to provide services to Medi-Cal patients at their most favorable rates.  California Code of Regulations, title 22, section 51480 (a) requires as follows:

(a)     No provider shall bill or submit a claim for reimbursement for the rendering of health care services to a Medi-Cal beneficiary in any amount greater or higher than the usual fee charged by the provider to the general public for the same service.

41.     Medi-Cal Provider Agreements also require, consistent with the program's public purposes, that the Provider Defendants charge their lowest fees to DHCS and refrain from conduct that would harm the Medi-Cal program or its beneficiaries.  Among other commitments, Provider Defendants agreed to do all of the following:

**Compliance with Laws and Regulations.**  Provider agrees to comply with all applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code (commencing with Sections 14000 and 14200), and any applicable rules or regulations promulgated by DHS pursuant to these chapters. . . .

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -10-

**Forbidden Conduct.**  Provider agrees that it shall not engage in conduct inimical to the public health, morals, welfare and safety of any Medi-Cal beneficiary, or the fiscal integrity of the Medi-Cal program.

.  .  .

**Provider Fraud and Abuse.**  Provider agrees that it shall not engage in fraud or abuse.

.  .  .

**Prohibition of Rebate, Refund or Discount.**  Provider agrees that it shall not offer, give, furnish, or deliver any rebate, refund, commission, preference, patronage dividend, discount, or any other gratuitous consideration, in connection with the rendering of health care services to any Medi-Cal beneficiary.  Provider further agrees that it shall not solicit, request, accept, or receive, any rebate, refund, commission, preference, patronage dividend, discount, or any other gratuitous consideration, in connection with the rendering of health care services to any Medi-Cal beneficiary.  Provider further agrees that it shall not take any other action or receive any other benefit prohibited by state or federal law.

42.    In other words, the Providers agreed to bill Medi-Cal at their lowest rates, not to give or take kickbacks, and to conduct their business relationship with DHCS with a view to the program's public purpose and the welfare of California's medically indigent citizens.

43.    To seek reimbursement for treatment of a patient, a provider participating in Medi-Cal submits a claim to the contractor that administers the Medi-Cal program.  In seeking reimbursement, the provider must state his/her charge for the particular service provided.

44.    Using state funds, Medi-Cal pays a claim if the beneficiary is eligible, the provider is authorized to bill Medi-Cal, the service is covered by Medi-Cal, and no information

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -11-

known to the Medi-Cal program indicates the claim is otherwise improper or in violation of billing rules. Medi-Cal receives reimbursement from the federal government for the federal share of the Medi-Cal expenditures. The claims that have been submitted to Medi-Cal are used to support the provider's reimbursement request. In this way, if a provider submits a fraudulent claim to Medi-Cal, s/he has caused a false claim to be submitted to both California and the federal government.

## V.   **APPLICABLE LAW**

### A.   **The Federal False Claims Act**

45.     The federal FCA provides, *inter alia*, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

46.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

47.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -12-

1  or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of

2  the money or property which is requested or demanded . . . ."  31 U.S.C. §3729(b)(2)(A)(i)-(ii).

3          **B.**    **The Federal Anti-Kickback Statute**

4        48.    The AKS arose out of congressional concern that remuneration provided to those

5  who can influence healthcare decisions would result in goods and services being provided that

6  are medically unnecessary, of poor quality, or harmful to a vulnerable patient population.  To

7  protect the Medicare and Medicaid programs from these harms, Congress enacted a prohibition

8  against the payment of kickbacks in any form.  First enacted in 1972, Congress strengthened the

9  statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not

10  evade its reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§242(b) and (c);

11  42 U.S.C. §1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-

12  142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

13        49.    The AKS prohibits knowingly and willfully offering, paying, soliciting or

14  receiving remuneration to any person to induce such person to order or receive any items or

15  service for which payment may be made under a federal healthcare program unless the

16  arrangement fits within a regulatory safe harbor.  The AKS is violated if "one purpose" of the

17  remuneration is to induce federal program business.  *United States v. Greber*, 760 F.2d 68 (3rd

18  Cir. 1985). Violations may result in a five year prison term, $25,000 criminal penalty, $50,000

19  administrative penalty, treble damages, and exclusion from Medicare and Medicaid. ( 42 CFR

20  1003.102.)

21        50.    Medicare, Medicaid and Medi-Cal (individually and collectively, the

22  "Government Healthcare Program(s)"), require every provider or supplier to ensure compliance

23  with the provisions of the AKS and other federal laws governing the provision of healthcare

24  services in the United States.  Compliance with the AKS is expressly and impliedly required for

25  reimbursement of Government Healthcare Programs federal program claims, and claims made in

26

27  CIVIL ACTION NO.:
    2:13-cv-3772-DMG (MRWx)

28  SECOND AMENDED COMPLAINT    -13-

violation of the law are actionable civilly under the False Claims Act.  *See* 42 U.S.C. §
1320a-7b(g) (2010) (a "claim that includes items or services resulting from a violation of . . . [the
AKS] constitutes a false or fraudulent claim for purposes of [the FCA]. . . .").  Further, the
United States has deemed violations of the AKS to be material to its decision to pay health care
claims, demonstrated in part through the requirement that providers and suppliers certify
compliance with the AKS as a condition of payment under Government Healthcare Programs.  If
the United States had been aware that the claims discussed herein resulted from conduct that
violated the AKS, the United States would not have paid the claims submitted in connection with
the Defendants' unlawful conduct.

51.    A violation of the AKS is a violation of the federal FCA.  The FCA, 31 U.S.C.
§ 3729, provides, in pertinent part, that:

(a) Any person who (1) knowingly presents, or causes to be presented, to an officer or
employee of the United States Government or a member of the Armed Forces of the
United States a false or fraudulent claim for payment or approval; (2) knowingly makes,
uses, or causes to be made or used, a false record or statement to get a false or fraudulent
claim paid or approved by the Government; (3) conspires to defraud the Government by
getting a false or fraudulent claim paid or approved by the Government;

\* \* \*

is liable to the United States Government for a civil penalty of not less than $5,000 and
not more than $10,000, plus 3 times the amount of damages which the Government
sustains because of the act of that person.

52.    The Patient Protection and Affordable Care Act ("PPACA"), Public Law No.
111-148, § 6402(g), amended the federal healthcare AKS, 42 U.S.C. § 1320a-7b(b), to
specifically allow "anti-kickback" violations to be enforced under the FCA.  The PPACA also
amended the Social Security Act's "intent requirement" to make clear that violations of its

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -14-

1   anti-kickback provisions, like violations of the FCA, may occur even if an individual does "not

2   have actual knowledge" or "specific intent to commit a violation."   Public Law No. 111-148, §

3   6402(h).  Therefore, in order to establish a willful violation of the AKS, the Plaintiff-Relators

4   need not prove that Defendants had actual knowledge of or a specific intent to violate the AKS.

