1  Mark Hardiman (SBN 136602)
   Salvatore Zimmitti (SBN 245678)
2  **NELSON HARDIMAN LLP**
   11835 West Olympic Boulevard, Suite 900
3  Los Angeles, CA 90064
   Telephone:   (310) 203-2800
4  Facsimile:   (310) 203-2727
   mhardiman@nelsonhardiman.com
5  szimmitti@nelsonhardiman.com

6  Attorneys for Defendants

7

8                UNITED STATES DISTRICT COURT
                 CENTRAL DISTRICT OF CALIFORNIA
9

10  UNITED STATES OF AMERICA,          CASE NO.:  2:13-cv-3772-DMG (MRWx)
    and STATE OF CALIFORINA, *ex*
11  *rel* BOBBETTE A. SMITH and        (Assigned to Judge Dolly M. Gee)
    SUSAN C. ROGERS,
12                                      **DEFENDANTS' NOTICE OF**
                 Plaintiffs,            **CONSOLIDATED MOTION AND**
13                                      **MOTION TO DISMISS RELATORS'**
                                        **SECOND AMENDED COMPLAINT**
       v.                               **PURSUANT TO FEDERAL RULES OF**
14                                      **PROCEDURE 12(B)(6) AND 9(B);**
    TOM S. CHANG, M.D., TOM S.          **MEMORANDUM OIF POINTS AND**
15  CHANG, M.D., INC., MICHAEL A.       **AUTHORITIES**
    SAMUEL, M.D., MICHAEL J.
16  DAVIS, M.D., RETINA                 Date:   March 17, 2017
    INSTITUTE OF CALIFORNIA             Time:   9:30 a.m.
17  MEDICAL GROUP, CALIFORNIA           Place:  Courtroom 8C, 8th Floor
    EYE AND EAR SPECIALISTS,
18  BRETT BRAUN and
    SAN GABRIEL AMBULATORY
19  SURGERY CENTER LP,

20               Defendants.

21

22

23

24  **TO THE HONORABLE COURT AND ALL PARTIES AND THEIR**

25  **COUNSEL OF RECORD:**

26        PLEASE TAKE NOTICE that on March 17, 2017, at 9:30 a.m., or as soon

27  thereafter as the matter shall be heard, before the Honorable Dolly M. Gee, United

28  States District Judge, in Courtroom 8C of the United States Courthouse, located at

    350 West 1st Street, Los Angeles, CA, 90012,  Defendants Tom S. Chang, M.D.,

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

1   Tom S. Chang, M.D., Inc., Michael A. Samuel, M.D., Michael J. Davis, M.D.,
2   Brett Braun, Retina Institute of California Medical Group, California Eye and Ear
3   Specialists, and San Gabriel Ambulatory Surgery Center LP, by and through their
4   attorneys of record, will and hereby do move the Court for an order dismissing the
5   Second Amended Complaint of Relators Bobbette A. Smith and Susan C. Rogers,
6   alleging violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*,
7   ("FCA"), the California False Claims Act, Cal. Gov. Code §§ 12650 *et seq.* ("CA-
8   FCA"), and the California Insurance Frauds Prevention Act, Cal. Insurance Code §
9   1871.7 ("CA-IFPA"), for failure to state a claim and to allege fraud with sufficient
10  particularity pursuant to Federal Rules of Civil Procedure Rule 12(b)(6) and 9(b).

11        This motion is based on the accompanying memorandum of points and
12  authorities, the files and records in this case, upon such matters as the Court may
13  take judicial notice, and on such further evidence and argument as may be
14  presented at any hearing of this motion.

15        This motion is made following discussions by counsel for the parties,
16  pursuant to Local Rule 7-3, which took place via telephone and email on
17  November 10 and December 16, 2016.

18  DATED: February 14, 2017

                              Respectfully submitted,

19

20                            NELSON HARDIMAN LLP

21

22
                              /S/ *M.S. Hardiman*
23                            MARK S. HARDIMAN

24                            Attorneys for Defendants

25

26

27

28

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' SECOND AMENDED COMPLAINT

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................ 1

II.   STATEMENT OF FACTS AS ALLEGED ........................................ 1

      A.    RIC's Alleged Improper Waivers of Medicare Part B Deductibles
            And Co-Payments ................................................................... 1

      B.    RIC's Alleged Improper Co-Marketing Agreement With RIC
            Diagnostics ............................................................................ 4

      C.    The RIC and CEES Physicians' Alleged Improper Referrals
            To the San Gabriel Ambulatory Surgery Center........................ 4

      D.    The RIC Partners' Medicare Claims for Alleged "Upcoded
            Visits...................................................................................... 4

      E.    RIC's Medicare Claims For Allegedly Unnecessary ICG Tests ......... 5

      F.    RIC's Alleged Duplicate Medicare Claims for Dr. Bhatti's
            Services at Fr. Kislinger's Clinic ............................................ 6

      G.    CEES' Alleged Medicare Claims For Assistant Surgeon Sevices
            Not Performed ....................................................................... 6

      H.    RIC's Alleged Submission of Incomplete Data to the Medicare
            Physician Quality Reporting System ....................................... 7

      I.    RIC's Alleged Failure to Charge Medi-Cal the Same Prices
            Charged to Patients Without Insurance Who Paid Cash..................... 8

      J.    The RIC Partners' Alleged Failure to Advise Medi-Cal Patients
            Of Their Ownership Interest in SG-ASC ................................. 9

      K.    RIC's Alleged Waiver of Deductibles and Co-Payments
            For Commercial Insurance  Payments ...................................... 9

      L.    Relator's FCA, CA-FCA and CA-IFPA Causes of Action.................. 9

NELSON HARDIMAN LLP

11835 WEST OLYMPIC BOULEVARD, SUITE 900

i

III.   STANDARDS OF REVIEW.................................................................................10

IV.   ARGUMENT........................................................................................................12

    A.   THE COMPLAINT FAILS TO STATE A VALID
        FEDERAL FCA CLAIM AGAINST DEFENDANTS .....................12

        1.   The Federal FCA..........................................................................12

        2.   The Complaint Fails to State a Federal FCA Claim
              Based on RIC's Alleged Waiver of Medicare Patients'
              Deductibles and Co-Payments.....................................................15

        3.   The Complaint Fails to State a Federal FCA Claim
              Based on RIC's Co-Marketing Agreement with RICX............18

        4.   The Complaint Fails to State a Federal FCA Claim
              Based on the RIC Physicians' Patient Referrals to The
              SG-ASC In Which They Allegedly Have Investment
              Interests ......................................................................................19

        5.   The Complaint Fails to State a Federal FCA Claim Based on
              Dr. Davis' and Dr. Samuels' Alleged "Upcoding" of
              Office Visits ................................................................................21

        6.   The Complaint Fails to State a Federal FCA Claim Based
              on RIC's Medicare Claims For Allegedly Unnecessary
              or Worthless ICG's .....................................................................21

        7.   The Complaint Fails to State a Federal FCA Claim Based
              On RIC's Alleged Duplicate Medicare Claims for Dr.
              Bhattio's Services at Dr. Kislinger's Clinic .............................25

        8.   The Complaint Fails to State a Federal FCA Claim Based
              on CEES' Alleged Medicare Claims for Assistant
              Surgeon Services Not Performed.................................................26

ii

TABLE OF CONTENTS AND AUTHORITIES

NELSON HARDIMAN LLP

11835 WEST OLYMPIC BOULEVARD, SUITE 900

9. The Complaint Fails to State a Federal FCA Claim Based on Submission of Incomplete Data to the Medicare Physician Quality Reporting System ........................................27

B. THE COMPLAINT FAILS TO STATE A VALID CALIFORNIA FCA CLAIM AGAINST DEFENDANTS ........................................27

    1. The Complaint Fails to State a Valid California FCA Claim Against Defendants Based on Alleged Violations of The Medi-Cal Discriminatory Billing Rule ..............................28

    2. The Complaint Fails to State a California FCA Claim Based on Violations of Business & Professions Code Section 654.2 ........................................29

C. RELATOR'S COMPLAINT FAILS TO STATE A CA-IFPA CLAIM BASED ON WAIVER OF CO-PAYS AND DEDUCTIBLES ........................................30

D. THE COMPLAINT MUST BE DISMISSED BECAUSE IT CHARGES ALL DEFENDANTS IN EACH CAUSE OF ACTION ........................................31

V. CONCLUSION........................................33

TABLE OF CONTENTS AND AUTHORITIES

1
2

# **TABLE OF AUTHORITES**

Cases

3
4

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .......................................................................... 10

5

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .......................................................................... 10

6
7

*Epstein v. Wash. Energy Co.,*
    83 F.3d 1136 (9th Cir. 1996) ....................................................... 10, 25

8

*Frazier ex rel. U S. v. Iasis Healthcare Corp.,*
    392 Fed. Appx. 535  2010 WL 3190641 (9th Cir. 2010).................. 23

9
10

*Gonzalez v. Fresenius Medical Care North America,*
    689 F.3d 470 (5th Cir. 2012) ........................................................... 13

11

*Hanlester Network v. Shalala,*
    51 F.3d 1390 (9th Cir. 1995) ........................................................... 21

12
13

*Hericks v. Lincare Inc.,*
    2014 WL 1225660  (E.D. Pa. Mar. 25, 2014) ................................. 12

14

*Klaczak v. Consolidated Medical Transport,*
    458 F.Supp.2d 622 (N.D. Ill. 2006) ................................................. 20

15
16

*Lubin v. Sybedon Corp.,*
    688 F. Supp. 1425 (S.D. Cal. 1988) ................................................. 32

17

*Magluta v. Samples,*
    256 F.3d 1282 (11th Cir. 2001) ....................................................... 32

18
19

*Mikes v. Straus,*
    274 F.3d 687 (2d Cir. 2001) ............................................................. 14

