1    Kolin C. Tang (SBN 279834)
     Shepherd, Finkelman, Miller & Shah, LLP
2    11755 Wilshire Boulevard, 15th Floor
     Los Angeles, CA 90025
3    Phone: (323) 510-4060
     Fax: (866) 300-7367
4    Email: ktang@sfmslaw.com

5    Attorneys for Plaintiffs-Relators

6    [Additional Counsel Listed On Signature Page]

7

**IN THE UNITED STATES DISTRICT COURT**

8

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

9

| | |
|---|---|
| UNITED STATES OF AMERICA, and the STATE OF CALIFORINA, *ex rel* BOBBETTE A. SMITH and SUSAN C. ROGERS, | CIVIL ACTION NO.: 2:13-cv-3772-DMG (MRWx) |
| | (Assigned to the Honorable Dolly M. Gee) |
| Plaintiffs-Relators, | **PLAINTIFFS-RELATORS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |
| vs. | |
| TOM S. CHANG, M.D.; TOM S. CHANG, M.D., INC.; MICHAEL A. SAMUEL, M.D.; MICHAEL J. DAVIS, M.D.; RETINA INSTITUTE OF CALIFORNIA MEDICAL GROUP, CALIFORNIA EYE AND EAR SPECIALISTS, a/k/a OCULAR INSTITUTE OF CALIFORNIA; BRETT BRAUN; and SAN GABRIEL AMBULATORY SURGERY CENTER LP, | Date:    March 17, 2017 Time:    9:30 a.m. Place:    Courtroom 8C, 8th Floor |
| Defendants. | |

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      The Claims At Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.      Defendants' Co-Payment Waiver Scheme . . . . . . . . . . . . . . . . . 4

                1.      Co-Payment Waivers As Inducement to Medicare Patients . . . 4

                2.      Co-Payment Waivers As Inducement for Patient Referrals . . . 6

        C.      Defendants Obtain Referrals That Violate the
                Anti-Kickback Statute and the Anti-Self-Referral Laws . . . . . . . . . 7

        D.      RIC Defendants' Violation of the AKS
                Relating to the San Gabriel Ambulatory Surgery Center . . . . . . . . . 9

        E.      The RIC Defendants Engage In Upcoding And Perform
                Worthless And Harmful Procedures . . . . . . . . . . . . . . . . . . . . . . . . 10

                1.      The RIC Defendants Engage in Overcoding of E/M Events . 10

        F.      RIC Defendants' Unnecessary Claims for CPT
                Code 92240: ICG Testing . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        G.      Defendants Engage in Double Billing . . . . . . . . . . . . . . . . . . . . 13

        H.      The Compensation Structure Encourages Unnecessary
                Tests and Upcoding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        I.      RIC Through CEES Bills Medicare For Services Not
                Performed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        J.      RIC Defendants Knowingly Retain Overpayments
                From The Physicians Quality Reporting System . . . . . . . . . . . . . . 14

        K.      California Legal Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                1.      Violations of California Discriminatory Billing Rules . . . . . 15

                2.      Violations of the CA-IFPA . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                3.      Violation of the California Business and Professions
                        Code Sec. 654.2 - San Gabriel Surgery Center . . . . . . . . . . . 17

CIVIL ACTION NO.:                                        PLAINTIFFS' MPA IN OPP.
2:13-cv-3772-DMG (MRWx)            -i-                    TO MOTION TO DISMISS

III.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

A.   Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

B.   The SAC Pleads Cogent And Actionable
Claims Under The FCA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

1.   The Claims Under The Federal FCA . . . . . . . . . . . . . . . . . . . 18

2.   The Routine Waivers Of Co-Payments Violated
The FCA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

3.   The SAC Pleads Actionable Claims Based On RIC's
Co-Marketing Agreement With RICX . . . . . . . . . . . . . . . . . . 24

4.   The SAC Pleads FCA Violations Based on the RIC Physicians'
Referrals to the San Gabriel Ambulatory
Surgery Center . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

5.   The SAC Pleads an FCA Claim Based on the Upcoding
of Drs. Davis, Samuel and Chang . . . . . . . . . . . . . . . . . . . . . . 28

6.   The SAC States FCA Claims Based on Defendants'
Medicare Claims For Unnecessary and/or Worthless ICG
Angiography Tests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

7.   The SAC States A Claim For Duplicate Billing
Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

8.   The SAC States A Claim For Services Not
Performed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

9.   The SAC States A Claim For The Knowing
Submission Of Incomplete Data To Medicare . . . . . . . . . . . . 31

C.   The SAC States Claims Under The CA FCA . . . . . . . . . . . . . . . . . 32

1.   The SAC Pleads Violations Of Medi-Cal's
Discriminatory Billing Rules . . . . . . . . . . . . . . . . . . . . . . . . . 32

2.   The SAC Pleads Violations Of California
Business & Profession Code 654.2 . . . . . . . . . . . . . . . . . . . . 32

D.   The SAC Pleads Violations Of The CA-IFPA . . . . . . . . . . . . . . . . 33

E.   The SAC Does Not Violate Any Group Pleading
Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# TABLE OF AUTHORITIES

## Cases

*Advanced Rehab., LLC v. UnitedHealthgroup, Inc.*,
   498 F. App'x 173 (3d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Ameritox, Ltd. v. Millennium Labs., Inc.*,
   20 F.Supp.3d 1348 (M.D. Fla. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*ASARCO, LLC v. Union Pac. R. Co.*,
   765 F.3d 999 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Berg v. Popham*,
   412 F.3d 1122 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Ebeid ex rel. U.S. v. Lungwitz*,
   616 F.3d 993 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 35

*Erickson v. Pardus*,
   551 U.S. 89 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Frazier ex rel. U.S. v. Iasis*,
   392 F. App'x 535 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . 21, 27, 28, 29

*Gao v. JPMorgan Chase & Co.*,
   2015 WL 3606308 (S.D.N.Y. June 9, 2015) . . . . . . . . . . . . . . . . . . . . . . 34

*Gingras v. Rosette*,
   2016 WL 2932163 (D. Vt. May 18, 2016) . . . . . . . . . . . . . . . . . . . . . . . . 34

*Hudson v. United States*,
   522 U.S. 93 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Jenkins v. McKeithen*,
   395 U.S. 411 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Klaczak v. Consol. Med. Transp.*,
   458 F.Supp.2d 622 (N.D. Ill. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Lubin v. Sybedon Corp.*,
   688 F. Supp. 1425 (S.D. Cal. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Magluta v. Samples*,
   256 F.3d 1282 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*People v. Hering*,
  20 Cal. 4th 440 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Remmes v. Int'l Flavors & Fragrances, Inc.*,
  389 F. Supp. 2d 1080 (N.D. Iowa 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Sams v. Yahoo! Inc.*,
  713 F.3d 1175 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*San Francisco Unified Sch. Dist. ex rel. Contreras v. Laidlaw Transit, Inc.*,
  182 Cal. App. 4th 438 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Superbalife, Int'l v. Powerpay*,
  2008 WL 4559752 (N.D. Cal. Oct. 7, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Caris Life Scis., Inc.*,
  2013 WL 11579021 (N.D. Tex. Oct. 23, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Corinthian Colls.*,
  655 F.3d 984 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 30, 31, 35

*United States v. Halper*,
  490 U.S. 435 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Job*,
  387 Fed.Appx. 445 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Krizek*,
  192 F.3d 1024 (D.C.Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. LaHue*,
  261 F.3d 993 (10th Cir.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Norton*,
  17 Fed.Appx. 98 (4th Cir.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Prabhu*,
  442 F. Supp. 2d 1008 (D. Nev. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Rogan*,
  459 F. Supp.2d 692 (N.D. Ill.2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*U.S. v. Gen. Dynamics*,
  315 F. Supp. 2d 939 (N.D. Ill. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*U.S. v. Narco Freedom, Inc.*,
  2015 WL 1499265 (S.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 24

*U.S. ex rel. Bartlett v. Ashcroft*,
  39 F. Supp. 3d 656 (W.D. Pa. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 24, 25

*U.S. ex rel. Bennett v. Boston Sci. Corp.*,
2011 WL 1231577 (S.D. Tex. Mar. 31, 2011) . . . . . . . . . . . . . . . . . . . . . . . . 28

*U.S. ex rel. Bilotta v. Novartis Pharmaceuticals Corp.*,
50 F.Supp.3d 497 (S.D.N.Y. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*U.S. ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*U.S. ex rel. Harris v. Bernad*,
275 F. Supp. 2d 1, 6-7 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*U.S. ex rel. Hendow v. Univ. of Phoenix*,
461 F.3d 1166 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*U.S. ex rel. McDonough v. Symphony Diagnostic Servs.*,
36 F.Supp.3d 773 (S.D. Ohio 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*U.S. ex rel. Obert-Hong v. Advocate Health Care*,
211 F. Supp. 2d 1045 (N.D. Ill. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*U.S. ex rel. Osheroff v. Tenet Healthcare Corp.*,
2013 WL 1289260 (S.D. Fla. Mar. 27, 2013) . . . . . . . . . . . . . . . . . . . . . . . . 19

*U.S. ex rel. Schmidt v. Zimmer, Inc.*,
386 F.3d 235 (3d Cir.2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 33

*U.S. ex rel. Schuhardt v. Washington Univ.*,
228 F. Supp. 2d 1018 (E.D. Mo. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*U.S. ex rel. Stewart v. The Louisiana Clinic*,
2002 WL 1066745 (E.D. La. May 28, 2002) . . . . . . . . . . . . . . . . . . . . . . . . 28

*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
20 F.Supp.2d 1017 (S.D. Tex. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
125 F.3d 899 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 29

*U.S. ex rel. Villafane v. Solinger*,
543 F.Supp.2d 678 (W.D. Ky. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**Rules**

Fed.R.Civ.P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed.R.Civ.P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Federal Statutes**

31 U.S.C. § 3729 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

CIVIL ACTION NO.:                          PLAINTIFFS' MPA IN OPP.
2:13-cv-3772-DMG (MRWx)          -v-      TO MOTION TO DISMISS

42 U.S.C. 1320a-7a(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. § 1320a-7a(i)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

42 U.S.C. § 1320a-7b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 1320a–7b(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

42 U.S.C. § 1320a–7b(b)(3)(A)–(J) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

42 U.S.C. § 1395 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 1395(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. § 1395y(a)(l)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 1395cc(a)(2)(A)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. § 1395nn . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

42 U.S.C. § 1395nn(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

42 U.S.C. § 1395nn(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

42 U.S.C. § 1395nn(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

42 U.S.C. §§ 1396 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Federal Regulations**

42 C.F.R. § 414.90 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

42 C.F.R. § 1001.952 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

42 C.F.R. § 1001.952(r) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

42 C.F.R. § 1003.110 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

56 Fed. Reg. 35952, 35954 (July 29, 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 9

72 Fed. Reg. 51,011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

75 Fed. Reg. § 5 (Aug. 26, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

76 Fed. Reg. 42772 (July 19) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**State Statutes**

Cal. Bus. & Prof. Code § 654.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 32

Cal. Bus. & Prof. Code § 657 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Cal. Bus. & Prof. Code § 657(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34

Cal. Gov. Code §12650 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

CA-IFPA §1871.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**State Regulations**

22 C.C.R 51480(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 32

**Other Authorities**

OIG Advisory Opinion No. 97-4 (HHSOIG),
  1997 WL 34684552 (September 25, 1997) . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

J. Boese, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS, § 3.01[A] . . . . . . . 26

# I.   __INTRODUCTION__

On behalf of the United States of America ("United States") and the State of California ("California"), Plaintiffs-Relators, Bobbette A. Smith ("Plaintiff-Relator Smith") and Susan C. Rogers ("Plaintiff-Relator Rogers") (collectively, "Plaintiffs-Relators" or "Relators" or "Plaintiffs"), respectfully submit this Memorandum of Points and Authorities in Opposition ("MPA") to the Motion to Dismiss ("Motion") the Second Amended Complaint ("Complaint" or "SAC") of Defendants, Tom S. Chang, M.D. ("Dr. Chang"), Tom S. Chang, M.D., Inc. ("Dr. Chang Inc."), Michael A. Samuel, M.D. ("Dr. Samuel"), Michael J. Davis, M.D. ("Dr. Davis") (collectively, "RIC Partners"); Brett Braun ("Braun"); Retina Institute of California Medical Group, ("RIC," and with RIC Partners, the "RIC Defendants"); California Eye and Ear Specialists ("CEES" or "California Eye and Ear"); and San Gabriel Ambulatory Surgery Center LP, ("SG-ASC" or "San Gabriel Surgery Center") (collectively, "Defendants").  Defendants' requested dismissal is, in a word, perfunctory.  In essence, as discussed below, Defendants literally are "going through the motions" by submitting a Motion that has no prospects for success on the merits and essentially repeats the same, tired arguments contained in their previous Motion to Dismiss the Amended Complaint.[1] That effort should not be permitted to stand.

