Mark Hardiman (SBN 136602)
Salvatore Zimmitti (SBN 245678)
**NELSON HARDIMAN LLP**
11835 West Olympic Boulevard, Suite 900
Los Angeles, CA 90064
Telephone:   (310) 203-2800
Facsimile:   (310) 203-2727
mhardiman@nelsonhardiman.com
szimmitti@nelsonhardiman.com

Attorneys for Defendants

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and STATE OF CALIFORINA, *ex rel* BOBBETTE A. SMITH and SUSAN C. ROGERS,<br><br>Plaintiffs,<br><br>v.<br><br>TOM S. CHANG, M.D., TOM S. CHANG, M.D., INC., MICHAEL A. SAMUEL, M.D., MICHAEL J. DAVIS, M.D., RETINA INSTITUTE OF CALIFORNIA MEDICAL GROUP, CALIFORNIA EYE AND EAR SPECIALISTS, BRETT BRAUN and SAN GABRIEL AMBULATORY SURGERY CENTER LP,<br><br>Defendants. | CASE NO.: 2:13-cv-3772-DMG (MRWx)<br><br>(Assigned to Judge Dolly M. Gee)<br><br>**DEFENDANTS' REPLY TO RELATORS' OPPOSITION TO CONSOLIDATED MOTION TO DISMISS SEECOND AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF PROCEDURE 12(B)(6) AND 9(B); MEMORANDUM OIF POINTS AND AUTHORITIES**<br><br>Date:   March 17, 2017<br>Time:   9:30 a.m.<br>Place:   Courtroom 8C, 8th Floor |

Defendants Tom S. Chang, M.D., Tom S. Chang, M.D., Inc., Michael A. Samuel, M.D., Michael J. Davis, M.D., Brett Braun, Retina Institute of California Medical Group ("RIC"),  California Eye and Ear Specialists ("CEES"), and San Gabriel Ambulatory Surgery Center LP ("SG-ASC") (collectively, "Defendants"), by and through their attorneys of record, hereby file their reply to  the opposition by Relators Bobbette A. Smith and Susan C. Rogers to Defendants' consolidated

motion to dismiss the Second Amended Complaint alleging violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, ("FCA"), the California False Claims Act, Cal. Gov. Code §§ 12650 *et seq.* ("CA-FCA"), and the California Insurance Frauds Prevention Act, Cal. Insurance Code § 1871.7 ("CA-IFPA"), for failure to state a claim and to allege fraud with sufficient particularity pursuant to Federal Rules of Civil Procedure Rule 12(b)(6) and 9(b).

This reply is based on the accompanying memorandum of points and authorities, the files and records in this case, upon such matters as the Court may take judicial notice, and on such further evidence and argument as may be presented at any hearing of this motion.

DATED: March 3, 2017

Respectfully submitted,

NELSON HARDIMAN LLP


/S/ *M.S. Hardiman*
MARK S. HARDIMAN

Attorneys for Defendants

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

In their opposition, Relators agree that Rule 9(b) requires their FCA, CA-FCA and CA-IFPA allegations to be made with factual particularity, including the "who, what, when, where, and how" of the fraud charged. *See* Opposition at 18, citing *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010). Yet, throughout their opposition, Relators apply the Rule 9(b) requirements selectively, depending on whether they can plausibly claim that these requirements have been satisfied with respect to each of their eight different FCA, CA-FCA and CA-IFPA theories of liability. Where they cannot, Relators simply repeat the conclusory allegations establishing a theoretically viable FCA cause of action and then ask the Court to deem them sufficient to provide "notice" to Defendants even though particular factual allegations are entirely lacking.

While one purpose of Rule 9(b) is certainly to provide notice to defendants, the rule's heightened pleading standard "also prevents discovery intended as a mere fishing expedition, and protects the defendants' reputations from baseless allegations." *Nunnally v. West Calcasieu Cameron Hosp.*, 519 F. App'x 890, 895 (5th Cir. 2013); *Ebeid,* 616 F.3d at 999 n. 2. "When [relators] do[] not specifically plead the minimum elements of their allegation, it enables them to learn the complaint's bare essentials through discovery and may needlessly harm a defendants' goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, are baseless allegations used to extract settlements." *U.S. ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301 n. 22 (11th Cir. 2002). "This is especially so in [non-intervened] cases involving the False Claims Act, which provides a windfall for the first person to file and permits recovery on behalf of the real victim, the Government." *Id*.

