1   Kolin C. Tang (SBN 279834)
    Shepherd, Finkelman, Miller & Shah, LLP
2   11755 Wilshire Boulevard, 15th Floor
    Los Angeles, CA 90025
3   Telephone: (323) 510-4060
    Facsimile:  (866) 300-7367
4   Email: ktang@sfmslaw.com

5   Attorneys for Plaintiffs-Relators

6   [Additional Counsel Listed On Signature Page]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and STATE OF CALIFORINA, *ex rel* BOBBETTE A. SMITH and SUSAN C. ROGERS, | CIVIL ACTION NO.: 2:13-cv-3772-DMG (MRWx) |
| Plaintiffs-Relators, | (Assigned to the Honorable Dolly M. Gee) |
| vs. | **THIRD AMENDED COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729, *ET SEQ.*, THE CALIFORNIA FALSE CLAIMS ACT, CAL. GOVT. CODE §§ 12650, *ET SEQ.* AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT, CAL. INSURANCE CODE § 1871.7** |
| TOM S. CHANG, M.D., TOM S. CHANG, M.D., INC., MICHAEL A. SAMUEL, M.D., MICHAEL J. DAVIS, M.D., RETINA INSTITUTE OF CALIFORNIA MEDICAL GROUP, CALIFORNIA EYE AND EAR SPECIALISTS a/k/a OCULAR INSTITUTE OF CALIFORNIA and n/k/a ACUITY EYE SPECIALISTS, BRETT BRAUN and SAN GABRIEL AMBULATORY SURGERY CENTER LP, | |
| Defendants. | **JURY TRIAL DEMANDED** |

On behalf of the United States of America ("United States") and the State of California ("California"), Plaintiffs-Relators, Bobbette A. Smith ("Plaintiff-Relator Smith") and Susan C. Rogers ("Plaintiff-Relator Rogers") (collectively,

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT

"Plaintiffs-Relators" or "Plaintiffs"), file this Third Amended Complaint ("Complaint") against Defendants (defined below), pursuant to the Court's Order dated July 25, 2017 and Fed.R.Civ.P. 15(a)(2), and allege as follows:

## I.   PRELIMINARY STATEMENT

1.     The Plaintiffs-Relators bring this Complaint seeking damages and civil penalties against Tom S. Chang, M.D. ("Dr. Chang" or "Chang"), Tom S. Chang, M.D., Inc. ("Dr. Chang Inc."), Michael A. Samuel, M.D. ("Dr. Samuel" or "Samuel"), Michael J. Davis, M.D. ("Dr. Davis" or "Davis") (collectively "RIC Partners"), Brett Braun ("Braun"), Retina Institute of California Medical Group, ("RIC", and with RIC Partners, the "RIC Defendants"), California Eye and Ear Specialists n/k/a Acuity Eye Specialists ("CEES" or "California Eye and Ear") and San Gabriel Ambulatory Surgery Center LP, ("SG-ASC" or "San Gabriel Surgery Center")(collectively "Defendants"), for violations of the United States False Claims Act ("FCA" or "Federal FCA"), 31 U.S.C. §§ 3729, *et seq.*, the Anti-Kickback Statute (the "AKS"), 42 U.S.C. § 1320a-7b, the California False Claims Act ("CA-FCA" or "State FCA"), Cal. Gov. Code §§12650, *et seq.*, and the California Insurance Frauds Prevention Act, Cal. Insurance Code §1871.7 ("CA-IFPA" or "State Insurance Fraud Law"), based on schemes to defraud the United States and California in connection with government-funded health care programs, namely the federal Medicare Program, Title XVIII of the Social Security Act ("Medicare"), 42 U.S.C. §§ 1395, *et seq*., and the federal Medicaid Program ("Medicaid"), 42 U.S.C. §§ 1396, *et seq*., and California's corresponding Medicaid Program ("Medi-Cal").

2.     As set forth more fully below, Plaintiffs-Relators allege in this action that Defendants engaged in multiple fraudulent schemes, each resulting in the

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT        -2-

submission of false and fraudulent claims for reimbursements from Medicaid, Medicare and/or Medi-Cal.

3. In the one scheme, the RIC Defendants provided kickbacks to Medicare beneficiaries by routinely waiving their co-payments, which is the amount the beneficiaries were required to pay for services rendered, without an individualized determination of financial hardship or exhaustion of reasonable collection efforts. In addition, even though the RIC Defendants waived the co-payments, they included the co-payment amounts in billings submitted to Medicare for reimbursement, thereby falsely inflating its bills to Medicare for those services.

4. In the another scheme, the RIC Defendants submitted claims for Medicare, Medicaid and Medi-Cal reimbursements for Current Procedural Terminology ("CPT") billing codes 99204, 99244, 99214, 99215 and 92240, even though these services (i) were not medically necessary, (ii) were not actually performed, (iii) were not documented in the medical record, and/or (iv) failed to otherwise comply with Medicare, Medicaid and Medi-Cal rules and regulations. As a result, RIC submitted thousands of fraudulent claims to Medicare, Medicaid and Medi-Cal, and was paid based on each of those claims.

5. As described more fully below, Defendants engaged in multiple acts of additional fraud, all of which they utilized to aggressively build their business (quadrupling in size in four short years from 2009 to 2012) in a highly competitive market. The secret to Defendants' success is simple: engaging in multiple and consistent acts of fraudulent and unscrupulous business practices centered upon submitting false claims to the United States government and the State of California, as well as private insurers.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT        -3-

## II.   JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.  This Court has supplemental jurisdiction over the counts relating to the CA-FCA and CA-IFPA pursuant to 28 U.S.C. § 1367.

7.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in, reside, or transact business in this District.  Additionally, this Court has personal jurisdiction over Defendants because acts prohibited by 31 U.S.C. § 3729 occurred in this District.

8.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

9.      Plaintiffs-Relators have complied with all procedural requirements of the laws under which this case is brought.

10.      Plaintiffs-Relators' claims and this Complaint are not based upon allegations or transactions that are the subject of a civil suit or an administrative civil monetary penalty proceeding in which the Government is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

11.      Plaintiffs-Relators are the original source of the information upon which this Complaint is based and the facts alleged herein, as that phrase is used in the FCA and other laws at issue in this Complaint.

12.      Plaintiffs-Relators bring this action based on their direct knowledge and, where indicated, on information and belief.  None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. §3730(e)(4).

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT       -4-

1

### III.   PARTIES

2   13.   Plaintiff-Relator Smith is a resident of the State of Nevada.  She has a

3   B.A. in Business Administration from the University of North Florida, a Master of

4   Science in Logistics Management from the Florida Institute of Technology, and a

5   Master of Health Care Administration from Baylor University.  She has over thirty

6   years of experience in the health care industry, including experience with federal

7   and state funded healthcare programs in multi-physician medical practices.

8   Plaintiff-Relator Smith was recruited and hired by Dr. Chang in June of 2012 to

9   serve as the Chief Operating Officer ("COO") of RIC.  Plaintiff-Relator Smith

10  served as RIC's COO for six months until she resigned in January, 2013.

11  14.   Plaintiff-Relator Rogers is a resident of the State of Arizona.  She has

12  over twenty years of experience in the area of medical billing and coding,

13  including for federal and state funded healthcare programs in multi-physician

14  offices.  She has received numerous certifications in CPT Coding and Billing and

15  Ophthalmic Coding and Reimbursement and was hired by RIC in June, 2012, at

16  the recommendation of Plaintiff-Relator Smith, to be the Billing Department

17  Manager of RIC.  Plaintiff-Relator Rogers served in that position for six months

18  until she resigned in January 2013.

19  15.   Plaintiffs-Relators bring this action on behalf of the United States as

20  plaintiff, which seeks relief on behalf of the Department of Human Services

21  ("HHS"), the Centers for Medicare and Medicaid Services ("CMS") and federally-

22  funded programs including Medicare and Medicaid.

23  16.   Plaintiffs-Relators also bring this action on behalf of the State of

24  California as plaintiff, which seeks relief on behalf of the California Department

25  of Health Care Services and its Medi-Cal program.

26

27  CIVIL ACTION NO.:
    2:13-cv-3772-DMG (MRWx)

28  THIRD AMENDED COMPLAINT       -5-

17.     Defendant, RIC, is a retina sub-specialty ophthalmology practice with 35 offices and approximately 20 physicians licensed to practice medicine in California ("Provider Physicians" or "RIC Physicians"), who provide services to Medicare patients, patients covered by Government Healthcare Programs (defined below) and patients who are privately insured or uninsured.  RIC is registered as medical partnership owned by its partners Defendants Chang, Samuel and Davis and Dr. Chang Inc., who are legally responsible for the acts of RIC.  RIC was founded by Dr. Chang in or around 2006 and has a current place of business at 100 E. California Boulevard, Pasadena, CA 91105.  Upon information and belief, RIC is in the process of merging its operations with CEES to become known as Acuity Eye Specialists.  RIC and the RIC Partners (*i.e.,* the RIC Defendants) are legally responsible for the acts and omissions of the Provider Physicians, all of whom were employed by RIC and for whose conduct the RIC Defendants are legally responsible.

18.     Defendant, Dr. Chang, is a Canadian-trained ophthalmologist licensed to practice medicine by the State of California whose clinical interests include macular degeneration and diabetic retinopathy.  At all pertinent times, Dr. Chang was the majority owner and controlling partner at RIC and received the vast majority of the partnership distributions from RIC, as well as the majority of the compensation derived by all physicians employed by RIC.  Dr. Chang controls, directs and supervises the day to day practice of medicine at RIC.  Dr. Chang maintains an office at 100 E. California Boulevard, Pasadena, CA 91105.

19.     Defendant, Dr. Chang Inc., is a management company owned by Dr. Chang with an office at 100 E. California Boulevard, Pasadena, CA 91105.  Dr. Chang receives 10% of all of RIC's collectibles as his management fee through

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT        -6-

1  Chang Inc.  Chang, Inc. earns in excess of $1 million per year in such management

2  fees for Dr. Chang.

3      20.    Defendant, Dr. Samuel, is RIC's Chief Medical Director and is an

4  ophthalmologist licensed by the State of California who maintains an office at 100

5  E. California Boulevard, Pasadena, CA 91105.

6      21.    Defendant, Dr. Davis, is RIC's Fellowship and Educational Director

7  and is an ophthalmologist licensed by the State of California who maintains an

8  office at 100 E. California Boulevard, Pasadena, CA 91105.

9      22.    Defendant, CEES, is an ophthalmology practice owned by Dr. Chang,

10  which is now known as Acuity Eye Specialists.  CEES absorbed a practice known

11  as Ocular Institute of California ("OIC"), which was formerly owned by Dr.

12  Stephen Ma and was purchased by Dr. Chang in 2011.  For a time, CEES

13  continued to bill Medicare for some patients using the tax identification number of

14  Dr. Ma and/or OIC.  In 2012, CEES was carried on RIC's balance sheet as owing

15  RIC receivables of $674,078.44.  CEES has the same current place of business as

16  RIC, 100 E. California Boulevard, Pasadena, CA 91105.  At all pertinent times,

17  CEES acted and functioned as the alter ego of and as an integrated enterprise with

18  RIC.

19      23.    Defendant, Braun, is a former California resident and the former CEO

20  of RIC.  His principal place of business was 301 West Huntington Drive, Suite

21  107, Arcadia, California 91007.  Braun is currently a resident of the

22  Commonwealth of Pennsylvania.  Braun's principal task at RIC was to increase

23  patient referrals, including Medicare Part B patient referrals.