5   *See* 42 U.S.C. § 1320a-7b(h).

6       53.    The AKS contains statutory exceptions and certain regulatory "safe harbors" that

7   exclude certain types of conduct from the reach of the statute.  *See* 42 U.S.C. § 1320a-7b(b)(3).

8   None of the AKS statutory exceptions or regulatory safe harbors protect Defendants from

9   liability for the conduct alleged herein.

10      **C.    The California False Claims Act**

11      54.    The CA-FCA is modeled after the federal FCA and contains provisions similar to

12  those quoted in paragraphs 44-46 above.  Relators assert claims under the CA-FCA for

13  Defendants' false and fraudulent claims made to the California Medicaid program as alleged

14  herein.  *See also* Cal. Bus. & Prof. Code § 650 and § 650.1, and Cal. Welfare & Inst. Code §

15  14107.2.

16      **VI.    DEFENDANTS' CO-PAYMENT WAIVER SCHEME**

17      **A.    Co-payment Waivers As Inducement to Medicare Patients**

18      55.    Medicare generally covers 80% of the "reasonable charges" billed by the

19  provider for the Medicare-approved health services provided to a patient.  42 U.S.C. §

20  1395(a)(1). Accordingly, the patient is normally required to contribute the remaining 20% as a

21  co-payment.  42 U.S.C. § 1395cc(a)(2)(A)(ii).

22      56.    Waiver of co-payments in consideration of a particular patient's financial hardship

23  is permitted in exceptional circumstances.  The hardship exception, however, must not be used

24  routinely; it should be used occasionally to address the special financial needs of a particular

25  patient, supported by documentation of financial hardship.  Except in such special cases, a good

26

27  CIVIL ACTION NO.:
    2:13-cv-3772-DMG (MRWx)

28  SECOND AMENDED COMPLAINT        -15-

faith effort to collect deductibles and co-payments must be made.

57. The Office of Inspector General ("OIG") has interpreted the AKS to apply to waiving patient cost sharing amounts if "one purpose" of the waiver is to induce or reward federal program business. *See* OIG, Special Fraud Alert: Routine Waivers of Co-payments or Deductibles under Medicare Part B (May 1991).

58. In addition, 42 U.S.C. 1320a-7a(a)(5) prohibits a person from offering or transferring remuneration to a beneficiary that such person knows or should know is likely to influence the beneficiary to order items or services from a particular provider or supplier for which payment may be made under any federal health care program. "Remuneration" is defined as including a waiver of coinsurance and deductible amounts, with exceptions for certain financial hardship waivers, which are not prohibited.

59. Over two-thirds of RIC's patients are covered by Medicare Part B.

60. The average Medicare co-payment a patient would be required to pay RIC is $90-100 per visit.

61. It is RIC's policy and practice to routinely waive co-payments without making an individualized determination of financial hardship or exhausting reasonable collection efforts.

62. RIC waives co-payments for various reasons, including for individuals who sought frequent medical services, who had a high balance, whose insurance did not pay certain amounts, or who expressed an inability to pay. None of these reasons is an allowable exception. Additionally, RIC consistently waived the co-payments without receiving any supporting documentation or additional information from the patients for whom co-payment waivers were made.

63. RIC notes the waiver of these co-payments in its billing system using terms such as "financial hardship" or "balance write off," often with notations such as "w/o [written off] per doctor" or "per Dr. Chang."

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT        -16-

64.     Shown in the chart below is a sample of Medicare patients whose co-payments were not collected by RIC for any of their visits/encounters, and for which RIC records do not contain any documentation explaining the reasons for the co-payment waivers:

| RIC PATIENT | Treatment Period | # Encounters | MEDICARE CHARGE |
|---|---|---|---|
| LMG | OCT-NOV 2012 | 6 | $21,123 |
| WMC | OCT 2012 | 2 | $ 3,082 |
| AV | AUG-NOV 2012 | 12 | $11,966 |
| HJJ | JULY-NOV 2012 | 7 | $ 5,653 |
| HB | FEB-OCT 2012 | 10 | $15,909 |
| CA | JAN-NOV 2012 | 4 | $ 1,141 |
| JG | JULY-AUG 2012 | 2 | $ 1,030 |
| JB | MAY 09-JAN 2010 | 10 | $12,641 |
| LN | AUG 08-JULY 2010 | 10 | $ 7,691 |
| CYS | SEPT 09-OCT 2012 | 10 | $11,246 |

Claims for payment were made by RIC to Medicare for the full amount of the services provided to these patients.

65.     While RIC has a "Statement of Financial Hardship" form, conspicuously missing from the form is language requesting a waiver of  Medicare co-payments and a request for an explanation of the patient's financial hardship.  Instead, the form contains a request that RIC "reduce their usual and customary charges in order to allow me to receive care required by my current health care condition,"  and then the patient is required to insert the dollar amount s/he believes s/he can afford to pay RIC.  In addition, one option the patient is given on the form to establish "hardship" is "retired, fixed income"; this option makes the form a meaningless exercise to excuse Medicare co-payment waivers because nearly 100% of RIC's Medicare patients would fit this category.  Also, a review by Plaintiffs-Relators of the hardship forms in

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -17-

1    RIC records revealed that most were incomplete or missing critical financial information, thereby

2    rendering the forms even more useless.  Finally, no financial review was ever performed by

3    anyone at RIC to determine the patient's inability to afford the co-payment and, on the contrary,

4    Plaintiffs-Relators were specifically instructed by Dr. Chang not to attempt to collect these co-

5    payments.

6          66.    Plaintiff-Relator Smith was hired by Dr. Chang in June 2012 primarily to increase

7     RIC's collectibles.  In the course of her first three months at RIC, she became concerned about

8    RIC's practice of waiving patient co-payments.  In September 2012, she shared her concerns in a

9    report to the three RIC partners in which she advised them as follows:  "We do not need to be in

10    the business of writing-off deductibles and co-insurance as there are many adverse consequences

11    to those actions." She received no response to this advice.

12          67.    On September 25, 2012, RIC held a senior management meeting that was attended

13    by Plaintiffs-Relators, the three RIC Partners and three RIC Providers: Drs. Bhatti, Hau and Lin.

14    Plaintiffs-Relators gave a billing report presentation at this meeting and specifically advised the

15    doctors that they should discontinue their practice of routinely waiving and writing off Medicare

16    co-payments without any proper verification of financial hardship.  To their surprise, instead of

17    discussing the issue, Dr. Chang told the group that if Medicare found out about their routine

18    waiver practice, he was prepared to pay the fines rather than lose Medicare patients and referrals.