20

*Neubronner v. Milken,*
    6 F.3d 666 (9th Cir. 1993) ............................................................... 11

21
22

*Remmes v. Internat'l Flavors & Fragrances, Inc.,*
    389 F. Supp. 2d 1080 (N.D. Iowa 2005) .......................................... 32

23

*Resnick v. Hayes,*
    213 F.3d 443 (9th Cir. 2000) ........................................................... 10

24
25

*U.S. ex rel. Bennett v. Boston Scientific Corp.,*
    No. H-07-2467 2011 WL 1231577 (S.D. Tex. 2011) ....................... 24

26

*U.S. ex rel. Bogina v. Medline Industries, Inc.,*
    809 F.3d 365 (7th Cir. 2016) ........................................................... 12

27
28

iv

NELSON HARDIMAN LLP

11835 WEST OLYMPIC BOULEVARD, SUITE 900

*U.S. ex rel. Clausen v. Laboratory Corp. of America, Inc.*,
290 F.3d 1301 (2002)........................................................................ 14

*U.S. ex rel.v. General Dynamics C4 Systems, Inc.*
637 F.3d 1047 (9th Cir. 2011)......................................................... 11

*U.S. ex rel. Harris v. Bernad,*
275 F. Supp. 2d 1 (D.D.C. 2003) .................................................... 21

*U.S. ex rel. Hendow v. Univ. of Phoenix,*
461 F.3d 1166 (9th Cir. 2006).......................................................... 14

*U.S. ex rel. Lam v. Tenet Healthcare Corp.,*
481 F. Supp. 2d 673 (W.D. Tex. 2006)............................................ 17

*U.S. ex rel. Landis v. Hospice Care of Kansas, LLC,*
2010 WL 5067614 4 (D. Kan. Dec. 7, 2010).................................... 24

*U.S. ex rel. Lee v. Corinthian Colleges,*
655 F.3d 984 (9th Cir. 2011)............................................................ 26

*U.S. ex rel. Morton v. A Plus Benefits, Inc.,*
139 Fed. Appx. 980 (10th Cir. 2005)............................................... 24

*U.S. ex rel. Obert-Hong v. Advocate Health Care,*
211 F. Supp. 2d 1045 (S.D. Fl. 2012) ............................................ 21

*U.S. ex rel. Riley v. St. Luke's Episcopal Hospital,*
355 F.3d 370 (5th Cir. 2004)............................................................ 24

*U.S. ex rel. Stewart v. The Louisiana Clinic,*
2002 WL 106674 (E.D. La. 2002) ................................................... 23

*U.S. ex rel. Thayer v. Planned Parenthood of the Heartland,*
765 F.3d 914 (8th Cir. 2014)............................................................ 22

*US. ex rel. Thompson v. Columbia/ HCA Healthcare Corp.,*
125 F.3d 899 (5th Cir. 1997)............................................................ 25

*U.S. v. Bollinger Shipyards, Inc.,*
775 F.3d 255 (5th Cir. 2014)............................................................ 10

*U.S. v. Bornstein,*
423 U.S. 303 (1976)......................................................................... 12

*U.S. v. Kitsap Physicians Service,*
314 F.3d 995 (9th Cir. 2002)............................................................ 14

*U.S. v. Mackby,*
261 F.3d 821 (9th Cir. 2001)............................................................ 12

v

TABLE OF CONTENTS AND AUTHORITIES

*U.S. v. Mousavi,*
604 F.3d 1084 (9th Cir. 2010) ............................................................... 15

*U. S. v. Rivera,*
55 F.3d 703 (1st Cir. 1995) .................................................................... 13

*U.S. v. Singh,*
390 F.3d 168 (2d Cir. 2004) ................................................................... 22

*U.S. v. Starks,*
157 F.3d 833 (11th Cir.1998) ................................................................. 15

*United States ex rel. Ebeid v. Lungwitz,*
616 F.3d 993 (9th Cir. 2010) ................................................. 11, 14, 32

*Universal Health Services v. U.S. ex rel. Escobar,*
136 S. Ct. 1989 (2016) ........................................................... 14, 15

*Vess v. Giba-Ceigy Corp.,*
317 F.3d 1097 (9th Cir. 2003) ............................................................... 11

**Statutes**

22 C.C.R. § 51450(a) .............................................................................. 28

22 C.C.R. § 51480 ........................................................................... 8, 28

31 U.S.C. § 3729(a)(1) ................................................................... *passim*

31 U.S.C. § 3729(b) ................................................................................ 13

42 U.S.C. § 1001.952(r) .......................................................................... 20

42 U.S.C. § 1320a–7b ....................................................................... 15, 16

42 U.S.C. § 1395cc(a)(2)(A)(ii) ............................................................... 2

42 U.S.C. §§ 1395 ............................................................................. 2, 18

Cal. Bus. & Prof. Code § 654.2 ........................................................ 29, 30

Cal. Bus. & Prof. Code § 657(c) ........................................................ 28, 31

Cal. Gov. Code § 1265l(a)(l) and (a)(2) ................................................. 10

Cal. Ins. Code § 1871.7 .............................................................. 2, 10, 31

Cal. Penal Code § 550 ........................................................... 10, 30, 31

F.R.C.P. Rule 9(b) ....................................................................... *passim*

vi

NELSON HARDIMAN LLP

11835 WEST OLYMPIC BOULEVARD, SUITE 900

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

By their instant motion, defendants Defendants Tom S. Chang, M.D., Tom S. Chang, M.D., Inc.,   Michael A. Samuel, M.D., Michael J. Davis, M.D. (collectively the "RIC Partners"), Brett Braun, Retina Institute of California Medical Group ("RIC"), California Eye and Ear Specialists ("CEES"), and San Gabriel Ambulatory Surgery Center LP ("SG-ASC"), seek an order dismissing the Second Amended Complaint ("Complaint" or "SAC") of relators Bobbette A. Smith and Susan C. Rogers ("Relators"), alleging FCA, CA-FCA, and CA-IFPA violations, for failure to state a claim and to allege fraud with particularity pursuant to Federal Rules of Civil Procedure ("Rule") 12(b)(6) and 9(b).

## II.   STATEMENT OF FACTS AS ALLEGED

On January 17, 2017, Relators filed their Second Amended Complaint on behalf of the United States and the State of California, alleging that RIC, an ophthalmology group specializing in retina diseases, the RIC Partners, who owned and operated RIC, Braun, RIC's CEO, CEES, an ophthalmology practice owned by Dr. Chang, and SG-ASC, an ambulatory surgery center in which the RIC Partners allegedly have investment interests, submitted false claims to the Medicare and Medi-Cal programs and to commercial insurance plans for providing medical care to patients.  (Clerk's Record ("CR") 8; SAC ¶¶ 1-5, 15-17, 22, 24, 91, 150)..  In accordance with the FCA and CA-FCA, the United States and the State of California investigated Relators' allegations and declined to intervene.  (CR 36, 38).

### A.   RIC's Alleged Improper Waivers of Medicare Part B Deductibles and Co-Payments

According to Complaint, two thirds of RIC's patients are covered by Part B of the Medicare program, a federally funded health care program providing health insurance coverage to people who are aged 65 and over or who have certain

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' SECOND AMENDED COMPLAINT

physical disabilities.   (*See* SAC ¶ 59; 42 U.S.C. §§ 1395 *et seq.*).[1]   Under Medicare Part B, patients are responsible for a co-payment generally consisting of 20% of the reasonable charges for physician services as established by the Medicare physician fee schedule. (SAC ¶¶ 55-56; 42 U.S.C. § 1395cc(a)(2)(A)(ii)).[2]   The Medicare program only reimburses health care services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." (42 U.S.C. § 1395y(a)(1)(A)).

Between 2006 and the present, RIC and the RIC Partners allegedly routinely waived their Medicare patients' deductible and co-payment obligations without complying with Medicare requirements for writing these obligations off based on financial hardship. (SAC ¶¶ 55-76).   The RIC Partners aggressively marketed this routine waiver to referring physicians in order to "induce" their Medicare patients to choose RIC physicians based on the improper elimination of their out-of-pocket expense, rather than on whether RIC physicians were best qualified to meet their medical needs.   (SAC ¶¶ 72, 75).   RIC's marketing efforts were overseen by Braun, RIC's CEO. (SAC ¶ 69).[3]

---

[1] Medicare Part A covers hospital inpatient services and Medicare Part B, a voluntary supplementary insurance program, covers outpatient services, including medical care in physicians' offices. (42 U.S.C. §§ 1395C-1395i).

[2] The Medicare program is administered by the U.S. Department of Health & Humans Services through its agency, the Center for Medicare and Medicaid Services ("CMS").   CMS in turn contracts with private organizations to act as Medicare Administrative Contractors ("MACs") to review and process Medicare claims submitted by hospitals and physicians for treatment of Medicare patients. (*See* 42 U.S.C. §§ 1395ff(a)(1), 1395kk-1(a)(3)-(4)).