---

[1]Indeed, many of the citations in Defendants' Motion and supporting papers are to paragraphs of the First Amended Complaint ("FAC"), as opposed to the SAC, thereby making it clear that Defendants have made no serious effort to confront the actual averments of the SAC.  Likewise, Defendants' alleged compliance with Local Civil Rule 7-3, based upon discussions in November and December, 2016 -- dates which pre-date the filing of the SAC - make clear the approach that Defendants have taken to the current Motion.  *See Superbalife, Int'l v. Powerpay*, CV 08-5099 PSG (PJWx), 2008 WL 4559752, at *2 (N.D. Cal. Oct. 7, 2008) (denying a motion after the party violated Local Rule 7-3 and stating that "absent any evidence that a party attempted to meet and confer in good faith, this Court is unwilling to excuse noncompliance with the Local Rules").

1 | II.  **STATEMENT OF FACTS**

2 |      A.     **The Claims At Issue**

3 |        Plaintiffs[2] assert claims against Defendants for violations of the United

4 | States False Claims Act ("FCA" or "Federal FCA"), 31 U.S.C. §§ 3729, *et seq.*; the

5 | Anti-Kickback Statute (the "AKS"), 42 U.S.C. § 1320a-7b, the California False

6 | Claims Act ("CA-FCA" or "State FCA"), Cal. Gov. Code §§12650, *et seq.*; and the

7 | California Insurance Frauds Prevention Act, Cal. Insurance Code §1871.7 ("CA-

8 | IFPA" or "State Insurance Fraud Law"), based on schemes to defraud the United

9 | States and California in connection with government-funded health care programs,

10 | namely the federal Medicare Program, Title XVIII of the Social Security Act

11 | ("Medicare"), 42 U.S.C. §§ 1395, *et seq.*, the federal Medicaid Program

12 | ("Medicaid"), 42 U.S.C. §§ 1396, *et seq.*, and California's corresponding Medicaid

13 | Program ("Medi-Cal").  SAC, ¶ 1.[3]

---

[2]Plaintiff-Relator Smith has a B.A. in Business Administration from the University of North Florida, a Master of Science in Logistics Management from the Florida Institute of Technology, and a Master of Health Care Administration from Baylor University, and over 30 years of experience in the health care industry, including experience with federal and state funded healthcare programs in multi-physician medical practices. *Id.* ¶ 13.  Plaintiff-Relator Smith was recruited and hired by Dr. Chang in June of 2012 to serve as the Chief Operating Officer ("COO") of RIC but served only six months until she resigned in January, 2013. *Id.*  Plaintiff-Relator Rogers has over 20 years of experience in the area of medical billing and coding, including for federal and state funded healthcare programs in multi-physician offices, and has received numerous certifications in Current Procedural Terminology ("CPT") Coding and Billing and Ophthalmic Coding and Reimbursement. *Id.* ¶ 14.  She was hired by RIC in June, 2012, at the recommendation of Plaintiff-Relator Smith, to be the Billing Department Manager of RIC, but only served in that position for six months until she resigned in January 2013. *Id.*

[3]Defendant, RIC, is a retina sub-specialty ophthalmology practice with 35 offices and approximately 20 Medicare Provider Physicians ("Provider Physicians") licensed to practice medicine in California. *Id.*, ¶ 17.  RIC is a

CIVIL ACTION NO.:                      PLAINTIFFS' MPA IN OPP.

2:13-cv-3772-DMG (MRWx)      -2-       To MOTION TO DISMISS

Plaintiffs allege that Defendants engaged in multiple fraudulent schemes, each resulting in the submission of false claims for reimbursements from Medicaid, Medicare and/or Medi-Cal. *Id.*, ¶ 2. In one scheme, the RIC Defendants provided kickbacks to Medicare beneficiaries by routinely waiving their co-payments, which is the amount the beneficiaries were required to pay for services rendered, without an individualized determination of financial hardship or exhaustion of reasonable collection efforts. *Id.*, ¶ 3. In addition, even though Defendants waived the co-

medical partnership founded by Dr. Chang in or around 2006 and owned by his partners, Dr. Chang, Dr. Samuel and Dr. Davis. *Id.* Defendant, Dr. Chang, is a Canadian-trained ophthalmologist licensed to practice medicine by the State of California whose clinical interests include macular degeneration and diabetic retinopathy. *Id.*, ¶ 18. At all pertinent times, Dr. Chang was the majority owner and controlling partner at RIC and received the vast majority of the partnership distributions from RIC, as well as the majority of the compensation derived by all physicians employed by RIC. *Id.* Dr. Chang controls, directs and supervises the day to day practice of medicine at RIC. *Id.* Defendant, Dr. Chang Inc., is a management company owned by Dr. Chang. *Id.*, ¶ 19. Dr. Chang receives 10% of all of RIC's collectibles as his management fee through Dr. Chang Inc. *Id.* Defendant, Dr. Samuel, is RIC's Chief Medical Director and is an ophthalmologist licensed by the State of California. *Id.*, ¶ 20. Defendant, Dr. Davis, is RIC's Fellowship and Educational Director and is an ophthalmologist licensed by the State of California. *Id.*, ¶ 21. Defendant, CEES, is an ophthalmology practice owned by Dr. Chang. CEES includes a practice known as Ocular Institute of California ("OIC"). *Id.*, ¶ 22. In 2012, CEES was carried on RIC's balance sheet as owing RIC receivables of $674,078.44. *Id.* At all pertinent times, CEES acted and functioned as the alter ego of and as an integrated enterprise with RIC. *Id.* Defendant, Braun, is a former California resident and the former CEO of Retina Institute. *Id.*, ¶ 23. Braun's principal task at RIC was to increase patient referrals, including Medicare Part B patient referrals. *Id.* Defendant, SG-ASC, is a limited partnership organized under the laws of the State of California. *Id.*, ¶ 24. SG-ASC provides multi-speciality outpatient surgical services, including ophthalmology services, and receives Medicare patient referrals from CEES. *Id.* In 2012, SG-ASC was carried on RIC's balance sheet as owing RIC receivables of $593,247.27. *Id.* At all pertinent times, SG-ASC acted and functioned as the *alter ego* of and as an integrated enterprise with RIC. *Id.*

CIVIL ACTION NO.:                                    PLAINTIFFS' MPA IN OPP.
2:13-cv-3772-DMG (MRWx)          -3-        To MOTION TO DISMISS

payments, they included the co-payment amounts in billings submitted to Medicare for reimbursement, thereby falsely inflating bills to Medicare for those services. *Id.* In another scheme, the RIC Defendants submitted claims for Medicare, Medicaid and Medi-Cal reimbursements for CPT billing codes 99204, 99214, 99215 and 92240, even though these services (i) were not medically necessary, (ii) were not actually performed, (iii) were not documented in the medical records, and/or (iv) failed to otherwise comply with Medicare, Medicaid and Medi-Cal rules and regulations. *Id.*, ¶ 4. RIC submitted thousands of fraudulent claims to Medicare, Medicaid and Medi-Cal, and was paid based on each of those claims. *Id.* As described more fully below, Defendants engaged in multiple acts of additional fraud, all of which they utilized to aggressively build their business (quadrupling in size in four short years from 2009 to 2012) in a highly competitive market. *Id.*, ¶ 5. The secret to Defendants' success was simple: engaging in multiple and consistent acts of fraudulent and unscrupulous business practices centered upon submitting false claims to the United States and California, as well as private insurers. *Id.*

### B.   Defendants' Co-Payment Waiver Scheme

#### 1.   Co-Payment Waivers As Inducement to Medicare Patients

Medicare generally covers 80% of the "reasonable charges" billed by the provider for the Medicare-approved health services provided to a patient. 42 U.S.C. § 1395(a)(1); *id.*, ¶ 55. Accordingly, the patient is normally required to contribute the remaining 20% as a co-payment. 42 U.S.C. § 1395cc(a)(2)(A)(ii); *id.* Waiver of co-payments in consideration of a particular patient's financial hardship is permitted in ***exceptional circumstances***. *Id.*, ¶ 56. (emphasis added). The hardship exception, however, must not be used routinely; it should be used occasionally to address the special financial needs of a particular patient, supported by documentation of financial hardship. *Id.* Except in special cases, a good faith effort to collect deductibles and co-payments must be made. *Id.*

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)          -4-

PLAINTIFFS' MPA IN OPP.
To MOTION TO DISMISS

The Office of Inspector General ("OIG") has interpreted the AKS to apply to waiving patient cost sharing amounts if "*one purpose*" of the waiver is to induce or reward federal program business. *Id.*, ¶ 57, *citing* OIG, Special Fraud Alert: Routine Waivers of Co-payments or Deductibles under Medicare Part B (May 1991)(emphasis added).  In addition, 42 U.S.C. 1320a-7a(a)(5) prohibits a person from offering or transferring remuneration to a beneficiary that such person knows or should know is likely to influence the beneficiary to order items or services from a particular provider or supplier for which payment may be made under any federal health care program. *Id.*, ¶ 58.  "Remuneration" is defined as *including a waiver of coinsurance and deductible amounts*, with exceptions for certain financial hardship waivers, which are not prohibited. *Id.*, ¶ 58 (emphasis added).