In this case, as further detailed below, Relators, as former insider RIC employees, have no excuse for their failure to allege fraud with sufficient factual particularity. While they are certainly entitled to prosecute an a federal or state

FCA case action on behalf of United States or California, Rule 9(b) bars them from doing so unless they have the knowledge needed to describe each of the Defendants' alleged fraud with factual particularity. In this case, the Complaint falls far short of the Rule 9(b) standard, substituting Relators' suspicions, opinions and conclusions for specific factual allegations confirming that they observed or learned of actual fraud being committed by each of the Defendants while employed at RIC. Further, Relators' pleading also fail to satisfy the legal standards governing federal and state FCA claims predicated on violations of the federal Anti-Kickback Statute, ("AKS"), 42 U.S.C. § 1320a-7b, the Medi-Cal discriminatory billing rule, 22 C.C.R. § 51480(a), and California's anti-markup statute. California Business & Professions Code § 654.2. Accordingly, Relators' Complaint must be dismissed.[1]

## II. THE COMPLAINT FAILS TO STATE A FEDERAL FCA CLAIM BASED ON RIC'S ALLEGED WAIVER OF MEDICARE PATIENTS' DEDUCTIBLES AND CO-PAYMENTS

Relators' primary theory of FCA liability is that Defendants violated the FCA by submitting Medicare claims that were false and non-reimbursable because their "routine" waivers of the patients' co-payments without adequately verifying that they qualified for a financial hardship allegedly (a) violated the AKS, and (b) misrepresented the true charges for RIC services by failing to subtract the waived copayment amount from RIC's billed charges. *See* SAC ¶¶ 55-76, 98-100. As of 2010, any Medicare claim that includes services delivered in violation of the AKS

---

[1] Relators are correct that Defendants did not engage in a repeat "meet and confer" when Relators' Second Amended Complaint, filed after Defendant's first motion to dismiss, made some strategic deletions and added some facts regarding the upcoding and unnecessary testing theories of liability, but otherwise was largely identical to the First Amended Complaint. For that reason, Relators are also correct that Defendants' instant motion to dismiss was largely identical to their first motion to dismiss (and inadvertently failed to update a few of the complaint citations) because the Second Amended Complaint failed to cure the pleading failures of the First Amended Complaint.

constitutes a false claim within the meaning of the FCA. 42 U.S.C. § 1320a-7b(g) (2010).

In their opposition, Relators argue at length that "routine" waivers by a provider of Medicare co-payments can support FCA liability based on a theory that such waivers constitute kickbacks that induce Medicare patients to obtain services from the waiving provider. Relators point out (through exhibits A and B) that the government has obtained an FCA settlement from a New York medical group based on this theory of liability. *See* Opposition at 22-23. However, Defendants do not dispute that co-payment waivers could support FCA liability based on AKS violations if such waivers were intended as illegal bribes for the ordering or referral of Medicare services. What Defendants do contend is that Relators' FCA claims based on alleged AKS violations are long on conclusions and short on facts.

A. <u>Relators' Allegations That RIC's Co-Payment Waivers Were Kickbacks to Patients Do Not Satisfy Rules 12(b)(6) or 9(b)</u>

While the Complaint repeatedly alleges that Defendants "routinely" waived the co-payments of Medicare payments and did so without documenting or determining that such patients had a "financial hardship" or pursuing reasonable collection efforts, and that Dr. Chang dismissed Relator Smith's concern, (SAC ¶¶ 61-65, 67), the Complaint alleges no facts establishing that such "routine" waivers violated the AKS and thereby resulted in false claims. At best, the Complaint alleges that Defendants violated CMS's regulatory requirements for copayment waivers based on "financial hardship."

In particular, the Complaint simply alleges that "RIC waives co-payments for various reasons, including for individuals, who sought frequent medical services, who had a high balance, whose insurance did not pay certain amounts, or who expressed an inability to pay," and that these reasons are not valid "exceptions" to Medicare co-payment obligations. SAC ¶ 62. However, none of these alleged waiver reasons establish an AKS violation, which requires specific

factual allegations establishing that RIC knowingly and willfully offered remuneration in cash or in kind to a patient (or any person) person to "induce such person" to purchase or order Medicare services. *See* 42 U.S.C. § 1320a–7b(b)(2).