24      24.    Defendant, SG-ASC, is a limited partnership organized under the

25  laws of the State of California with an address at 207 S. Santa Anita Avenue, Suite

26

27  CIVIL ACTION NO.:
    2:13-cv-3772-DMG (MRWx)

28  THIRD AMENDED COMPLAINT        -7-

G16, San Gabriel, California.  SG-ASC provides multi-speciality outpatient surgical services, including ophthalmology services, and receives Medicare patient referrals from CEES and RIC. In 2012, SG-ASC was carried on RIC's balance sheet as owing RIC receivables of $593,247.27.  At all pertinent times, SG-ASC acted and functioned as the alter ego of and as an integrated enterprise with RIC.

## IV.    GOVERNMENT-FUNDED HEALTHCARE PROGRAMS

### A.    Overview of Medicare

25.    In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. §1395, *et seq.*, known as the Medicare Program, as part of Title XVIII of the Social Security Act, to pay for the costs of certain health care services.  Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease.  *See* 42 U.S.C. §§426, 426-1.  The regulations implementing the Medicare Program are found at 42 C.F.R. §409, *et seq*.

26.    HHS is responsible for the administration and supervision of the Medicare Program.  CMS is a component of HHS and is directly responsible for the administration of the Medicare Program.  Medicare Part B covers physician services, as well as a variety of "medical and other health services."  *See* 43 U.S.C. §§1395j-1395w-4.  The allegations herein involve Part B services billed by the Defendants to Medicare.

27.    To participate in the Medicare program, a provider of services must file a provider agreement with the Secretary of HHS.  42 U.S.C. §1395cc.  The provider certifies that he/she/it is knowledgeable of Medicare requirements on his Medicare provider enrollment form.  The provider agreement requires compliance with the requirements that the HHS Secretary deems necessary for participation in the program.  *Id.*

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -8-

28.     In submitting Medicare claim forms, providers must certify: (1) that they are knowledgeable of Medicare requirements; (2) that the information included on the form presents an accurate description of the services rendered; and (3) that the services were medically indicated and necessary for the health of the patient.

29.     Part B of the Medicare Program is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury.  Eligible individuals who are aged 65 or older or disabled may enroll in Part B to obtain benefits in return for payments of monthly premiums as established by HHS.  Payments under the Medicare Program are often made directly to service providers such as physicians, rather than to the patient/beneficiary.  This occurs when the provider accepts assignment of the right to payment from the beneficiary.  In that case, the provider bills the Medicare Program.

30.     Part B of the Medicare Program covers certain facility use and medical services provided to qualified patients/beneficiaries, including outpatient services such as the services rendered by Defendants.

31.     The United States provides reimbursement for Medicare claims from the Medicare Trust Fund through CMS.  To assist in the administration of Part B of the Medicare Program, CMS contracts with Medicare Administrative Contractors ("MACs").   MACs process the reimbursement of claims for Part B services submitted by Defendants on Form 1500 to Medicare.

32.     Medicare and other government-funded healthcare programs pay only for those services that meet appropriate medical necessity standards, and providers may not bill for services that do not meet the applicable standards set by Medicare

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT        -9-

1  for medical necessity.  *See* 42 U.S.C. §1395y(a)(1)(A); 42 C.F.R. §411.15(k)(1);

2  Medicare Carrier's Manual §2049 (Medicare and other federal healthcare

3  programs only cover medical services that are "reasonable and necessary for the

4  diagnosis or treatment of illness or injury"); *see* California Welfare and

5  Institutions Code Sec. 14133.3.

6       33.    Accordingly, providers may only submit claims for Medicare

7  reimbursement for "reasonable and necessary" medical services.  In submitting

8  claims, providers make certain express certifications, including any assurance that

9  the services were "provided economically and only when, and to the extent,

10 medically necessary." 42 U.S.C. §1320c-5(a)(1); *see also* 42 U.S.C.

11 §1395n(a)(2)(B) (to receive payment for claims providers must certify that

12 services were "medically required").  Additionally, each time a provider submits a

13 claim, the provider impliedly certifies that the service was provided in accordance

14 with Federal and State statutes, regulations, and program rules.

15      34.    Similarly, a claim for "worthless" medical care violates the federal

16 False Claims Act ("FCA") because the government believes it is paying for

17 services or items that have medical value when, in fact, the services or items are

18 essentially worthless.  *See Mikes v. Straus*, 274 F.3d 687, 702-4 (2d Cir. 2001); *US*

19 *v. Smithkline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001).

20      35.    Defendants were required to comply with all the applicable statutes,

21 regulations and guidelines in order to be reimbursed by Medicare Part B, and had

22 a duty to be knowledgeable of the statutes, regulations and guidelines regarding

23 coverage and payment for Medicare services.  Defendants certified that they were

24 knowledgeable of Medicare requirements on their Medicare provider enrollment

25 forms and on each CMS Form 1500 they submitted to Medicare.

26

27 CIVIL ACTION NO.:
   2:13-cv-3772-DMG (MRWx)

28 THIRD AMENDED COMPLAINT      -10-

**B.** **The Medicaid Program**

36.    Medicaid was created on July 30, 1965, through Title XIX of the Social Security Act.  Medicaid is a cooperative federal-state program through which the federal government provides financial assistance to states so that they may furnish medical care to needy individuals.  42 U.S.C. § 1396, *et seq.*

37.    Each state administers its own Medicaid program.  However, each state program is governed by federal statutes, regulations and guidelines.  The federal portion of a state's Medicaid payments -- the Federal Medical Assistance Percentage -- is based on the state's per capita income compared to the national average.  During the relevant time period, the Federal Medicaid Assistance Percentage for California was in the range of 50% to 65%.

38.    The law requires state Medicaid plans to execute written agreements between the Medicaid agency and each provider furnishing services under the plan ("provider agreements").  42 C.F.R. §431.107(b).

39.    Doctors Chang, Samuel and Davis and the Provider Physicians (collectively, "Providers"), all of whom are employed by RIC as "providers," signed provider agreements (the "Medi-Cal Provider Agreements") with the California Medicaid program, Medi-Cal.

**C.** **The California Medicaid Program: "Medi-Cal"**

40.    The California Department of Health Care Services ("DHCS") (formerly the California Department of Health Services ("DHS")) enacts regulations for California's State Medicaid program, Medi-Cal.  As participating Medi-Cal providers, the Providers were and are subject to DHCS regulations that require them to provide services to Medi-Cal patients at their most favorable rates. California Code of Regulations, title 22, section 51480 (a) requires as follows:

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT       -11-

(a) No provider shall bill or submit a claim for reimbursement for the rendering of health care services to a Medi-Cal beneficiary in any amount greater or higher than the usual fee charged by the provider to the general public for the same service.

41. Medi-Cal Provider Agreements also require, consistent with the program's public purposes, that the Provider Defendants charge their lowest fees to DHCS and refrain from conduct that would harm the Medi-Cal program or its beneficiaries. Among other commitments, Provider Defendants agreed to do all of the following:

**Compliance with Laws and Regulations.** Provider agrees to comply with all applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code (commencing with Sections 14000 and 14200), and any applicable rules or regulations promulgated by DHS pursuant to these chapters. . . .

**Forbidden Conduct.** Provider agrees that it shall not engage in conduct inimical to the public health, morals, welfare and safety of any Medi-Cal beneficiary, or the fiscal integrity of the Medi-Cal program.

. . .

**Provider Fraud and Abuse.** Provider agrees that it shall not engage in fraud or abuse.

. . .

**Prohibition of Rebate, Refund or Discount.** Provider agrees that it shall not offer, give, furnish, or deliver any rebate, refund, commission, preference, patronage dividend, discount, or any other gratuitous consideration, in connection with the rendering of health care services to any Medi-Cal beneficiary. Provider further agrees that it shall not solicit,

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -12-

1   request, accept, or receive, any rebate, refund, commission, preference,

2   patronage dividend, discount, or any other gratuitous consideration, in

3   connection with the rendering of health care services to any Medi-Cal

4   beneficiary.  Provider further agrees that it shall not take any other action or

5   receive any other benefit prohibited by state or federal law.

6       42.     In other words, the Providers agreed to bill Medi-Cal at their lowest

7   rates, not to give or take kickbacks, and to conduct their business relationship with

8   DHCS with a view to the program's public purpose and the welfare of California's

9   medically indigent citizens.

10      43.     To seek reimbursement for treatment of a patient, a provider

11  participating in Medi-Cal submits a claim to the contractor that administers the

12  Medi-Cal program.  In seeking reimbursement, the provider must state his/her

13  charge for the particular service provided.

14      44.     Using state funds, Medi-Cal pays a claim if the beneficiary is eligible,

15  the provider is authorized to bill Medi-Cal, the service is covered by Medi-Cal,

16  and no information known to the Medi-Cal program indicates the claim is

17  otherwise improper or in violation of billing rules.  Medi-Cal receives

18  reimbursement from the federal government for the federal share of the Medi-Cal

19  expenditures.  The claims that have been submitted to Medi-Cal are used to

20  support the provider's reimbursement request.  In this way, if a provider submits a

21  fraudulent claim to Medi-Cal, s/he has caused a false claim to be submitted to both

22  California and the federal government.

23

24

25

26

27  CIVIL ACTION NO.:
    2:13-cv-3772-DMG (MRWx)

28  THIRD AMENDED COMPLAINT      -13-

# V.   APPLICABLE LAW

## A.   The Federal False Claims Act

45.     The federal FCA provides, *inter alia*, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages.  31 U.S.C. § 3729(a)(1)(A)-(B).

46.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A)(i)-(iii).  Proof of specific intent to defraud is not required.  31 U.S.C. § 3729(b)(1)(B).

47.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ."  31 U.S.C. §3729(b)(2)(A)(i)-(ii).

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT       -14-

## B.   The Federal Anti-Kickback Statute

48.   The AKS arose out of congressional concern that remuneration provided to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or harmful to a vulnerable patient population.  To protect the Medicare and Medicaid programs from these harms, Congress enacted a prohibition against the payment of kickbacks in any form.  First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.  S*ee* Social Security Amendments of 1972, Pub. L. No. 92-603, §§242(b) and (c); 42 U.S.C. §1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

49.   The AKS prohibits knowingly and willfully offering, paying, soliciting or receiving remuneration to any person to induce such person to order or receive any items or service for which payment may be made under a federal healthcare program unless the arrangement fits within a regulatory safe harbor. The AKS is violated if "one purpose" of the remuneration is to induce federal program business.  *United States v. Greber*, 760 F.2d 68 (3rd Cir. 1985). Violations may result in a five year prison term, $25,000 criminal penalty, $50,000 administrative penalty, treble damages, and exclusion from Medicare and Medicaid. ( 42 CFR 1003.102.)