19    Dr. Chang's response was alarming because he had served as the Medicare Compliance Officer

20    at the University of Southern California School of Medicine's Department of Ophthalmology.

21    The Provider Physicians appeared concerned and indicated that they wanted more information

22    about the issue, but rather than continue the discussion at that meeting, it was agreed to continue

23    the discussion at the following week's Executive Committee meeting (a meeting of the senior

24    executives and the three Partners, Drs. Chang, Davis and Samuel).  However, the issue was not

25

26

27    CIVIL ACTION NO.:
        2:13-cv-3772-DMG (MRWx)

28    SECOND AMENDED COMPLAINT      -18-

1   discussed at the next or any other Executive Committee meeting because the periodic billing

2   report was removed from the Executive Committee meeting agendas permanently.

3          **B.**     **Co-Payment Waivers As Inducement for Patient Referrals**

4         68.     In order to obtain Medicare patient referrals from optometrists and other

5   ophthalmologists who do not perform the same types of retina procedures performed by RIC ,

6   RIC physicians were instructed by the RIC Partners to inform referring physicians that RIC

7   waived co-payments and deductibles for Medicare patients.

8         69.     As CEO, Braun's primary duty was to market RIC to physicians for their patient

9   referrals, including Medicare patients.  In his 2012 Year in Review Report to the RIC Executive

10   Committee, Braun noted that, for 2012, there were 3,937 new patients, 2,568 of whom came

11   from referring doctors.

12        70.     Braun provided each Provider Physician a target list of doctors in their

13   geographical area from whom they were expected to solicit referrals and with whom they were

14   expected to schedule at least one lunch and one dinner per month.  As Braun told the doctors on

15   August 9, 2012, the "Goal is to have everyone to have one day/week to schedule lunches."  He

16   also advised the Executive Committee that "each doctor will be given a list of 20 other doctors to

17   call each month."  Fifty-six lunches and dinners occurred in September, 2012 alone as part of this

18   referral marketing effort.

19        71.     RIC also sponsors a large continuing medical education program called

20   Okularfest, where attendees then become targets for possible patient referral with the inducement

21   of the Medicare co-payment waiver.

22        72.     Referred patients are induced to go to Defendants' practice not because they are

23   choosing a physician who best serves their needs based on medical factors, but, rather,

24   because they will not incur any out-of-pocket expenses in connection with RIC's services.

25

26

27   CIVIL ACTION NO.:
     2:13-cv-3772-DMG (MRWx)

28   SECOND AMENDED COMPLAINT     -19-

73.     An example of a referring physician who expected and was assured that RIC would waive the Medicare co-payments for his patients is Dr. Michael R. Rose, who had a general ophthalmology practice located across the street from RIC's Lincoln Heights location. When Plaintiff-Relator Smith began to work at RIC, she was told by RIC Physician Provider Dr. Kristy Lin, that Dr. Rose expected co-pays for Medicare patients to be waived and that he would not refer patients if co-payments were not waived.  When Plaintiff-Relator raised concerns with Dr. Chang about this practice, he confirmed that Dr. Rose refused to make referrals if co-payments were not waived.  In fact, RIC's records for Dr. Rose's referred Medicare patients reveal that RIC did not collect co-payments from any of these patients, and total receipts for these patients reflect that RIC received only 80% of the Medicare allowable amount.  These records also reveal that the patients' co-payments were waived without regard to financial hardship criteria.  Dr. Rose became an employee of CEES in 2012, and he continued to make Medicare patient referrals to RIC.

74.     Plaintiff-Relator Rogers also spoke with RIC Physician Provider Dr. Suk, who worked at the RIC Garden Grove office that received a significant volume of Medicare referrals. Plaintiff-Relator Rogers advised Dr. Suk that he should not be routinely waiving payment of the co-payments, but he insisted that the waivers continue so that referrals would continue to be received from the referring doctors.

75.     In sum, from at least 2006 and continuing to the present, in violation of FCA, CA-FCA and AKS, Defendants knowingly and routinely waived co-payments owed by Medicare Part B beneficiaries in order to unlawfully induce them to use their services and in order to continue to attract new Medicare patients and receive referrals from other eye care physicians.

76.     Defendants submitted, or caused to be submitted, claims for payment to Medicare for services rendered to each of the Medicare beneficiaries who had their co-payments waived, which were accompanied by an express or implied certification that the transaction was not in

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -20-

violation of federal or state statutes, regulations, or program rules.  Each of those certifications was false, because each claim for payment was tainted by the kickbacks detailed in this action.

### C.  Defendants Obtain Referrals That Violate the Anti-Kickback Statute and the Anti-Self-Referral Laws

77.   In or about June, 2012, RIC entered into a co-marketing agreement with and/or made a loan to a business known as RIC Diagnostics ("RICX"), whose president is Dan Bienenfeld.  Upon information and belief, RICX is a corporate entity that is related to RIC and in which Dr. Chang maintains a financial interest.  In return, RICX is expected to funnel referrals from optometrists to RIC.  RIC is aware that payments for services rendered to some of the referred patients will be made by Medicare.

78.   RICX was a regular topic at the weekly Executive Committee meetings, which are attended by the RIC Partners and the senior Providers of the practice.  Dr. Chang was very focused on the referrals to be received from this venture.  On June 26, 2012, he asked for an update; he said he wanted to see "specific referrals from RD 2020 DX [RICX]."  On July 24, 2012, he requested a report of how many patients had been referred by RICX.  He repeated these comments on August 7, 2012.  He stated he wanted a written summary from Dan Bienenfeld of "how many patients seen and how many referral [sic]" to RIC.  RICX operates a mobile optical coherence tomography ("OCT") device used to diagnose various conditions of the retina.  RICX brings the equipment to the optometrist's office, charging him/her a per use fee.  In turn, the optometrist bills the patient or the patient's insurer a higher fee for the test that uses the OCT equipment.

79.   RICX actively encourages optometrists to refer patients to RIC.  The optometrists are provided with a referral form to complete when they send the patient to RIC after RICX's OCT is used for diagnostic purposes.

80.   RIC physicians train optometrists, at no charge, how to read the OCT images at 2-3 hour workshops for optometrists.

81.     The optometrists are also told that RIC ophthalmologists will interpret the image free of charge if requested to do so by the optometrists.  Obviously, the expectation is that once an RIC doctor has looked at the image, he or she would handle any retina condition that was discovered.

82.     RICX received considerable attention as part of RIC's overall marketing efforts. The minutes of the weekly doctors' telephone meeting of July 28, 2012 state "Plan for webinar with Dan [Bienenfeld] July 10th to learn about OCT diagnostics, also plan for OCT workshops after."  The webinar was attended by all the Providers.  The Providers were also given RICX brochures to hand out to optometrists.