[3] The Complaint specifically identifies only one referring physician – Dr. Michael Rose, an ophthalmologist – who allegedly required RIC to waive co-payments for his patients.   (SAC ¶ 73).   Both Dr. Chang and another RIC employee (Dr. Kristy Lin) told Relator Smith that Dr. Rose would only refer his Medicare patients to RIC if their co-payments were waived.   (*Id.*)   Based on their review of records relating to certain unidentified Rose patients that showed only 80% of allowable

320381.1                                                      2

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 800
LOS ANGELES, CALIFORNIA 90064

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

1   With respect to RIC's Medicare patients, RIC Partners allegedly informed
2   RIC physicians that "RIC waived co-payments and deductibles for Medicare
3   patients." (SAC ¶ 68). According to Relators, RIC would routinely waive co-
4   payments and made no effort to determine whether the Medicare patients qualified
5   for a financial hardship waiver. (SAC ¶ 61).[4]
6   The RIC physicians allegedly would also sometimes use a financial hardship
7   form to support a waiver of the patient's co-insurance obligations, but would use
8   justifications (e.g. "retired, fixed income") that would qualify virtually every
9   Medicare patient and would also sign the forms even if the patient provided no
10  financial hardship information. (SAC ¶ 65).[5] In addition, RIC allegedly submitted
11  Medicare claims for the physicians' "full" charges  for their services to patients
12  who had their deductibles and co-payments waived, rather than subtracting the
13  waived payment amounts from their "full" charges" to properly bill their "true"
14  charges. (SAC ¶ 99).[6]

---

Medicare charges were collected, Relators conclude that "[t]hese patients had their
co-payments waived, without regard to financial hardship criteria or
documentation." (*Id.*)

[4] According to the Complaint, at RIC's Garden Grove office, Dr. Suk, a RIC
physician, allegedly insisted to Relator Rogers that "the waivers continue so that
referrals would continue to be received from the referring doctors," despite being
told by Relator Rogers that such routine waivers were improper. (SAC ¶ 74).

[5] The Complaint includes a list of 10 RIC Medicare patients (identified by patient,
treatment period, encounters, and Medicare charges) who allegedly had their
copayments waived without explanation   (SAC ¶ 64).

[6] According to Relators, they advised the RIC Partners orally (including at a
September 25, 2012 meeting) that the RIC policy of routinely waiving payment of
Medicare co-payments and deductibles without any proper verification of financial
hardship did not comply with Medicare regulations. (SAC ¶ 67). Dr. Chang
allegedly responded that he wanted to continue the financial hardship waivers to
ensure that RIC would not lose patient referrals and patients and would just pay the
fines if Medicare discovered what was occurring with the waivers. (*Id.*)

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' SECOND AMENDED COMPLAINT

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

B.   RIC's Alleged Improper Co-Marketing Agreement With RIC Diagnostics

The Complaint also alleges that RIC entered into an improper co-marketing agreement and/or made a loan to RIC Diagnostics ("RICX"), a company that provided mobile optical coherence tomography ("OCT") testing for optometrists to screen for and diagnose various retina diseases.  (SAC ¶¶ 77-78).

According to Relators, RIC advertised and encouraged optometrists to use RICX's mobile OCT service, including by offering free workshops to optometrists on how to interpret OCT images and free interpretations of such images by RIC physicians if optometrists requested them.  (SAC ¶¶ 79-83).   CEO Braun also allegedly offered free RICX tests to optometrists, told them that they could bill the free OCT tests, and encouraged the optometrists to refer their patients to RIC. (SAC ¶ 88).

C.   The RIC and CEES Physicians' Alleged Improper Referrals to the San Gabriel Ambulatory Surgery Center

According to Relators, the RIC Partners, other RIC physicians, and CEES physicians, also made improper patient referrals to SG-ASC, an ambulatory surgery center in which the RIC Partners have "investment interests," without advising the referred patients of such interests.  (SAC ¶¶ 91-92, 95).

Patients were allegedly provided with a brochure that informed them that the ownership of SG-ASC could be verified by calling the center.  (SAC ¶ 95).   At Relator Smith's request, an RIC employee called SG-ASC to determine who owned the center, but no one at the center could provide that employee with any ownership information.  (SAC ¶ 96).

D.   The RIC Partners' Medicare Claims for Alleged "Upcoded" Visits

Relators next allege that the RIC Partners regularly billed Medicare for office visits using higher levels of evaluation and management ("E&M") codes

320381.1                                          4

than the services actually provided, thereby falsely increasing reimbursement. (SAC ¶¶ 101-116).

According to Relators, a "government audit" of Dr. Chang (1/3/06-7/30/13), Dr. Davis (7/17/08-7/31/13), and Dr. Samuel (1/4/06-7/31/13) found that they consistently billed a Level 4 office – using Common Procedural Terminology ("CPT") code 99204 or 99214 – and that such coding was "unsupported by the medical records" primarily because the "History of Present Illness" was too "brief" and only supported a Level 2 office visit (CPT Code 99202 or 99212). (SAC ¶ 113). According to the audit, the RIC Partners billed at Level 4 for 98 to 99% of their office visits even though the state-wide average for retina specialists was 57% and Dr. Davis' rate of billing for a Level 5 office visit (CPT code 99205 or 99215) was the highest in California. (SAC ¶ 114.) In addition, the audit allegedly found that the RIC Partners would bring these patients back every few weeks for "unnecessary" follow-up visits. (SAC ¶ 115).

Based on the government's audit, Relators allege that the RIC Partners overbilled Medicare for $208,566.47 of "overcoded" E&M services, or approximately 30% of their total E&M billings. (SAC ¶ 116).

E.    RIC's Medicare Claims For Allegedly Unnecessary ICG Tests

The Complaint further alleges that RIC submitted Medicare claims for unnecessary indocyanine green angiography ("ICG") (CPT Code 92240), a "controversial" diagnostic that is "infrequently" used to treat age-related macular degeneration ("AMD"), and is not the standard of care according to the American Academy of Ophthalmology's practice guidelines. (SAC ¶¶ 117-119).

\According to Relators, the RIC Partners' use of ICGs was inconsistent and not within the standard of care for AMD treatment. (SAC ¶ 119). In addition, the RIC Partners allegedly emphasized that the ICGs (at about $300 per test) were more profitable that optical coherence tomography (at about $50 per test), the standard test used to diagnose AMD, thereby suggesting that money was the real

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' SECOND AMENDED COMPLAINT

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

reason for ordering ICGs.  (SAC ¶ 120).[7]   The ICG tests were also allegedly not ordered for HMO patients because these plans required prior authorization and would not have authorized these unnecessary tests.  (SAC ¶ 121).

The Complaint also alleges that the "Department of Justice" evaluated RIC's use of ICG on Medicare patients between February and May 2014 and determined that ICGs were ordered for virtually every patient visit and that 98.2% of tests were medically unnecessary.  (SAC ¶ 119).   Relators also note that Dr. Chang and Dr. Davis are the top two physicians with respect to Medicare ICG payments in California. (SAC ¶ 121).

F.   RIC's Alleged Duplicate Medicare Claims for Dr. Bhatti's Services at Dr. Kislinger's Clinic

According to the Complaint, RIC had an agreement with Dr. Mark Klisinger under which Dr. Bhatti, a RIC physician, would provide services at Dr. Klisinger's Glendora clinic and Dr. Klisinger would bill Dr. Bhatti's services and pay half of the fees collected to RIC.  (SAC ¶ 122).  Between as least April through June of 2012, RIC allegedly billed Medicare for the services Dr. Bhatti had performed in Dr. Kislinger's clinic as though the services had been provided at a RIC facility.   (SAC ¶ 123).  Dr. Chang was allegedly informed by Dr. Klisinger and Relator Smith that this double billing needed to be corrected, but RIC failed to return the Medicare overpayments that it received for Dr. Bhatti's services.  (SAC ¶ 125).

G.   CEES' Alleged Medicare Claims For Assistant Surgeon Services Not Performed

Relators also allege that CEES, an ophthalmology practice owned by Dr. Chang, billed Medicare for the assistant surgeon services of Dr. Lily Lee, Dr. Chang's spouse, during retinal surgeries even though she was not present and did

---

[7] For example, Dr. Chang allegedly noted Dr. Suk's outstanding reimbursement of $15,000 in just one morning by "simply by warming up the ICG." (SAC ¶ 120).

320381.1                                          6

1   not participate in the surgeries. (SAC ¶¶ 129-132).   The Complaint identifies six

2   CEES retinal surgeries (by patient, date of service, and claim amount) in 2012 and

3   2013 for which Dr. Lee's assistant surgeon services were allegedly billed even

4   though she was not present during the surgeries.   (SAC ¶ 131).

5      H.   <u>RIC's Alleged Submission of Incomplete Data to the Medicare</u>

6           <u>Physician Quality Reporting System</u>

7        As a voluntary participant in Medicare's Physician Quality Reporting

8   System ("PQRS") for 2011,[8] RIC was allegedly required to submit 12 months of

9   data on quality measures in order to qualify for incentive patients.   (SAC ¶¶ 133-

10   135).   According to Relators, RIC only submitted data on quality measures to

11   Medicare for the last four months of 2011.   (SAC ¶ 135).   RIC also allegedly

---

[8] The PQRS is "a voluntary individual reporting program that provides an incentive payment to identified eligible professionals who satisfactorily report data on quality measures for covered Physician Fee Schedule (PFS) services furnished to Medicare Part B beneficiaries." *See* CMS, *2011 Physician Quality Reporting System (Physician Quality Reporting) Implementation Guide*, at 3 (2011) available at https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-instruments/PQRS/Downloads/2011_PhysQualRptg_Implementation Guide_03312011.pdf.  Reporting physicians are required to select and report data for various care measures, including "prevention, chronic-and acute-care management, procedure-related care, resource utilization, and care coordination," applicable to their practice. *Id.* at 3-4. The physicians' reporting of such data depends on which of the various authorized reporting methods (claims-based, registry-based, electronic health record-based, and group practice reporting options-based) is selected, and, depending on the reporting method, the reporting period is either 6 months (July 1, 2011 through December 31, 2011) or 12 months (January 1, 2011 through December 31, 2011). *Id.* at 12-13, 18-25. Within the applicable reporting period, PQRS requires different quality measures to be reported with different frequencies for patients with specified medical conditions. *See* CMS, *Physician Quality Reporting System (Physician Quality Reporting) Measure Specifications Manual for Claims and Registry*, at 1(2011), available at https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/PQRS/2011-Physician-Quality-Reporting-System-Items/ CMS125 4515.html?DLPage=1&DLEntries=10&DLSort=0&DLSortDir=ascending.