Over two-thirds of RIC's patients are covered by Medicare Part B. *Id.*, ¶ 59. The average Medicare co-payment a patient would be required to pay RIC is $90-100 per visit. *Id.*, ¶ 60.  It is RIC's policy and practice to routinely waive co-payments without making an individualized determination of financial hardship or exhausting reasonable collection efforts. *Id.*, ¶ 61.  RIC waives co-payments for various reasons, including for individuals who sought frequent medical services, who had a high balance, whose insurance did not pay certain amounts, or who expressed an inability to pay. *Id.*, ¶ 62.  None of these reasons is an allowable exception. *Id.*  Additionally, RIC consistently waived the co-payments without receiving any supporting documentation or information. *Id.*  RIC notes the waiver of these co-payments in its billing system using terms such as "financial hardship" or "balance write off," often with notations such as "w/o [written off] per doctor" or "per Dr. Chang." *Id.*, ¶ 63.[4]  No financial review was ever performed by anyone

_____

[4]While RIC has a "Statement of Financial Hardship" form, conspicuously missing from the form is language requesting a waiver of Medicare co-payments and a request for an explanation of the patient's financial hardship. *Id.*, ¶ 65. Instead, the form contains a request that RIC "reduce their usual and customary

1    at RIC to determine a patient's inability to afford the co-payment.  *Id.*, ¶ 65.  On

2    the contrary, Plaintiffs-Relators were specifically instructed by Dr. Chang not to

3    attempt to collect co-payments.  *Id.*, ¶ 65.  Plaintiffs-Relators repeatedly raised

4    concerns with senior management of RIC and other Defendants, to no avail.  *Id.*, ¶¶

5    66-67.

6                    2.    <u>Co-Payment Waivers As Inducement for Patient Referrals</u>

7            In order to obtain Medicare patient referrals from optometrists and other

8    ophthalmologists who do not perform the same types of retina procedures as those

9    performed by RIC, RIC physicians were instructed by the RIC Partners to inform

10   referring physicians that RIC waived co-payments and deductibles for Medicare

11   patients.  *Id.*, ¶ 68.  RIC sponsors a large continuing medical education program

12   called Okularfest, where attendees then become targets for possible patient referral

13   with the inducement of the Medicare co-payment waiver.  *Id.*, ¶ 71.  Referred

14   patients are induced to go to Defendants' practice not because they are choosing a

15   physician who best serves their needs based on medical factors, but, rather,

16   because they will not incur any out-of-pocket expenses in connection with RIC's

17   services.  *Id.*, ¶ 72.  An example of a referring physician who expected and was

18   assured that RIC would waive the Medicare co-payments for his patients is Dr.

19   Michael R. Rose, who had a general ophthalmology practice located across the

20   street from RIC's Lincoln Heights location.  *Id.*, ¶ 73.  When Plaintiff-Relator

21   Smith began to work at RIC, she was told by RIC Physician Provider, Dr. Kristy

22   Lin, that Dr. Rose expected co-pays for Medicare patients to be waived and that he

23

24   _____

25   charges in order to allow me to receive care required by my current health care
     condition," and then the patient is required to insert the dollar amount s/he believes

26   s/he can afford to pay RIC.  *Id.*  In addition, one option the patient is given on the
     form to establish "hardship" is "retired, fixed income"; this option makes the form

27   a meaningless exercise to excuse Medicare co-payment waivers because nearly

28   100% of RIC's Medicare patients would fit this category.  *Id.*

CIVIL ACTION NO.:                          PLAINTIFFS' MPA IN OPP.
2:13-cv-3772-DMG (MRWx)          -6-      To MOTION TO DISMISS

would not refer patients if co-payments were not waived. *Id.* When Plaintiff-Relator Smith raised concerns with Dr. Chang about this practice, he confirmed that Dr. Rose refused to make referrals if co-payments were not waived. *Id.* In fact, RIC's records for Dr. Rose's referred Medicare patients reveal that RIC did not collect co-payments from any of these patients, and total receipts for these patients reflect that RIC received only 80% of the Medicare allowable amount. *Id.* These records also reveal that the patients' co-payments were waived without regard to financial hardship criteria. *Id.* Plaintiff-Relator Rogers had a similar experience with RIC Physician Provider, Dr. Suk. *Id.*, ¶ 74.

In sum, from at least 2006 and continuing to the present, in violation of the FCA, CA-FCA and AKS, Defendants knowingly and routinely waived co-payments owed by Medicare Part B beneficiaries in order to unlawfully induce them to use their services and in order to continue to attract new Medicare patients and receive referrals from other eye care physicians. *Id.*, ¶ 75. Defendants then knowingly submitted, or caused to be submitted, claims for payment to Medicare for services rendered, knowing that those certifications were false, because each claim for payment was tainted by the kickbacks detailed in this action. *Id.*

## C. Defendants Obtain Referrals That Violate the Anti-Kickback Statute and the Anti-Self-Referral Laws

In or about June, 2012, RIC entered into a co-marketing agreement with and/or made a loan to a business known as RIC Diagnostics ("RICX"), whose president is Dan Bienenfield. *Id.*, ¶ 77. Upon information and belief, RICX is a corporate entity that is related to RIC and in which Dr. Chang maintains a financial interest. *Id.* In return, RICX is expected to funnel referrals from optometrists to RIC. *Id.* RIC is aware that payments for services rendered to some of the referred patients will be made by Medicare. *Id.*

RICX operates a mobile optical coherence tomography ("OCT") device used to diagnose various conditions of the retina. *Id.* at 78. RICX brings this equipment

to the optometrist's office, charging him/her a per use fee. *Id.* In turn, the optometrist bills the patient or the patient's insurer a higher fee for the test that uses the OCT equipment. *Id.* RICX actively encourages optometrists to refer patients to RIC. *Id.*, ¶ 79. The optometrists are provided with a referral form to complete when they send the patient to RIC after RICX's OCT is used for diagnostic purposes. *Id.* RIC physicians train optometrists, at no charge, how to read the OCT images at 2-3 hour workshops for optometrists. *Id.*, ¶ 80. The optometrists are also told that RIC ophthalmologists will interpret the image free of charge if requested to do so by the optometrists. *Id.*, ¶ 81. Obviously, the expectation is that once an RIC doctor has looked at the image, he or she would handle any retina condition that was discovered. *Id.*[5]

At a meeting on August 9, 2012, Braun told the providers that "RIC has had large financial and [sic] Commitment to this project—everyone should strongly promote this service." *Id.*, ¶ 84. In other words, the RIC doctors are supposed to contact optometrists and encourage them to use the RICX service, which will, in turn, generate referrals to RIC. *Id.* At an August 19, 2012 Executive Committee meeting, Dr. Samuel wanted the doctors "to focus on all referrals from Dan [Bienenfeld]." *Id.*, ¶ 85. Further, at a meeting on September 20, 2012, Braun stated to the doctors: RICX is "still growing. Need to help Dan [Bienenfeld] identify potential users. SK [Dr. Kamjoo] has been proactive by targeting current users of the service as an introduction: Will do an iPad giveaway for potential referrals during October CE. Will also speak about OCT/Diagnostics during CE event." *Id.*, ¶ 86. The target for referrals from RICX was 20 patients per month. *Id.*, ¶ 89. Plaintiff-Relator Smith's handwritten notes from the January 15, 2013

---

[5]RICX received considerable attention as part of RIC's overall marketing efforts, including a webinar attended by all providers and the provision of RICX brochures to be distributed to optometrists. *Id.*, ¶ 82.

Executive Committee Meeting record and that Dr. Chang stated, "*If he did increase our referrals, I'll give him another $15,000, but don't put that in the minutes*." *Id.* (emphasis added.)

### D.   RIC Defendants' Violation of the AKS
### Relating to the San Gabriel Ambulatory Surgery Center

RIC owns investment interests in an ambulatory surgery center known as the San Gabriel Surgery Center. *Id.,* ¶ 91. Drs. Chang, Samuel and Davis collectively own 50% of SG-ASC. *Id.* Drs. Chang, Samuel, and Davis routinely refer patients of RIC who require surgery to SG-ASC for the performance of that surgery. *Id.,* ¶ 92. Physicians employed by RIC and CEES also refer patients to SG-ASC. *Id.* Plaintiffs-Relators are in possession of a list of patients referred by RIC and CEES doctors to SG-ASC between 2010 and 2012. *Id.*

Referrals for medical services to an entity in which the referring physicians has a financial interest violate the AKS unless they fall within the requirements of "safe harbor" regulations promulgated by CMS. *Id.,* ¶ 93. A referral of a patient to an ambulatory surgery center in which a physician has an investment interest does not meet the "safe harbor" regulations of the AKS unless the patient is fully informed of the investor's investment interest. 42 C.F.R. 1001.952(r); *id.* Strict compliance with all elements is required for safe harbor protection. 56 Fed. Reg. 35952, 35954 (July 29, 1991); *id.,* ¶ 94. RIC and CEES physicians do not advise their patients that the RIC Defendants have an investment interest in SG-ASC. *Id.,* ¶ 95. Rather, patients are given a brochure which states, "[t]he ownership for San Gabriel Ambulatory Surgery Center may be obtained by contacting the center at (626) 300-5300." *Id.* At the request of Plaintiff-Relator Smith, the RIC scheduler, Krystal Ramirez, called (626) 300-5300 to learn who owned SG-ASC. *Id.,* ¶ 96. However, the individuals at the center who responded to the call could not provide any information about the ownership of that facility, nor could they name or identity anyone who could do so. *Id.*

1

2

      **E.**    **The RIC Defendants Engage In Upcoding And Perform**
               **Worthless And Harmful Procedures**

3

          1.    <u>The RIC Defendants Engage in Overcoding of E/M Events</u>

4

      The RIC Defendants and their providers regularly submit claims to Medicare

5

for examinations and procedures different from those actually performed. *Id.,* ¶

6

101. For example, the RIC Defendants and the providers frequently billed for CPT

7

codes 99214, 99215 and 99204 exams, when the providers did not perform the

8

requisite services for these codes. *Id*. The amount of money a medical provider is

9

paid for his or her services by Medicare or Medicaid depends on which CPT codes

10

are used. *Id.,* ¶ 102. The Medicare program requires physician providers to bill

11

Medicare Part B services, including office visits, using the American Medical

12

Association's Current Procedural Terminology ("CPT-4") numeric codes to

13

describe the procedures and services provided. *Id.*, *citing* Medicare Claims

14

Processing Manual ("MCPM"), Pub. 100-04, Ch.12, § 30. CPT codes determine

15

both coverage, *i.e.*, if Medicare will pay for the billed medical procedures and

16

services, and the reimbursement amount, *i.e.*, how much Medicare will pay for the

17

billed medical procedures and services. *Id*.[6]

18

      Medicare reimburses only for "medically necessary," or "reasonable and

19

20

    [6]For patients making an office visit, a provider physician's evaluation and
management ("E/M") services are billed using five-level series of CPT codes, for
either a new patient (CPT-4 Codes 99201 through 99205) or an established patient
(CPT-4 Codes 99211 through  99215). *Id.,* ¶ 103. In addition, there are varying
levels of complexity assigned to the patient's visit from level 1 to level 5, with
level 1 being the lowest and level 5 being the highest level of complexity. *Id*. The
applicable E/M code level of service is defined by the level of History, the level of
Examination, and the Complexity of Medical Decision Making. *Id.,* ¶ 104. These
three components are evaluated in the context of the medical necessity for the level
of history and the level of examination. *Id*. As the patient's examination becomes
increasingly in-depth or greater time is spent with the patient, the code number
increases, with 99211 as the lowest level and 99215 as the highest-level. *Id*.

21

22

23

24

25

26

27

28

CIVIL ACTION NO.:              PLAINTIFFS' MPA IN OPP.