Otherwise, the Complaint contains no factual allegations indicating that Defendants were "routinely" waiving copayments to induce Medicare patients to use RIC, rather than some other provider. Without such allegations, Relators have simply alleged a regulatory violation with respect to CMS's "financial hardship" exception to Medicare copayment obligations, but have failed to allege any AKS violations that would make the resulting Medicare claims false. *See United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996) ("[m]ere regulatory violations do not give rise to a viable FCA action.") In addition, Relators fail to include any particular factual allegations that Defendants Samuels, Davis, Braun, CEES, and SG-ASC ever waived or caused RIC to waive Medicare co-payments without justification. Nor does the Complaint allege any specific facts establishing the Medicare standards for "financial hardship" waivers or that any of the Medicare patients for whom the co-payments were "routinely" waived without adequate inquiry or documentation did not satisfy whatever Medicare "financial hardship" standard applied.

Accordingly, under Rules 12(b)(6) and 9(b), the Complaint fails to state a valid FCA claim predicated on Defendants' payment of illegal remuneration to patients in violation of the AKS. *See Nunnally*, 519 F. App'x 890, 895 (5th Cir. 2013) (FCA complaint properly dismissed where Relator's conclusory allegations failed to plausibly establish existence of kickback scheme or describe fraud with particularity); *U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 687-688 (W.D. Tex. 2006) (dismissing FCA kickback claim for failure to satisfy Rule 9(b) particularity requirement).

### B. Relators' Allegations That RIC's Co-Payment Waivers Were Kickbacks to Referring Physicians Do Not Satisfy Rule 9(b)

Alternatively, the Complaint alleges in conclusory fashion that "RIC physicians were instructed by the RIC Partners to inform referring physicians that RIC waived co-payments and deductibles for Medicare patients," and that RIC "sponsors a large continuing medical education program called Okularfest, where attendees then become targets for possible patient referral with the inducement of the Medicare co-payment waiver." *See* SAC ¶¶ 68, 71. Even if the marketing of co-payment waivers to referring physicians could be considered illegal remuneration under the AKS, a far from self-evident proposition, the Complaint fails to provide the required "who, what, when, where and how" supporting details that Rule 9(b) requires.

Instead, the Complaint is entirely silent about when Defendants Chang, Samuels, Davis or Braun instructed RIC physicians (none of whom are identified) to inform referring physicians about co-payment waivers. Nor do Relators include any factual allegations about the identity of referring physicians who were solicited in this fashion, who at RIC made the waiver offers, when such offers were made, which Medicare patients of the referring physicians were referred as a result, and whether the co-payment obligations of these referred patients were in fact waived by a particular RIC physician, and resulted in Medicare claims.

It is true that the Complaint does identify one referring physician (Dr. Michael Rose) who allegedly required such a waiver as a condition of his referrals, and further alleges that Dr. Chang ratified the arrangement when one of the Relators spoke to him about it and that the co-payment obligations for Dr. Rose's Medicare patients were waived by RIC "without regard to financial hardship." *See* SAC ¶ 73. However, while concededly more specific, these bare-boned allegations are still either silent or conclusory with respect to time and whether the co-payment obligations of Dr. Rose's unidentified patients were waived as "illegal

remuneration" in exchange for his referrals and also do not support the broader illegal marketing scheme alleged by Relators –i.e., RIC's affirmative marketing to referring physicians of co-payment waivers as an inducement to refer patients – where Dr. Rose himself allegedly demanded such waivers. Similarly, Relators' allegation that, at some unspecified time, Dr. Suk, a RIC physician, told Relator Rogers that he refused to stop waiving co-payments for unidentified patients in order to continue receiving patent referrals, *see* SAC ¶ 73, by itself does not plausibly establish the existence of an illegal RIC marketing scheme, where Dr. Suk is not a defendant and Relators do not otherwise allege that Dr. Suk was acting at Defendants' direction or with their consent.

In sum, the Complaint's factual allegations are insufficient under Rule 9(b) to establish that Defendants routinely offered illegal remuneration to referring physicians as an inducement for patient referrals in violation of the AKS and that false Medicare claims resulted. According this FCA theory of liability must be dismissed for failure to state a claim.