50.   Medicare, Medicaid and Medi-Cal (individually and collectively, the "Government Healthcare Program(s)"), require every provider or supplier to ensure compliance with the provisions of the AKS and other federal laws governing the provision of healthcare services in the United States.  Compliance

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -15-

with the AKS is expressly and impliedly required for reimbursement of Government Healthcare Programs federal program claims, and claims made in violation of the law are actionable civilly under the False Claims Act. *See* 42 U.S.C. § 1320a-7b(g) (2010) (a "claim that includes items or services resulting from a violation of . . . [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]. . . ."). Further, the United States has deemed violations of the AKS to be material to its decision to pay health care claims, demonstrated in part through the requirement that providers and suppliers certify compliance with the AKS as a condition of payment under Government Healthcare Programs. If the United States had been aware that the claims discussed herein resulted from conduct that violated the AKS, the United States would not have paid the claims submitted in connection with the Defendants' unlawful conduct.

51. A violation of the AKS is a violation of the federal FCA. The FCA, 31 U.S.C. § 3729, provides, in pertinent part, that:

(a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government;

\* \* \*

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -16-

52.     The Patient Protection and Affordable Care Act ("PPACA"), Public Law No. 111-148, § 6402(g), amended the federal healthcare AKS, 42 U.S.C. § 1320a-7b(g), to specifically allow "anti-kickback" violations to be enforced under the FCA.  The PPACA also amended the Social Security Act's "intent requirement" to make clear that violations of its anti-kickback provisions, like violations of the FCA, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation."   Public Law No. 111-148, § 6402(h).  Therefore, in order to establish a willful violation of the AKS, the Plaintiff-Relators  need not prove that Defendants had actual knowledge of or a specific intent to violate the AKS.  *See* 42 U.S.C. § 1320a-7b(h).

53.     The AKS contains statutory exceptions and certain regulatory "safe harbors" that exclude certain types of conduct from the reach of the statute.  *See* 42 U.S.C. § 1320a-7b(b)(3).  None of the AKS statutory exceptions or regulatory safe harbors protect Defendants from liability for the conduct alleged herein.

### C.     The California False Claims Act

54.     The CA-FCA is modeled after the federal FCA and contains provisions similar to those quoted in paragraphs 44-46 above.  Relators assert claims under the CA-FCA for Defendants' false and fraudulent claims made to the California Medicaid program as alleged herein.  *See also* Cal. Bus. & Prof. Code § 650 and § 650.1, and Cal. Welfare & Inst. Code § 14107.2.

### VI.     THE CO-PAYMENT WAIVER SCHEME CONDUCTED BY THE RIC DEFENDANTS AND DEFENDANT BRAUN

### A.     Co-payment Waivers As Inducement to Medicare Patients

55.     Medicare generally covers 80% of the "reasonable charges" billed by the provider for the Medicare-approved health services provided to a patient.  42

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -17-

U.S.C. § 1395(a)(1). Accordingly, the patient is normally required to contribute the remaining 20% as a co-payment.  42 U.S.C. § 1395cc(a)(2)(A)(ii).

56.   Waiver of co-payments in consideration of a particular patient's financial hardship is permitted in exceptional circumstances.  The hardship exception, however, must not be used routinely; it should be used occasionally to address the special financial needs of a particular patient, supported by documentation of financial hardship.  Except in such special cases, a good faith effort to collect deductibles and co-payments must be made.

57.   The Office of Inspector General ("OIG") has interpreted the AKS to apply to waiving patient cost sharing amounts if "one purpose" of the waiver is to induce or reward federal program business.  *See* OIG, Special Fraud Alert: Routine Waivers of Co-payments or Deductibles under Medicare Part B (May 1991).

58.   In addition, 42 U.S.C. 1320a-7a(a)(5) prohibits a person from offering or transferring remuneration to a beneficiary that such person knows or should know is likely to influence the beneficiary to order items or services from a particular provider or supplier for which payment may be made under any federal health care program.  "Remuneration" is defined as including a waiver of coinsurance and deductible amounts, with exceptions for certain financial hardship waivers, which are not prohibited.

59.   Over two-thirds of RIC's patients are covered by Medicare Part B.

60.   The average Medicare co-payment a patient would be required to pay RIC is $90-100 per visit.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -18-

61.     It is RIC's policy and practice to routinely waive co-payments without making an individualized determination of financial hardship or exhausting reasonable collection efforts.

62.     RIC waives co-payments for various reasons, including for individuals who sought frequent medical services, who had a high balance, whose insurance did not pay certain amounts, or who expressed an inability to pay.  None of these reasons is an allowable exception.  Additionally, RIC consistently waived the co-payments without receiving any supporting documentation or additional information from the patients for whom co-payment waivers were made.

63.     RIC notes the waiver of these co-payments in its billing system using terms such as "financial hardship" or "balance write off," often with notations such as "w/o [written off] per doctor" or "per Dr. Chang."

64.     Shown in the chart below is a sample of Medicare patients whose co-payments were not collected by RIC for any of their visits/encounters, and for which RIC records do not contain any documentation explaining the reasons for the co-payment waivers:

| RIC PATIENT | Treatment Period | # Encounters | MEDICARE CHARGE |
|---|---|---|---|
| LMG | OCT-NOV 2012 | 6 | $21,123 |
| WMC | OCT 2012 | 2 | $ 3,082 |
| AV | AUG-NOV 2012 | 12 | $11,966 |
| HJJ | JULY-NOV 2012 | 7 | $ 5,653 |
| HB | FEB-OCT 2012 | 10 | $15,909 |
| CA | JAN-NOV 2012 | 4 | $ 1,141 |
| JG | JULY-AUG 2012 | 2 | $ 1,030 |

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -19-

| | | | |
|---|---|---|---|
| JB | MAY 09-JAN 2010 | 10 | $12,641 |
| LN | AUG 08-JULY 2010 | 10 | $ 7,691 |
| CYS | SEPT 09-OCT 2012 | 10 | $11,246 |

Claims for payment were made by RIC to Medicare for the full amount of the services provided to these patients.

65.     While RIC has a "Statement of Financial Hardship" form, conspicuously missing from the form is language requesting a waiver of Medicare co-payments and a request for an explanation of the patient's financial hardship. Instead, the form contains a request that RIC "reduce their usual and customary charges in order to allow me to receive care required by my current health care condition," and then the patient is required to insert the dollar amount s/he believes s/he can afford to pay RIC.  In addition, one option the patient is given on the form to establish "hardship" is "retired, fixed income"; this option makes the form a meaningless exercise to excuse Medicare co-payment waivers because nearly 100% of RIC's Medicare patients would fit this category.  Also, a review by Plaintiffs-Relators of the hardship forms in RIC records revealed that most were incomplete or missing critical financial information, thereby rendering the forms even more useless.  Finally, no financial review was ever performed by anyone at RIC to determine the patient's inability to afford the co-payment and, on the contrary, Plaintiffs-Relators were specifically instructed by Dr. Chang not to attempt to collect these co-payments.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -20-

66.     Plaintiff-Relator Smith was hired by Dr. Chang in June 2012 primarily to increase RIC's collectibles.  In the course of her first three months at RIC, she became concerned about RIC's practice of waiving patient co-payments. In September 2012, she shared her concerns in a report to the three RIC partners in which she advised them as follows:  "We do not need to be in the business of writing-off deductibles and co-insurance as there are many adverse consequences to those actions." She received no response to this advice.

67.     On September 25, 2012, RIC held a senior management meeting that was attended by Plaintiffs-Relators, the three RIC Partners and three RIC Providers: Drs. Bhatti, Hau and Lin.  Plaintiffs-Relators gave a billing report presentation at this meeting and specifically advised the doctors that they should discontinue their practice of routinely waiving and writing off Medicare co-payments without any proper verification of financial hardship.  To their surprise, instead of discussing the issue, Dr. Chang told the group that if Medicare found out about their routine waiver practice, he was prepared to pay the fines rather than lose Medicare patients and referrals.  Dr. Chang's response was alarming because he had served as the Medicare Compliance Officer at the University of Southern California School of Medicine's Department of Ophthalmology.  The Provider Physicians appeared concerned and indicated that they wanted more information about the issue, but rather than continue the discussion at that meeting, it was agreed to continue the discussion at the following week's Executive Committee meeting (a meeting of the senior executives and the three Partners, Drs. Chang, Davis and Samuel).  However, the issue was not discussed at the next or any other Executive Committee meeting because the periodic billing

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT     -21-

report was removed from the Executive Committee meeting agendas permanently at Dr. Chang's direction.

68.     Defendant, Braun, participated and conspired with the RIC Defendants in connection with this co-payment waiver scheme by, *inter alia*, marketing to referring physicians on behalf of RIC that RIC waived co-payments for patients.

69.     The RIC Defendants and Braun are legally responsible for all legal violations arising from the co-payment scheme detailed above.

**B.    Co-Payment Waivers And Other Inducements for Patient Referrals By The RIC Defendants And Braun**

70.     In order to obtain Medicare patient referrals from optometrists and other ophthalmologists who do not perform the same types of retina procedures performed by RIC, the RIC Physicians were instructed by the RIC Partners to inform referring physicians that RIC waived co-payments and deductibles for Medicare patients.

71.     Referred patients also are induced to go to Defendants' practice not because they are choosing a physician who best serves their needs based on medical factors, but, rather, because they will not incur any out-of-pocket expenses in connection with RIC's services.

72.     An example of a referring physician who expected and was assured that RIC would waive the Medicare co-payments for his patients is Dr. Michael R. Rose, who had a general ophthalmology practice located across the street from RIC's Lincoln Heights location.  When Plaintiff-Relator Smith began to work at RIC, she was told by RIC Physician Provider Dr. Kristy Lin, that Dr. Rose expected co-pays for Medicare patients to be waived and that he would not refer patients if co-payments were not waived.  When Plaintiff-Relator raised concerns

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -22-

with Dr. Chang about this practice, he confirmed that Dr. Rose refused to make referrals if co-payments were not waived.  In fact, RIC's records for Dr. Rose's referred Medicare patients reveal that RIC rarely collected co-payments from any of these patients, and total receipts for these patients reflect that RIC generally received only 80% of the Medicare allowable amount.  These records also reveal that the patients' co-payments were waived without regard to financial hardship criteria.  Dr. Rose became an employee of CEES in 2012, and he continued to make Medicare patient referrals to RIC.

73.   Plaintiff-Relator Rogers also spoke with RIC Physician Provider Dr. Suk, who worked at the RIC Garden Grove office that received a significant volume of Medicare referrals.  Plaintiff-Relator Rogers advised Dr. Suk that he should not be routinely waiving payment of the co-payments, but he insisted that the waivers continue so that referrals would continue to be received from the referring doctors.

74.   In sum, from at least 2006 and continuing to the present, in violation of FCA, CA-FCA and AKS, the RIC Defendants knowingly and routinely waived co-payments owed by Medicare Part B beneficiaries in order to unlawfully induce them to use their services and in order to continue to attract new Medicare patients and receive referrals from other eye care physicians.  In addition, as detailed below, the RIC Defendants induced referrals from the Referring Practitioners (defined below) by providing remuneration in the form of free meals, drinks, tickets to events and other gifts.