83.     RIC advertised the services of RICX by a blast email sent to over 1700 people in August 2012.

84.     At a meeting on August 9, 2012, Braun told the Providers that "RIC has had large financial and [sic] Commitment to this project—everyone should strongly promote this service." In other words, the RIC doctors are supposed to contact optometrists and encourage them to use the RICX service, which will in turn general referrals to RIC.

85.     At an August 19, 2012 Executive Committee meeting, Dr. Samuels wanted the doctors "to focus on all referrals from Dan [Bienenfeld]."

86.     At a meeting on September 20, 2012, Braun stated to the doctors:  RICX is "still growing.  Need to help Dan [Bienenfeld] identify potential users.  SK [Dr. Kamjoo] has been proactive by targeting current users of the service as an introduction: Will do an iPad giveaway for potential referrals during October CE.  Will also speak about OCT/Diagnostics during CE event."

87.     At meetings on November 15 and December 13, 2012 with Providers, Braun stated "Diagnostics needs to be embraced further.  Try to get more leads for Dan [Bienenfeld]" and, importantly, "Referrals are starting to be sent."

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -22-

88.     Braun also called optometrists directly and told them: "We are going to have 10 lucky winners of their first month of RIC DX [meaning RICX services] free."  Over fifty leads for Braun's calls were generated at the very well-attended CME called "Okularfest" that was sponsored by RIC in 2012.  He told the optometrists that they could bill for each of the free OCT tests.  He also asks them to send their patients to RIC.  Braun reported on the progress made by RICX at each RIC Executive Committee meeting.  Braun tracked the names of RIC patients resulting from referrals from RICX.  Plaintiffs-Relators have in their possession a list of the names of optometrists signed up to use the RICX service and who have made referrals to RIC, the names of patients referred, the dates of service and the amount charged by RIC to the patients.

89.     The target for referrals from RICX was 20 patients per month.  Plaintiff-Relator Smith's handwritten notes from the January 15, 2013 Executive Committee Meeting record that Dr. Chang stated "If he did increase our referrals, I'll give him another $15,000, but don't put that in the minutes."

90.     Each claim made to Medicare for services for a patient referred to RIC through or on account of RICX violates the federal AKS and is not reimbursable under Medicare Part B.

**D.     RIC Defendants' Violation of the Anti-Kickback Act Relating to the San Gabriel Ambulatory Surgery Center**

91.     RIC owns investment interests in an ambulatory surgery center known as the San Gabriel Surgery Center which is located at 207 Santa Anita Avenue, Suite G-16, San Gabriel, California.  Drs. Chang, Samuels and Davis collectively own 50% of SG-ASC.

92.     Drs. Chang, Samuels, and Davis routinely refer patients of RIC who require surgery to SG-ASC for the performance of that surgery.  Physicians employed by RIC and CEES also refer patients to SG-ASC.  Plaintiffs-Relators are in possession of a list of patients referred by RIC and CEES doctors to SG-ASC between 2010 and 2012.

93.     Referrals for medical services to an entity in which the referring physicians has a financial interest violate the AKS unless they fall within the requirements of "safe harbor" regulations promulgated by CMS.  A referral of a patient to an ambulatory surgery center in which a physician has an investment interest does not meet the "safe harbor" regulations of the AKS unless the patient is fully informed of the investor's investment interest, 42 C.F.R. 1001.952®.

94.     Strict compliance with all elements is required for safe harbor protection, *see* 56 Fed. Reg. 35952, 35954 (July 29, 1991).

95.     RIC and CEES physicians do not advise their patients that the RIC Defendants have an investment interest in SG-ASC.  Rather, patients are given a brochure which states, "[t]he ownership for San Gabriel Ambulatory Surgery Center may be obtained by contacting the center at (626) 300-5300."

96.     At the request of Plaintiff-Relator Smith, the RIC scheduler, Krystal Ramirez, called (626) 300-5300 to learn who owned SG-ASC.  However, as she reported to Plaintiff-Relator Smith, the individuals at the center who responded to the call could not provide any information about the ownership of that facility, nor could they name or identity anyone who could do so.

97.     Defendants' failure to comply with the requirements of 42 U.S.C. 1001.952® results in remuneration prohibited by 42 U.S.C. 1395nn and 42 C.F.R. 411.353.  Accordingly, any claim submitted by the Defendants to Medicare for physician services provided at SG-ASC is false and fraudulent.

## VII.    RIC DEFENDANTS' FALSE CLAIMS BASED ON FALSE STATEMENTS ON THEIR FORM 1500s

98.     The RIC Defendants submitted or caused to be submitted CMS Form 1500s for reimbursement for the services they provided to Medicare Part B and Medi-Cal beneficiaries. The Form 1500 requests information about the patient, insurance coverage, the diagnoses and the

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -24-

services provided for which reimbursement is requested.  Entry 24F contains a blank titled, "$ charges," with a space for a separate entry for each supply/procedure.  Entry 28 contains a blank titled, "Total Charge."  The Medicare Carriers Manual and government pronouncements point out that providers are paid based on "actual charges," which is defined as "the amount the physician or supplier actually expects to receive from the patient and/or the third party payer."

99.     The RIC Defendants submitted to caused to be submitted a false statement to the government in their CMS Form 1500s when they submitted claims seeking reimbursement based on the full charge, without revealing that the charge contained a waived co-payment element.  Specifically, the "charge" entry on the provider's claim forms requires that the provider state the total amount, including the co-payment, it expects to collect.  When the provider routinely waives the 20% co-pay on a $100 procedure, however, the true charge is not $100, but 80% or $80.

100.     Knowingly submitting false claims to the government for reimbursement creates liability under the FCA.  Thus, each of the claims submitted to the government by Defendants constituted a violation of section 3729 of the FCA.

## VIII.   RIC DEFENDANTS ENGAGE IN UPCODING AND PERFORM WORTHLESS AND HARMFUL PROCEDURES

### A.     RIC Defendants Engage in Overcoding of E/M Events

101.     The RIC Defendants and its Providers regularly submit claims to Medicare for examinations and procedures different from those actually performed.  For example, the RIC Defendants and the Providers frequently billed for CPT  codes 99214, 99215 and 99204 exams, when the Providers did not perform the requisite services for these codes.

102.     The amount of money a medical provider is paid for his or her services by Medicare or Medicaid depends on which CPT codes are used.  The Medicare program requires physician providers to bill Medicare Part B services, including office visits, using the American

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -25-

Medical Association's Current Procedural Terminology ("CPT-4") numeric codes to describe the procedures and services provided.  *See* Medicare Claims Processing Manual ("MCPM"), Pub. 100-04, Ch.12, § 30.  CPT codes determine both coverage, *i.e.*, if Medicare will pay for the billed medical procedures and services, and the reimbursement amount, *i.e.*, how much Medicare will pay for the billed medical procedures and services.