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' SECOND AMENDED COMPLAINT

provided PQRS data in 2012 that included information "for activities that had not actually occurred." (*Id.*)  In October 2012, Medicare allegedly paid $60,000 to RIC based on the incomplete data submitted by RIC for the 2011 PQRS. (SAC ¶ 136).   Although Relator Smith allegedly advised the RIC Partners that this payment needed to be returned because RIC had submitted insufficient PQRS data for 2011, they refused to refund the overpayment.  (SAC ¶¶ 137-138).

I.   RIC's Alleged Failure to Charge Medi-Cal the Same Prices Charged to Patients Without Insurance Who Paid in Cash

Between 2006 and the present, RIC, the RIC Partners, CEES and SG-ASC also allegedly "charged patients without any insurance, who paid for medical services in cash, fees that were lower than the rate Medi-Cal was billed for the same services," in supposed violation of the Medi-Cal Program's Discriminatory Billing Rule, Title 22, California Code of Regulations ("CCR"), Section 51480(a). (SAC ¶¶ 141, 145).[9]

According to the Complaint, the CPT codes for which RIC charged uninsured self-pay patients less than the price charged to Medi-Cal included CPT codes 67028 and CPT 67105.   (SAC ¶ 141).  Self-pay patients allegedly paid on average 36.8% of RIC's usual charges in 2011 and 23.1% of RIC's usual charges in 2012. (*Id.*)  CEES physicians allegedly charged patients "who paid cash $35.00 for CPT 92250, but Medi-Cal paid $42.11."  (SAC ¶ 145).   Relators also allege that RIC's usual charge for CPT code 67028 was $370.00, just over Medi-Cal's $364.11 reimbursement rate, even though RIC typically calculated its usual charge

---

[9] The Medi-Cal program, administered by the California Department of Health Care Services, is California's implementation of the Medicaid program, a joint federal-state health care program through which the federal government provides financial assistance to states furnishing medical services to qualified indigent persons. (*See* 42 U.S.C. §§ 1396-1396v; Cal. Welf. & Inst. Code, §§ 14000 *et seq.*; 22 CCR §§ 50000 *et seq.*; *Physicians & Surgeons Laboratories, Inc. v. Department of Health Service*, 6 Cal.App.4th 968, 973 (1992)).

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' SECOND AMENDED COMPLAINT

1  at 200% of the Medicare reimbursement rate, which would have been $250 for this

2  code.  (SAC ¶ 142).[10]

3      J.      The RIC Partners' Alleged Failure to Advise Medi-Cal Patients
               of Their Ownership Interest in SG-ASC
4

5      According to the Complaint, RIC, the RIC Partners, CEES and SG-ASC all

6  submitted Medi-Cal claims for services to patients who were referred to SG-ASC

7  by RIC Partners without being advised of the physicians' ownership interest in the

8  ambulatory surgery center and the patients' right to obtain services at a facility of

9  their choosing.  (SAC ¶¶ 155-159).  Instead, the patients were allegedly provided

10  with a brochure that informed them that the ownership of SG-ASC could be

11  verified by calling the center, but, when Relators called the center, no one there

12  could provide them with any ownership information.  (SAC ¶¶ 156-157).

13      K.      RIC's Alleged Waiver of Deductibles and Co-Payments For
               Commercial Insurance Patients
14

15      Relators also allege that RIC, the RIC Partners, CEES and SG-ASC

16  routinely waived the deductible and co-payments amounts that they were obligated

17  to charge patients covered by commercial health plans (e.g., Empire BlueCross/

18  Blue Shield, Cigna and United Healthcare) pursuant to the terms of their provider

19  agreements with those plans.  (SAC ¶¶ 148-149).  In addition, these defendants

20  allegedly failed to disclose their usual charges to these plans because they charged

21  lower prices to uninsured patients who paid in cash.  (SAC ¶ 150).

22      L.      Relators' FCA, CA-FCA and CA-IFPA Causes of Action

23      Based on these allegations, the Complaint charges that, between July 2006

24  and the present, defendants presented false claims to the Medicare program, in

25  violation of 31 U.S.C. § 3729(a)(1)(A) (Count I), made false statements material to

26

27  [10] The Complaint also lists three examples (by patient initials date of service) of
    RIC patients who were allegedly charged less than the usual rates charged to Medi-
28  Cal.  (SAC ¶ 141).

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' SECOND AMENDED COMPLAINT

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

1   Medicare false claims, in violation of  31 U.S.C. § 3729(a)(1)(B) (Count II),

2   retained Medicare overpayments, in violation of 31 U.S.C. § 3729(a)(1)(G) (Count

3   III), submitted false claims to the Medi-Cal program and made false statements to

4   obtain payment for such false claims, in violation of Cal. Gov. Code § 12651(a)(l)

5   and (a)(2) (Count IV), and made false insurance claims for healthcare benefits to

6   insurance plans and false statements supporting such claims, in violation of Cal.

7   Ins. Code § 1871.7(b) and Cal. Penal Code § 550 (Count V).  (SAC ¶¶ 15, 172-

8   188).

9   **III.    STANDARDS OF REVIEW**

10          A complaint will survive a motion to dismiss pursuant to Rule 12(b)(6) if it

11   contains "sufficient factual matter, accepted as true, to state a claim to relief that is

12   plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

13   *Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible

14   under Rule 8 when the plaintiff pleads facts that allow the court to "draw the

15   reasonable inference that the defendant is liable for the misconduct alleged."

16   *Iqbal*, 556 U.S. at 678; *U.S. v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 260 (5th

17   Cir. 2014).  When considering a motion to dismiss, this Court must accept as true

18   all allegations of material fact and must construe those facts in the light most

19   favorable to the plaintiff.  *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000);

20   *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).[11] However,

21   conclusory allegations or allegations that are no more than a statement of a legal

22

---

23   [11] "In ruling on a 12(b)(6) motion, a court may generally consider only allegations

24   contained in the pleadings, exhibits attached to the complaint, and matters properly

25   subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir.

    2007).  A district court can also consider documents referenced by the complaint,

26   *U.S. v. Corinthian Colleges*, 655 F.3d 984, 993 n.4 (9th Cir. 2011), and "need not

27   accept as true allegations contradicting documents that are referenced in the

    complaint or that are properly subject to judicial notice." *Lazy Y Ranch Ltd. v.*

28   *Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' SECOND AMENDED COMPLAINT

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

conclusion "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. *Id*. at 679.   In other words, relators must support their claim with more than a formulaic recitation of the elements, labels and conclusions, and naked assertions of fact.  *Id*. at 678.   Instead, relators must allege sufficient facts such that a court has "plausible grounds to infer" that their claims rise "above the speculative level." *Twombly*, 550 U.S. at 555-56.

Since Relators' Complaint is brought under the FCA, CA-FCA and CA-IFPA, it must also fulfill the requirements of Rule 9(b).  *See Cafasso, U.S. ex rel.v. General Dynamics C4 Systems, Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011); *Vess v. Giba-Ceigy Corp.*, 317 F.3d 1097, 1103 (9th Cir. 2003) (Rule 9(b) applies to state-law causes of action).   Rule 9(b) requires that the details constituting the alleged fraud must "give defendants notice of the particular misconduct which is alleged fraud charged so that they can defend against the charge and not just deny that they have done anything wrong."  *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993).   This requires that the particular facts supporting a fraud cause of action include the "who, what, when, where and how" of the misconduct charged, as well as "what is false or misleading about a statement and why it is false."  *United States ex rel. Ebeid v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (citing *Vess*, 317 F.3d at 1106). [12]  Allegations on information and belief do not satisfy Rule

---

[12]   In the context of an FCA action, Rule 9(b) can be satisfied without detailed allegations regarding the false claims – such as the exact dollar amounts, billing numbers, or dates – if the complaint alleges "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."  *Ebeid*, 616 F.3d at 998-999 (quoting *U.S. ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).   However, "[t]his does not absolve [a relator] of the burden of otherwise sufficiently pleading the time, place, or identity details of the traditional standard, in order to effectuate Rule 9(b)'s function of fair notice and protection from frivolous suits."  *U.S. ex rel. Nunnally v. West Calcasieu Cameron Hosp.*, 519 F. App'x 890, 895 (5th Cir. 2013); *Ebeid*, 616 F.3d at 999.   Rule 9(b)'s "heightened pleading standard for fraud claims supplies defendants with the information they need to prepare

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

9(b).  *U.S. ex rel. Bogina v. Medline Industries, Inc.*, 809 F.3d 365, 370 (7th Cir. 2016); *County of Santa Clara v. Astra U.S., Inc.*, 428 F.Supp.2d 1029, 1036-37 (N.D. Cal. 2006).  Rule 9(b)'s particularity requirement applies to FCA claims based on alleged kickbacks.  *Nunnally*, 519 F. App'x at 894; *Hericks v. Lincare Inc.*, 2014 WL 1225660, at *12 (E.D. Pa. Mar. 25, 2014).  A dismissal for failure to plead fraud with particularity pursuant to Rule 9(b) is treated the same as a Rule 12(b)(6) dismissal for failure to state a claim.  *Vess*, 317 F.3d at 1107.

## IV.   ARGUMENT

### A.   THE COMPLAINT FAILS TO STATE A VALID FEDERAL FCA CLAIM AGAINST DEFENDANTS

As detailed below, the Complaint alleges eight different theories of liability under the federal FCA against some or all of the eight defendants.  However, Relators' various allegations fail to state a valid FCA claim against any of the defendants, either as a matter of law or because they do not allege fraud with the required factual particularity pursuant to Rules 12(b)(6) and 9(b).