2:13-cv-3772-DMG (MRWx)      -10-     To MOTION TO DISMISS

1    necessary" services and procedures, including levels of E/M.  42 U.S.C. §

2    1395y(a)(l)(A).  *Id.,* ¶ 112.  Based on a government audit conducted of Medicare

3    claims data submitted by Dr. Chang (1-3-2006 to 7-30-2013), Dr. Davis (7-17-08

4    to 7-31-13) and Dr. Samuel (1-4-06 to 7-31-13), the following overcoding/under

5    documenting was observed for new patients and established patients: virtually all

6    new patients were coded at Level 4 (99204 Office or Outpatient Encounter, Level

7    4, or 99244, Office or Outpatient Consultation, Level 4) and most established

8    patients were coded at Level 4 (99214; some were at Level 3 or Level 5), which

9    coding was unsupported by the medical records.  *Id.,* ¶ 113.  While Level 4 new

10   patients and/or consultations require all three components -- Comprehensive

11   History, Comprehensive Examination, and Moderately Complex Medical

12   Decision-Making -- and the code is based on the lowest of the three components,

13   most of the RIC Defendants' encounters failed because the documentation of the

14   "History of Present Illness" was brief (only 1 – 3 of  8 possible elements),

15   downgrading the history to "Expanded Problem-Focused," and, therefore, the code

16   should have been at Level 2, even though the "Decision-Making" and the "Eye

17   Examination" were properly documented.  *Id.*

18         Based on the audit described above, Dr. Chang was found to have charged at

19   Level 4 on 98% of his encounters, Dr. Samuel charged at Level 4 on 99% of his

20   encounters (even though he averaged 40 to 50 patient visits per day), and Dr. Davis

21   charged at Level 4 or 5 99% of the time.  Statewide, retina specialists charge at

22   level 4 only 57% of the time.  *Id.,* ¶ 114.  In addition, while Dr. Davis has advised

23   other RIC Provider Physicians not to use Level 5 because it is rarely justified, he

24   singlehandedly accounts for 25% of all Level 5 charges by retina specialists in the

25   State of California.  RIC records show that Dr. Davis billed 428 patients at 99215.

26   *Id.*  Further, the audit found that the RIC Defendants' practice of bringing their

27   patients back every few weeks for follow-up visits was medically unnecessary and

28   unreasonable.  *Id.,* ¶ 115.

CIVIL ACTION NO.:                              PLAINTIFFS' MPA IN OPP.
2:13-cv-3772-DMG (MRWx)          -11-          To MOTION TO DISMISS

The chart below provides a summary of RIC Defendants' E/M overcoding scheme for CPT codes 99204, 99214, and 99215:

| RIC Medicare Provider | Medicare Charges | Overcoded Medicare Charges | % Overcoded Medicare Charges |
|---|---|---|---|
| CHANG | $407,677.70 | $119,911.05 | 29% |
| DAVIS | $ 86,028.50 | $ 29,141.76 | 34% |
| SAMUEL | $201,640.28 | $ 59,513.66 | 30% |
| TOTALS | $695,346.48 | $208,566.47 | 30% |

F.    **RIC Defendants' Unnecessary Claims for CPT Code 92240: ICG Testing**

CPT Code 92240 is the code used to bill Medicare for Indocyanine green angiography or "ICG," a controversial technique used infrequently in evaluating and treating age-related macular degeneration ("AMD"). *Id.,* ¶ 117. According to the American Academy of Ophthalmology ("AAO") Preferred Practice Pattern ("PPP"), the standard of care diagnostic test for AMD is Optical Coherence Tomography ("OCT"), and, if indicated, followed by Fluorescein Angiography ("FA"). *Id.* This PPP was developed and written by the Retina/Vitreous Preferred Practice Panel of the AAO, and it was carefully reviewed by nationally recognized panels. *Id.* The PPP was approved by the AAO Board of Trustees on September 20, 2014 and continues to be the current standard of care for the evaluation and treatment of AMD. *Id.*

While the AAO discusses the use of ICG in very limited circumstances, the routine use of ICG in evaluating and treating AMD is not supported by scientific studies, and, unsurprisingly, the AAO has advised that when ICG is performed, the physician must be aware of the potential risks associated with the procedure, including severe medical complications, allergic reactions and even death. *Id.,* ¶ 118. An independent Department of Justice ("DOJ") evaluation of RIC Defendants' use of ICGs performed on Medicare patients between February and

May 2014 revealed that ICG was used for virtually every patient visit, and only 9.2% of the ICG studies were found to be appropriate and medically necessary. *Id.,* ¶ 119.

The importance of the ICG testing to the RIC Defendants is unequivocally the Medicare reimbursement amount at issue: the AAO's PPP (*i.e.*, OCT), reimburses approximately $50.00 for the Medicare patient (the amount may differ by year and region), contrasted against the ICG CPT Code 99240, which reimburses approximately $300.00 per patient. *Id.,* ¶ 120. As a result, each Medicare patient represents an additional $250.00 to the RIC Defendants for their use of ICGs. *Id.* Unsurprisingly, in electronic correspondence, Dr. Samuel describes ICG as "the most important test we run," while Dr. Davis comments about how one of their new clinics could make much more money, "[i]magine if there was ICG there...," and Dr. Chang comments about Dr. Suk's outstanding patient reimbursement, $15,000 in just one morning, "...simply by warming up the ICG."[7] *Id.*

### G.    Defendants Engage in Double Billing

RIC entered into an arrangement with Dr. Mark B. Kislinger whereby Dr. Bhatti of RIC would staff Dr. Kislinger's Glendora, California clinic several times per week. *Id.,* ¶ 122. Dr. Kislinger was supposed to and did bill Medicare and other payors for Dr. Bhatti's services performed at the Glendora clinic. *Id.* RIC was to and did receive from Dr. Kislinger one-half of the fees collected for Dr. Bhatti's services. *Id.* Between at least April through June of 2012, RIC also billed

---

[7]In 2012, the RIC Defendants billed Medicare $3,883,206 for CPT Code 92240. *Id.,* ¶ 121. Dr. Chang is paid more for ICGs every year than any other doctor in California, and Dr. Davis is right behind him in the number two slot. *Id.* Moreover, while 88% of RIC's ICG charges are for Medicare patients, only 0.5% are billed to HMOs; this is because HMOs require prior authorization, which the RIC Defendants knew they would likely be unable to obtain. *Id.*

Medicare for the services Dr. Bhatti had performed in Dr. Kislinger's clinic as though the services had been provided at RIC. *Id.,* ¶ 123. The claims submitted to Medicare by Defendants for work performed by Dr. Bhatti at Glendora, which had already been billed by Dr. Kislinger, were false and fraudulent. *Id.,* ¶ 124.

## H.   The Compensation Structure Encourages Unnecessary Tests and Upcoding

In January, 2013, RIC announced that, in order to become a partner, an employed doctor would have to exceed the average charges (minus charges paid by J Code) of the three partners, for two quarters. *Id.,* ¶ 126. Because the partners of RIC were billing for unnecessary ICG tests and upcoding, the only way an employed doctor could meet this requirement would be to order unnecessary ICG tests or also to upcode. *Id.,* ¶ 127. Indeed, when informed of this change, Dr. Camille Harrison stated she could never meet the requirement because she did not order ICG tests as often as the RIC principals. *Id.,* ¶ 128.

## I.   RIC Through CEES Bills Medicare For Services Not Performed

Dr. Lily Lee, Dr. Chang's wife, is a plastic surgeon licensed to practice medicine in California, as well as an approved Medicare provider. *Id.,* ¶ 129. CEES billed Medicare for Dr. Lee's services for assisting in retinal surgeries when it knew that she was not present and in which she did not actually participate. *Id.,* ¶ 130. For example, Medicare was billed for retinal surgery performed on patient NEG on December 13, 2012, under CPT 67113, which surgery, as CEES was aware, did not require an assistant surgeon, and the SAC details numerous other instances where Medicare was billed for Dr. Lee's services when she was not present. *Id.,* ¶ 131.

## J.   RIC Defendants Knowingly Retain Overpayments From The Physicians Quality Reporting System

RIC is a voluntary participant in the Physician Quality Reporting System ("PQRS"). *Id.,* ¶ 133. Under the PQRS, eligible professionals who satisfactorily report data on quality measures for covered Physician Fee Schedule Services

CIVIL ACTION NO.:                              PLAINTIFFS' MPA IN OPP.
2:13-cv-3772-DMG (MRWx)          -14-          To MOTION TO DISMISS

provided to Medicare Part B Fee for Service beneficiaries receive specified

incentive payments, 42 U.S.C. §1395w-4(k), (m).  *Id.*  In order to receive the

payments provided under the PQRS program for 2011, RIC was required to

provide data for a 12-month period, or the period January 1, 2011 to December 31,

2011.  75 Fed. Reg. § 5 (Aug. 26, 2010), pp. 40168-40178; *see* 76 Fed. Reg. 42772

(July 19) at p. 42842; 42 CFR § 414.90.  *Id.,* ¶ 134.  When RIC provided its data

on quality measures, although it should have provided information for the entire

year, it only provided information for the four months from September through

December of 2011.  *Id.,* ¶ 135.  For 2012, certain of the information reported was

for activities that had not actually occurred.  *Id.*  Each of the RIC principals

attested to the accuracy of the information submitted.  *Id.*

In October, 2012, RIC received $60,000 from CMS as a result of the

purportedly complete information it provided to PQRS for 2011.  *Id.,* ¶ 136.

Plaintiff-Relator Smith advised the RIC partners that RIC should return the funds

because RIC had not complied with the PQRS program by providing the required

amount of data.  *Id.,* ¶ 137.

### K.   California Legal Violations

1.   Violations of California Discriminatory Billing Rules

The CA-FCA, codified in the California Government Code sections 12650,

*et seq.*, states that it is a violation to: (a) knowingly present or cause to be presented

false claims for payment or approval of claims for Medi-Cal reimbursement; and/or

(b) knowingly make, use, or cause to be made or used false records or statements to

get false claims paid or approved by California for Medi-Cal reimbursement.  *Id.,* ¶

139.  Under Title 22, Section 51480(a) of the California Code of Regulations, "no

provider shall bill or submit a claim for reimbursement for the rendering of health

care services to a Medi-Cal beneficiary in any amount greater or higher than the

usual fee charged by the provider to the general public for the same service" (the

"Discriminatory Billing Rule").  *Id.,* ¶ 140.