### C. Relators' Allegation That RIC's Co-Payment Waivers Caused Their Medicare Claims to Mispresent RIC's True Charges Fails to a State a Valid FCA Claim

In their opposition, Defendants also argued that Relators' allegation that such routine waivers caused RIC's resulting Medicare claims to be false because the claims mispresented RIC's charges by failing to subtract the amount of the waived copayment, *see* SAC ¶¶ 98-99, failed to state a valid FCA claim under Rules 12(b)(6) and 9(b) because Medicare reimburses a Part B physician service at 80 percent of the rate set by the Medicare physician fee schedule and any co-payment waiver is therefore not material to the amount of reimbursement that Medicare actually pays. *See American Society of Cataract and Refractive Surgery v. Thompson*, 279 F.3d 447, 449 (7th Cir. 2002) ("Physicians who participate in the Medicare program are reimbursed at a rate outlined in a physicians' fee schedule");

*American Medical Ass'n v. Thompson*, 2001 WL 619510, at * 1 (N.D. Ill. May 29, 2001) (Part B "fee schedule specifies how much the government will pay physicians for each particular medical service"); 66 FR 40372, 40394 (Aug. 2, 2001); 63 FR 58814, 58882 (Nov. 2, 1998); 56 FR 59502 (Nov. 25, 1991).

In response to this argument, Relators continue to incorrectly contend that physicians are reimbursed for Medicare services based on a percentage of their charges so that when "the provider routinely waives the 20% co-pay on a $100 procedure . . . the true charge is not $100, but 80% or $80." *See* Opposition at 22-23; SAC ¶¶ 98-99. However, since this allegation is incorrect as a matter of law, the Complaint fails to state an FCA claim under Rules 12(b)(6) and 9(b) predicated on Relators' mistaken belief that Defendants' allegedly improper co-payment waivers were material to the reimbursement paid by Medicare for the RIC physicians' Medicare claims.

## III. THE COMPLAINT FAILS TO STATE A FEDERAL FCA CLAIM BASED ON RIC'S CO-MARKETING AGREEMENT WITH RICX

The Complaint also alleges that defendants RIC, the RIC Partners, and Barnes somehow violated the FCA by having an "improper" co-marketing agreement and/or making a "loan" to RIC Diagnostics ("RICX"), a mobile optical coherence tomography ("OCT") company, under which RIC and RICX each allegedly encouraged optometrists to refer their patients to the other, including by variously offering free workshops and OCT tests and interpretations, and Dr. Chang suggested that RIC would pay RICX more if referrals increased. SAC ¶¶ 77-89. Other than claiming that this "conduct is the essence of an AKS violation," Relators' Opposition makes no argument that these allegations satisfy Rule 9(b). *See* Opposition at 24.

This lack of opposition is unsurprising because Relators' Complaint includes no factual allegations that describe the specific nature of the financial relationship between RIC and RICX, identify any illegal payment (whether by date or amount)

by RIC or Dr. Chang to RICX for Medicare patient referrals, or identify any of the optometrists who allegedly received free workshops or free OCT tests or interpretations, any Medicare patients referred by such optometrists to RIC, or any RIC services that were provided to such patients and billed to the Medicare program. As a result, under Rules 12(b)(6) and 9(b), Relators' FCA claim predicated on alleged AKS violations arising from RIC's relationship with RICX must be dismissed for failure to allege fraud with particularity.

### IV. THE COMPLAINT FAILS TO STATE A FEDERAL FCA CLAIM BASED ON THE RIC PHYSICIANS' PATIENT REFERRALS TO THE SG-ASC IN WHICH THEY ALLEGEDLY HAVE INVESTMENT INTERESTS

Next, the Complaint alleges that the RIC Partners' Medicare claims for services provided at the defendant SG-ASC were false because they resulted from referrals of patients who were not informed of the physicians' 50% ownership interest in the ambulatory surgery center, in supposed violation of the federal AKS. *See* SAC ¶¶ 91-97. Specifically, Relators allege that the RIC Partners violated the AKS because they did not satisfy the AKS safe harbor for such investments (42 C.F.R. § 1001.95(r) which requires patients to be "fully informed of the investor's investment interest." *See* SAC ¶¶ 93, 95-96.

In their opposition, Relators do not respond to Defendants' arguments that these allegations do not state a valid FCA claim because a failure to satisfy the safe harbor for investments does not establish a AKS violation, *see Klaczak v. Consolidated Medical Transport*, 458 F.Supp.2d 622, 686 (N.D. Ill. 2006); 64 FR 63518, 63521 (Nov. 19, 1999), and, in any event, Relators' allegation that RIC informed patients via brochure that they could verify defendant SG-ASC's ownership by calling the center, but that center staff were unable to do so when Relator had someone call the center on a single occasion is insufficient to plausibly establish that all patients were never fully informed of the RIC Partners' investment interests. *See* Motion to Dismiss, at 19-21.