75.   As CEO, Braun's primary duty was to market RIC to physicians for their patient referrals, including Medicare patients.  In his 2012 Year in Review

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -23-

Report to the RIC Executive Committee, Braun noted that, for 2012, there were 3,937 new patients, 2,568 of whom came from referring doctors.

76.     Braun provided each Provider Physician a target list of doctors in their geographical area from whom they were expected to solicit referrals and with whom they were expected to schedule at least one lunch and one dinner per month. As Braun told the doctors on August 9, 2012, the "Goal is to have everyone to have one day/week to schedule lunches."  He also advised the Executive Committee that "each doctor will be given a list of 20 other doctors to call each month."  Fifty-six lunches and dinners occurred in September, 2012 alone as part of this referral marketing effort.

77.     RIC (by and through the Provider Physicians) and the RIC Defendants routinely provided remuneration in the form of free meals, drinks, tickets to events and other gifts unrelated to any legitimate, continuing medical education to referring optometrists, physicians and other providers (the "Referring Practitioners"), with the purpose of inducing referrals to RIC and RICX (defined below) and in return for patient referrals.  For example, an expense report of Defendant Braun reflects the following kickback payments to Referring Practitioners:

| Event Date | Amount | Description | Referring Practitioner(s) |
|---|---|---|---|
| 11/21/2012 | $64.06 | Lunch - Kings Fish House | EB and guest |
| 11/30/2012 | $375.00 | Disneyland Tickets for G.S. and family | GS |

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT     -24-

| 12/2/2012 | $318.42 | Magic Castle Party Sponsorship | NVision |
| 12/3/2012 | $581.57 | OD Dinner | CR & FL |
| 12/4/2012 | $188.38 | OCT Workshop and Dinner (Anaheim Hills, CA) | Unidentified Referring Practitioners |
| 12/6/2012 | $26.68 | Drinks | TL |
| 12/10/2012 | $290.00 | OCT Workshop and Dinner (Garden Grove, CA) | Unidentified Referring Practitioners |
| 12/11/2012 | $29.09 | Drinks | RD |
| 12/12/2012 | $70.00 | Lunch | Unidentified Referring Practitioner |
| 12/17/2012 | $144.00 | Santa Cookie Gift Bags | Doctors in El Centro |
| 12/18/2012 | $150.00 | Dinner | TC & ML |
| 12/21/2012 | $100.00 | Drinks (holiday gathering) | FL, JL, LR and staff |
| 12/23/2012 | $200.00 | Macy's Gift Cards | Dr. S and Office Manager |
| 12/28/2012 | $100.00 | Golf - Black Gold | DS |

78.   The RIC Defendants also regularly provided remuneration to Referring Practitioners in the form of meals at expensive restaurants, some of

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -25-

which the RIC Defendants arranged to be paid for by biotechnology companies and other vendors, including Sequenom (which was willing to pay $2500-$3000 for any dinner hosted by RIC and paid as much as $10,000 to sponsor certain RIC "events" to induce referrals) and Alcon, and the RIC Defendants also provided free "training" through the RICX program with respect to RICX's mobile optical coherence tomography ("OCT") device used to diagnose various conditions of the retina, all of which was designed to and did, in fact, induce referrals.

79.    The above remuneration was not isolated in nature but, rather, these examples are provided to illustrate the RIC Defendants' consistent pattern and practice of providing inducements to Referring Practitioners to refer patients to them.  The RIC Defendants directed all Provider Physicians to schedule at least one lunch per week and one dinner per month with Referring Practitioners on their "target lists" to induce more referrals, all of which were paid for by the RIC Defendants.

80.    RIC also sponsors a large continuing medical education program called Okularfest, where attendees then become targets for possible patient referral with one of the inducements being the Medicare co-payment waiver.  The attendees at Okularfest were not charged for attendance.  Rather, the RIC Defendants paid all expenses associated with the attendance by referring practitioners, including paying for meals associated with this program that were offered under the guise of providing continuing medical education.  In addition, the following gifts were offered to attendees at Okularfest: free IPADs, gift cards and 10 lucky winners would get RICDX services for free for 1 month.

81.    The RIC Defendants engaged in these practices at all pertinent times and provided this remuneration to Referring Practitioners to induce referrals to

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -26-

them to refer patients and specifically in return for referrals, which resulted in payments being made by Government Healthcare Programs, since the referrals included both Medicare and Medicaid patients.

82.     Defendants submitted, or caused to be submitted, claims for payment to the Government Healthcare Programs for services rendered to each of the Medicare beneficiaries who had their co-payments waived and each of the Medicare and Medicaid patients, which were accompanied by an express or implied certification that the transaction was not in violation of federal or state statutes, regulations, or program rules.  Each of those certifications was false, because each claim for payment was tainted by the kickbacks detailed in this action.

83.     Defendant, Braun, participated and conspired with the RIC Defendants in connection with providing remuneration and other inducements to Referring Practitioners, including practitioners employed by CEES and other referring practices, as detailed above.

84.     The RIC Defendants and Braun are legally responsible for all legal violations arising from the inducement/kickback scheme detailed above.

**C.     The RIC Defendants Obtain Referrals That Violate the Anti-Kickback Statute and the Anti-Self-Referral Laws**

85.     In or about June, 2012, RIC entered into a co-marketing agreement with and/or made a loan to a business known as RIC Diagnostics ("RICX"), whose president is Dan Bienenfield.  Upon information and belief, RICX is a corporate entity that is related to RIC and in which Dr. Chang maintains a financial interest.  In return, RICX is expected to funnel referrals from optometrists to RIC.  RIC is

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT     -27-

aware that payments for services rendered to some of the referred patients will be made by Medicare and other Government Healthcare Programs..

86.   RICX was a regular topic at the weekly Executive Committee meetings, which are attended by the RIC Partners and the senior Providers of the practice.  Dr. Chang was very focused on the referrals to be received from this venture.  On June 26, 2012, he asked for an update; he said he wanted to see "specific referrals from RD 2020 DX [RICX]."  On July 24, 2012, he requested a report of how many patients had been referred by RICX.  He repeated these comments on August 7, 2012.  He stated he wanted a written summary from Dan Bienenfeld of "how many patients seen and how many referral [sic]" to RIC.  RICX operates a mobile optical coherence tomography ("OCT") device used to diagnose various conditions of the retina.  RICX brings the equipment to the optometrist's office, charging him/her a per use fee.  In turn, the optometrist bills the patient or the patient's insurer a higher fee for the test that uses the OCT equipment.

87.   RICX actively encourages optometrists to refer patients to RIC.  The optometrists are provided with a referral form to complete when they send the patient to RIC after RICX's OCT is used for diagnostic purposes.

88.   The RIC Physicians train optometrists, at no charge, how to read the OCT images at 2-3 hour workshops for optometrists.

89.   The optometrists are also told that RIC ophthalmologists will interpret the image free of charge if requested to do so by the optometrists.  Obviously, the expectation is that once an RIC doctor has looked at the image, he or she would handle any retina condition that was discovered.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -28-

90.     RICX received considerable attention as part of RIC's overall marketing efforts.  The minutes of the weekly doctors' telephone meeting of July 28, 2012 state "Plan for webinar with Dan [Bienenfield] July 10th to learn about OCT diagnostics, also plan for OCT workshops after."  The webinar was attended by all the Providers.  The Providers were also given RICX brochures to hand out to optometrists.

91.     RIC advertised the services of RICX by a blast email sent to over 1700 people in August 2012.

92.     At a meeting on August 9, 2012, Braun told the Providers that "RIC has had large financial and [sic] Commitment to this project—everyone should strongly promote this service."  In other words, the RIC doctors are supposed to contact optometrists and encourage them to use the RICX service, which will in turn general referrals to RIC.

93.     At an August 19, 2012 Executive Committee meeting, Dr. Samuel wanted the doctors "to focus on all referrals from Dan [Bienenfeld]."

94.     At a meeting on September 20, 2012, Braun stated to the doctors: RICX is "still growing.  Need to help Dan [Bienenfeld] identify potential users. SK [Dr. Kamjoo] has been proactive by targeting current users of the service as an introduction: Will do an iPad giveaway for potential referrals during October CE. Will also speak about OCT/Diagnostics during CE event."

95.     At meetings on November 15 and December 13, 2012 with Providers, Braun stated "Diagnostics needs to be embraced further.  Try to get more leads for Dan [Bienenfeld]" and, importantly, "Referrals are starting to be sent."

96.     Braun also called optometrists directly and told them: "We are going to have 10 lucky winners of their first month of RIC DX [meaning RICX services]

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -29-

free."  Over fifty leads for Braun's calls were generated at the very well-attended CME called "Okularfest" that was sponsored by RIC in 2012.  He told the optometrists that they could bill for each of the free OCT tests.  He also asks them to send their patients to RIC.  Braun reported on the progress made by RICX at each RIC Executive Committee meeting.  Braun tracked the names of RIC patients resulting from referrals from RICX.  Plaintiffs-Relators have in their possession a list of the names of optometrists signed up to use the RICX service and who have made referrals to RIC, the names of patients referred, the dates of service and the amount charged by RIC to the patients.

97.    The target for referrals from RICX was 20 patients per month. Plaintiff-Relator Smith's handwritten notes from the January 15, 2013 Executive Committee Meeting record that Dr. Chang stated "If he did increase our referrals, I'll give him another $15,000, but don't put that in the minutes."

98.    Each claim made to Medicare and the other Government Healthcare Programs for services for a patient referred to RIC through or on account of RICX violates the federal AKS and is not reimbursable under Medicare Part B.

99.    Defendant, Braun, participated and conspired with the RIC Defendants in connection with the practices related to RICX, which are detailed above.

100.   The RIC Defendants and Braun are legally responsible for all legal violations arising from the inducement/kickback and referral scheme detailed above.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -30-

**D.    RIC Defendants' And CEES's Violation of the Anti-Kickback Act Relating to the San Gabriel Ambulatory Surgery Center**

101.    RIC owns investment interests in an ambulatory surgery center known as the San Gabriel Surgery Center which is located at 207 Santa Anita Avenue, Suite G-16, San Gabriel, California.  Drs. Chang, Samuel and Davis collectively own 50% of SG-ASC and derive a direct financial benefit from referrals to SG-ASC.

102.    Drs. Chang, Samuel, and Davis routinely refer patients of RIC who require surgery to SG-ASC for the performance of that surgery.  Physicians employed by RIC and CEES were also required to refer patients to SG-ASC as a condition of their continuing employment.  Plaintiffs-Relators are in possession of a list of patients referred by RIC and CEES doctors to SG-ASC between 2010 and 2012.

103.    Referrals for medical services to an entity in which the referring physicians has a financial interest violate the AKS unless they fall within the requirements of "safe harbor" regulations promulgated by CMS.  A referral of a patient to an ambulatory surgery center in which a physician has an investment interest does not meet the "safe harbor" regulations of the AKS unless the patient is fully informed of the investor's investment interest, 42 C.F.R. 1001.952(r).

104.    Strict compliance with all elements is required for safe harbor protection, *see* 56 Fed. Reg. 35952, 35954 (July 29, 1991).