103.    For patients making an office visit, a provider physician's evaluation and management (E/M) services are billed using five-level series of CPT codes, for either a new patient (CPT-4 Codes 99201 through 99205) or an established patient (CPT-4 Codes 99211 through  99215).  In addition, there are varying levels of complexity assigned to the patient's visit from level 1 to level 5, with level 1 being the lowest and level 5 being the highest level of complexity.

104.    The applicable E/M code level of service is defined by the level of History, the level of Examination, and the Complexity of Medical Decision Making.  These three components are evaluated in the context of the medical necessity for the level of history and the level of examination. As the patient's examination becomes increasingly in-depth or greater time is spent with the patient, the code number increases, with 99211 as the lowest level and 99215 as the highest-level.

105.    CPT Code 99211 is used when the established patient's problems are "minimal," meaning they require little to no independent medical evaluation; typically, only 5 minutes are spent "performing or supervising" routine patient services.  Code 99211 is the only E/M code that explicitly states that it "may not require the presence of a physician or other qualified healthcare professional."  Code 99211 is typically used to bill for services provided exclusively by nurses.

106.    CPT Code 99212 is used for office or outpatient E/M visits with established

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -26-

patients that require two of three key components: (1) a problem-focused history; (2) a problem-focused examination; and (3) a straightforward medical decision. This code is typically appropriate where approximately 10 minutes are spent face-to-face with the patient and/or family.

107.     CPT Codes 99213-99215 are used when the patient's examination becomes increasingly in-depth, the medical decisions become more complex, and/or greater time is spent with the patient.

108.     CPT Code 99214 is used for office or outpatient E/M visits with established patients that require moderately complex decision-making and either a detailed, problem-focused history or a detailed, problem-focused examination.

109.     CPT Code 99215 is used for office or outpatient E/M visits with established patients that require a highly complex decision-making and either comprehensive problem-focused history or comprehensive problem-focused examination.

110.     CPT Code 99204 is used for office or outpatient E/M visits with new patients who require all three of the following: comprehensive history; comprehensive examination; and moderately complex medical decision-making.  As with the equivalent codes for established patients (99211-99215), CPT 99204 is part of a five-level payment scale for new patients. The applicability of a given code is based upon the lowest of the three components -- history, examination, and decision-making -- required.

111.     For all CPT codes, the medically necessary E/M service and the procedure must be appropriately and sufficiently documented by the physician or qualified non-physician practitioner in the patient's medical record to support the claim for these services. *See* Medicare Claims Processing Manual, Chap. 12 at § 30.6.6(B).

112.     Medicare reimburses only for "medically necessary," or "reasonable and necessary" services and procedures, including levels of E/M.  42 U.S.C. § 1395y(a)(l)(A).

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -27-

113.     Based on a government audit conducted of Medicare claims data of Dr. Chang (1-3-2006 to 7-30-2013), Dr. Davis (7-17-08 to 7-31-13) and Dr. Samuel (1-4-06 to 7-31-13), the following overcoding/under documenting was observed for new patients and established patients: virtually all new patients were coded at Level 4 (99204 Office or Outpatient Encounter, Level 4, or 99244, Office or Outpatient Consultation, Level 4) and most established patients were coded at Level 4 (99214, some were at level 3 or level 5), which coding was unsupported by the medical records. While Level 4 New Patients and/or Consultations require all three components -- Comprehensive History, Comprehensive Examination, and Moderately Complex Medical Decision-Making -- and the code is based on the lowest of the three components, most of the RIC Defendants' encounters failed because the documentation of the "History of Present Illness"  was brief (only 1 – 3 of  8 possible elements), downgrading the history to "Expanded Problem-Focused," and, therefore, the code should have been at Level 2, even though the "Decision-Making" and the "Eye Examination" were properly documented.

114.     Based on the audit described above, Dr. Chang was found to have charged at level  4 on 98% of his encounters,  Dr. Samuel charged at level 4 on 99% of his encounters (even though he averaged 40 to 50 patient visits per day), and Dr. Davis charged at level 4 or 5 99% of the time.  Statewide, retina specialists charge at level 4 only 57% of the time.  In addition, while Dr. Davis has advised other RIC Provider Physicians not to use level 5 because it is rarely justified, he singlehandedly accounts for 25% of all level 5 charges by retina specialists in the State of California.  RIC records show that Dr. Davis billed 428 patients at 99215.

115.     In addition, the audit found that the RIC Defendants' practice of bringing their  patients back every few weeks for follow-up visits was medically unnecessary and unreasonable. In short, not only was it unjustified to charge at level 4 for these visits, the conclusion was that it was unjustified to charge anything at all for these visits.

116.     The chart below provides a summary of RIC Defendant's E/M overcoding scheme

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -28-

for CPT codes 99204, 99214, and 99215:

| RIC Medicare Provider | Medicare Charges | Overcoded Medicare Charges | % Overcoded Medicare Charges |
|---|---|---|---|
| CHANG | $407,677.70 | $119,911.05 | 29% |
| DAVIS | $ 86,028.50 | $ 29,141.76 | 34% |
| SAMUEL | $201,640.28 | $ 59,513.66 | 30% |
| TOTALS | $695,346.48 | $208,566.47 | 30% |

## B. RIC Defendants' Unnecessary Claims for CPT Code 92240: ICG Testing

117.    CPT Code 92240 is the code used to bill Medicare for Indocyanine green angiography or "ICG," a controversial technique used infrequently in evaluating and treating age-related macular degeneration ("AMD"). According to the American Academy of Ophthalmology ("AAO") Preferred Practice Pattern ("PPP"), the standard of care diagnostic test for AMD is Optical Coherence Tomography ("OCT"), and if indicated, followed by Fluorescein Angiography ("FA"). This PPP was developed and written by the Retina/Vitreous Preferred Practice Panel of the AAO, and it was carefully reviewed by nationally recognized panels, including the National Eye Institute, the Practicing Ophthalmologists Advisory Committee for Education, the Ophthalmic Technology Assessment Committee Retina/Vitreous Panel, the Macula Society, and the American Society of Retina Specialists. The PPP was approved by the AAO Board of Trustees on September 20, 2014 and continues to be the current standard of care for the evaluation and treatment of AMD. *See* American Academy of Ophthalmology: Age-Related Macular Degeneration Preferred Practice Pattern 2014.