#### 1.   The Federal FCA

The federal FCA is designed to punish and deter fraud against the federal government. *See U.S. v. Bornstein*, 423 U.S. 303, 309 & n.5 (1976).  To establish FCA liability for presenting false claims, a relator must allege (1) a false or fraudulent claim, (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval, (3) with knowledge that the claim was false. *See* 31 U.S.C. § 3729(a)(1)(A); *U.S. v. Mackby*, 261 F.3d 821, 826 (9th Cir. 2001).[13]  To establish a valid FCA claim for making false statements,

---

responses, prevents discovery intended as a mere fishing expedition, and protects the defendants' reputations from baseless allegations." *Nunnally*, 519 F. App'x at 892 n.2.

[13] Relators' Complaint is brought under FCA provisions that permit a private litigant to bring a *qui tam* action on behalf of the federal government against

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

320381.1                                       12

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

a relator must allege that (1) there was a false statement, (2) made knowingly, (3) that was material, and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim).   31 U.S.C. § 3729(a)(1)(B); *Gonzalez v. Fresenius Medical Care North America*, 689 F.3d 470, 475 (5th Cir. 2012).[14]   In order to state a valid FCA "reverse false claim" for retaining overpayments, a relators must allege that defendants either (1) knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay money to the government or (2) knowingly made or used a false statement material to an obligation to pay money to the government. 31 U.S.C. § 3729(a)(1)(G).

Under the FCA, a person acts "knowingly" when that person (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.   31 U.S.C. § 3729(b).   No proof of specific intent to defraud is required to establish knowledge. *Id.*

The FCA is not a catchall anti-fraud provision, but expressly "'attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment.'" *Cafasso*, 637 F.3d at 1055 (quoting *U. S. v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995)).   "Evidence of an actual false claim is

---

anyone who submits a false claim to the government. *See* 31 U.S.C. §§ 3729(a), 3730(b) (2016) (authorizing private individual, the relator, to "bring a civil action for a violation of section 3729 . . . for the United States Government."). The government may intervene in the action, but if it chooses not to do so, the relator bringing the action may proceed on his own. *See* 31 U.S.C. § 3730(b)(2) (2016).

[14] Stated differently, a relator "must show that the government paid a false claim to prove a violation" of the FCA's false statement provision. *Hopper v. Solvay Pharmaceuticals*, Inc., 588 F.3d 1318, 1328 (11th Cir. 2009).   In addition, Relators "must demonstrate that [the government] was owed a specific, legal obligation at the time that the alleged false record or statement was made [.]" *U.S. v. Bourseau*, 531 F.3d 1159, 1169 (9th Cir. 2008).   The obligation "cannot be merely a potential liability." *Id.*

1    'the *sine qua non* of a False Claims Act violation.'" *U.S. v. Kitsap Physicians*
2    *Service*, 314 F.3d 995, 1002 (9th Cir. 2002), quoting *U.S. ex rel. Clausen v.*
3    *Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1312 (2002).

4        A claim can be "false" within the meaning of the FCA under a variety of
5    theories.  Most simply, a claim is facially or factually false if "the claim for
6    payment is itself literally false or fraudulent." *U.S. ex rel. Hendow v. Univ. of*
7    *Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006).  Alternatively, a claim can be
8    "false" under an express certification theory if (1) the defendant knowingly makes
9    a false certification or statement of compliance with a government regulation, (2)
10   that is "material to the government's decision to pay out moneys to the claimant"
11   and (4) the claim asks for government payment. *Id.* at 1171-1173.

12       Finally, under an implied certification theory, the U.S. Supreme Court has
13   recently held that a claim can be a "false" misrepresentation (1) if the claim "does
14   not merely request payment, but also makes specific representations about the
15   goods or services provided," (2) "the defendant's failure to disclose noncompliance
16   with material statutory, regulatory, or contractual requirements makes those
17   representations misleading half-truths," and (3) these misrepresentations are
18   material to the government's payment decision. *Universal Health Services v. U.S.*
19   *ex rel. Escobar*, 136 S. Ct. 1989, 2001-2002 (2016).  While the Supreme Court
20   declined to decide whether the submission of claim impliedly represents that the
21   billing party is legally entitled to payment, *id.* at 2000, the Ninth Circuit has held
22   that the implied certification theory is "'based on the notion that  the act of
23   submitting a claim for reimbursement itself implies compliance with governing
24   federal rules that are a precondition to payment.'" *Ebeid,* 616 F.3d at 996 (quoting
25   *Mikes v. Straus*, 274 F.3d 687, 699 (2d Cir. 2001)).

26       Under the FCA's "demanding" materiality standard, it is not sufficient for
27   relators to simply allege that the government "designates compliance with a
28   particular statutory, regulatory, or contractual requirement as a condition of

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' SECOND AMENDED COMPLAINT

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

payment" or "would have the option to decline to pay if it knew of the defendant's noncompliance." *Escobar*, 136 S. Ct at 2003. In addition, materiality "cannot be found where noncompliance is minor or insubstantial." *Id*. at 2003.

> **2.** The Complaint Fails to State a Federal FCA Claim Based on RIC's Alleged Waiver of Medicare Patients' Deductibles and Co-Payments

Relators' primary theory of FCA liability is that RIC and the RIC Partners violated the FCA by submitting Medicare claims that were false and non-reimbursable because their "routine" waivers of the patients' co-payments without adequately verifying that they qualified for a financial hardship allegedly (a) violated the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, and (b) misrepresented the true charges for RIC services by failing to subtract the waived copayment amount from RIC's billed charges. *See* SAC ¶¶ 55-76, 98-100..

Under the AKS, it is illegal to knowingly and willfully offer or pay "remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person" to either (a) "refer an individual to a person for the furnishing or arranging for the furnishing of any item or services" or (b) "purchase, lease, order . . . any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a–7b(b)(2). The AKS includes various "safe harbor" provisions that exclude certain types of payments from being considered illegal remuneration. *See* 42 U.S.C. § 1320a–7b(b)(3). In order to establish a willful violation of the AKS, the government must prove that the defendant acted with knowledge that his conduct was unlawful, but need not prove that he had actual knowledge of or a specific intent to violate the AKS. *See* 42 U.S.C. § 1320a-7b(h); *U.S. v. Starks,* 157 F.3d 833, 838 (11th Cir.1998); *U.S. v. Mousavi*, 604 F.3d 1084, 1092-1093 (9th Cir. 2010). As of 2010, any Medicare claim that includes services delivered in violation of the AKS constitutes a false

1    claim within the meaning of the FCA.  42 U.S.C. § 1320a-7b(g) (2010).

2         In this case, the Complaint's allegations fail to legally and factually establish

3    that RIC's alleged "routine" waivers of their Medicare patients' co-payment

4    obligations violated the AKS.  While the Office of Inspector General ("OIG")

5    guidance cited in the Complaint states that providers who provide such waivers

6    "could be held liable" under the AKS because when they "forgive financial

7    obligations for reasons other than genuine financial hardship of the particular

8    patient, they may be unlawfully inducing that patient to purchase items or services

9    from them," *see* SAC ¶ 57(citing *OIG Special Fraud Alert: Routine Waivers of*

10   *Copayments and Deductibles Under Medicare Part B* (May 1991) (reprinted in 59

11   FR 242 (December 19, 1994), such routine waivers do not necessarily violate the

12   AKS.   Thus, merely alleging that a Medicare provider routinely waives co-

13   payment obligations does not excuse Relators' obligation to sufficiently allege all

14   elements of an AKS violation underlying an FCA claim.

15        Here, Relators' conclusory allegations that RIC and the RIC Partners

16   "routinely" waived the copayment obligations of Medicare patients are insufficient

17   under Rules 12(b)(6) and  9(b) to show an AKS violation absent any factual

18   allegations establishing that such waivers were improper because the Medicare

19   patients did not have a "financial hardship" or "financial need" supporting such

20   waivers and that such waivers were to "induce" the Medicare patients to receive

21   services from RIC versus some other provider.   In particular, the First Amended

22   Complaint indicated that RIC only waived the copayment obligations if asked to

23   do so by patients, *see* FAC ¶ 75, and, while Relators now allege in conclusory

24   fashion that RIC did not appropriately determine or document whether patients had

25   a "financial hardship" before providing a waiver or writing off the debt, the

26   Complaint fails to identify what "financial hardship" standard RIC was required to

27   satisfy for Medicare patients and contains no factual allegations indicating that RIC

28   patients did not have such a "financial  hardship."    Under Rule 9(b), such vague

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

320381.1                                    16

allegations are factually insufficient to establish that the RIC physicians' "routine" waivers of the co-payment obligations of certain Medicare patients when asked to do so constituted a willful criminal violation of the AKS or resulted in Medicare false claims. *See Nunnally*, 519 F. App'x 890, 895 (5th Cir. 2013) (FCA complaint properly dismissed where Relator's conclusory allegations failed to plausibly establish existence of kickback scheme or describe fraud with particularity); *U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 687-688 (W.D. Tex. 2006) (dismissing FCA kickback claim for failure to satisfy Rule 9(b) particularity requirement).

Similarly, the Complaint's allegation that RIC's waivers of copayments were intended to induce other physicians to refer their patients also fails to meet the "who, what, when and how" requirements of Rule 9(b). While Relators allege that RIC physicians and the RIC Partners routinely informed potential referring physicians that their patients' Medicare co-payment or deductible obligations would be waived, this solicitation by itself does not plausibly constitute "remuneration" to "induce" the referring physician to refer such patients to RIC because such a waiver provides nothing of value to the referring physician. Moreover, even if RIC's alleged waiver offer to referring physicians did constitute "remuneration" within the meaning of the AKS, Rule 9(b) requires that Relators provide factual specifics regarding the identity of referring physicians who were solicited in this fashion, who at RIC made the waiver offers, when such offers were made, which Medicare patients of the referring physicians were referred as a result, and whether the co-payment and deductible obligations of those Medicare patients were in fact waived by identified RIC physicians.