1    During the time period relevant to the asserted claims, the RIC Defendants
2   charged patients without any insurance, who paid for medical services in cash, fees
3   that were lower than the rate Medi-Cal was billed for the same services.  *Id.,* ¶ 141.
4   Examples include Patients AD 8/27/2012, MG 10/25/2011 and AG 7/9/2012.  The
5   CPT codes for which cash patients paid less than paid by Medi-Cal included, but
6   were not limited to, CPT 67028 and CPT 67105.  *Id.*  An RIC Comparison of Self-
7   Pay Payments analysis shows that self-pay patients paid, on average, 36.8% of
8   RIC's stated charges in 2011 and 23.1% of RIC's stated charges in 2012.  *Id.*
9   Accordingly, each claim submitted by the RIC Defendants to Medi-Cal as a
10  primary payer was in violation of the Discriminatory Billing Rule. *Id.*

11    For almost all CPT codes, the RIC Defendants based the supposed usual fee
12  or chargemaster on 200% of the Medicare reimbursement rate. *Id.,* ¶ 142.  For
13  example, the rate Medicare reimburses for CPT 67028 in Southern California is
14  $124.28. *Id.*  If RIC followed its usual procedure, the usual charge rate would have
15  been $250.00. *Id.*  However, because Medi-Cal reimburses $364.11 for this code,
16  RIC's usual charge was listed at $370.00. *Id.*  In submitting claims for payment to
17  Medi-Cal, each of the RIC Defendants and providers certified that their services
18  complied with California statutes and regulations.  *Id.,* ¶ 143.  Those certifications
19  were false, in that the RIC Defendants and providers were, in fact charging far
20  lower fees to the general public than the amounts they claimed for reimbursement
21  for the rendering of the same services to Medi-Cal beneficiaries. *Id.*
22  Consequently, each claim for payment to Medi-Cal was a false claim in violation
23  of the CA-FCA. *Id.,* ¶ 144.  The payments received by the RIC Defendants due to
24  such false claims from 2006 through 2012 total $1,233,356.78 and Defendants
25  continue to receive payments from Medi-Cal for false claims. *Id.*[8]

26
27    [8]Similarly, as directed by RIC, cash-paying CEES patients and RIC patients,
28  as well as SG-ASC patients, paid lower amounts than paid by Medi-Cal. *Id.,* ¶ 145.

1

2.     Violations of the CA-IFPA

2

Approximately one-third of the RIC patients had commercial insurance

3

coverage for the services provided by RIC. *Id.,* ¶ 148. The contracts between the

4

RIC Defendants and commercial insurance carriers, including, but not limited to

5

Empire Blue Cross/Blue Shield, Cigna and United Healthcare, require that the

6

patient be charged and pay a deductible and/or a co-payment before a benefit is

7

payable under the plan. *Id.* However, Defendants routinely waived co-payments

8

and deductibles for patients with commercial insurance as well. *Id.,* ¶ 149. When

9

submitting claims to commercial carriers for these patients, the RIC Defendants

10

and providers listed the co-payment amounts and actually or impliedly represented

11

that they were charging the required co-payments or deductibles, when they were

12

not. *Id.*[9]

13

3.     Violation of the California Business and Professions
Code Sec. 654.2 - San Gabriel Surgery Center

14

15

Due to the conduct set forth in Section II(D) above, the RIC Defendants'

16

submissions to Medi-Cal for services they perform at the San Gabriel Surgery

17

Center and for the use of its facilities and nursing services by patients referred by

18

RIC, CEES and the providers is false and fraudulent, in violation of Sec. 654.2 of

19

the California Professions and Business Code. *Id.,* ¶¶ 155-161.

20

_____

21

For example, CEES doctors charged patients who paid cash $35.00 for CPT 92250,

22

but Medi-Cal paid $42.11. *Id.* Accordingly, each claim submitted by CEES and
SGASC providers to Medi-Cal as a primary payer was in violation of the

23

Discriminatory Billing Rule. *Id.*

24

[9]Further, because Defendants accepted lower payments from patients who

25

paid cash, Defendants failed to disclose their actual, usual prices when making
claims for benefits to commercial carriers. *Id.,* ¶ 150. Each of the claims for

26

payment that Defendants presented or caused to be presented to insurers that failed

27

to reveal the waiver of co-payments and deductibles, or that failed to disclose their
true usual charges for the services listed, contained false and misleading

28

information about material facts. *Id.,* ¶ 151.

CIVIL ACTION NO.:                          PLAINTIFFS' MPA IN OPP.
2:13-cv-3772-DMG (MRWx)        -17-        To MOTION TO DISMISS

1   **III.   ARGUMENT**

2     **A.   Standard Of Review**

3      A complaint meets the rigors of Rule 12(b)(6) if it pleads "enough facts to

4   state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550

5   U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads

6   factual content that allows the court to draw the reasonable inference that the

7   defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662,

8   678, 129 S.Ct. 1937, 1949 (2009).  In determining whether the complaint states a

9   plausible claim for relief, the court must "draw on [its] judicial experience and

10   common sense," *Iqbal*, 556 U.S. at 679, and consider "'obvious alternative

11   explanation[s].'" *Id.* at 682.  "The plausibility standard is not akin to a 'probability

12   requirement,' but it asks for more than a sheer possibility that a defendant has

13   acted unlawfully." *United States v. Corinthian Colls.*, 655 F.3d 984, 991 (9th Cir.

14   2011).  In considering whether to dismiss a complaint, the court must accept the

15   allegations of the complaint as true, *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007),

16   construe the pleading in the light most favorable to the pleading party, and resolve

17   all doubts in the pleader's favor.  *See Jenkins v. McKeithen*, 395 U.S. 411, 421-22

18   (1969); *Berg v. Popham*, 412 F.3d 1122, 1125 (9th Cir. 2005).   Rule 9(b) also

19   applies because the FCA is an anti-fraud statute, which the complaint meets when

20   the circumstances constituting fraud, *i.e.*, the "who, what, when, where, and how of

21   the misconduct charged," are alleged with particularity, but conditions of a

22   person's mind may be alleged generally.  *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d

23   993, 998 (9th Cir. 2010).  As set forth below, the SAC thoroughly meets the

24   standard and dismissal is unwarranted.

25     **B.   The SAC Pleads Cogent And Actionable Claims Under The FCA**

26      1.   The Claims Under The Federal FCA

27      Defendants begin their Motion with a boilerplate discussion of certain legal

28   principles governing claims asserted under the FCA.  *See* Motion at 12-14.  But,

CIVIL ACTION NO.:      PLAINTIFFS' MPA IN OPP.
2:13-cv-3772-DMG (MRWx)  -18-  To MOTION TO DISMISS

1   despite that general discussion, Defendants make no effort to apply the law cited to

2   the facts pled in the Complaint and, indeed, do not assert that the Complaint fails to

3   meet the requirements of many of the legal principles cited in that discussion.

4           2.     The Routine Waivers Of Co-Payments Violated The FCA

5           The AKS forbids, *inter alia*, any person or entity from knowingly and

6   willfully paying or receiving anything of value ("remuneration") to influence the

7   referral of services reimbursable by a federal healthcare program.  *U.S. ex rel.*

8   *Bartlett v. Ashcroft*, 39 F. Supp. 3d 656, 675 (W.D. Pa. 2014) (citing 42 U.S.C. §

9   1320a–7b(b); *United States v. LaHue*, 261 F.3d 993, 996 (10th Cir.2001); *see also*

10  *Ameritox, Ltd. v. Millennium Labs., Inc.*, 20 F.Supp.3d 1348, 1356 (M.D. Fla.

11  2014) (same); *U.S. ex rel. Osheroff v. Tenet Healthcare Corp.*, 2013 WL 1289260,

12  at *1 (S.D. Fla. Mar. 27, 2013) (same).  There are no exceptions to what may

13  constitute remuneration under the AKS, which is broadly construed to mean

14  "anything of value."  *See*, *e.g.*, *U.S. v. Narco Freedom, Inc.*, 2015 WL 1499265 at

15  *8 (S.D.N.Y. 2015) (remuneration under AKS is anything of value and not limited

16  to traditional bribes; remuneration may include an "in-kind benefit [i.e., subsidized

17  housing] provided at below market value to Medicaid beneficiaries"); *Ameritox,*

18  *Ltd.*, 20 F. Supp.3d at 1356 ("[T]he AKS does not contain exceptions to the broad

19  definition of remuneration."); *U.S. ex rel. McDonough v. Symphony Diagnostic*

20  *Servs.*, 36 F.Supp.3d 773 (S.D. Ohio 2014) (remuneration can be "anything of

21  value"); *Klaczak v. Consol. Med. Transp.*, 458 F.Supp.2d 622, 678 (N.D. Ill. 2006)

22  ("Remuneration, for purposes of the AKS, is defined broadly, meaning 'anything

23  of value.'").

24          Defendants do not contest the guidance of the Office of Inspector General of

25  the Department of Health and Human Services that the routine waiver of co-

26  payments can violate the AKS and misrepresent the true charges for RIC's

27  services.  *See* OIG Advisory Opinion No. 97-4 (HHSOIG), 1997 WL 34684552

28  (September 25, 1997).  As the OIG explained in that advisory opinion letter:

CIVIL ACTION NO.:                        PLAINTIFFS' MPA IN OPP.
2:13-cv-3772-DMG (MRWx)        -19-      To MOTION TO DISMISS

Section 231(h) of HIPAA, effective January 1, 1997, provides for the imposition of civil monetary penalties against any person who:

**offers or transfers remuneration** to any individual eligible for benefits under [Federal health care programs (including Medicare or Medicaid)] that such person knows or should know is likely to influence such individual to order or receive from a particular provider, practitioner, or supplier any item or service for which payment may be made, in whole or in part, [by a Federal health care program].

Section 231(h) defines "remuneration" as including, inter alia, the waiver of coinsurance and deductible amounts (or any part thereof). Waivers of coinsurance and deductible amounts are excepted from the definition of remuneration if:

(i) the waiver is not offered as part of any advertisement or solicitation;

(ii) **the person making the waiver does not routinely waive coinsurance or deductible amounts**; and

(iii) the person making the waiver

(I) waives the coinsurance and deductible amounts after determining in good faith that the individual is in financial need; or

(II) fails to collect coinsurance or deductible amounts after making reasonable collection efforts.

*Id.* at *2, *citing* 42 U.S.C. § 1320a-7a(i)(6); *see also* 42 CFR § 1003.110 (including waiver of co-payments in unlawful remuneration).

Instead, Defendants "creatively" argue that Plaintiffs' detailed averments are somehow "conclusory" because the Complaint allegedly fails to establish that the Medicare patients for whom co-payment waivers were made "did not have 'financial hardship' or 'financial need' supporting such waivers and that such waivers were to 'induce' the Medicare patients to receive services from RIC...." *See* Motion at 16.  That is nonsense.  The Complaint pleads exactly such conduct:

- RIC waives co-payments for impermissible reasons such as frequent patients and patients with a high balance, and requires no supporting documentation for patients claiming financial hardship (*id.* ¶ 62);

- RIC's co-payment waivers note the reason for the write-off, often with notations from the instructing provider;

CIVIL ACTION NO.:                                  PLAINTIFFS' MPA IN OPP.
2:13-cv-3772-DMG (MRWx)          -20-        To MOTION TO DISMISS

- A sample of Medicare patients whose co-payments were not collected by RIC and without any documentation explaining the reason for the waivers (*id.* ¶ 64);

- Details regarding RIC's woefully inadequate financial hardship form (*id.* ¶ 65);

- Three of the RIC partners ignoring Plaintiff-Relator Smith's advice, as RIC's COO, to cease RIC's practice of waiving patient co-payments (*id.* ¶ 66);

- Plaintiff-Relators personally witnessed Dr. Chang instructing providers to continue to routinely waive co-payments regardless of any potential Medicare fines (*id.* ¶ 67);

- Details of RIC CEO Braun's program pushing Provider Physicians to solicit referrals through waiving co-payments (*id.* ¶¶ 69-72);

- Physician Provider Dr. Kristy Lin and Dr. Chang informing Plaintiff Relator Smith's that patients were only referred Dr. Rose because their co-payments would be waived (*id.* ¶ 73); and

- Physician Provider Dr. Suk's insistence, despite Plaintiff-Relator Rogers' warning, that routine co-payments be waived to ensure continued referrals (*id.* ¶ 74).