Nor doe Relators respond to Defendants' argument that their allegations also fail to satisfy Rules 12(b)(6) and 9(b) because without any factual allegations describing the nature of the RIC Partners' ownership interests in defendant SG-ASC, how they received any returns on such interests, and the financial relationship between such returns and their referrals of unidentified patients to the center, the Complaint provides no factual basis for inferring that the RIC Partners' investment interest violated the AKS by "inducing" them to refer patients to the center and caused any resulting Medicare claims for such patients to be false. *See Hanlester Network v. Shalala*, 51 F.3d 1390, 1399 (9th Cir. 1995) (joint venture laboratories did not violate AKS by merely encouraging physician investors to refer patients to them).

Instead, Relators' opposition tries to switch horses by arguing that their Complaint also alleges that the RIC Partners' investment interests in defendant SG-ASC violated the Stark Self Referral Act, 42 U.S.C. § 1395nn, and that compliance with safe harbors under either the AKS or the Stark Law are affirmative defenses. *See* Opposition at 24. While the Complaint does incorrectly allege (through a mistaken citation) that a failure to satisfy the AKS safe harbor "results in remuneration prohibited by 42 U.S.C. l 395nn and 42 C.F.R. 411.353 [the Stark Law]," SAC ¶ 97, the Complaint's factual allegations regarding their claim – entitled "RIC Defendants' Violation of the Anti-Kickback Act Relating to the San Gabriel Ambulatory Surgery Center" – do not mention the Stark Law at all. Further, Relators cannot permissibly plead an FCA claim predicated on Defendants' alleged violation of an AKS safe harbor and then argue that compliance with such harbor is not relevant to their claim.

Accordingly, under Rules 12(b)(6) and 9(b), the Complaint fails to state a valid FCA claim predicated on Relators' allegations that the RIC Partners' investment interests in defendant SG-ASC violated the AKS.

## V. THE COMPLAINT FAILS TO STATE A FEDERAL FCA CLAIM BASED ON DR. CHANG'S, DR. DAVIS' AND DR. SAMUELS' ALLEGED "UPCODING" OF OFFICE VISITS

In their opposition, Relators argue that their allegations that Defendants Chang, Samuels and Davis submitted false Medicare claims for office visits using billing codes for higher levels of evaluation and management ("E/M") services than actually provided satisfied Rule 9(b)'s particularity requirement. They also complain that Defendants' motion to dismiss does not address Dr. Chang's alleged upcoding. *See* Opposition at 26-27.

However, as described in the motion to dismiss, the Medicare program's reimbursement of E/M office visits is based on a five-level series of Current Procedural Terminology ("CPT") codes that describe the services provided based on inherently ambiguous and subject standards reflecting the increasing "complexity of the physician's decision-making, the comprehensiveness of both the physical examination and the patient history, the severity of the presenting medical problem, and the amount of face-to-face time that the physician spends with the patient and the patient's family." *U.S. v. Singh*, 390 F.3d 168, 177 (2d Cir. 2004); *U.S. ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 920 (8th Cir. 2014); Medicare Claims Processing Manual, Pub. 100-04, Ch. 12, § 30.

In this case, Relators concede that the sole factual basis for the Complaint's allegation that the RIC Partner (including Dr. Chang) improperly billed Level 4 is some type of "government audit" that allegedly found the physicians' documentation of "History of Present Illness" was too "brief" to support a Level 4 code for 98.2% of the patients seen between January 2006 and July 2013, and that certain follow-up visits were also somehow "unnecessary." With respect to Dr. Davis allegedly being the highest biller of the Level 5 code in California, Relators allege no facts at all establishing such billings were improper.

These conclusory allegations are patently insufficient under Rule 9(b) to establish an FCA claim. Contrary to Relators' opposition, an audit by some unidentified government agency that found that Defendants Chang, Samuels and Davis did not adequately document one element of a Level 4 visit and that some follow-up visits were allegedly "unnecessary" does not plausibly establish that these physicians "engaged in massive upcoding," *see* Opposition at 27, without any other factual allegations establishing something more than inadequate documentation by Defendants under Medicare's ambiguous guidelines for E/M services, or explaining why certain unidentified follow-up visits were unnecessary. Since the FCA is not intended to police mere documentation errors by physicians, the Complaint fails under Rule 9(b) to state an FCA claim based on "upcoded" E/M office visits or "unnecessary" follow-up visits.

## VI. THE COMPLAINT FAILS TO STATE A FEDERAL FCA CLAIM BASED ON RIC'S MEDICARE CLAIMS FOR ALLEGEDLY UNNECESSARY OR WORTHLESS ICGS

In support of their fifth theory of FCA liability, Relators allege that RIC submitted Medicare (and Medi-Cal) claims for unnecessary indocyanine green angiography ("ICG") tests. SAC ¶¶ 113-114, 116.