105.    RIC and CEES physicians do not advise their patients that the RIC Defendants have an investment interest in SG-ASC.  Rather, patients are given a brochure which states, "[t]he ownership for San Gabriel Ambulatory Surgery Center may be obtained by contacting the center at (626) 300-5300."

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -31-

106.   At the request of Plaintiff-Relator Smith, the RIC scheduler, Krystal Ramirez, called (626) 300-5300 to learn who owned SG-ASC.  However, as she reported to Plaintiff-Relator Smith, the individuals at the center who responded to the call could not provide any information about the ownership of that facility, nor could they name or identity anyone who could do so.

107.   As a result of the patients referred to SG-ASC by the RIC Defendants, RIC itself and CEES, a number of claims were submitted for reimbursement to Medicare, Medicaid and other Government Healthcare Programs for services provided at SG-ASC.  Indeed, the financial records of SG-ASC reflect that a significant percentage of patients referred to SG-ASC (over 25%) were Medicare patients.  As a result of the referrals to SG-ASC and the services then provided by SG-ASC, claims were submitted for reimbursement to Medicare and other Government Healthcare Programs with respect to the Medicare patients referred to SG-ASC by RIC and CEES.

108.   Defendants' failure to comply with the requirements of 42 U.S.C. 1001.952(r) results in remuneration prohibited by 42 U.S.C. 1395nn and 42 C.F.R. 411.353.  Accordingly, any claim submitted by the Defendants to Medicare and other Government Healthcare Programs for physician services provided at SG-ASC is false and fraudulent.

109.   The RIC Defendants and CEES are legally responsible for all legal violations arising from the referrals to SG-ASC detailed above.

## VII.   RIC DEFENDANTS' FALSE CLAIMS BASED ON FALSE STATEMENTS ON THEIR FORM 1500s

110.   The RIC Defendants submitted or caused to be submitted CMS Form 1500s for reimbursement for the services they provided to Medicare Part B and

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT       -32-

Medi-Cal beneficiaries.  The Form 1500 requests information about the patient, insurance coverage, the diagnoses and the services provided for which reimbursement is requested.  Entry 24F contains a blank titled, "$ charges," with a space for a separate entry for each supply/procedure.  Entry 28 contains a blank titled, "Total Charge."  The Medicare Carriers Manual and government pronouncements point out that providers are paid based on "actual charges," which is defined as "the amount the physician or supplier actually expects to receive from the patient and/or the third party payer."

111.   The RIC Defendants submitted to caused to be submitted a false statement to the government in their CMS Form 1500s when they submitted claims seeking reimbursement based on the full charge, without revealing that the charge contained a waived co-payment element.  Specifically, the "charge" entry on the provider's claim forms requires that the provider state the total amount, including the co-payment, it expects to collect.  When the provider routinely waives the 20% co-pay on a $100 procedure, however, the true charge is not $100, but 80% or $80.

112.   Knowingly submitting false claims to the government for reimbursement creates liability under the FCA.  Thus, each of the claims submitted to the government by the RIC Defendants constituted a violation of section 3729 of the FCA.

## VIII.   THE RIC DEFENDANTS ENGAGE IN UPCODING AND PERFORM WORTHLESS AND HARMFUL PROCEDURES

### A.   The RIC Defendants Engage in Overcoding of E/M Events

113.   The RIC Defendants and their Providers regularly submit claims to Medicare for examinations and procedures different from those actually

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -33-

performed.  For example, the RIC Defendants and the Providers frequently billed for CPT  codes 99214, 99215 and 99204 exams, when the Providers did not perform the requisite services for these codes.

114.   The amount of money a medical provider is paid for his or her services by Medicare or Medicaid depends on which CPT codes are used.  The Medicare program requires physician providers to bill Medicare Part B services, including office visits, using the American Medical Association's Current Procedural Terminology ("CPT-4") numeric codes to describe the procedures and services provided.  *See* Medicare Claims Processing Manual ("MCPM"), Pub. 100-04, Ch.12, § 30.  CPT codes determine both coverage, *i.e.*, if Medicare will pay for the billed medical procedures and services, and the reimbursement amount, *i.e.*, how much Medicare will pay for the billed medical procedures and services.

115.   For patients making an office visit, a provider physician's evaluation and management (E/M) services are billed using five-level series of CPT codes, for either a new patient (CPT-4 Codes 99201 through 99205) or an established patient (CPT-4 Codes 99211 through  99215).  In addition, there are varying levels of complexity assigned to the patient's visit from level 1 to level 5, with level 1 being the lowest and level 5 being the highest level of complexity.

116.   The applicable E/M code level of service is defined by the level of History, the level of Examination, and the Complexity of Medical Decision Making.  These three components are evaluated in the context of the medical necessity for the level of history and the level of examination. As the patient's examination becomes increasingly in-depth or greater time is spent with the patient, the code number increases, with 99211 as the lowest level and 99215 as the highest-level.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -34-

117.    CPT Code 99211 is used when the established patient's problems are "minimal," meaning they require little to no independent medical evaluation; typically, only 5 minutes are spent "performing or supervising" routine patient services.  Code 99211 is the only E/M code that explicitly states that it "may not require the presence of a physician or other qualified healthcare professional." Code 99211 is typically used to bill for services provided exclusively by nurses.

118.    CPT Code 99212 is used for office or outpatient E/M visits with established patients that require two of three key components: (1) a problem-focused history; (2) a problem-focused examination; and (3) a straightforward medical decision. This code is typically appropriate where approximately 10 minutes are spent face-to-face with the patient and/or family.

119.    CPT Codes 99213-99215 are used when the patient's examination becomes increasingly in-depth, the medical decisions become more complex, and/or greater time is spent with the patient.

120.    CPT Code 99214 is used for office or outpatient E/M visits with established patients that require moderately complex decision-making and either a detailed, problem-focused history or a detailed, problem-focused examination.

121.    CPT Code 99215 is used for office or outpatient E/M visits with established patients that require a highly complex decision-making and either comprehensive problem-focused history or comprehensive problem-focused examination.

122.    CPT Code 99204 is used for office or outpatient E/M visits with new patients who require all three of the following: comprehensive history; comprehensive examination; and moderately complex medical decision-making. As with the equivalent codes for established patients (99211-99215), CPT 99204

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -35-

is part of a five-level payment scale for new patients. The applicability of a given code is based upon the lowest of the three components -- history, examination, and decision-making -- required.

123.   For all CPT codes, the medically necessary E/M service and the procedure must be appropriately and sufficiently documented by the physician or qualified non-physician practitioner in the patient's medical record to support the claim for these services. *See* Medicare Claims Processing Manual, Chap. 12 at § 30.6.6(B).

124.   Medicare reimburses only for "medically necessary," or "reasonable and necessary" services and procedures, including levels of E/M.  42 U.S.C. § 1395y(a)(l)(A).

125.   Based on a government audit conducted of Medicare claims data of Dr. Chang (1-3-2006 to 7-30-2013), Dr. Davis (7-17-08 to 7-31-13) and Dr. Samuel (1-4-06 to 7-31-13), the following overcoding/under documenting was observed for new patients and established patients:  virtually all new patients were coded at Level 4 (99204 Office or Outpatient Encounter, Level 4, or 99244, Office or Outpatient Consultation, Level 4) and most established patients were coded at Level 4 (99214, some were at level 3 or level 5), which coding was unsupported by the medical records. While Level 4 New Patients and/or Consultations require all three components -- Comprehensive History, Comprehensive Examination, and Moderately Complex Medical Decision-Making -- and the code is based on the lowest of the three components, most of the RIC Defendants' encounters failed because the documentation of the "History of Present Illness" was brief (only 1 – 3 of  8 possible elements), downgrading the history to "Expanded Problem-Focused," and, therefore, the code should have been at Level 2, even

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -36-

though the "Decision-Making" and the "Eye Examination" were properly documented.

126.  Based on the audit described above, Dr. Chang was found to have charged at level 4 on 98% of his encounters,  Dr. Samuel charged at level 4 on 99% of his encounters (even though he averaged 40 to 50 patient visits per day), and Dr. Davis charged at level 4 or 5 99% of the time.  Statewide, retina specialists charge at level 4 only 57% of the time.  In addition, while Dr. Davis has advised other RIC Provider Physicians not to use level 5 because it is rarely justified, he singlehandedly accounts for 25% of all level 5 charges by retina specialists in the State of California.  RIC records show that Dr. Davis billed 428 patients at 99215.

127.  In addition, the audit found that the RIC Defendants' practice of bringing their patients back every few weeks for follow-up visits was medically unnecessary and unreasonable. In short, not only was it unjustified to charge at level 4 for these visits, the conclusion was that it was unjustified to charge anything at all for these visits.

128.  The chart below provides a summary of RIC Defendant's E/M overcoding scheme for CPT codes 99204, 99214, and 99215:

| RIC Medicare Provider | Medicare Charges | Overcoded Medicare Charges | % Overcoded Medicare Charges |
|---|---|---|---|
| CHANG | $407,677.70 | $119,911.05 | 29% |
| DAVIS | $ 86,028.50 | $ 29,141.76 | 34% |
| SAMUEL | $201,640.28 | $ 59,513.66 | 30% |
| TOTALS | $695,346.48 | $208,566.47 | 30% |

129.  The RIC Defendants are legally responsible for all legal violations arising from the coding fraud detailed above.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT       -37-

**B.** **The RIC Defendants' Unnecessary Claims for CPT Code 92240: ICG Testing**

130. CPT Code 92240 is the code used to bill Medicare for Indocyanine green angiography or "ICG," a controversial and invasive technique used infrequently in evaluating and treating age-related macular degeneration ("AMD").

131. AMD is the leading cause of adult blindness in the United States. There are basically two forms of AMD: dry (atrophic); and wet (neovascular). There is currently no method to prevent or cure either form of AMD, and there is no method for treating the dry form of AMD. However, there is a class of drugs called VEGF inhibitors (with the brand names being Lucentis, Avastin and Eylea), that physicians, including the RIC Defendants and Physicians, use to treat wet AMD. These medications are delivered to the eye through a very slender needle, and they help reduce the number of abnormal blood vessels in the retina and also slow any leaking from blood vessels in the eye.

132. According to the American Academy of Ophthalmology ("AAO") Preferred Practice Pattern ("PPP"), the standard of care diagnostic test for AMD is Optical Coherence Tomography ("OCT"), and if indicated, followed by an Fluorescein Angiography ("FA"). This PPP was developed and written by the Retina/Vitreous Preferred Practice Panel of the AAO, and it was carefully reviewed by nationally recognized panels, including the National Eye Institute, the Practicing Ophthalmologists Advisory Committee for Education, the Ophthalmic Technology Assessment Committee Retina/Vitreous Panel, the Macula Society, and the American Society of Retina Specialists. The PPP was approved by the AAO Board of Trustees on September 20, 2014 and continues to be the current standard of care for the evaluation and treatment of AMD. *See* American

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -38-

Academy of Ophthalmology: Age- Related Macular Degeneration Preferred Practice Pattern 2014.

133.   In connection with its proposals to health maintenance organizations ("HMOs"), RIC specifically represented that its own standard of care for AMD followed the PPP and use of the OCT as a diagnostic test, and if indicated, followed by an FA.  In contrast, when using the ICGs for patients insured by Government Healthcare Programs, RIC was not even following its own standard of care for AMD.