118.    While the AAO discusses the use of ICG in very limited circumstances, the routine use of ICG in evaluating and treating AMD is not supported by scientific studies, and, unsurprisingly, the AAO has advised that when ICG is performed, the physician must be aware of the potential risks associated with the procedure, including severe medical complications, allergic reactions and even death. *Id.*

119.    An independent Department of Justice ("DOJ") evaluation of RIC Defendants' use of ICGs performed on Medicare patients between February and May 2014 revealed that ICG was used for virtually every patient visit, and only 9.2% of the ICG studies were found to be appropriate and medically necessary.  The evaluation also found that Drs. Chang, Davis and Samuel essentially ignore the AAO's PPP and use their own approach to the AMD patient, even though that approach has not been proven effective in clinical trials, nor published in peer reviewed journals, and is not used or considered a standard of care in the retinal community. Moreover, it was determined that the RIC Defendants used their own approach inconsistently; for example, while they routinely performed the ICG technique for supposed patient evaluation, they did not appear to use ICG images to make their diagnoses.  In addition, RIC Defendants bring their patients back at very short intervals, regardless of what the images show and do not appear to use the ICG images to make patient treatment decisions.

120.    The importance of the ICG testing to the RIC Defendants is unequivocally the Medicare reimbursement amount at issue:  the AAO's PPP (i.e., OCT), reimburses approximately $50.00 for the Medicare patient (the amount may differ by year and region), contrasted against the ICG CPT Code 99240, which reimburses approximately $300.00 per patient.  As a result, each Medicare patient represents an additional $250.00 to the RIC Defendants for its use of ICGs.  Unsurprisingly, in electronic correspondence, Dr. Samuel describes ICG as "the most important test we run," while Dr. Davis comments about how one of their new clinics could make much more money, "[i]magine if there was ICG there...," and Dr. Chang comments about Dr. Suk's outstanding patient reimbursement, $15,000 in just one morning, "...simply by warming up the ICG."

121.    In 2012, the RIC Defendants billed Medicare $3,883,206 for CPT Code 92240. Dr. Chang is paid more for ICGs every year than any other doctor in California, and Dr. Davis is right behind him in the number two slot.  Moreover, while 88% of RIC's ICG charges are for

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT            -30-

Medicare patients, only 0.5% are billed to HMOs; this is because HMOs require prior authorization, and the RIC Defendants know it is highly unlikely that they would be able to obtain the HMO's authorization for this unwarranted ICG procedure.  Finally, of the 1397 ICG angiograms reviewed pursuant to a DOJ evaluation of ICG use by Drs. Chang, Davis and Samuel, 90.8% of CPT Code 99240 charges to Medicare were found to be medically unnecessary.

  **C.** **Defendants Engage in Double Billing**

  122. RIC entered into an arrangement with Dr. Mark B. Kislinger whereby Dr. Bhatti of RIC would staff Dr. Kislinger's Glendora, California clinic several times per week.  Dr. Kislinger was supposed to and did bill Medicare and other payors for Dr. Bhatti's services performed at the Glendora clinic.  RIC was to and did receive from Dr. Kislinger one-half of the fees collected for Dr. Bhatti's services.

  123. Between at least April through June of 2012, RIC also billed Medicare for the services Dr. Bhatti had performed in Dr. Kislinger's clinic as though the services had been provided at RIC.

  124. The claims submitted to Medicare by Defendants for work performed by Dr. Bhatti at Glendora, which had already been billed by Dr. Kislinger, were false and fraudulent.

  125. Plaintiff-Relator Smith advised Dr. Chang that this double billing was improper and "would need to be reconciled."  Dr. Kislinger advised Dr. Chang that the double billing to Medicare was fraudulent.  Nevertheless, RIC knowingly failed and refused to report and return the amounts it had double billed to Medicare in violation of 42 U.S.C. §1320(a)-7(k)(d).

  **D.** **The Compensation Structure Encourages Unnecessary Tests and Upcoding**

  126. In January, 2013, RIC announced that, in order to become a partner, an employed doctor would have to exceed the average charges (minus charges paid by J Code) of the three partners, for two quarters.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT  -31-

127.   Because the partners of RIC were billing for unnecessary ICG tests and upcoding, the only way an employed doctor could meet this requirement would be to order unnecessary ICG tests or also to upcode.

128.   Indeed, when informed of this change, Dr. Camille Harrison stated she could never meet the requirement because she did not order ICG tests as often as the RIC principals. She has since left the RIC practice.

**E.   RIC Through CEES Bills Medicare For Services Not Performed**

129.   Dr. Lily Lee, Dr. Chang's wife, is a plastic surgeon licensed to practice medicine in California.  She is also an approved Medicare provider.

130.   CEES billed Medicare for Dr. Lee's services for assisting in retinal surgeries when it knew that she was not present and in which she did not actually participate.  For example, Medicare was billed for retinal surgery performed on patient NEG on December 13, 2012, under CPT 67113.  This surgery does not require an assistant surgeon, as CEES was aware.

131.   Examples of additional surgeries for which Medicare was billed for Dr. Lee's assistance but where she was not present and CEES knew that she was not present, include:

| Patient | Date of Service | Amount |
| --- | --- | --- |
| JB | 11/21/2012 | $340.00 |
| NP | 12/13/2012 | $500.00 |
| SK | 01/03/2013 | $560.00 |
| DWW | 01/03/2013 | $500.00 |
| BH | 01/03/2013 | $400.00 |
| MA | 01/03/2013 | $400.00 |

132.   Plaintiffs-Relators have learned that CEES continues to bill Medicare for Dr. Lee's services in connection with surgeries where she is not present and in which she does not participate.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -32-

## IX.   RIC DEFENDANTS KNOWINGLY RETAIN AN OVERPAYMENT FROM THE PHYSICIANS QUALITY REPORTING SYSTEM

133.    RIC is a voluntary participant in the Physician Quality Reporting System (PQRS). Under the PQRS, eligible professionals who satisfactorily report data on quality measures for covered Physician Fee Schedule Services provided to Medicare Part B Fee for Service beneficiaries receive specified incentive payments, 42 U.S.C. §1395w-4(k), (m).

134.    In order to receive the payments provided under the PQRS program for 2011, RIC was required to provide data for a twelve-month period or the period January 1, 2011 to December 31, 2011, 75 Fed. Reg. § 5 (Aug. 26, 2010), pp. 40168-40178; *see* 76 Fed. Reg. 42772 (July 19) at p. 42842; 42 CFR § 414.90.

135.    When RIC provided its data on quality measures, although it should have provided information for the entire year, it only provided information for the four months from September through December of 2011.  For 2012, certain of the information reported was for activities that had not actually occurred.  Each of the RIC principals attested to the accuracy of the information submitted.

136.    In October, 2012, RIC received $60,000 from CMS as a result of the purportedly complete information it provided to PQRS for 2011.

137.    Plaintiff-Relator Smith advised the RIC Partners that RIC was not entitled to receive these funds and that they should be returned because RIC had not complied with the PQRS program by providing the required amount of data.