Here, however, the Complaint only identifies one referring physician (Dr. Michael Rose) who allegedly required such a waiver as a condition of his referrals, *see* SAC ¶ 73, but fails to specifically identify any Medicare patients who were referred by that physician to RIC, had their co-payment and deductible obligations

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

improperly waived without regard to "financial hardship," and received RIC services that were billed to the Medicare program.  Such bare-boned factual allegations are insufficient to establish that RIC and the RIC Partners routinely offered illegal remuneration to referring physicians as an inducement for patient referrals in violation of the AKS and that Medicare false claims resulted.

In a similar vein, Relators' allegation that such routine waivers also caused RIC's resulting claims to be false because the claims mispresented RIC's charges by failing to subtract the amount of the waived deductible or co-payment, see SAC ¶¶ 98-99, fails to state a valid FCA claim under Rules 12(b)(6) and 9(b).  While such a waiver might have impacted proper Medicare reimbursement prior to 1991 when services were based on the provider's "reasonable charge," *see* 42 U.S.C. §§ 1395l, 1395u(o), CMS now reimburses Medicare Part B physician services based on a Medicare physician fee schedule – which sets reimbursement for such services at fixed amounts – and under which Medicare pays 80 percent of the fee schedule amount and the patient is responsible for paying the remaining 20 percent.  66 FR 40372, 40394 (Aug. 2, 2001); 63 FR 58814, 58882 (Nov. 2, 1998); 56 FR 59502 (Nov. 25, 1991).  Thus, Medicare's payments to RIC for office visit or other physician service claims would be the same regardless of whether RIC allegedly improperly waived the patient's deductible or co-payment obligations. Under such circumstances, Relators have failed to allege any facts establishing that RIC's charges for Medicare services were material to Medicare's payment decision.

### 3. The Complaint Fails to State a Federal FCA Claim Based On RIC's Co-Marketing Agreement With RICX

The Complaint also alleges that defendants RIC, the RIC Partners, and Barnes somehow violated the FCA by having an "improper" co-marketing agreement and/or making a "loan" to RIC Diagnostics ("RICX"), a mobile optical coherence tomography ("OCT") company, under which RIC and RICX each

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' SECOND AMENDED COMPLAINT

allegedly encouraged optometrists to refer their patients to the other, including by variously offering free workshops and OCT tests and interpretations, and Dr. Chang suggested that RIC would pay RICX more if referrals increased. SAC ¶¶ 77-89.

Without any factual allegations about the specific nature of the financial relationship between RIC and RICX – whether through marketing agreement or loan – the Complaint fails to describe any "improper" relationship or any illegal between the two entities violating the AKS with the factual particularity required by Rule 9(b). Nor does the Complaint identify any illegal payment (whether by date or amount) by RIC or Dr. Chang to RICX for Medicare patient referrals. Similarly, Relators' generic allegations fail to establish that the defendants paid any illegal remuneration to optometrists in exchange for Medicare referrals.

In particular, Relators' allegations fail to identify any of the optometrists who allegedly received free workshops or free OCT tests or interpretations, any Medicare patients referred by such optometrists to RIC, or any RIC services that were provided to such patients and billed to the Medicare program. As such, under Rules 12(b)(6) and 9(b), Relators have failed to state a valid FCA claim predicated on alleged AKS violations arising from RIC's relationship with RICX.

4. The Complaint Fails to State A Federal FCA Claim Based On the RIC Physicians' Patient Referrals To The SG-ASC In Which They Allegedly Have Investment Interests

Next, the Complaint alleges that the RIC Partners' Medicare claims for services provided at the defendant SG-ASC were false because they resulted from referrals of patients who were not informed of the physicians' 50% ownership interest in the ambulatory surgery center, in supposed violation of the federal AKS. See SAC ¶¶ 91-97. Under the Medicare AKS safe harbor for investments in ambulatory surgery centers, 42 U.S.C. § 1001.952(r), "remuneration" does not include any payment that is a return on an investment interest made to a physician

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

1   investor in an ambulatory surgical center if various standards are met, including

2   that "patients referred to the investment entity by an investor are fully informed of

3   the investor's investment interest." 42 U.S.C. § 1001.952( r).  Relators allege that

4   the RIC Partners' "failure to comply with the requirements" of this safe harbor

5   "results in remuneration prohibited by 42 U.S.C. l 395nn and 42 C.F.R. 411.353."

6   SAC ¶ 97.

7          However, the RIC Partners' alleged failure to comply with one element of

8   the safe harbor for ASC investments does not establish an AKS violation.  In

9   particular, "the various Medicare 'safe harbors' define a subset of clearly legal

10  conduct, but that does not mean that anything outside of the 'safe harbors' violates

11  the AKS." *Klaczak v. Consolidated Medical Transport*, 458 F.Supp.2d 622, 686

12  (N.D. Ill. 2006).     Rather, CMS has confirmed that "it is not true that every

13  arrangement that does not comply with a safe harbor is suspect under the anti-

14  kickback statute, though such arrangements may be suspect in particular

15  circumstances." 64 FR 63518, 63521 (Nov. 19, 1999).  In addition, Relators have

16  failed to plausibly allege that the RIC Partners did not satisfy the safe harbor.[15]

17         In addition, Relators have failed to allege any facts specifically describing

18  the nature of the RIC Partners' ownership interests in defendant SG-ASC, how

19  they received any returns on such interests, and the financial relationship between

20  such returns and their referrals of unidentified patients to the center.  Without such

21  particular allegations, the Complaint provides no factual basis for inferring that the

22  RIC Partners' investment interest violated the AKS by "inducing" them to refer

23

24  [15] In particular, Relators' allegation that RIC informed patients via brochure that

25  they could verify defendant SG-ASC's ownership by calling the center, but that
     center staff were unable to do so when Relator had someone call  the center on a

26  **single** occasion is insufficient to plausibly establish that all patients were never

27  fully informed of the RIC Partners' investment interests.  As a result, the
     Complaint fails to establish that the RIC Partners' investment interests were not

28  protected by the federal AKS safe harbor for investments.

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

patients to the center and caused any resulting Medicare claims for such patients to be false.  *See Hanlester Network v. Shalala*, 51 F.3d 1390, 1399 (9th Cir. 1995) (joint venture laboratories did not violate AKS by merely encouraging physician investors to refer patients to them).  Accordingly, under Rules 12(b)(6) and 9(b), the Complaint fails to state a valid FCA claim predicated on the RIC Partners' investment interests in defendant SG-ASC.

     5.    <u>The Complaint Fails to State a Federal FCA Claim Based on Dr. Davis' and Dr. Samuels' Alleged "Upcoding" of Office Visits</u>

Relators next allege that RIC physicians regularly billed Medicare for office visits using billing codes for higher levels of evaluation and management ("E/M") services than actually provided, thereby fraudulently increasing reimbursement. SAC ¶ 124.  Such a billing practice (known as "upcoding") can be actionable under the FCA.  *U.S. ex rel. Obert-Hong v. Advocate Health Care*, 211 F. Supp. 2d 1045, 1051 (S.D. Fl. 2012); *U.S. ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 6 (D.D.C. 2003).

The Medicare program requires physicians to bill Medicare Part B services, including office visits, using the American Medical Association's Current Procedural Terminology ("CPT") numeric codes to describe the services provided. *See* Medicare Claims Processing Manual, Pub. 100-04, Ch. 12, § 30.[16]  In the case of office visits, a physician's E/M services are typically billed using a five-level series of CPT codes for either a new patient (CPT-4 Codes 99201 through 99205) or an established patient (CPT-4 Codes 99211 through 99215), with the higher code or "Level" numbers (e.g., Level 1 being the lowest and Level 5 being the highest) corresponding with the increased "complexity of the physician's decision-making, the comprehensiveness of both the physical examination and the patient

[16] CMS's Medicare manuals are available on the Internet at https://www.cms.gov/regulations-and-guidance/guidance/manuals/internet-only-manuals-ioms.html.

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' SECOND AMENDED COMPLAINT

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

history, the severity of the presenting medical problem, and the amount of face-to-face time that the physician spends with the patient and the patient's family." *U.S. v. Singh*, 390 F.3d 168, 177 (2d Cir. 2004); *U.S. ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 920 (8th Cir. 2014). In guidance, CMS has explained that history, examination, and medical decision making – and not time spent with the patient – are generally "the key components in selecting the level of E/M services" unless the office visit consists "predominantly of counseling or coordination of care" in which case "time is the key or controlling factor to qualify for a particular level of E/M service." *See* CMS, *1997 Documentation Guidelines for Evaluation and Management Services*, at 4 (1997).[17] By way of example, an office visit qualifying for E/M CPT Code 99214 (Level 4) is described by the AMA as follows:

> Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 key components:
>
> - A detailed history;
> - A detailed examination;
> - Medical decision making of moderate complexity.
>
> Counseling and/or coordination of care with other physicians, other qualified healthcare professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.
>
> Usually, the presenting problem(s) are of moderate to high severity. Typically, 25 minutes are spent face-to-face with the patient and/or family.

AMA, *CPT 2014*, at 9 (2014).

In this case, the sole factual basis for the Complaint's allegation that the RIC Partners improperly billed Level 4 is some type of "government audit" that allegedly found the physicians' documentation of "History of Present Illness" was

---

[17] Available at https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNEdWebGuide/Downloads/97Docguidelines.pdf.

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' SECOND AMENDED COMPLAINT

too "brief" to support a Level 4 code for 98.2% of the patients seen between January 2006 and July 2013, and that certain follow-up visits were also somehow "unnecessary." With respect to Dr. Davis allegedly being the highest biller of the Level 5 code in California, Relators allege no facts at all establishing such billings were improper.