Moreover, Defendants' argument that the Complaint somehow fails to fulfill the requirements of Fed.R.Civ.P. 9(b) are pure makeweight. The allegations that can satisfy a Rule 9(b) analysis are not contained in a strict checklist. *See Frazier ex rel. U.S. v. Iasis*, 392 F. App'x 535, 537 (9th Cir. 2010) (Relator not required to plead representative examples; "he must only plead with sufficient particularity to lead to a strong inference that false claims were actually submitted."); *U.S. ex rel. Schuhardt v. Washington Univ.*, 228 F. Supp. 2d 1018, 1034 (E.D. Mo. 2002) ("plaintiffs . . . [are] not required to provide a specific allegation to substantiate each and every general allegation within the complaint."); *U.S. v. Gen. Dynamics*, 315 F. Supp. 2d 939, 946 (N.D. Ill. 2004) (the "[l]ength and grueling exaction is not the purpose of Rule 9(b)."). Rather, as the Court in *U.S. ex rel. Bilotta v. Novartis Pharmaceuticals Corp.*, 50 F.Supp.3d 497, 507-508 (S.D.N.Y. 2014), cogently explained:

"Because the False Claims Act is an anti-fraud statute, 'claims brought under the FCA fall within the express scope of Rule 9(b).'" *United States v. New York Soc. for the Relief of the Ruptured & Crippled, Maintaining the Hosp. for Special Surgery*, No. 07 Civ. 292(PKC), 2014 WL 3905742, at *7 (S.D.N.Y. Aug. 7, 2014) (quoting *Gold v. Morrison–Knudsen Co.*, 68 F.3d 1475, 1477 (2d Cir.1995)). Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). "The purpose of Rule 9(b) is threefold—it is designed to provide a defendant with fair notice of a plaintiff's claims, to safeguard a defendant's reputation from 'improvident charges of wrongdoing,' and to protect a defendant against the institution of a strike suit." *O'Brien v. Nat'l Analysts Partners*, 936 F.2d 674, 676 (2d Cir.1991) (quoting *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir.1990)).

"Rule 9(b) does not impose a 'one size fits all' list of facts that must be included in every FCA complaint." *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F.Supp.3d 242, 258, 2014 WL 2324465, at *15 (S.D.N.Y. May 29, 2014) (quoting *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 337–38 (D.Conn.2004)). "Ultimately, whether a complaint satisfies Rule 9(b) 'depends upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading.' " *Id.* (quoting *United States v. Wells Fargo Bank, N.A.*, 972 F.Supp.2d 593, 616 (S.D.N.Y.2013)). This "is a fact-specific inquiry." *Id.*

Here, the detailed averments of the Complaint place Defendants specifically on notice as to the claims against them.  That is all that is required.

Likewise, Defendants' argument that the waiver of co-payments does not change the amount of Medicare reimbursement misses the entire point.  *See* Motion at 18 (claiming that reimbursement occurs at 80% of fee schedule amount).  As was recently explained in an article detailing a settlement reached regarding the waiver of co-payments by a medical group in a circumstance similar to that present here:

Medical Group Settles Case Over Copay Waivers, Low-Level Codes

A medical group in New York state has settled a false claims lawsuit over copay waivers and misuse of low-level CPT codes, two areas that seem to be dogging providers.

Hudson Valley Hematology-Oncology Associates, which operates six clinics, agreed to pay $5.31 million to settle Medicare and Medicaid false claims allegations, the U.S. Attorney's Office for the Southern

District of New York said Oct. 21. Hudson Valley also entered into a five-year corporate integrity agreement with the HHS Office of Inspector General over the misconduct, which spanned 2010 to 2015.

***The routine waiver of Medicare cost-sharing amounts potentially implicates the anti-kickback statute and the civil monetary penalty (CMP) law forbidding inducements to beneficiaries***.

\*     \*     \*

***Copay waivers trouble the government because they inflate the amount Medicare pays for services***.  As the HHS Office of Inspector General said in a 1994 fraud alert, "if a supplier claims that its charge for a piece of equipment is $100, but routinely waives the copayment, the actual charge is $80. Medicare should be paying 80 percent of $80 (or $64), rather than 80 percent of $100 (or $80). As a result of the supplier's misrepresentation, the Medicare program is paying $16 more than it should for this item."

Providers are permitted to occasionally waive copays when they document the patient's financial hardship, but it shouldn't be the norm. According to the complaint, "Hudson Valley routinely waived copayments, without making an individualized determination of financial hardship or exhausting reasonable collection efforts." Patients were given a pass because they had high balances, said they couldn't pay or were frequent patients. "Hudson Valley often waived the copayment associated with it even if the patient did not request a waiver. Hudson Valley would note the automatic waiver in its billing systems by indicating '99212 courtesy write off,'" the complaint said. These reasons didn't pass muster, and there was no documentation to support them.

"***It is such a black and white area, and it has been since the 1994 OIG fraud alert***," says Ed Gaines, chief compliance officer for Zotec Partners' Emergency Medicine Division in Greensboro, N.C. There's no waiving copays and deductibles routinely for government payers and it should be done on a case-by-case basis when patients have established financial need, he says. While there's "tremendous pressure on practices to ease the burden on patients — aside from government payers, they are now the largest payer in health care, with average out-of-pocket costs of $1,060 per patient, according to the Kaiser Family Foundation" — copay waivers will get practices in hot water, Gaines says. They have been dominant in other cases. The Institute of Cardiovascular Excellence in Ocala, Fla., was accused in a false claims lawsuit of waiving copays and performing medically unnecessary procedures (RMC 1/12/15, p. 5), and on June 30, 2016, agreed to settle the case for $2 million.

*See* Report on Medicare Compliance, Vol. 25, No. 39 at 3-4 (October 31,

2016)(emphasis added), a true and correct copy of which is attached as Exhibit "A"

to the Declaration of Kolin C. Tang ("Tang Decl."); *see also* Complaint in

Intervention in *United States v. Hudson Valley Hematology-Oncology Associates,*

| CIVIL ACTION NO.: | | PLAINTIFFS' MPA IN OPP. |
|---|---|---|
| 2:13-cv-3772-DMG (MRWx) | -23- | To MOTION TO DISMISS |

1    *RLLP et al.*, 14-CV-2653 (S.D.N.Y.), a true and correct copy of which is attached

2    as Exhibit "B" to the Tang Decl.  Thus, Defendants' arguments are without merit.

3                    3.    The SAC Pleads Actionable Claims Based On RIC's
                           Co-Marketing Agreement With RICX

4          Defendants' similar argument -- that the Complaint's detailed averments

5    regarding the co-marketing arrangements between RIC and RICX somehow fail to

6    meet the requirements of Rule 9(b) -- is absurd.  *See* Motion at 18-19.  The

7    Complaint specifically pleads that RIC entered into an arrangement with RICX, an

8    entity in which Dr. Chang maintains an ownership interest, to generate self-

9    referrals, and that RIC provided significant inducements in order to obtain

10   referrals.  SAC, ¶¶ 77-89.  Such conduct is the essence of an AKS violation, as

11   well as a violation of the Stark Act, as more fully discussed below.

12                   4.    The SAC Pleads FCA Violations Based on the RIC Physicians'
13                         Referrals to the San Gabriel Ambulatory Surgery Center

14         Keeping with their "kitchen-sink" approach, Defendants argue that Relators'

15   claims related to the RIC Defendants' referrals to the SG-ASC should be dismissed

16   because Relators fail "to plausibly allege that the RIC Partners did not satisfy the

17   safe harbor."  Motion at 20.  Unsurprisingly, Defendants' argument ignores both

18   the allegations of the SAC and the relevant law.

19         Initially, Relators properly and plausibly allege that Defendants violated the

20   AKS and the Stark Act, 42 U.S.C. § 1395nn, by routinely referring patients to SG-

21   ASC, a surgery center in which they held a 50% ownership interest.  SAC, at ¶¶

22   91-92.  As detailed above, the AKS forbids, *inter alia*, any person or entity from

23   knowingly and willfully paying or receiving anything of value ("remuneration") to

24   influence the referral of services reimbursable by a federal healthcare program.

25   *See, e.g., U.S. ex rel. Bartlett v. Ashcroft*, 39 F. Supp. 3d at 675.  And, again, there

26   are no exceptions to what may constitute remuneration under the AKS, which is

27   broadly construed to mean "anything of value."  *See*, *e.g.*, *U.S. v. Narco Freedom,*

28   *Inc.*, 2015 WL 1499265, at *8.  Defendants, through their ownership interest in

CIVIL ACTION NO.:                              PLAINTIFFS' MPA IN OPP.
2:13-cv-3772-DMG (MRWx)         -24-           To MOTION TO DISMISS

SG-ASC, received remuneration as a result of the referrals they, and other physicians employed by RIC and CEES, made to SG-ASC.  As such, they sought to induce physicians to arrange for services for which payment may be made under Medicare and/or Medicaid, in violation of the AKS.

Defendants' violation of the Stark Act is equally clear.  Simply stated, the Stark Act prohibits physicians from making patient referrals for "designated health services," if the referring physician (or an immediate family member) has a "financial relationship" with the entity providing the services.  *U.S. ex rel. Bartlett*, 39 F. Supp. 3d at 662 (citing 42 U.S.C. § 1395nn(a)(1)(A). The Stark Act further proscribes a healthcare entity from presenting or causing to be presented a Medicare claim for services furnished pursuant to a prohibited self-referral.  *Id*. (citing 42 U.S.C. § 1395nn(a)(1)(B); *U.S. ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 239 (3d Cir. 2004)).  A physician has a "financial relationship" with an entity if, as is alleged here, the physician has "an ownership or investment interest in the entity" with it.  42 U.S.C. § 1395nn(a)(2).  The Stark Act "is a strict liability statute" that does not require intent.  72 Fed. Reg. 51,011, at 51,026.  A hospital's submission of a false certification violates the Stark Act and also violates the FCA.  *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902-03 (5th Cir. 1997).  Further, a Stark Act violation is a ***per se*** FCA violation.  *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1039 (S.D. Tex. 1998).[10]

---

[10]Both the AKS and the Stark Act contain safe harbor provisions.  It is Defendants' actions in violation of the AKS and the Stark Act, however, and not Defendants' failure to satisfy the safe harbor provisions, which form the basis for Relators' claims.  Although a number of statutory and regulatory safe harbors protect certain business arrangements that might otherwise violate the AKS, *see* 42 U.S.C. § 1320a–7b(b)(3)(A)–(J); 42 C.F.R. § 1001.952, these safe harbors are affirmative defenses, and Defendants carry the burden of proof at trial.  *U.S. ex rel. Bartlett*, 39 F. Supp. 3d at 676 (citing *United States v. Rogan*, 459 F. Supp.2d 692,

5.    The SAC Pleads an FCA Claim Based on the Upcoding of
Drs. Davis, Samuel and Chang

Although the SAC alleges upcoding by Drs. Davis, Samuel and Chang, Defendants' Motion only addresses the allegations against Drs. Davis and Samuel without discussing the allegations against Dr. Chang at all.  Upcoding is actionable under the FCA.  *U.S. ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 6-7 (D.D.C. 2003) (citing *United States v. Halper*, 490 U.S. 435, 437-38, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), *overruled on other grounds*, *Hudson v. United States*, 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997)); *United States v. Krizek*, 192 F.3d 1024, 1025-26 (D.C.Cir.1999); J. Boese, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS, § 3.01[A]).  Defendants do not dispute that upcoding is actionable but

_____

716 (N.D. Ill. 2006)); *United States v. Job*, 387 Fed.Appx. 445, 455 (5th Cir. 2010) (unpublished); *United States v. Norton*, 17 Fed.Appx. 98, 102 (4th Cir. 2001) (unpublished).  It is well-settled that "the assertion of an affirmative defense may be considered properly on a motion to dismiss where the 'allegations in the complaint suffice to establish' the defense." *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013); *see also ASARCO, LLC v. Union Pac. R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014).  That is clearly not the case here, as Defendants are not arguing that the SAC establishes that they satisfied the safe harbor requirements, only that the SAC fails to establish that they did not, which is clearly not Relators' burden at this, or any stage.