Once again, Relators' opposition does not directly respond to Defendants' argument that the Complaint fails to state a valid FCA claim under Rule 9(b) because their allegations that many of the RIC ICGs were "medically unnecessary" and were found to be so by a Department of Justice study are entirely conclusory. In particular, Relators' allegations that the RIC Partners' use of ICGs was not the usual standard of care for diagnosing AMD, that the number of tests performed was higher than other retinal practices, or that RIC made money from the tests and ordered more ICGs for Medicare patients that for commercial plan patients do not plausibly establish that any of the tests were objectively unnecessary when the Complaint contains zero information about when an ICG is medically appropriate

and necessary. Nor does the Complaint identify a single Medicare patient for whom an unnecessary ICG claim was actually submitted to the Medicare program. *U.S. v. Kitsap Physicians Service*, 314 F.3d 995, 1002 (9th Cir. 2002) ("Evidence of an actual false claim is 'the sine qua non of a False Claims Act violation.'") ,

Without such specific factual support, Relators have failed to state an FCA claim based on "medically unnecessary" services. *See Frazier,* 2010 WL 3190641, at *1 (9th Cir. 2010) (FCA complaint properly dismissed where relator's "allegations regarding medically unnecessary procedures were conclusory at best"); *US. ex rel. Thompson v. Columbia/ HCA Healthcare Corp.,* 125 F.3d 899, 903 (5th Cir. 1997) (FCA claim properly dismissed where relator failed to provide factual basis for allegation that hospital chain submitted claims for medically unnecessary services).

## VII. THE COMPLAINT FAILS TO STATE A FEDERAL FCA CLAIM BASED ON RIC'S ALLEGED DUPLICATE MEDICARE CLAIMS FOR DR. BHATTIO'S SERVICES AT DR. KISLINGER'S CLINIC

According to the Complaint, between at least April through June of 2012, RIC also submitted duplicate Medicare claims for the services of Dr. Bhattio, a RIC physician, "as though the services had been provided at RIC," when in fact they had been provided at Dr. Mark Klisinger's Glendora clinic under an agreement whereby Dr. Klisinger billed Dr. Bhattio's services and paid half of the fees collected to RIC. *See* SAC ¶¶ 122-125.

While Relators' allegations state a valid theory of FCA liability based on double billing or failure to return an overpayment, they fall far short of satisfying Rule 9(b)'s particularity requirement. In particular, the Complaint contains no factual allegations about how RIC billed Dr. Bhattio's services "as though the services had been provided at RIC," or otherwise establishing that such duplicate billings were "fraudulent" as opposed to being a simple billing error. In addition, the Complaint fails to identify any Medicare claims (whether by patient, service, or

payment amount) submitted by both Dr. Klisinger and RIC for the same services of Dr. Bhattio and otherwise allege no facts plausibly establishing that duplicate claims were submitted for Medicare patients versus patients covered by Medi-Cal or a commercial plan.

Relators' Opposition does not address any of these Rule 9(b) pleading deficiencies. Accordingly, Relators' FCA claim based on alleged duplicate Medicare claims for Dr. Bhattio's services fails to satisfy Rule 9(b) and must be dismissed.

## VIII. THE COMPLAINT FAILS TO STATE A FEDERAL FCA CLAIM BASED ON CEES' ALLEGED MEDICARE CLAIMS FOR ASSISTANT SURGEON SERVICES NOT PERFORMED

Relators also allege that CEES, an ophthalmology practice owned by Dr. Chang, billed Medicare for the assistant surgeon services of Dr. Lily Lee, Dr. Chang's spouse, during retinal surgeries even though she was not present and did not participate in the surgeries, and identifies seven CEES retinal surgery claims in 2012 and 2013 for which Dr. Lee's services were billed. *See* SAC ¶¶ 129-132.

While these allegations come closest to stating a valid FCA claim, the Complaint contains no factual allegations establishing that such allegedly false claims were "knowingly" made within the meaning of the FCA. While CEES's intent may be generally pleaded under Rule 9(b), Relators must still allege "sufficient facts to support an inference or render plausible" that CEES submitted claims that it knew were non-reimbursable and not simply the result of mere negligence or innocent billing error. *See U.S. ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984, 996-997 (9th Cir. 2011).