134.   While the AAO discusses the use of ICG in very limited circumstances, the  routine use of ICG in evaluating and treating AMD is not supported by scientific studies, and, unsurprisingly, the AAO has advised that when ICG is performed, the physician must be aware of the potential risks associated with the procedure, including severe medical complications, allergic reactions and even death.  *Id.*

135.   The diagnostic test used by the RIC Defendants and Physicians for its treatment of AMD is, in fact, OCT -- the accepted standard of care.  However, the RIC Defendants and Physicians also select and charge for ICG as a diagnostic tool for patients of Government Healthcare Programs, even though it provides no medically necessary data for the AMD treatment method.  Simply put, the RIC Defendants' and Physicians' selection of ICG as a diagnostic tool is medically unnecessary precisely because the treatment approach used by the RIC Defendants and Physicians does not use the ICG testing results data and, therefore, except in rare circumstances, use of the ICG is worthless on its face.

136.   An independent Department of Justice ("DOJ") evaluation of the RIC Defendants' use of ICGs performed on Medicare patients between February and

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -39-

May 2014 revealed that ICG was used for virtually every patient visit, and only 9.2% of the ICG studies were found to be appropriate and medically necessary. The evaluation also found that Drs. Chang, Davis and Samuel essentially ignore the AAO's PPP and use their own approach to each AMD patient, even though that approach has not been proven effective in clinical trials, nor published in peer reviewed journals, and is not used or considered a standard of care in the retinal community.  Moreover, it was determined that the RIC Defendants used their own approach inconsistently; for example, while they routinely performed the ICG technique for supposed patient evaluation, they did not use ICG images to make their diagnoses, thereby confirming the worthless nature of the ICG tests administered in the vast majority of circumstances.   In addition, the RIC Defendants bring their patients back at very short intervals for return visits, regardless of what the ICG images show and do not use the ICG images to make patient treatment decisions.  Therefore, based upon the manner in which the RIC Defendants conduct their practice, the selection and use of the ICG was medically unnecessary on its face.

137.   The importance of the ICG testing to the RIC Defendants is unequivocally the Medicare reimbursement amount at issue: the AAO's PPP (i.e., OCT), reimburses approximately $50.00 for the Medicare patient (the amount may differ by year and region), contrasted against the ICG CPT Code 99240, which reimburses approximately $300.00 per patient.  As a result, each Medicare patient represents an additional $250.00 to the RIC Defendants for its use of ICGs. Unsurprisingly, in electronic correspondence, Dr. Samuel describes ICG as "the most important test we run," while Dr. Davis comments about how one of their new clinics could make much more money, "[i]magine if there was ICG there...,"

and Dr. Chang comments about Dr. Suk's outstanding patient reimbursement, $15,000 in just one morning, "...simply by warming up the ICG."

138.   In 2012, the RIC Defendants billed Medicare $3,883,206 for CPT Code 92240 (i.e., the ICG tests).  Dr. Chang is paid more for ICGs every year than any other doctor in California, and Dr. Davis is right behind him in the number two slot.  Moreover, while 88% of RIC's ICG charges are for Medicare patients, only 0.5% are billed to HMOs; this is because HMOs require prior authorization, and the RIC Defendants know it is highly unlikely that they would be able to obtain the HMO's authorization for this unwarranted ICG procedure.  Finally, of the 1397 ICG angiograms reviewed pursuant to a DOJ expert evaluation of ICG use by Drs. Chang, Davis and Samuel, 90.8% of CPT Code 99240 charges to Medicare were found to be medically unnecessary. ICG testing also is considerably more dangerous than OCT with one side-effect of ICG being death of the patient.

139.   Expert review of 1397 angiograms performed by the RIC Defendants found that the RIC Defendants relied on the OCT findings and not the ICG data to treat their patients.  In addition, this expert analysis found that the ICG data had no influence on treatment management. The following is a chart of samples from this expert analysis regarding the RIC Defendants' selection of ICG as a diagnostic tool for Medicare patients:

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -41-

| RIC DEFENDANTS' 92240 ICG TESTING FOR MEDICARE PATIENTS |
| --- |
| DOJ EXPERT REVIEW FOR MEDICAL NECESSITY |

| Medicare Patient | 92240 Amt paid to RIC | Medically Necessary | Amount Deemed Not To Be Medically Necessary |
| --- | --- | --- | --- |
| GF | $183.82 | NO | $183.82 |
| SH | $183.82 | NO | $183.82 |
| WS | $175.05 | YES | 0 |
| RD | $183.82 | NO | $183.82 |
| FK | $181.92 | YES | 0 |
| PW | $208.60 | NO | $208.60 |
| GF | $188.45 | NO | $188.45 |
| LB | $181.10 | YES | 0 |
| VB | $188.30 | NO | $188.30 |
| JA | $187.14 | NO | $187.14 |
| IM | $183.82 | NO | $183.82 |
| AD | $178.62 | NO | $178.62 |
| RF | $110.95 | NO | $110.95 |
| RE | $183.82 | NO | $183.82 |
| EG | $188.45 | NO | $188.45 |
| RW | $160.50 | NO | $160.50 |
| RV | $208.60 | NO | $208.60 |
| GS | $184.68 | NO | $184.68 |
| MA | $183.82 | YES | O |
| WA | $183.82 | NO | $183.82 |
| RT | $188.30 | NO | $188.30 |
| SE | $80.30 | NO | $80.30 |

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -42-

| PP | $183.82 | YES | 0 |
|----|---------|-----|---|
| ES | $183.82 | NO | $183.82 |
| AC | $208.60 | NO | $208.60 |
| EUM | $208.60 | NO | $208.60 |
| EH | $184.68 | NO | $184.68 |
| LY | $183.82 | NO | $183.82 |
| JD | $183.82 | NO | $183.82 |
| WH | $367.65 | NO | $367.65 |
| DB | $367.65 | NO | $367.65 |
| AN | $188.45 | NO | $188.45 |
| JG | $184.68 | NO | $184.68 |
| ES | $208.60 | NO | $208.60 |
| AM | $183.82 | NO | $183.82 |
| PT | $183.82 | NO | $183.82 |
| SZ | $208.60 | NO | $208.60 |
| EA | $174.26 | YES | 0 |
| TC | $175.05 | NO | $175.05 |
| SG | $208.60 | NO | $208.60 |
| LM | $174.26 | NO | $174.26 |
| GH | $178.62 | NO | $178.62 |
| SS | $187.14 | NO | $187.14 |
| CL | $348.53 | YES | 0 |
| RS | $178.62 | NO | $178.62 |
| EK | $208.60 | NO | $208.60 |

140.   As a result, the vast majority of reimbursements from Government Healthcare Programs, including Medicare, for ICG testing ordered by the RIC Defendants and Physicians was medically unnecessary since the tests themselves

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -43-

were, among other things, worthless in nature and were not used for diagnostic, treatment or other medically appropriate purposes.

141.   The expert analysis of the RIC Defendants' selection of ICG as a diagnostic tool determined that it was medically unnecessary for 98% of the claims submitted to Medicare.   Indeed, based upon a review of the charts prepared by the RIC Defendants and treatment of the very patients upon whom the ICGs were performed by the RIC Defendants, experts have confirmed that there was no medical basis for the RIC Defendants' selection of the ICG as a diagnostic tool, and further found, based upon treating physicians' review, that the diagnoses used by the RIC Defendants to justify the ICG tests were falsified.  Specifically, review of patient charts for the RIC Defendants confirms that the RIC Defendants (a) do not use the ICGs to make treatment decisions; (b) it is irrelevant to them whether feeder vessels (*i.e.*, the abnormal vessels which cause "wet" macular degeneration) are present; and (c) do not use the ICGs to determine how often to see their patients for injections (despite contrary claims and representations by the RIC Defendants) because the RIC Defendants bring their patients back at very short intervals, regardless of what the ICG images show.  In fact, review of the RIC Defendants and their patient charts reveals that there is no evidence that the RIC Defendants pay any attention at all to the ICG images or that they use the ICG tests for any purpose other than to generate fraudulent revenue by submitting false claims to Government Healthcare Programs.  In addition, as noted above, the RIC Defendants virtually never select ICG testing for HMO patients because they know they would not be able to demonstrate the medical necessity for ICG testing in order to obtain prior authorization for this testing.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT        -44-

142.   The motives of the RIC Defendants in using the ICG tests can be confirmed by their choices and use of dye in connection with these tests.  First, the RIC Defendants knowingly chose not to use the amount of dye the manufacturer of the equipment recommended and, instead, used single-dose ICG dye vials on multiple patients to save on costs, even though it increased the risks and dangers to the patients associated with the ICG tests.  Second, the RIC Defendants elected to switch the type of dye they used for certain ICG surgical procedures from ICG dye to Brilliant Blue dye because it was cheaper and even though the Brilliant Blue dye was not FDA approved for use for this procedure.  The Brilliant Blue dye was obtained from a pharmacy supplier and was subsequently determined to be contaminated with fungus.  As a result of using Brilliant Blue dye, 7-8 patients developed endopththalmitis and some lost complete vision in their eye and were blinded.  The California Department of Health issued a warning to cease using products from this pharmacy supplier until the extent of the contamination could be determined.  Finally, when the RIC Defendants learned that the dye it was using in their clinical settings for the ICGs had been supplied by a pharmacy supplier that had been implicated in violating FDA guidelines and supplying contaminated dye, the RIC Defendants refused to cease using potentially contaminated dye that could place its patients at risk and, instead, continued using this dye in the face of specific warnings and recommendations from regulators that the RIC Defendants cease using all products from the supplier.  The RIC Defendants made this callous and dangerous choice on the basis that the dye was expensive and the RIC Defendants would "switch when we run out."  Even after receiving indications that the dye being utilized in the ICGs was adulterated and not performing as required, the RIC Defendants continued to use the dye in the

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT        -45-

ICGs, thereby confirming that the sole purpose of the ICGs was to generate

fraudulent revenue, regardless of efficacy, necessity or patient safety.

143.   The RIC Defendants also regularly competed with each other on how

much income they could generate in short periods of time, indicating that it was a

"good thing the ICG came in" and that, as a result, Dr. Chang billed $26,800 in 3

hours and 22 minutes, but Dr. Davis beat him with $30,210 in 3 hours and 15

minutes."  Likewise, Dr. Chang boasted to Dr. Samuel that "Kevin (Suk) did $15K

this am in GL…simply by warming up the ICG."  The RIC Defendants also

regularly joked about physicians in the RIC practice "turning green" or painting

offices "green" with the ICGs and in reference to the color of dye used in the ICG

tests.

144.   The RIC Defendants also expressed concern about physicians in the

RIC practice who might not be prepared to "get on the ICG train" and regarding

those physicians who stopped using the ICG altogether.  The RIC Defendants

induced other RIC Physicians to use the ICG tests to generate income for RIC --

even though the ICG tests were medically unnecessary in virtually 100% of the

cases -- by making clear that partnership and advancement opportunities, as well

as future compensation (including bonuses for RIC Physicians that were tied to

revenues generated from, among other things, the ICG tests), at RIC essentially

depended on use by the RIC Physicians of the worthless ICG tests.