138.    The RIC physicians knowingly failed and refused to report and return to CMS these funds to which they were not entitled in violation of the requirements of 42 U.S.C. § 3120a-7k(d).

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT        -33-

**X.**   **ADDITIONAL FALSE CLAIMS TO THE STATE OF CALIFORNIA**

**A.**   **Violations of the Discriminatory Billing Rules**

139.   The California False Claims Act, codified in the California Government Code sections 12650, *et seq.*, states that it is a violation to: (a) knowingly present or cause to be presented false claims for payment or approval of claims for Medi-Cal reimbursement; and/or (b) knowingly make, use, or cause to be made or used false records or statements to get false claims paid or approved by California for Medi-Cal reimbursement.

140.   Under Title 22, Section 51480(a) of the California Code of Regulations, "no provider shall bill or submit a claim for reimbursement for the rendering of health care services to a Medi-Cal beneficiary in any amount greater or higher than the usual fee charged by the provider to the general public for the same service" (the "Discriminatory Billing Rule").

141.   During the time period relevant to this complaint, the RIC Defendants charged patients without any insurance, who paid for medical services in cash, fees that were lower than the rate Medi-Cal was billed for the same services.  Examples include Patients AD 8/27/2012, MG 10/25/2011 and AG 7/9/2012.  The CPT codes for which cash patients paid less than paid by Medi-Cal included, but were not limited to, CPT 67028 and CPT 67105.  An RIC Comparison of Self-Pay Payments analysis shows that self-pay patients paid on average 36.8% of RIC's stated charges in 2011 and 23.1% of RIC's stated charges in 2012.  Accordingly, each claim submitted by the RIC Defendants to Medi-Cal as a primary payer was in violation of the Discriminatory Billing Rule.

142.   For almost all CPT codes, the RIC Defendants based the supposed usual fee or chargemaster on 200% of the Medicare reimbursement rate.  For example, the rate Medicare reimburses for CPT 67028 in Southern California is $124.28.  If RIC followed its usual procedure, the usual charge rate would have been $250.00.  However, because Medi-Cal reimburses $364.11 for this code, RIC's usual charge was listed at $370.00.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -34-

143.     In submitting claims for payment to Medi-Cal, each of the RIC Defendants and Providers certified that their services complied with California statutes and regulations.  Those certifications were false, in that the RIC Defendants and Providers were in fact charging far lower fees to the general public than the amounts they claimed for reimbursement for the rendering of the same services to Medi-Cal beneficiaries.

144.     Consequently, each claim for payment to Medi-Cal was a false claim in violation of California's False Claims Act (Gov. Code §12650 *et seq.*).  The payments received by the RIC Defendants on account of such false claims from 2006 through 2012 total $1,233,356.78.  Defendants continue to receive payments from Medi-Cal for false claims.

145.     Similarly, as directed by RIC, cash-paying CEES patients and RIC patients, as well as SG-ASC patients, paid lower amounts than paid by Medi-Cal.  For example, CEES doctors charged patients who paid cash $35.00 for CPT 92250, but Medi-Cal paid $42.11.  Accordingly, each claim submitted by CEES and SGASC providers to Medi-Cal as a primary payer was in violation of the Discriminatory Billing Rule.

**B.     Violations of the California Insurance Frauds Prevention Act**

146.     The California Insurance Frauds Prevention Act ("CIFPA") creates civil liability for any person who violates sections 549, 550, or 551 of the California Penal Code. Cal. Ins. Code §1872.7(b).  This statute was intended, in particular, to reach health insurance fraud, Cal. Ins. Code Sec. 1871(h).  Any person may bring a civil action under the Act on behalf of themselves and the State of California, so long as the action is brought in the name of the State of California, Cal. Ins. Code §1871.7(e)(1).

147.     The California Penal Code Sec. 550 provides, in relevant part:

(a)     It is unlawful to do any of the following, or to aid, abet, solicit, or

conspire with any person to do any of the following:

(1)     Knowingly present or cause to be presented any false or

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -35-

1    fraudulent claim for the payment of a loss or injury, including

2    payment of a loss or injury under a contract of insurance.

3                          *   *   *

4        (6)    Knowingly make or cause to be made any false or

5    fraudulent claim for payment of a health care benefit.

6                          *   *   *

7        (9)    Knowingly present for payment any undercharges for

8    health care benefits on behalf of a specific claimant unless any

9    known overcharges for health care benefits for that claimant are

10   presented for reconciliation at that same time.

11       (10)   For purposes of paragraphs (6) and (9), inclusive, a claim or

12   a claim for payment of a health care benefit also means a claim or

13   claim for payment submitted by or on the behalf of a provider of

14   any workers' compensation health benefits under the Labor Code.

15   (b)    It is unlawful to do, or to knowingly assist or conspire with any person

16   to do, any of the following:

17       (1)    Present or cause to be presented any written or oral

18   statement as part of, or in support of or opposition to, a claim

19   for payment or other benefit pursuant to an insurance policy,

20   knowing that the statement contains any false or misleading

21   information concerning any material fact.

22       (2)    Prepare or make any written or oral statement that is

23   intended to be presented to any insurer or any insurance

24   claimant in connection with, or in support of or opposition to,

25   any claim or payment or other benefit pursuant to an insurance

26

27   CIVIL ACTION NO.:
     2:13-cv-3772-DMG (MRWx)
28   SECOND AMENDED COMPLAINT          -36-

1       policy, knowing that the statement contains any false or

2       misleading information concerning any material fact.

3     148.   Approximately one-third of the RIC patients had commercial insurance coverage

4 for the services provided by RIC.  The contracts between the RIC Defendants and commercial

5 insurance carriers, including but not limited to Empire Blue Cross/Blue Shield, Cigna and United

6 Healthcare, require that the patient be charged and pay a deductible and/or a co-payment before a

7 benefit is payable under the plan.

8     149.   However, as stated in paragraphs 55 to 76, which are incorporated herein by

9 reference, Defendants routinely waived co-payments and deductibles for patients with

10 commercial insurance as well.  Waivers of co-payments and deductibles were regularly and

11 commonly made for patients who had commercial insurance coverage.  When submitting claims

12 to commercial carriers for these patients, the RIC Defendants and Providers listed the co-

13 payment amounts and actually or impliedly represented that they were charging the required co-

14 payments or deductibles, when they were not.

15     150.   Further, because Defendants accepted lower payments from patients who paid

16 cash, the Defendants failed to disclose their actual, usual prices when making claims for benefits

17 to commercial carriers.

18     151.   Each of the claims for payment that Defendants presented or caused to be

19 presented to insurers that failed to reveal the waiver of co-payments and deductibles, or that

20 failed to disclose their true usual charges for the services listed, contained false and misleading

21 information about material facts.