This bare-boned, conclusory and second-hand recitation of the results of some type of unidentified "government audit" that supposedly found poor physician supporting documentation and "unnecessary" follow-up visits fails to state an FCA claim based on alleged "upcoding" of office visits under Rule 12(b)(6) and does not describe any fraud with the particularity required by Rule 9(b). In particular, Relators' generic conclusion (based on the audit results) that the RIC Partners' documentation of one element of a Level 4 code was too "brief" does not support a plausible claim that the Level 4 claims were "objectively false" within the meaning of the FCA, nor establish that Relators have any personal knowledge regarding the conduct described. *See U.S. v. Prabhu*, 442 F.Supp.2d 100, 1032-1034 (D. Nevada. 2006) (because rules regarding documentation for establishing medical necessity for services provided were ambiguous, Medicare services provider could not be found to have "knowingly" submitted any "false" claim to the government regarding the medical necessity of his claims);

Similarly, Relators' conclusory allegation that certain "follow-up" visits were "unnecessary" does not satisfy Rule 9(b) when they include no facts identifying which visits fell into this category or why the visits were unnecessary. *See Frazier ex rel. U S. v. Iasis Healthcare Corp.*, 392 Fed. Appx. 535, 2010 WL 3190641, at *1 (9th Cir. 2010) (FCA complaint properly dismissed where relator's "allegations regarding medically unnecessary procedures were conclusory at best"); *Advocate Health Care*, 211 F. Supp. 2d at 1051 (Rule 9(b) required dismissal of complaint where relator failed to provide factual basis for allegation that provider upcoded services); *U.S. ex rel. Stewart v. The Louisiana Clinic*, 2002

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

320381.1                          23

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

WL 106674, *2, 4 (E.D. La. 2002) (same as to claims for unnecessary and upcoded services against clinic versus various ordering physicians); see *also U.S. ex rel. Bennett v. Boston Scientific Corp.*, No. H-07-2467, 2011 WL 1231577, at *30 (S.D. Tex. 2011) (dismissing FCA upcoding claim pursuant to Rule 9(b)).

6. The Complaint Fails to State a Federal FCA Claim Based On RIC's Medicare Claims For Allegedly Unnecessary or Worthless ICGs

In support of their fifth theory of FCA liability, Relators allege that RIC submitted Medicare (and Medi-Cal) claims for unnecessary indocyanine green angiography ("ICG") tests. SAC ¶¶ 113-114, 116. Medicare claims for medically unnecessary services can be actionable under the FCA, but "must be based on an objectively verifiable fact." *U.S. ex rel. Landis v. Hospice Care of Kansas, LLC*, 2010 WL 5067614, *4 (D. Kan. Dec. 7, 2010); *U.S. ex rel. Riley v. St. Luke's Episcopal Hospital*, 355 F.3d 370, 376 (5th Cir. 2004); *U.S. ex rel. Morton v. A Plus Benefits, Inc.*, 139 Fed. Appx. 980, 982 (10th Cir. 2005).

In this case, Relators' broad allegation that many of the RIC ICGs were "medically unnecessary" is entirely conclusory. Their allegations that the RIC Partners' use of ICGs was not the usual standard of care for diagnosing AMD, that the number of tests performed was higher than other retinal practices, or that RIC made money from the tests and ordered more ICGs for Medicare patients that for commercial plan patients do not plausibly establish that any of the tests were objectively unnecessary when the Complaint contains no information about when an ICG is medically appropriate and necessary.

While the Complaint does baldly allege that a Department of Justice study found that 90.8% of the ICGs provided to RIC Medicare patients between February and May of 2014 were not "medically necessary," Relators do not allege how and why such ICGs were unnecessary for this or any other category of Medicare patients nor identify any Medicare patient for whom an unnecessary ICG claim

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

1   was actually submitted to the Medicare program.   Without such specific factual

2   support, Relators have failed to state an FCA claim based on "medically

3   unnecessary" services.   *See Frazier*, 2010 WL 3190641, at *1 (9th Cir. 2010)

4   (FCA complaint properly dismissed where relator's "allegations regarding

5   medically unnecessary procedures were conclusory at best"); *US. ex rel. Thompson*

6   *v. Columbia/ HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (FCA

7   claim properly dismissed where relator failed to provide factual basis for allegation

8   that hospital chain submitted claims for medically unnecessary services).[18]

9
10         7.    The Complaint Fails to State a Federal FCA Claim Based
                  on RIC's Alleged Duplicate Medicare Claims for Dr.
11                     Bhattio's Services at Dr. Kislinger's Clinic

12         According to the Complaint, between at least April through June of 2012,

13   RIC also submitted duplicate Medicare claims for the services of Dr. Bhattio, a

14   RIC physician, "as though the services had been provided at RIC," when in fact

15   they had been provided at Dr. Mark Klisinger's Glendora clinic under an

16   agreement whereby Dr. Klisinger billed Dr. Bhattio's services and paid half of the

17   fees collected to RIC. *See* SAC ¶¶ 122-125.

18         While Relators' allegations state a valid theory of FCA liability based on

19   double billing or failure to return an overpayment, they fall far short of satisfying

20   Rule 9(b)'s particularity requirement.   In particular, the Complaint contains no

21   factual allegations about how RIC billed Dr. Bhattio's services "as though the

22   services had been provided at RIC," or otherwise establishing that such duplicate

23

24   [18] *See also Advanced Rehabilitation, LLC v. UnitedHealthgroup, Inc.*, 498 Fed.
Appx. 173, 177 (3d Cir. 2012) (complaint dismissed where plaintiffs alleged
25   no facts to demonstrate that therapy procedures were "medically necessary" for the
particular patients who received them); *Illinois Farmers Ins. Co. v. Mobile*
26   *Diagnostic Imaging, Inc.*, 2014 WL 4104789, at *12 (D. Minn. Aug. 19, 2014)
27   ("Of course, the conclusory statement that the [MRI] scans were medically
unnecessary is not entitled to the assumption of truth.")
28

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' SECOND AMENDED COMPLAINT

billings were "fraudulent" as opposed to being a simple billing error. In addition, the Complaint fails to identify any Medicare claims (whether by patient, service, or payment amount) submitted by both Dr. Klisinger and RIC for the same services of Dr. Bhattio and otherwise allege no facts plausibly establishing that duplicate claims were submitted for Medicare patients versus patients covered by Medi-Cal or a commercial plan. Accordingly, Relators' FCA claim based on alleged duplicate Medicare claims for Dr. Bhattio's services fails to satisfy Rule 9(b).

8. The Complaint Fails to State a Federal FCA Claim Based on CEES' Alleged Medicare Claims For Assistant Surgeon Services Not Performed

Relators also allege that CEES, an ophthalmology practice owned by Dr. Chang, billed Medicare for the assistant surgeon services of Dr. Lily Lee, Dr. Chang's spouse, during retinal surgeries even though she was not present and did not participate in the surgeries, and identifies seven CEES retinal surgery claims in 2012 and 2013 for which Dr. Lee's services were billed. *See* SAC ¶¶ 129-132.

While these allegations come closest to stating a valid FCA claim, the Complaint contains no factual allegations establishing that such allegedly false claims were "knowingly" made within the meaning of the FCA. While CEES's intent may be generally pleaded under Rule 9(b), Relators must still allege "sufficient facts to support an inference or render plausible" that CEES submitted claims that it knew were non-reimbursable and not simply the result of mere negligence or innocent billing error. *U.S. ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984, 996-997 (9th Cir. 2011). Here, the Complaint contains no factual allegations establishing that CEES had any knowledge or should have known that Dr. Lee did not participate as an assistant in the billed surgeries. Absent any such allegations, Relators' FCA claim against CEES based on the billing of Dr. Lee's services fails to satisfy Rule 9(b).

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' SECOND AMENDED COMPLAINT

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

9.     <u>The Complaint Fails to State a Federal FCA Claim Based on Submission of Incomplete Data to the Medicare Physician Quality Reporting System</u>

According to the Complaint, Defendants RIC and the RIC Partners also allegedly violated the FCA by retaining a supposed overpayment of $60,000 from CMS that was based on 4 months of supposedly incomplete data submitted by RIC to the Medicare PQRS in 2011 when RIC "purported to provide information for the entire year," and also allegedly provided PQRS data in 2012 that included information "for activities that had not actually occurred." *See* SAC ¶¶ 133-138.

Relator's allegations are insufficient to establish an FCA claim predicated on PQRS data reporting under Rule 12(b)(6) or Rule 9(b). The Complaint fails to include any factual allegations establishing that the 4 months of data submitted by RIC did not satisfy the reporting frequencies required for quality measures during the 12-month reporting period allegedly used, or how RIC "purported to provide" 12 months of data, but only provided four months of data to CMS, and why the $60,000 incentive payment received was an overpayment (versus a reduced payment) even if only 4 months of data was submitted.

Nor does the Complaint explain how RIC's submission of incomplete data constituted a factually or legally false claim for the incentive payment received. Likewise, with respect to 2012 PQRS data, Relators fail to provide any factual specifics regarding which data allegedly submitted by RIC was for "activities that had not actually occurred." Such vague and conclusory allegations are insufficient to state a valid FCA claim.

    B.     **THE COMPLAINT FAILS TO STATE A VALID CALIFORNIA FCA CLAIM AGAINST DEFENDANTS**

In addition to alleged violations of federal FCA, the Complaint also alleges two theories of liability under the California False Claims Act against various defendants. Once again, however, Relators' allegations fail to state a valid

California FCA claim against any of the defendants under Rules 12(b)(6) and 9(b).

        1.    <u>The Complaint Fails to State A Valid California FCA</u>
<u>Claim Against Defendants Based on Alleged Violations</u>
<u>of the Medi-Cal Discriminatory Billing Rule</u>

According to the Complaint, defendants RIC, SG-ASC, and CEES violated the California False Claims Act ("CA-FCA") by submitting Medi-Cal claims that violated Medi-Cal's discriminatory billing rule because defendants charged fees for cash-paying patients without insurance that were lower than the Medi-Cal reimbursement rates for those services. *See* SAC ¶¶ 139-145.