The Stark Act also contains certain safe harbors, however, like the AKS safe harbors, those safe harbors are affirmative defenses and, "a defendant bears the burden of establishing his eligibility for an exception to the Stark law." *U.S. ex rel. Villafane v. Solinger*, 543 F.Supp.2d 678, 687 (W.D. Ky. 2008); *see also U.S. v. Job*, 387 F.Appx. at 455.  Contrary to Defendants' argument, a relator "need not prove, as an element of its case, that defendant's conduct does not fall within a safe harbor or exception." *Rogan*, 459 F.Supp.2d at 716 (N.D. Ill. 2006).  Relators have plausibly and specifically plead the RIC Defendants' ownership interest in SG-ASC and plead that the RIC Defendants referred patients to that facility and, although clearly not required to do so, Relators also plead facts that establish that the RIC Defendants did not establish the safe harbor requirements of the AKS and Stark Act.  *See SAC*, at ¶¶ 95-96.

CIVIL ACTION NO.:                              PLAINTIFFS' MPA IN OPP.
2:13-cv-3772-DMG (MRWx)          -26-       To MOTION TO DISMISS

contend that Relators have failed to adequately allege that Drs. Davis and Samuel engaged in improper upcoding.  This argument fails.

As noted above, the allegations that can satisfy a Rule 9(b) analysis are not a strict checklist.  *See Frazier ex rel. U.S.*, 392 F. App'x at 537 (Relator not required to plead representative examples; "he must only plead with sufficient particularity to lead to a strong inference that false claims were actually submitted.").  Far from conclusory allegations, Relators allege that data from a government audit of the Medicare claims data of Drs. Chang, Davis and Samuel for claims between 2006 and 2013 reveals that the doctors engaged in massive upcoding, accounting for 30% of their Medicare charges, which was unsupported by the pertinent medical records.  SAC ¶¶ 113-116.  In addition, the audit data revealed that the RIC Defendants engaged in the medically unnecessary and unreasonable practice of bringing patients back every few weeks for follow-up visits without medical justification.  SAC ¶ 115.  Finally, Relators allege that the compensation structure at RIC encouraged, and indeed required, upcoding in order to advance professionally at RIC.  SAC ¶¶ 126-128.  Relators' allegations are sufficiently particular to easily satisfy the requirements of Rule 9(b).  The cases cited by Defendants do not change this obvious conclusion.[11]

---

[11]Defendants suggest that *United States v. Prabhu*, 442 F. Supp. 2d 1008 (D. Nev. 2006), supports the position that allegations of unnecessary treatment cannot establish FCA liability as a matter of law.  Motion at 23.  This is manifestly incorrect.  In *Prabhu*, the Court granted summary judgment on the United States' FCA claims because "[t]he Government has failed to adduce any evidence that . . . from a clinical standpoint--the services were medically unnecessary." *Prabhu*, 442 F. Supp. at 1032.  *Prabhu* stands for the unremarkable proposition that, where there is no evidence in the record to support the allegation that the services provided were medically unnecessary, summary judgment is appropriate on claims that billing for those services violated the FCA and does not support the extraordinary assertion that Defendants make here, that allegations of billing for unnecessary services -- even if proven -- cannot support FCA liability. *Frazier* is

CIVIL ACTION NO.:                           PLAINTIFFS' MPA IN OPP.
2:13-cv-3772-DMG (MRWx)          -27-        To MOTION TO DISMISS

6.   The SAC States FCA Claims Based on Defendants' Medicare
Claims For Unnecessary and/or Worthless ICG Angiography Tests

Throughout their Motion to Dismiss, Defendants have conveniently ignored the actual allegations of the SAC.  In arguing that Relators' claims based on unnecessary ICG tests are somehow deficient, Defendants literally ignore the allegations of the SAC and are, instead, apparently discussing the allegations of the FAC.  *See* Motion at 24.  (Defendants cite to SAC ¶¶ 113-114, 116 ,which discuss upcoding and not ICG tests, but which discussed ICG tests in the FAC and pointedly ignore the actual allegations contained in the SAC).

As with Relators' upcoding claims, Defendants concede that claims based on the prescription of medically unnecessary services can be actionable under the FCA.  Defendants, however, question the sufficiency of Relators' allegations (or, it would appear, the allegations of the FAC).  The allegations of the SAC make it clear that Defendants were prescribing and charging Medicare for medically unnecessary services and unquestionably satisfy Rule 9(b).

Relators allege that ICGs are a controversial technique used infrequently in evaluating and treating AMD and use of this technique is not the preferred practice

---

equally inapposite.  There, the Ninth Circuit upheld the dismissal of an FCA complaint because the complaint lacked any "reliable indicia" that the defendant had submitted claims for medically unnecessary procedures.  *Frazier*, 392 F. App'x at 537.  Such scant allegations stand in stark contrast to the allegations of the SAC and *Frazier* does not support dismissal of Relators' upcoding claims.  The other cases relied upon by Defendants are similar in that they are dismissals of claims based on a lack of adequate allegations, or actually support Relators' position.  *See U.S. ex rel. Obert-Hong v. Advocate Health Care*, 211 F. Supp. 2d 1045, 1051 (N.D. Ill. 2002) ("nothing in the complaint to suggest a pattern of upcoding"); *U.S. ex rel. Stewart v. The Louisiana Clinic*, No. CIV.A. 99-1767, 2002 WL 1066745, at *2 (E.D. La. May 28, 2002) (finding allegations less detailed than in the SAC to be sufficient to maintain upcoding claims at the pleading stage); *U.S. ex rel. Bennett v. Boston Sci. Corp.*, No. CIV.A. H-07-2467, 2011 WL 1231577, at *30 (S.D. Tex. Mar. 31, 2011) ("relator has not identified any hospital or physician who did in fact 'upcode' improperly").

1   or current standard of care for the evaluation and treatment of AMD recommended

2   by the AAO.  SAC ¶ 117.  Relators also allege that, despite the fact that the routine

3   use of ICGs is not scientifically supported, Defendants used it for virtually every

4   patient.  SAC ¶¶ 118-119.  Relators further allege that the DOJ evaluated the RIC

5   Defendants' use of ICGs performed on Medicare patients between February and

6   May 2014 and the results of that evaluation revealed that only 9.2% of the ICG

7   studies were found to be appropriate and medically necessary.  SAC ¶¶ 119, 121.

8   Finally, Relators allege that the RIC Defendants conducted the ICG tests as a

9   means of making more money from Medicare patients and cited specific

10   correspondence in which Drs. Samuel, Davis and Chang discuss how they make

11   money from the ICG testing.  SAC ¶¶ 120-121.  These well-pled allegations are

12   clearly sufficient to satisfy Rule 9(b).[12]

13                7.    The SAC States A Claim For Duplicate Billing Services

14          Defendants concede that the SAC's duplicate billing allegations (SAC ¶¶

15   122-125) constitute a valid theory of FCA liability, but then argue, in a conclusory

16   fashion and without citation to any authority, that the SAC's allegations that

17   Defendants engaged in double billing do not meet the requirements of Rule 9(b).

18   Motion, at 25-26.  Not so.

19

20   _____

21          [12]The cases cited by Defendants do not support another conclusion.  As
22   discussed above, the threadbare allegations in *Frazier* are not similar in any way to
     the allegations of the SAC.  *Frazier*, 392 F. App'x at 537.  The complaint in *U.S.*
23   *ex rel. Thompson*, was similarly infirm and in no way similar to the allegations of
24   the SAC.  125 F.3d at 902-03 (only allegation supporting medically unnecessary
     services claim was that "[i]n reasonable probability, based on statistical studies
25   performed by the Government and others").  *Advanced Rehab., LLC v.*
26   *UnitedHealthgroup, Inc.*, does not even discuss an FCA claim and should be
     disregarded altogether. 498 F. App'x 173, 175 (3d Cir. 2012) ("Plaintiffs'
27   complaint alleged breach of contract and breach of fiduciary duty under both
28   ERISA and state law.").

CIVIL ACTION NO.:                         PLAINTIFFS' MPA IN OPP.
2:13-cv-3772-DMG (MRWx)        -29-       To MOTION TO DISMISS

1    The SAC alleges the "who" (RIC, Dr. Kislinger, and Dr. Bhatti, *id.* ¶ 123),

2   the "what,"(RIC double billing for services Dr. Bhatti performed in Dr. Kislinger's

3   clinic, *id.* ¶ 123), the "where" (Dr. Kislinger's Glendora's office, *id.*) the "when"

4   (at least April through June of 2012, *id.* ¶ 123), and the "how" (Defendants

5   submitting those fraudulent claims to Medicare, *id.* ¶ 124).   Nevertheless,

6   Defendants argue that the SAC does not explain "how" the fraudulent claims were

7   submitted or that such billings were fraudulent as opposed to an inadvertent error,

8   or identify any Medicare claims.  Motion, at 25-26.  But the SAC alleges that

9   Plaintiff-Relator Smith, as the COO of RIC, personally witnessed records of these

10   fraudulent claims, advised Dr. Chang of their fraudulent nature, but was then

11   ignored.  SAC ¶ 125.  Given the totality of the circumstances, this is more than

12   sufficient to satisfy Rule 9(b).  *See United States v. Caris Life Scis., Inc.*, No.

13   3:10-CV-02237-P, 2013 WL 11579021, at *6 (N.D. Tex. Oct. 23, 2013)

14   ("[c]onsidering the totality of the allegations, [r]elators successfully state a FCA

15   claim and comply with the particularity requirements of Rule 9(b)" because one of

16   the relators' "position as a coder purportedly allowed her to 'witness' these

17   practices, gave her access to 'reports documenting duplicate billing,' and provided

18   opportunities to speak with coding supervisors about the practice").

19            8.    The SAC States A Claim For Services Not Performed

20         Defendants concede that the allegations that CEES billed Medicare for

21   services not performed by Dr. Lee is a valid theory for FCA liability (SAC ¶¶ 129-

22   132), but argue that there are no factual allegations establishing that CEES knew or

23   should have known that Dr. Lee did not participate in the relevant surgeries, citing

24   *Corinthian Colls*.  Motion, at 26.  But *Corinthian Colls.* provides no support.