Contrary to Relators' Opposition, the *Corinthian Colleges* court's annunciation of this pleading rule was not limited to cases where defendant is expressly relying on a regulatory safe harbor and the Complaint contains no factual allegations establishing or even alleging that CEES knew that these retinal

surgeons did not require an assistant surgeon by virtue of its experience as medical provider. *See* Opposition at 30-31. Absent any such allegations, Relators' FCA claim against CEES based on the billing of Dr. Lee's services fails to satisfy Rule 9(b).

## IX. THE COMPLAINT FAILS TO STATE A FEDERAL FCA CLAIM BASED ON SUBMISSION OF INCOMPLETE DATA TO THE MEDICARE PHYSICIAN QUALITY REPORTING SYSTEM

According to the Complaint, Defendants RIC and the RIC Partners also allegedly violated the FCA by retaining a supposed overpayment of $60,000 from CMS that was based on 4 months of supposedly incomplete data submitted by RIC to the Medicare PQRS in 2011 when RIC "purported to provide information for the entire year," and also allegedly provided PQRS data in 2012 that included information "for activities that had not actually occurred."  *See* SAC ¶¶ 133-138.

In their Opposition, Relators stand on the sufficiency of their allegations under Rule 9(b) without any real argument or analysis. *See* Opposition at 31. However, the Complaint fails to include any factual allegations establishing that the 4 months of data submitted by RIC did not satisfy the reporting frequencies required for quality measures during the 12-month reporting period allegedly used, or how RIC "purported to provide" 12 months of data, but only provided four months of data to CMS, and why the $60,000 incentive payment received was an overpayment (versus a reduced payment) even if only 4 months of data was submitted. Nor does the Complaint explain how RIC's submission of incomplete data constituted a factually or legally false claim for the incentive payment received. Likewise, with respect to 2012 PQRS data, Relators fail to provide any factual specifics regarding which data allegedly submitted by RIC was for "activities that had not actually occurred."  Such vague and conclusory allegations are insufficient under Rules 12(b)(6) and 9(b)to state a valid FCA claim.

## X. THE COMPLAINT FAILS TO STATE A VALID CALIFORNIA FCA CLAIM AGAINST DEFENDANTS BASED ON ALLEGED VIOLATIONS OF THE MEDI-CAL DISCRIMINATORY BILLING RULE

According to the Complaint, defendants RIC, SG-ASC, and CEES violated the California False Claims Act ("CA-FCA") by submitting Medi-Cal claims that violated Medi-Cal's discriminatory billing rule, 22 C.C.R. § 51480(a), because defendants charged fees for cash-paying patients without insurance that were lower than the Medi-Cal reimbursement rates for those services. *See* SAC ¶¶ 139-145.

In their motion to dismiss, Defendants argued that Relators' CA-FCA claims for Medi-Cal discriminatory billing fail as a matter of law because defendants are expressly authorized under California Business & Professions Code § 657 to charge discounted fees (which may not be considered their usual fees) for uninsured patients who are not eligible for Medi-Cal and Relators allege no facts establishing that defendants' lower fees for "patients without any insurance, [or] who paid for medical services in cash" were not so authorized. *See* SAC ¶ 141. Further, Defendants argued that Relators' theory of liability assumes that that RIC's lower fee for uninsured cash paying patients is "the usual fee charged by the provider to the general public for the same service" without any factual allegations explaining why this counter-intuitive proposition is correct. Instead, the Complaint indicates that RIC treats a wide range of patients – including those covered by the Medi-Cal and Medicare programs and by private insurance plans with contractually negotiated rates, as well as uninsured self-paying and non-paying patients – and Relators have alleged no factual basis for simply concluding that RIC's lower fee for uninsured cash-paying patients is the usual fee charged to the general public.

In their Opposition, Relators' only response to these arguments is that Defendants had "no reasonable cause to believe" that the patients to whom cash discounts were provided were not insured because the "discounts were provided as

part of the overall scheme of waiving co-pays for every patient." *See* Opposition at 32. However, this argument finds not support in the Complaint which does not factually allege any link between Defendants' discounts to cash paying patients without insurance and their alleged co-payment waivers, and expressly alleges that "the RIC Defendants **charged patients without any insurance, who paid for medical services in cash**, fees that were lower than the rate Medi-Cal was billed for the same services." *See* SAC ¶ 141 (emphasis added). Thus, Relators cannot contradict themselves by now arguing that Defendants had no "reasonable cause" for believing that these patients were without insurance. Accordingly, Relators' CA-FCA claim based on alleged violations of the Medi-Cal discriminatory rule must be dismissed pursuant to Rules 12(b)(6) and 9(b).