145.   In recognition of the fact that the RIC Defendants' use of the ICG

tests was unnecessary and unreasonable, in or about May, 2012, Dr. Harrison (one

of the physicians then employed by RIC) protested the use of the ICG tests and

refused to order these inappropriate tests going forward.   Dr. Harrison also

complained that it was impossible to advance to a partnership position at RIC

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -46-

1    without using the medically unnecessary ICG tests.  Perhaps unsurprisingly, Dr.

2    Harrison is no longer employed by RIC.  Likewise, in recognition of the fact that

3    the RIC Defendants' use of the ICG tests was consistently unnecessary and

4    unreasonable, in or about September, 2012, Dr. Lim of RIC wrote to Dr. Davis of

5    RIC and inquired as to how ICG tests could be ordered when there was no clinical

6    reason to justify the tests.

7         146.   The RIC Defendants' fraudulent use of the ICGs mirrors the conduct

8    of a Florida physician who was recently convicted of Medicare fraud:

9              Over the six-year-period cited in the case, Melgen raked

10             in $16 million for indocyanine green (ICG) angiography

11             tests, which prosecutors said are seldom used by other

12             doctors.

13

14             Melgen and his medical practice knew the limited types

15             of diagnoses necessary to justify billing Medicare for the

16             relatively rare test, prosecutors said. They said Melgen

17             listed those diagnoses (such as pigment epithelial

18             detachment) with undue frequency, so he could

19             repeatedly bill for ICGs.

20   https://www.courthousenews.com/doctor-convicted-massive-healthcare-fraud/

21   (May 1, 2017).  Similarly, as explained above, review of RIC patient charts reveals

22   that the purported reasons for use of the ICG by the RIC Defendants and

23   Physicians were not genuine, diagnoses in charts were falsified and the vast

24   majority of ICG tests were utterly and completely unnecessary from a medical

25   perspective.

26

27   CIVIL ACTION NO.:
     2:13-cv-3772-DMG (MRWx)

28   THIRD AMENDED COMPLAINT       -47-

147.   The RIC Defendants are legally responsible for all legal violations arising from the medically unnecessary use of the ICG tests detailed above.

### C.   The RIC Defendants Engage in Double Billing

148.   RIC entered into an arrangement with Dr. Mark B. Kislinger whereby Dr. Bhatti of RIC would staff Dr. Kislinger's Glendora, California clinic several times per week.  Dr. Kislinger was supposed to and did bill Medicare and other payors for Dr. Bhatti's services performed at the Glendora clinic.  RIC was to and did receive from Dr. Kislinger one-half of the fees collected for Dr. Bhatti's services.

149.   Between at least April through June of 2012, RIC also billed Medicare for the services Dr. Bhatti had performed in Dr. Kislinger's clinic as though the services had been provided at RIC.

150.   The claims submitted to Medicare by Defendants for work performed by Dr. Bhatti at Glendora, which had already been billed by Dr. Kislinger, were false and fraudulent.

151.   Plaintiff-Relator Smith advised Dr. Chang that this double billing was improper and "would need to be reconciled."  Dr. Kislinger advised Dr. Chang that the double billing to Medicare was fraudulent.  Nevertheless, RIC knowingly failed and refused to report and return the amounts it had double billed to Medicare in violation of 42 U.S.C. §1320(a)-7(k)(d).

152.   The RIC Defendants are legally responsible for all legal violations arising from the double-billing practices detailed above.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT       -48-

**D.   RIC's Compensation Structure Encourages Unnecessary Tests and Upcoding**

153.   In January, 2013, RIC announced that, in order to become a partner, an employed doctor would have to exceed the average charges (minus charges paid by J Code) of the three partners, for two quarters.

154.   Because the partners of RIC were billing for unnecessary ICG tests and upcoding, the only way an employed doctor could meet this requirement would be to order unnecessary ICG tests or also to upcode, thereby making these illegal practices a condition of career advancement within RIC.  In addition, as noted above, the RIC Physicians' compensation was effectively tied to the number of ICG tests utilized.

155.   Indeed, when informed of this change, Dr. Camille Harrison stated she could never meet the requirement because she did not order ICG tests as often as the RIC principals.  She has since left the RIC practice.

**E.   RIC Through CEES Bills Medicare For Services Not Performed**

156.   Dr. Lily Lee, Dr. Chang's wife, is a plastic surgeon licensed to practice medicine in California.  She is also an approved Medicare provider.

157.   CEES billed Medicare for Dr. Lee's services for assisting in retinal surgeries when it knew that she was not present and in which she did not actually participate.  For example, Medicare was billed for retinal surgery performed on patient NEG on December 13, 2012, under CPT 67113.  This surgery does not require an assistant surgeon, as CEES was aware.

158.   Examples of additional surgeries for which Medicare was billed for Dr. Lee's assistance but where she was not present and CEES knew that she was

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -49-

not present, include:

| Patient | Date of Service | Amount |
|---------|-----------------|--------|
| JB | 11/21/2012 | $340.00 |
| NP | 12/13/2012 | $500.00 |
| SK | 01/03/2013 | $560.00 |
| DWW | 01/03/2013 | $500.00 |
| BH | 01/03/2013 | $400.00 |
| MA | 01/03/2013 | $400.00 |

159.   Plaintiffs-Relators have learned that CEES continues to bill Medicare for Dr. Lee's services in connection with surgeries where she is not present and in which she does not participate.

160.   The RIC Defendants and CEES are legally responsible for all legal violations arising from the coding fraud detailed above.

### IX.   THE RIC DEFENDANTS KNOWINGLY RETAIN AN OVERPAYMENT FROM THE PHYSICIANS QUALITY REPORTING SYSTEM

161.   RIC is a voluntary participant in the Physician Quality Reporting System (PQRS).  Under the PQRS, eligible professionals who satisfactorily report data on quality measures for covered Physician Fee Schedule Services provided to Medicare Part B Fee for Service beneficiaries receive specified incentive payments, 42 U.S.C. §1395w-4(k), (m).

162.   In order to receive the payments provided under the PQRS program for 2011, RIC was required to provide data for a twelve-month period or the period January 1, 2011 to December 31, 2011, 75 Fed. Reg. § 5 (Aug. 26, 2010), pp. 40168-40178; *see* 76 Fed. Reg. 42772 (July 19) at p. 42842; 42 CFR § 414.90.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -50-

163.   When RIC provided its data on quality measures, although it should have provided information for the entire year, it only provided information for the four months from September through December of 2011.  For 2012, certain of the information reported was for activities that had not actually occurred.  Each of the RIC principals attested to the accuracy of the information submitted.

164.   RIC falsified the data submitted to CMS and represented that it was for a full year (even though it was not) and falsely certified that, for each of the reporting RIC Physicians, 80% of the Medicare cases had been entered when they had not been entered.  RIC made these false certifications and falsified data despite specific documentary requirements and the explicit requirement that the required certifications relate to a full year of data and that 80% of the applicable Medicare cases be entered.

165.   In October, 2012, RIC received slightly in excess of $60,000 from CMS as a result of the purportedly complete information it provided to PQRS for 2011.  The payment received from CMS was predicated upon receipt of data for a full year and for 80% of the Medicare cases seen during the year and RIC only received this payment by providing fraudulent data and certifications to CMS.

166.   Plaintiff-Relator Smith advised the RIC Partners that RIC was not entitled to receive these funds and that they should be returned because RIC had not complied with the PQRS program by providing the required amount of data and by falsely certifying that the appropriate data had been submitted.

167.   The RIC Defendants knowingly failed and refused to report and return to CMS these funds to which they were not entitled in violation of the requirements of 42 U.S.C. § 3120a-7k(d).

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -51-

168.   The RIC Defendants are legally responsible for all legal violations arising from the false statements and retention of the PQRS program payment detailed above.

## X.      ADDITIONAL FALSE CLAIMS TO THE STATE OF CALIFORNIA

### A.    Violations of the Discriminatory Billing Rules

169.   The California False Claims Act, codified in the California Government Code sections 12650, *et seq.*, states that it is a violation to: (a) knowingly present or cause to be presented false claims for payment or approval of claims for Medi-Cal reimbursement; and/or (b) knowingly make, use, or cause to be made or used false records or statements to get false claims paid or approved by California for Medi-Cal reimbursement.

170.   Under Title 22, Section 51480(a) of the California Code of Regulations, "no provider shall bill or submit a claim for reimbursement for the rendering of health care services to a Medi-Cal beneficiary in any amount greater or higher than the usual fee charged by the provider to the general public for the same service" (the "Discriminatory Billing Rule").

171.   During the time period relevant to this complaint, the RIC Defendants manipulated and falsified the amount reported as the "usual fee charged by the provider to the general public" in order to obtain increased reimbursements from Medi-Cal.

172.   For almost all CPT codes, the RIC Defendants based the supposed "usual fee" or "chargemaster" on approximately 200% of the Medicare reimbursement rate (specifically, 178.8% to 240.3% of the Medicare reimbursement rate for Southern California and 188% to 311% of the Medicare

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -52-

reimbursement rate for Northern California).  In actuality, however, the "usual fee" paid for services by RIC is much less than 200% of the Medicare reimbursement rate.  Specifically, RIC typically charges (a) Medicare patients 80% of the Medicare rate (as a result of the routine waiver of co-payments), (b) HMO and other commercially insured patients 60% of its supposed "usual fee" (i.e., 120% of the Medicare reimbursement rate) or the amount on the insurer's fee schedule for such services, whichever amount is lower, thereby creating a circumstance in which RIC typically charges privately insured clients no more than 120% of the Medicare reimbursement rate and often considerably less than such amounts, and (c) cash paying patients less than 80% of the Medicare reimbursement rates.  In stark contrast, in certain instances, RIC charges Medi-Cal patients more than its purported "usual fee" -- that is, more than 200% of the Medicare reimbursement rate -- and RIC falsely reports its supposed "usual fee" to justify such charges to Medi-Cal.   For example, the rate Medicare reimburses for CPT 67028 in Southern California is $124.28.  If RIC followed its usual procedure, the "usual fee" would have been calculated as approximately $250.00. However, because Medi-Cal reimburses up to $364.11 for this code, RIC falsely listed its "usual fee" as $370.00 to obtain the maximum Medi-Cal reimbursement rate.  Moreover, RIC's calculation of its "usual fee," even if somehow otherwise legitimate (which it is not), is consistently inflated because it fails to account for the fact that RIC routinely waives Medicare co-payments and thereby overstates the true Medicare rate charged by RIC by 25% (80% ± 20%).

173.   In submitting claims for payment to Medi-Cal, each of the RIC Defendants and Providers certified that their services complied with California statutes and regulations.  Those certifications were false because, in certain

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -53-

instances, as detailed above, the RIC Defendants and Providers were, in fact, charging far lower fees to the general public (meaning Medicare patients, privately insured patients and cash paying patients) than the amounts they claimed for reimbursement for the rendering of the same services to Medi-Cal beneficiaries.

174.    Consequently, each claim for payment to Medi-Cal was a false claim in violation of California's False Claims Act (Gov. Code §12650 *et seq.*).  The payments received by the RIC Defendants on account of such false claims from 2006 through 2012 total $1,233,356.78.  The RIC Defendants continue to receive payments from Medi-Cal for false claims.