22     **C.**   **Violation of the California Business and Professions Code Sec. 654.2**

23     152.   The allegations of paragraphs 91-97 are incorporated herein by reference as if

24 fully set forth.

25     153.   Section 654.2 of the California Professions and Business Code states:

26

27 CIVIL ACTION NO.:
   2:13-cv-3772-DMG (MRWx)

28 SECOND AMENDED COMPLAINT     -37-

It is unlawful for any person licensed under this division or under any initiative act referred to in this division to charge, bill, or otherwise solicit payment from a patient on behalf of, or refer a patient to, an organization in which the licensee, or the licensee's immediate family, has a significant beneficial interest, unless the licensee first discloses in writing to the patient, that there is such an interest and advises the patient that the patient may choose any organization for the purpose of obtaining the services ordered or requested by the licensee.

154.   The Attorney General of California, in opining on this section, noted that "what is absolutely essential to their fulfilling the statute's requirement, however, is that they alert the patient to the practitioner's interest in a comprehensible way and at a time before the actual referral takes place."  68 Ops Calif. Atty. Gen. 140.

155.   There is no sign posted at an RIC office which reveals that the RIC Defendants have an ownership interest in the San Gabriel Surgery Center.

156.   Patients are given a brochure which states "The ownership for San Gabriel Ambulatory Surgery Center may be obtained by contacting the center at (626) 300-5300."

157.   As described above, when one calls (626) 300-5300 to learn who owns SG-ASC, the individuals at the center who respond to the call cannot not provide any information about the ownership of that facility nor could they identify anyone who could do so.

158.   RIC patients who require surgery are not advised that they may have services performed at another facility nor are they given the names of specific alternative facilities or information as to where a listing of them might be obtained.

159.   The RIC Defendants submit claims to Medi-Cal for services they perform at the San Gabriel Surgery Center.  San Gabriel Surgery Center also submits claims to Medi-Cal for the

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -38-

use of its facilities and nursing services by patients referred by RIC, CEES and the Providers. Likewise, no disclosure is made regarding common ownership with respect to RICX.

160.    In submitting their claims, RIC, CEES, the Providers and San Gabriel Surgery Center expressly and impliedly certify that they have complied with state law and that the information on the claim is accurate, complete and does not conceal a material fact.

161.    As a result of the failure of RIC and the Providers to comply with Sec. 654.2 of the California Professions and Business Code, each claim submitted to Medi-Cal by Defendants is false and fraudulent.

**COUNT I**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(1986) and**
**31 U.S.C. § 3729(a)(1)(A)(2009)**

162.    Plaintiffs-Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth herein.

163.    Defendants knowingly submitted and caused the submission of false or fraudulent claims for payment or approval for medical services to officials of the United States Government in violation of 31 U.S.C. §3729(a)(1)(1986), and 31 U.S.C. §3729(a)(1)(A)(2009).

164.    By virtue of the false or fraudulent claims that Defendant presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

**COUNT II**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)(2009)**

165.    Plaintiffs-Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth herein.

166.    Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the United States Government in violation of 31 U.S.C. §3729(a)(1)(B)(2009).

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT        -39-

167.    By virtue of the false or fraudulent claims that Defendants made, used or caused to be made or used, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

**COUNT III**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(G)(2009)**

168.    Plaintiffs-Relators repeat and re-allege each and every allegation contained in the paragraphs above as if fully set forth herein.

169.    Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the United States in violation of 31 U.S.C. §3729(a)(1)(G).

**COUNT IV**
**California False Claims Act**
**Cal. Gov't Code § 12651(a)(1) and (a)(2)**

170.    Plaintiffs-Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth herein.

171.    By virtue of the acts described above, Defendants knowingly submitted to officers, employees or agents of the State of California, false or fraudulent claims for payment or approval.

172.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to the California State Government to obtain payment from the State of California for false or fraudulent claims.

173.    By reason of the acts of Defendants, the State of California has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false or fraudulent claim.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT            -40-

**COUNT V**
**California Insurance Code Sec. 1872.7(b)**
**and California Penal Code Sec. 550**

174.    Plaintiffs-Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth herein.

175.    By virtue of the acts described above, Defendants knowingly made or caused to be made false or fraudulent claims for payment of a health care benefit.

176.    By virtue of the acts described above, Defendants knowingly make or assist or cause to be presented written statements in support of claims for payment pursuant to an insurance policy, knowing that the statements contain false or misleading information concerning material facts.

177.    By virtue of the acts described above, Defendants knowingly make or assist in the preparation or making of written statements that are intended to be presented to an insurer in connection with or in support of claims and payments pursuant to an insurance policy, knowing that such statements contain false or misleading information concerning material facts.

178.    By virtue of the acts of Defendants, the State of California has suffered actual damages and is entitled to recover treble damages as well as civil penalties or each claim for compensation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs-Relators, on behalf of the United States and the State of California, demands that judgment be entered in their favor and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.  This includes, with respect to the federal False Claims Act, three times the amount of damages to the Federal Government plus civil penalties of no more than Eleven Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim on or before November 2, 2015 and civil penalties of no more than Twenty-One

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -41-

Thousand Five Hundred and Sixty-Three Dollars ($21,563.00) and not less than Ten Thousand Seven Hundred and Eighty-One Dollars ($10,781.00) for each false claim after November 2, 2015, and any other recoveries or relief provided for under the Federal False Claims Act.

Plaintiffs-Relators also request that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of California has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Cal. Govt. Code §12651(a).

Plaintiffs-Relators additionally request that this Court enter judgment against Defendants for a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than three times the amount of each claim for compensation submitted in violation of the California Insurance Frauds Prevention Act, Cal. Ins. Code Sec. 1872.7(b).

Finally, Plaintiffs-Relators request that they receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States and the State of California, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs.  Plaintiffs-Relators request that their award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT          -42-

## DEMAND FOR JURY TRIAL

Plaintiffs-Relators hereby demand a jury trial with respect to all issues so triable pursuant to Fed.R.Civ.P. 38 on all counts.

Dated: January 17, 2017

Respectfully submitted,
SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP

/s/ Kolin C. Tang
Kolin C. Tang
11755 Wilshire Boulevard, 15th Floor
Los Angeles, CA 90025
Phone: (323) 510-4060
Facsimile: (866) 300-7367
Email:  ktang@sfmslaw.com

James E. Miller
Laurie Rubinow
Shepherd Finkelman Miller
  & Shah, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
Email: jmiller@sfmslaw.com
         lrubinow@sfmslaw.com

Monique Olivier
Duckworth Peters Lebowitz Olivier, LLP
100 Bush Street, Suite 1800
San Francisco, CA 94104
Telephone (415) 433-0333
Fax: (415) 449-6556
Email: monique@dplolaw.com

***Attorneys for Plaintiffs-Relators***

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
SECOND AMENDED COMPLAINT            -43-