Under the Medi-Cal program, Title 22, California Code of Regulations ("C.C.R."), § 51450(a) provides that "[n]o provider shall bill or submit a claim for reimbursement for the rendering of health care services to a Medi-Cal beneficiary in any amount greater or higher than the usual fee charged by the provider to the general public for the same service." 22 C.C.R. § 51480(a). However, California Business & Professions Code § 657 expressly provides that California physicians may "grant discounts for health or medical care provided to any patient the health care provider has reasonable cause to believe is not eligible for, or is not entitled to, insurance reimbursement, coverage under the Medi-Cal program, or coverage by a health care service plan for the health or medical care provided" and that such discounted fees "shall not be deemed to be the health care provider's usual, customary, or reasonable fee for any other purposes, including, but not limited to, any health care service plan contract or insurance contract." Cal. Bus. & Prof. Code § 657(c).

In this case, Relators' CA-FCA claims for Medi-Cal discriminatory billing fail as a matter of law because defendants are expressly authorized to charge discounted fees (which may not be considered their usual fees) for uninsured patients who are not eligible for Medi-Cal and Relators allege no facts establishing that defendants' lower fees for "patients without any insurance, [or] who paid for

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

1   medical services in cash" were not so authorized.  *See* SAC ¶ 141.  Further,

2   Relators' theory of liability assumes that that RIC's lower fee for uninsured cash

3   paying patients is "the usual fee charged by the provider to the general public for

4   the same service" without any factual allegations explaining why this counter-

5   intuitive proposition is correct.  Instead, the Complaint indicates that RIC treats a

6   wide range of patients – including those covered by the Medi-Cal and Medicare

7   programs and by private insurance plans with contractually negotiated rates, as

8   well as uninsured self-paying and non-paying patients – and Relators have alleged

9   no factual basis for simply concluding that RIC's lower fee for uninsured cash-

10  paying patients is the usual fee charged to the general public.    Accordingly,

11  Relators'  CA-FCA  claim  based  on  alleged  violations  of  the  Medi-Cal

12  discriminatory rule must be dismissed pursuant to Rules 12(b)(6) and 9(b).[19]

13              2.    The Complaint Fails to State a California FCA Claim
                      Based on Violations of Business & Professions Code §
14                    654.2

15          Relators also allege that the RIC, the RIC Partners, CEES and SG-

16  ASC violated the CA-FCA by submitting Medi-Cal claims when they

17  supposedly failed to disclose the RIC Partners' investment interest in SG-

18  ASC in violation of California Business & Professions Code § 654.2.  SAC

19  ¶¶ 152-161.[20]

20

21  [19] Relators also allege that RIC's usual charge for CPT code 67028 was $370.00,

22  just over Medi-Cal's $364.11 reimbursement rate, even though RIC typically
    calculated its usual charge at 200% of the Medicare reimbursement rate, which
23  would have been $250 for this code.  SAC ¶ 142.  Even if true, the Complaint

24  contains no allegations establishing that this RIC usual charge for this CPT code

25  violates the Medi-Cal discriminatory billing rule when it is higher the Medi-Cal
    reimbursement rate or identifying any law or rule requiring RIC to calculate its
26  usual charge in a particular manner for this or any other code.

27  [20] Section 654.2 provides that is unlawful for a physician "to charge, bill, or

28  otherwise solicit payment from a patient on behalf of, or refer a patient to, an
    organization in which the licensee, or the licensee's immediate family, has a

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

320381.1

29

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

1    Relators' allegations fail to state a valid CA-FCA claim based on

2  alleged violations of Section 654.2 because the statute expressly provides

3  that a violation cannot serve as "the sole basis" for the denial of a claim by a

4  health care service plan, which would include the Medi-Cal program, and

5  such violations are therefore not material to Medi-Cal's payment of claims

6  as a matter of law.  *See* Cal. Bus. & Prof. Code § 654.2.  In addition, as

7  previously discussed, the Complaint also violates Rule 9(b) by not including

8  any factual allegations establishing the nature of the RIC Partners'

9  "significant beneficial interest" in the SG-ASC center or that the brochure

10  advising patients to call the center to obtain ownership information did not

11  serve to fully disclose such interest.

12  C.    RELATOR'S COMPLAINT FAILS TO STATE A CA-IFPA
        CLAIM BASED ON WAIVER OF CO-PAYS AND DEDUCTIBLES

13    The Complaint also alleges that RIC, the RIC Partners, CEES and SG-ASC

14  submitted false and fraudulent claims for patients covered by commercial health

15  plans (e.g., Empire BlueCross/ Blue Shield, Cigna and United Healthcare) in

16  violation of California Penal Code § 550 because defendants routinely waived the

17  deductible and co-payments amounts that they were obligated to charge patients

18  pursuant to the terms of their provider agreements and failed to disclose their usual

19

20

21  significant beneficial interest, unless the licensee first discloses in writing to the

22  patient, that there is such an interest and advises the patient that the patient may
    choose any organization for the purpose of obtaining the services ordered or

23  requested by the licensee." Cal. Bus. & Prof. Code § 654.2. The statute provides

24  that disclosure may be provided by "a conspicuous sign in an area which is likely
    to be seen by all patients who use the facility or by providing those patients with a

25  written disclosure statement." *Id*. In addition, the statute expressly provides that

26  "[n]othing in this section shall be construed to serve as the sole basis for the denial
    or delay of payment of claims by third party payers," including "any health care

27  service plan." *Id*.

28

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

1   charges to these commercial health plans because they charged lower prices to

2   uninsured patients who paid in cash.  According to Relators, the State of California

3   is therefore entitled to civil penalties plus treble damages for each fraudulent claim

4   under Insurance Code § 1871.7.  SAC ¶¶ 146-151.[21]

5        In this case, Relators' fraud allegations are woefully deficient under Rule

6   9(b).  The Complaint alleges no facts establishing the specific provisions of RIC's

7   alleged provider contracts with any commercial plans regarding co-payments and

8   deductibles, and only lists four examples of plans that supposedly required

9   payment of obligations as a condition of claim payment.  Nor do Relators allege

10  any facts establishing that RIC was not permitted to waive such commercial plan

11  deductibles and co-payments for financial hardship or other circumstances.

12       In addition, as previously discussed, RIC did not mispresent their charges to

13  any commercial plan because California law provides that discounts may be

14  provided to uninsured patients and shall not be considered the provider's usual

15  charge.  Cal. Bus. & Prof. Code § 657(c). Most critically, the Complaint does not

16  identify a single RIC claim to a commercial plan (whether by date, patient, service,

17  amount or plan) where the patient's deductible or co-payment amount was

18  improperly waived.  Accordingly, under Rules 12(b)(6) and 9(b), Relator's CIFPA

19  claim must also be dismissed for failure to state a claim or to allege fraud with

20  particularity.

21

22

23  _____

[21] Under CIFPA, Section 1871.7 of the Insurance Code authorizes Relators to bring

24  a *qui tam* action on behalf of the State of California to recover civil penalties (
    $5,000 to $10,000) and an assessment of no more than three times the claimed

25  compensation against anyone who knowingly submits a false or fraudulent claim

26  for a health care benefit to an insurance company or knowingly makes a false or
    misleading statement in support of such a claim in violation of Penal Code § 550.

27  Cal. Insurance Code § 1871.7; *see State ex rel. Wilson v. Superior Court*, 227

28  Cal.App.4th 579 (2014).

### D.   THE COMPLAINT MUST BE DISMISSED BECAUSE IT CHARGES ALL DEFENDANTS IN EACH CAUSE OF ACTION

The Complaint must also be dismissed because its five causes of action impermissibly charge all defendants with violations of the FCA, CA-FCA and CA-IFPA without distinguishing between the eight theories of FCA liability and two theories of CA-FCA liability alleged or the alleged involvement or lack of involvement of each defendant in each different category of false claims.[22]

Such indiscriminate grouping of defendants in a fraud case is impermissible and independently run afoul of Rule 9(b). *See Lubin v. Sybedon Corp.,* 688 F. Supp. 1425, 1443 (S.D. Cal. 1988). Instead, where multiple defendants sued under the FCA, the complaint must *separately identify* the fraudulent conduct of each defendant. *See Corinthian Colleges,* 665 F. 3d at 997-98; *Ebeid,* 630 F. 3d at 999; *Swartz,* 476 F. 3d at 764-65; *Grubbs,* 565 F. 3d at 190; *Remmes v. Internat'l Flavors & Fragrances, Inc.,* 389 F. Supp. 2d 1080, 1088 (N.D. Iowa 2005). Here, the defendants are left to puzzle through the Complaint's factual allegations in order to try to figure out which of those allegations tie to their individual involvement in one or more of the five counts charged. Such a "shotgun" complaint is impermissible under Rule 9(b). *Magluta v. Samples,* 256 F.3d 1282, 1284 (11th Cir. 2001).

## V.   CONCLUSION

For the foregoing reasons, Relators' Second Amended Complaint should be dismissed pursuant to Rules 12(b)(6) and 9(b) for failure to state a claim and to

---

[22] By way examples, (1) defendant Braun is charged in all five counts even though the factual allegations indicate that he was only supposedly involved in RIC's waiver of co-payments and deductibles and marketing activities, and (2) defendants SG-ASC and CEES are charged in the CA-IFPA count without any allegations that they had provider agreements with or submitted any claims to commercial plans.

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

1  allege fraud with particularity.

2  DATED: February 14, 2017

Respectfully submitted,

3

4  NELSON HARDIMAN LLP

5

6

/S/ *M.S. Hardiman*

7  MARK S. HARDIMAN

8  Attorneys for Defendants

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

320381.1                                    33

DEFENDANTS' CONSOLIDATED MOTION TO DISMISS RELATORS' SECOND AMENDED COMPLAINT