25   There, the Ninth Circuit found that, notwithstanding the general rule that, under

26   Rule 9(b), "'malice, intent, knowledge, and other conditions of a person's mind,'

27   including scienter, can be alleged generally," factual allegations were necessary to

28   establish that the defendant acted knowingly because of the existence of the "Safe

CIVIL ACTION NO.:                              PLAINTIFFS' MPA IN OPP.
2:13-cv-3772-DMG (MRWx)          -30-          To MOTION TO DISMISS

Harbor Provision on which it was entitled to rely." *Corinthian Colls.*, 655 F.3d at 996-97.  Here, these is no safe harbor, so fraudulent intent can be alleged generally (and, here, it is obvious from the averments of the SAC).  SAC ¶¶ 130-32. Regardless, the SAC does provide the factual basis to infer CEES' knowledge: some of these retinal surgeons did not require an assistant surgeon, which CEES was aware of from its experience as a medical provider, but CEES automatically billed for those services anyway.  SAC ¶ 131; *see Corinthian Colleges*, 655 F.3d at 997 (stating that deficiencies with the "intent" allegations could be readily cured with formal allegations that defendant "certified compliance with the HEA while knowing that it was in fact compensating recruiters based solely on their recruitment numbers").

9.    The SAC States A Claim For The Knowing Submission<br>Of Incomplete Data To Medicare

The SAC alleges that RIC also violated the FCA when it received a $60,000 payment from the CMS predicated on the submission of data for a 12-month period, or the period January 1, 2011 to December 31, 2011, because RIC falsely attested that the data it submitted was accurate and complete, even though the submitted data only included the four months from September through December 2011 and for activities in 2012 that had not yet occurred, was complete.  SAC ¶¶ 133-138; *see U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006) ("[s]o long as the statement in question is knowingly false when made, it matters not whether it is a certification, assertion, statement, or secret handshake; False Claims liability can attach").  Defendants argue, without any authority, that RIC's submission of incomplete data and subsequent receipt of funds predicated on RIC's provision of complete and accurate data to the RIC is somehow insufficient to establish an FCA claim.  Motion, at 26.  This nonsensical argument should be readily rejected.

## C.     **The SAC States Claims Under The CA FCA**

### 1.    The SAC Pleads Violations Of Medi-Cal's Discriminatory Billing Rules

The RIC Defendants and Providers and CEES and SG-ASC providers violated the Discriminatory Billing Rule under Title 22, Section 51480(a) of the California Code of Regulations by charging lower fees to uninsured cash patients, and, thus, falsely certifying that they were in compliance with state laws when making their submissions for Medi-Cal reimbursement.  SAC ¶¶ 139-145.  In response, Defendants argue that California Business & Professions Code § 657 expressly permits them to grant discounts to such cash payers and exempts such discounts from consideration of Defendants' "usual price" under the Discriminatory Billing Rule.  Motion, at 28-29.  But the RIC Defendants and Providers, CEES and SG-ASC providers are not entitled to the protection under Section 657, which requires that the provider have "reasonable cause to believe [the patient] is not eligible for, or is not entitled to, reimbursement, coverage under the Medi-Cal program" or other health care plan.  Cal. Bus. & Prof. Code § 657(c).  Specifically, those Defendants did not have "reasonable cause" to provide the discounts -- the discounts were provided as part of the overall scheme of waiving co-pays for every patient, regardless of the circumstance and without conducting any analysis whatsoever, for one purpose -- to induce referrals.  SAC ¶¶ 55-76; *see People v. Hering*, 20 Cal. 4th 440, 446 (1999) ("[O]nly the character [*i.e.*, motivation,] of the [rebate] offer controls" to determine if it was permissible, citing Section 657).

### 2.    The SAC Pleads Violations Of California Business & Profession Code 654.2

Defendants argue that RIC, the RIC Partners, CCES, and SG-ASC's failure to disclose the RIC Partners' investment interest in SG-ASC, in violation of California Business & Professions Code § 654.2, is insufficient to sustain a CA-FCA claim because Section 654.2 expressly provides that the failure to make such

1  a disclosure cannot serve as "the sole basis" for the denial of a claim by a health
2  care service plan, including the Medi-Cal program.  Motion, at 29-30.  This
3  argument is a red herring.  As a preliminary matter, as discussed above, there are
4  numerous other reasons for Medi-Cal to deny claims submitted by SG-ASC, so the
5  failure to disclose would not serve as the "sole basis."  In any event, Defendants'
6  CA-FCA liability does not stem from their failure to disclose pursuant to Section
7  654.2; rather, their liability stems from their false certification that they complied
8  with state law, which includes Section 654.2 and was material to Medi-Cal's
9  payment decision, when they submitted claims for reimbursement from Medi-Cal.
10  SAC ¶¶ 152-161; *see, e.g.*, *U.S. ex rel. Schmidt*, 386 F.3d at 239; *see generally San*
11  *Francisco Unified Sch. Dist. ex rel. Contreras v. Laidlaw Transit, Inc.*, 182 Cal.
12  App. 4th 438, 446, 452 (2010) ("[i]t is appropriate to turn to federal cases for
13  guidance in interpreting the" CA-FCA").

14      Defendants also argue that the SAC's allegations regarding RIC, the RIC
15  Partners, CCES, and SG-ASC's failure to disclose RIC Partners' investment
16  interest in SG-ASC do not meet the requirements of Rule 9(b).  Motion, at 30.  But
17  the SAC provides the relationship between SG-ASC and the other Defendants
18  (SAC ¶ 24), the lack of any clear disclosure to patients (SAC ¶¶ 155, 158), as well
19  as the ambiguous/false representation in brochures given to patients (SAC ¶¶ 156-
20  57).

21          **D.    The SAC Pleads Violations Of The CA-IFPA**

22      The SAC's allegations regarding Defendants' violation of the CA-IFPA
23  arising from Defendants' routine waivers of copayments for patients with private
24  insurance (SAC ¶¶ 146-151) is the California commercial insurance corollary to
25  Defendants' violation of the federal AKS and the FCA (SAC ¶¶ 55-76).  As such,
26  Defendants' argument that these allegations do not meet Rule 9(b) (Motion, at 30-
27  31) are similarly without merit as discussed above, *supra* Section III.B.2.

28

CIVIL ACTION NO.:                              PLAINTIFFS' MPA IN OPP.
2:13-cv-3772-DMG (MRWx)          -33-      To MOTION TO DISMISS

1    Defendants also assert that there are no allegations that they were not

2    permitted to waive plan deductibles and co-payments for financial hardship or

3    other circumstances (Motion, at 31), but that is irrelevant.  Regardless of the

4    availability of any "waivers," the RIC Defendants and Providers violated the CA-

5    IFPA by submitting claims to commercial carriers falsely representing that they

6    were charging the required co-payments.  SAC ¶ 149.[13]  And, as discussed above,

7    *supra* Section III.C.1, the discounts offered by the RIC Defendants and Providers

8    and CEES and SGASC providers were not protected by Cal. Bus. & Prof. Code §

9    657(c), which requires "reasonable cause," because the motivation for offering

10    discounts to uninsured patients was part of an overall scheme of inducing referrals

11    of patients covered by Medi-Cal and other health care plans.

12         **E.    The Complaint Does Not Violate Any Group Pleading Rules**

13    Finally, Defendants argue that the SAC engages in impermissible group

14    pleading.  Motion, at 32.  But the SAC identifies each of the Defendants and their

15    roles in the multiple and overlapping fraudulent schemes they engaged in.  SAC ¶¶

16    17-24 (identifying each of the Defendants and their roles).  Indeed, as reflected in

17    Defendants' Motion, Defendants were able to identify the allegations and claims

18    pertinent to each of them.  *See, e.g.*, Motion, at 19, 21 ("[n]ext, the Complaint

19    alleges that the RIC Partners' Medicare claims for services provided at the

20    defendant SG-ASC were false").  As such, this argument should be rejected.  *See,*

21    *e.g.*, *Gingras v. Rosette*, No. 5:15-CV-101, 2016 WL 2932163, at *21 (D. Vt. May

22    18, 2016) (rejecting "group pleading" argument where both companies had

23    complementary roles in the same alleged wrongdoing"); *Gao v. JPMorgan Chase*

24    *& Co.*, No. 14 CIV. 4281 PAC, 2015 WL 3606308, at *6 (S.D.N.Y. June 9, 2015)

25

26

27         [13]If such waivers did exist and were applicable, the RIC Defendants and

28    Providers presumably would have indicated as much in their claim submissions.

CIVIL ACTION NO.:                    PLAINTIFFS' MPA IN OPP.
2:13-cv-3772-DMG (MRWx)        -34-        To MOTION TO DISMISS

1  (rejecting "group pleading argument" where "the claims . . . and the grounds upon

2  which they rest, are clear from the complaint").[14]

3  **IV.   <u>CONCLUSION</u>**

4        For all of the reasons explained above, Defendants' Motion to Dismiss the

5  Second Amended Complaint should be denied in its entirety.

6

7  Dated: February 24, 2017                    Respectfully submitted,

8                                              SHEPHERD, FINKELMAN, MILLER
                                                  & SHAH, LLP
9
                                               /s/ Kolin C. Tang
10                                             Kolin C. Tang
                                               11755 Wilshire Boulevard, 15th Floor
11                                             Los Angeles, CA 90025
                                               Phone: (323) 510-4060
12                                             Facsimile: (866) 300-7367
                                               Email:  ktang@sfmslaw.com
13
                                               James E. Miller
14                                             Laurie Rubinow
                                               Shepherd Finkelman Miller
15                                              & Shah, LLP
                                               65 Main Street
16                                             Chester, CT 06412
                                               Telephone: (860) 526-1100
17                                             Facsimile: (866) 300-7367
                                               Email: jmiller@sfmslaw.com
18                                                    lrubinow@sfmslaw.com

19

20

21

22
   _____
23     [14]As such, the situation is clearly different than that in *Lubin v. Sybedon
   Corp.*, 688 F. Supp. 1425, 1443 (S.D. Cal. 1988); *Magluta v. Samples*, 256 F.3d
24  1282, 1284 (11th Cir. 2001); or *Remmes v. Int'l Flavors & Fragrances, Inc.*, 389
   F. Supp. 2d 1080, 1089 (N.D. Iowa 2005), where the complaint failed to identify
25  the specific roles of some or all of the defendants.  Meanwhile, *Corinthian Colls.*,
   665 F.3d 984; *Ebeid*, 616 F.3d 993 (9th Cir. 2010); and *U.S. ex rel. Grubbs v.
26  Kanneganti*, 565 F.3d 180, 191 (5th Cir. 2009), only set forth the general
27  specificity requirements of Rule 9(b).

28
   CIVIL ACTION NO.:                          PLAINTIFFS' MPA IN OPP.
   2:13-cv-3772-DMG (MRWx)          -35-      To MOTION TO DISMISS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Monique Olivier
Duckworth Peters Lebowitz Olivier, LLP
100 Bush Street, Suite 1800
San Francisco, CA 94104
Telephone (415) 433-0333
Facsimile: (415) 449-6556
Email: monique@dplolaw.com

***Attorneys for Plaintiffs-Relators***

CIVIL ACTION NO.:                                        PLAINTIFFS' MPA IN OPP.
2:13-cv-3772-DMG (MRWx)              -36-            To MOTION TO DISMISS