## XI. THE COMPLAINT FAILS TO STATE A CALIFORNIA FCA CLAIM BASED ON VIOLATIONS OF BUSINESS & PROFESSIONS CODE § 654.2

Relators also allege that the RIC, the RIC Partners, CEES and SG-ASC violated the CA-FCA by submitting Medi-Cal claims when they supposedly failed to disclose the RIC Partners' investment interest in SG-ASC in violation of California Business & Professions Code § 654.2. SAC ¶¶ 152-161.

In response to Defendants' argument that these allegations fail to state a valid CA-FCA claim based on alleged violations of Section 654.2 because the statute expressly provides that a violation cannot serve as "the sole basis" for the denial of a claim by Medi-Cal, Relators argue that there were other reasons for denying SG-ASC claims and that Defendants are liable under the CA-FCA for falsely certifying compliance with Section 654.2 regardless of whether a violation is the sole basis for denial. *See* Opposition at 32-33. However, the Complaint alleges no other valid reasons for denying SG-ASC's Medi-Cal claims and the argument that the SG-ASC

claim could still be false under the CA-FCA even though Section 654.2 provides that a violation cannot be the "sole basis" for denial of the claim eliminates the materiality of such a violation to Medi-Cal's payment decision as a matter of law.

Further, Relators do not respond to Defendants' additional argument that their allegations also violate Rule 9(b) by not including any factual allegations establishing the nature of the RIC Partners' "significant beneficial interest" in the SG-ASC center or that the brochure advising patients to call the center to obtain ownership information did not serve to fully disclose such interest. Accordingly, Relators' CA-FCA claim must be dismissed pursuant to Rules 12(b)(6) and 9(b).

## XII. RELATOR'S COMPLAINT FAILS TO STATE A CA-IFPA CLAIM BASED ON WAIVER OF CO-PAYS AND DEDUCTIBLES

The Complaint also alleges that RIC, the RIC Partners, CEES and SG-ASC submitted false and fraudulent claims for patients covered by commercial health plans (e.g., Empire BlueCross/ Blue Shield, Cigna and United Healthcare) in violation of California Penal Code § 550 because defendants routinely waived the deductible and co-payments amounts that they were obligated to charge patients pursuant to the terms of their provider agreements and failed to disclose their usual charges to these commercial health plans because they charged lower prices to uninsured patients who paid in cash. According to Relators, the State of California is therefore entitled to civil penalties plus treble damages for each fraudulent claim under Insurance Code § 1871.7. SAC ¶¶ 146-151.

In this case, Relators' fraud allegations are woefully deficient under Rule 9(b) and Relators' Opposition raises no serious argument to the contrary. The Complaint alleges no facts establishing the specific provisions of RIC's alleged provider contracts with any commercial plans regarding co-payments and deductibles, and does not identify a single RIC claim to a commercial plan

(whether by date, patient, service, amount or plan) where the patient's deductible or co-payment amount was improperly waived. Accordingly, under Rules 12(b)(6) and 9(b), Relator's CIFPA claim must also be dismissed for failure to state a claim or to allege fraud with particularity.

## XIII. THE COMPLAINT MUST BE DISMISSED BECAUSE IT CHARGES ALL DEFENDANTS IN EACH CAUSE OF ACTION

In response to Defendants' argument that the Complaint must also be dismissed because its five causes of action impermissibly charge all defendants with violations of the FCA, CA-FCA and CA-IFPA without distinguishing between the eight theories of FCA liability and two theories of CA-FCA liability alleged or the alleged involvement or lack of involvement of each defendant in each different category of false claims, Relators basically argue that such "shotgun" pleading of causes of action against **all** Defendants is permissible because the allegations of the Complaint show which of the defendants are actually charged within this "all defendants" group. The law is to the contrary. *See Lubin v. Sybedon Corp.,* 688 F. Supp. 1425, 1443 (S.D. Cal. 1988); *Corinthian Colleges*, 665 F. 3d at 997-98; *Ebeid,* 630 F. 3d at 999.

## XIV. CONCLUSION

For the foregoing reasons, Relators' Second Amended Complaint should be dismissed pursuant to Rules 12(b)(6) and 9(b) for failure to state a claim and to allege fraud with particularity.

DATED: March 3, 2017      Respectfully submitted,

NELSON HARDIMAN LLP

S/ *M.S. Hardiman*
MARK S. HARDIMAN

Attorneys for Defendants