175.    The RIC Defendants are legally responsible for all legal violations arising from the discriminatory billing practices detailed above.

**B.    Violations of the California Insurance Frauds Prevention Act**

176.    The California Insurance Frauds Prevention Act ("CIFPA") creates civil liability for any person who violates sections 549, 550, or 551 of the California Penal Code. Cal. Ins. Code §1871.7(b).  This statute was intended, in particular, to reach health insurance fraud, Cal. Ins. Code Sec. 1871(h).  Any person may bring a civil action under the Act on behalf of themselves and the State of California, so long as the action is brought in the name of the State of California, Cal. Ins. Code §1871.7(e)(1).

177.    The California Penal Code Sec. 550 provides, in relevant part:

(a)     It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:

(1)     Knowingly present or cause to be presented any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT     -54-

* * *

(6)     Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.

* * *

(9)     Knowingly present for payment any undercharges for health care benefits on behalf of a specific claimant unless any known overcharges for health care benefits for that claimant are presented for reconciliation at that same time.

(10)    For purposes of paragraphs (6) and (9), inclusive, a claim or a claim for payment of a health care benefit also means a claim or claim for payment submitted by or on the behalf of a provider of any workers' compensation health benefits under the Labor Code.

(b)     It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:

(1)     Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(2)     Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -55-

178. Approximately one-third of the RIC patients had commercial insurance coverage for the services provided by RIC. The contracts between the RIC Defendants and commercial insurance carriers, including but not limited to Empire Blue Cross/Blue Shield, Cigna and United Healthcare, require that the patient be charged and pay a deductible and/or a co-payment before a benefit is payable under the plan.

179. However, as detailed above, Defendants routinely waived co-payments and deductibles for patients with commercial insurance as well. Waivers of co-payments and deductibles were regularly and commonly made for patients who had commercial insurance coverage. When submitting claims to commercial carriers for these patients, the RIC Defendants and Providers listed the co-payment amounts and actually or impliedly represented that they were charging the required co-payments or deductibles, when they were not. The RIC Defendants routinely engaged in this practice of waiving the co-payments of patients with commercial insurance at all pertinent times. For example, for patient, NP, 3 HealthNet copayments were waived by Dr. Chang between April, 2011 and October, 2012; for patient, KL, 3 Blue Cross insurance co-payments were waived by an RIC Physician between May and October, 2012; and for patient MH, Dr, Chang waived two Pacific & Regal co-payments between March, 2011 and August, 2012.

180. Each of the claims for payment that the RIC Defendants presented or caused to be presented to insurers that failed to reveal the waiver of co-payments and deductibles, or that failed to disclose their true usual charges for the services listed, contained false and misleading information about material facts.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT       -56-

181.   The RIC Defendants are legally responsible for all legal violations arising from the insurance fraud detailed above.

C.   **Violation of the California Business and Professions Code Sec. 654.2**

182.   Section 654.2 of the California Professions and Business Code states:

It is unlawful for any person licensed under this division or under any initiative act referred to in this division to charge, bill, or otherwise solicit payment from a patient on behalf of, or refer a patient to, an organization in which the licensee, or the licensee's immediate family, has a significant beneficial interest, unless the licensee first discloses in writing to the patient, that there is such an interest and advises the patient that the patient may choose any organization for the purpose of obtaining the services ordered or requested by the licensee.

183.   The Attorney General of California, in opining on this section, noted that "what is absolutely essential to their fulfilling the statute's requirement, however, is that they alert the patient to the practitioner's interest in a comprehensible way and at a time before the actual referral takes place."  68 Ops Calif. Atty. Gen. 140.

184.   There is no sign posted at an RIC office which reveals that the RIC Defendants have an ownership interest in the San Gabriel Surgery Center.

185.   Patients are given a brochure which states "The ownership for San Gabriel Ambulatory Surgery Center may be obtained by contacting the center at (626) 300-5300."

186.   As described above, when one calls (626) 300-5300 to learn who owns SG-ASC, the individuals at the center who respond to the call cannot

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -57-

provide any information about the ownership of that facility nor can they identify anyone who could do so.

187.   RIC patients and CEES patients who require surgery are not advised that they may have services performed at another facility nor are they given the names of specific alternative facilities or information as to where a listing of them might be obtained.

188.   The RIC Defendants and CEES submit claims to Medi-Cal for services they perform at the San Gabriel Surgery Center.  San Gabriel Surgery Center also submits claims to Medi-Cal for the use of its facilities and nursing services by patients referred by RIC and CEES.  Likewise, no disclosure is made by RIC or CEES regarding common ownership with respect to RICX.

189.   In submitting their claims, RIC, CEES and San Gabriel Surgery Center expressly and impliedly certify that they have complied with state law and that the information on the claim is accurate, complete and does not conceal a material fact.

190.   As a result of the failure of RIC, CEES and SG-ASC to comply with Sec. 654.2 of the California Professions and Business Code, each claim submitted to Medi-Cal by Defendants is false and fraudulent.

191.   The RIC Defendants, CEES and SG-ASC are legally responsible for all legal violations arising from the fraudulent practices detailed above.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT       -58-

**COUNT I**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(1986) and**
**31 U.S.C. § 3729(a)(1)(A)&(C)(2009)**

192.   Plaintiffs-Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth herein.

193.   Defendants knowingly submitted and caused the submission of false or fraudulent claims for payment or approval for medical services to officials of the United States Government in violation of 31 U.S.C. §3729(a)(1)(1986), and 31 U.S.C. §3729(a)(1)(A)(2009) and/or conspired to commit such acts or omissions in violation of 31 U.S.C. §3729(a)(1)(C)(2009).

194.   By virtue of the false or fraudulent claims that Defendant presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

**COUNT II**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)&(C)(2009)**

195.   Plaintiffs-Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth herein.

196.   Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the United States Government in violation of 31 U.S.C. §3729(a)(1)(B)(2009) and/or conspired to commit such acts or omissions in violation of 31 U.S.C. §3729(a)(1)(C)(2009).

197.   By virtue of the false or fraudulent claims that Defendants made, used or caused to be made or used, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -59-

1
2

**COUNT III**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(C)&(G)(2009)**

3      198.   Plaintiffs-Relators repeat and re-allege each and every allegation

4   contained in the paragraphs above as if fully set forth herein.

5      199.   Defendants knowingly concealed or knowingly and improperly

6   avoided or decreased an obligation to pay or transmit money to the United States

7   in violation of 31 U.S.C. §3729(a)(1)(G) and/or conspired to commit such acts or

8   omissions in violation of 31 U.S.C. §3729(a)(1)(C)(2009)..

9
10

**COUNT IV**
**California False Claims Act**
**Cal. Gov't Code § 12651(a)(1) and (a)(2)**

11      200.   Plaintiffs-Relators repeat and re-allege each and every allegation

12   contained in the paragraphs above as though fully set forth herein.

13      201.   By virtue of the acts described above, Defendants knowingly

14   submitted to officers, employees or agents of the State of California, false or

15   fraudulent claims for payment or approval.

16      202.   By virtue of the acts described above, Defendants knowingly made,

17   used, or caused to be made or used, false records or statements to the California

18   State Government to obtain payment from the State of California for false or

19   fraudulent claims.

20      203.   By reason of the acts of Defendants, the State of California has

21   suffered actual damages and is entitled to recover treble damages and a civil

22   penalty for each false or fraudulent claim.

23
24
25
26
27
28

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -60-

**COUNT V**
**California Insurance Code Sec. 1871.7(b)**
**and California Penal Code Sec. 550**

204.    Plaintiffs-Relators repeat and re-allege each and every allegation contained in the paragraphs above as though fully set forth herein.

205.    By virtue of the acts described above, the RIC Defendants knowingly made or caused to be made false or fraudulent claims for payment of a health care benefit.

206.    By virtue of the acts described above, the RIC Defendants knowingly make or assist or cause to be presented written statements in support of claims for payment pursuant to an insurance policy, knowing that the statements contain false or misleading information concerning material facts.

207.    By virtue of the acts described above, the RIC Defendants knowingly make or assist in the preparation or making of written statements that are intended to be presented to an insurer in connection with or in support of claims and payments pursuant to an insurance policy, knowing that such statements contain false or misleading information concerning material facts.

208.    By virtue of the acts of the RIC Defendants, the State of California has suffered actual damages and is entitled to recover treble damages as well as civil penalties or each claim for compensation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs-Relators, on behalf of the United States and the State of California, demand that judgment be entered in their favor and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.  This includes, with respect to the

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT      -61-

federal False Claims Act, three times the amount of damages to the Federal Government plus civil penalties of no more than Eleven Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim on or before November 2, 2015 and civil penalties of no more than Twenty-One Thousand Five Hundred and Sixty-Three Dollars ($21,563.00) and not less than Ten Thousand Seven Hundred and Eighty-One Dollars ($10,781.00) for each false claim after November 2, 2015, and any other recoveries or relief provided for under the Federal False Claims Act.

Plaintiffs-Relators also request that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of California has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Cal. Govt. Code §12651(a).

Plaintiffs-Relators additionally request that this Court enter judgment against Defendants for a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than three times the amount of each claim for compensation submitted in violation of the California Insurance Frauds Prevention Act, Cal. Ins. Code Sec. 1872.7(b).

Finally, Plaintiffs-Relators request that they receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States and the State of California, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Plaintiffs-Relators request that their award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

CIVIL ACTION NO.:
2:13-cv-3772-DMG (MRWx)
THIRD AMENDED COMPLAINT        -62-

1

## DEMAND FOR JURY TRIAL

2     Plaintiffs-Relators hereby demand a jury trial with respect to all issues so

3  triable pursuant to Fed.R.Civ.P. 38 on all counts.

4  Dated: August 15, 2017              Respectfully submitted,

5                                      SHEPHERD, FINKELMAN, MILLER
                                        & SHAH, LLP
6
                                       /s/ Kolin C. Tang
7                                      Kolin C. Tang
                                       11755 Wilshire Boulevard, 15th Floor
8                                      Los Angeles, CA 90025
                                       Phone: (323) 510-4060
9                                      Facsimile: (866) 300-7367
                                       Email:  ktang@sfmslaw.com
10
                                       James E. Miller
11                                     Laurie Rubinow
                                       Shepherd Finkelman Miller
12                                      & Shah, LLP
                                       65 Main Street
13                                     Chester, CT 06412
                                       Telephone: (860) 526-1100
14                                     Facsimile: (866) 300-7367
                                       Email: jmiller@sfmslaw.com
15                                            lrubinow@sfmslaw.com

16                                     Monique Olivier
                                       Duckworth Peters Lebowitz Olivier, LLP
17                                     100 Bush Street, Suite 1800
                                       San Francisco, CA 94104
18                                     Telephone (415) 433-0333
                                       Fax: (415) 449-6556
19                                     Email: monique@dplolaw.com

20                                     *Attorneys for Plaintiffs-Relators*

21

22

23

24

25

26

27  CIVIL ACTION NO.:
    2:13-cv-3772-DMG (MRWx)
28  THIRD AMENDED COMPLAINT       -63-