Mark Hardiman (SBN 136602)
Salvatore Zimmitti (SBN 245678)
Jonathan Radke (SBN 257324)
**NELSON HARDIMAN LLP**
11835 West Olympic Boulevard, Suite 900
Los Angeles, CA 90064
Telephone:    (310) 203-2800
Facsimile:    (310) 203-2727
mhardiman@nelsonhardiman.com
szimmitti@nelsonhardiman.com
jradke@nelsonhardiman.com

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and STATE OF CALIFORINA, *ex rel* BOBBETTE A. SMITH and SUSAN C. ROGERS, <br><br> Plaintiffs, <br><br> v. <br><br> TOM S. CHANG, M.D., TOM S. CHANG, M.D., INC., MICHAEL A. SAMUEL, M.D., MICHAEL J. DAVIS, M.D., RETINA INSTITUTE OF CALIFORNIA MEDICAL GROUP, CALIFORNIA EYE AND EAR SPECIALISTS, BRETT BRAUN and SAN GABRIEL AMBULATORY SURGERY CENTER LP, <br><br> Defendants. | Case No.:  2:13-cv-3772-DMG (MRWx) <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS RELATORS' THIRD AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF PROCEDURE 12(B)(6) AND 9(B); MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> **[Filed concurrently with Defendants' Request for Judicial Notice]** <br><br> Date:    October 6, 2017 <br> Time:    9:30 a.m. <br> Court:    8C |

TO THE HONORABLE COURT AND ALL PARTIES AND THEIR

COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on October 6, 2017, at 9:30 a.m., or as soon

thereafter as the matter shall be heard, before the Honorable Dolly M. Gee, United

States District Judge, in Courtroom 8C of the United States Courthouse, located at

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

364870.1

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

350 West 1st Street, Los Angeles, CA, 90012, Defendants Tom S. Chang, M.D., Tom S. Chang, M.D., Inc., Michael A. Samuel, M.D., Michael J. Davis, M.D. (collectively the "RIC Partners"), Brett Braun, Retina Institute of California Medical Group ("RIC" and collectively with RIC Partners as "RIC Defendants"), California Eye and Ear Specialists ("CEES"), and San Gabriel Ambulatory Surgery Center LP ("SG-ASC," and collectively "Defendants"), by and through their attorneys of record, will and hereby do move the Court for an order dismissing six claims or theories of liability in the Third Amended Complaint of Relators Bobbette A. Smith and Susan C. Rogers, alleging violations of the federal False Claims Act, 31 U.S.C. §§ 3729 et seq., ("FCA"), the California False Claims Act, Cal. Gov. Code§§ 12650 et seq. ("CA- FCA"), and the California Insurance Frauds Prevention Act, Cal. Insurance Code § 1871.7 ("CA-IFPA"), for failure to state a claim and to allege fraud with sufficient particularity pursuant to Federal Rules of Civil Procedure Rule 12(b)(6) and 9(b).

This motion is based on the accompanying memorandum of points and authorities, Defendants' request for judicial notice and the declaration of Salvatore Zimmitti filed concurrently herewith, the files and records in this case, upon such matters as the Court may take judicial notice, and on such further evidence and argument as may be presented at any hearing of this motion.

This motion is made following discussions by counsel for the parties, pursuant to Local Rule 7-3, which took place via telephone on August 28, 2017.

Dated:  September 5, 2017          Respectfully submitted,

                                  NELSON HARDIMAN LLP


                                  By: */s/ Mark Hardiman*
                                      Mark Hardiman


                                  Attorneys for Defendants

364870.1

**DEFENDANTS' MOTION TON DISMISS RELATORS' THIRD AMENDED COMPLAINT**

NELSON HARDIMAN LLP

11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

By their instant motion ("Motion"), Defendants seek an order dismissing six theories of FCA, CA-FCA, or CA-IFPA liability alleged in the Third Amended Complaint ("TAC") of relators Bobbette A. Smith and Susan C. Rogers ("Relators") that this Court previously dismissed as alleged in their Second Amended Complaint ("SAC") for failure to state a claim and to allege fraud with particularity pursuant to Federal Rules of Civil Procedure ("Rule") 12(b)(6) and 9(b) on the ground that Relators' revised allegations have failed to cure the legal and factual deficiencies identified by the Court's July 25, 2017 dismissal order. *See* Clerk's Record ("CR") 97.   Accordingly, these six FCA, CA-FCA, or CA-IFPA theories of liability should again be dismissed, but this time without leave to amend.

## II.   FACTUAL BACKGROUND

On August 15, 2017, Relators filed their TAC on behalf of the United States and the State of California, alleging that RIC, an ophthalmology group specializing in retina diseases, the RIC Partners, who owned and operated RIC, Braun, RIC's CEO, CEES, an ophthalmology practice owned by Dr. Chang, and SG-ASC, an ambulatory surgery center in which the RIC Partners allegedly have investment interests, submitted false claims to the Medicare and Medi-Cal programs and to commercial insurance plans for providing medical care to patients.   (Clerk's Record ("CR") 98; TAC ¶¶ 1-5, 192-208).[1]

---

[1] In accordance with the FCA and CA-FCA, the United States and the State of California previously investigated Relators' allegations and declined to intervene. (CR 36, 38).

364870.1

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

1    By its July 25, 2017 order, this Court found that six of Relators' theories of

2    FCA, CA-FCA, or CA-IFPA liability alleged in their SAC stated valid claims,[2] but

3    dismissed the other six theories of liability for failure to state a claim or allege

4    fraud with sufficient particularity.  (*See* 7/25/17 Order (CR 97)).  Relators' TAC

5    has now re-alleged the six theories of liability that were previously dismissed by

6    this Court.

7    First, RIC and the RIC Partners allegedly violated the FCA by paying

8    kickbacks to physicians for patient referrals.  According to Relators, the RIC

9    Defendants routinely waived their Medicare patients' co-payment obligations and

10   engaged in aggressive marketing (overseen by Braun, RIC's CEO) of this routine

11   waiver to referring physicians in order to "induce" their Medicare patients to

12   choose RIC physicians.  (TAC ¶¶ 55-84).  The TAC identifies one referring

13   physician - Dr. Michael Rose, an ophthalmologist - who allegedly required RIC to

14   waive co-payments for his patients.  (TAC ¶ 72).  In addition, the RIC Defendants

15   allegedly provided physicians with remuneration in the form of free meals, drinks

16   and event tickets in order to "induce" them to refer Medicare patients to RIC.

17   (TAC ¶¶ 74, 76).  By way of examples, RIC physicians were allegedly involved in

18   56 marketing lunches and dinners with potential referral sources in September

19   2012, and the RIC Defendants also allegedly "arranged for" expensive free meals

20   for potential referral sources to be paid for by biotechnology companies and other

21

22   [2] The  theories of liability upheld by this Court and re-alleged by Relators' TAC

23   include FCA claims based (1) on the RIC Defendants' allegedly improper waivers
     of Medicare Part A deductibles and co-payments as improper remuneration to

24   Medicare patients (TAC ¶¶ 55-69); (2) RIC's allegedly improper co-marketing
     agreement with RIC Diagnostics ("RIC-DX") (TAC ¶¶ 85-97 ); (3) the RIC

25   Partners' Medicare Claims for allegedly "upcoded" office visits (TAC ¶¶ 113-129);
     (4) RIC's allegedly duplicate Medicare claims for Dr. Bhatti's services at Dr.

26   Kislinger' s clinic (TAC ¶¶ 148-152), and (5) CEES' Medicare claims for assistant
     surgeon services not performed (TAC ¶¶ 156-159), and a CA-FCA claim based on

27   (6) the RIC Partners' alleged failure to advise Medi-Cal patients of their ownership
     interest in SG-ASC. (TAC ¶¶ 103-106).  These six TAC claims are not the subject

28   of the instant motion to dismiss.

**DEFENDANTS' MOTION TON DISMISS RELATORS' THIRD AMENDED COMPLAINT**

364870.1

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

vendors. (TAC ¶¶ 77-78).[3]  In addition, RIC allegedly sponsored Okularfest, a continuing medical education program, paid all the program expenses of attending physicians, and also offered free gifts to program participants, including iPADs, gift cards and, in the case of 10 "lucky winners," free RIC-DX optometry testing services for a month. (TAC ¶¶ 78, 80).

Second, the RIC Partners, other RIC physicians, and CEES physicians, violated the FCA by allegedly making improper patient referrals to SG-ASC, an ambulatory surgery center in which the RIC Partners have "investment interests," without advising the referred patients of such interests. (TAC ¶¶ 101-102, 105). RIC and CEES physicians (other than the RIC partners) were allegedly required to refer patients to SG-ASC as a condition of their continuing employment. (TAC ¶ 102).  In addition, RIC patients were allegedly provided with a brochure that informed them that the ownership of SG-ASC could be verified by calling the center, but when an RIC employee called SG-ASC, no one at the center could provide that information. (TAC ¶¶ 105-106).  SG-ASC "financial records" also allegedly reflected that "a significant percentage of patients referred to SG-ASC (over 25%) were Medicare patients." (TAC ¶ 107).

Third, the RIC Partners violated the FCA by allegedly submitting Medicare claims for unnecessary indocyanine green angiography ("ICG") tests (CPT Code 92240) provided to patients with age-related macular degeneration ("AMD"). (TAC ¶¶ 130-132).  According to Relators, the RIC Partners' use of ICGs was not within the applicable standard of care and did not comply with the American Academy of Ophthalmology's practice guidelines standard of care because ICGs are "infrequently'" used to treat AMD. (TAC ¶¶ 135-136).  The ICGs were also

---

[3] The TAC includes a summary of an alleged expense report of Defendant Braun, listing 14 purported kickbacks, in the form of free meals, tickets, gifts and other expenditures (identified by date, expense, description, and referring practitioner) that were supposedly provided to physicians to induce referrals. (TAC ¶ 77).

364870.1

**DEFENDANTS' MOTION TON DISMISS RELATORS' THIRD AMENDED COMPLAINT**

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

medically unnecessary and worthless because the RIC Partners allegedly did not use these tests to make a diagnosis and the tests did not provide any medical data needed to treat AMD.  (TAC ¶ 135-136).[4]  A Department of Justice ("DOJ") expert also allegedly evaluated RIC's use of ICGs on Medicare patients and determined that ICGs were ordered for virtually every patient visit, 90.8% of tests were medically unnecessary, the diagnoses used to justify the ICG tests were falsified, and the ICG test results had no impact on the RIC Defendants' treatment decisions because the physicians did not rely on the ICG findings to treat AMD patients or to determine how often to see patients for injections.  (TAC ¶¶ 136, 138, 139, 141).

Fourth, as a voluntary participant in Medicare's Physician Quality Reporting System ("PQRS") for 2011, RIC was required to submit 12 months of data on quality measures in order to qualify for incentive payments, but the RIC Defendants allegedly violated the FCA by submitting false data to PQRS that was represented to be a full year, but was only for the last four months of 2011, and by also falsely certifying that 80% of the Medicare cases for each RIC Physician had been entered.  (TAC ¶¶ 161-164).  In October 2012, Medicare allegedly paid $60,000 to RIC based on the false and incomplete information submitted by RIC for the 2011 PQRS.  (TAC ¶ 165).  RIC also allegedly provided PQRS data for 2012 "for activities that had not actually occurred."  (TAC ¶ 163).  Relator Smith advised RIC Partners this payment should be returned, but they refused to do so.  (TAC ¶¶ 166-167).

---

[4] The RIC Partners would allegedly not order ICG tests for HMO patients because these health plans required prior authorization and would supposedly not have authorized such unnecessary tests.  (TAC ¶ 138).  In addition, the RIC Defendants allegedly emphasized the lucrative Medicare reimbursement paid for ICGs compared to optical coherence tomography ("OCT"), the standard test used to diagnose AMD, conditioned other RIC physicians' compensation and advancement on ordering these "worthless ICG tests," and also used a non-FDA approved "Brilliant Blue dye" for certain ICGs to save costs despite increased risks for their patients.  (TAC ¶¶ 132, 142, 144).

4

364870.1

Fifth, RIC and the RIC Partners also violated the CA-FCA by allegedly manipulating and falsifying the amount reported as RIC's "usual fee" for various services and charged Medicare, commercially insured, and cash paying patients fees that were lower than those charged to the Medi-Cal program for the same services thereby supposedly violating the Medi-Cal program's discriminatory billing rule. (TAC ¶¶ 171-172, 175).[5]

Finally, RIC, the RIC Partners, CEES and SG-ASC allegedly violated the CA-IFPA by routinely waiving the deductible and co-payments amounts that they were obligated to charge patients covered by commercial health plans (e.g., Empire BlueCross/Blue Shield, Cigna and United Healthcare) pursuant to the terms of their provider agreements with those plans and failing to disclose such waivers and the lower prices  charged to uninsured cash-paying patients in their claims to those plans.[6]  (TAC ¶¶ 178-180).  The TAC lists three examples (by patient initials, RIC physician, insurance and date range) of RIC patients with commercial insurance for whom co-payments were allegedly waived.  (TAC ¶ 179).

## III.   <u>STANDARDS OF REVIEW</u>

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may seek dismissal of a complaint for failure to state a claim upon which relief can be granted. A court may grant such a dismissal only where the plaintiff fails to present a cognizable legal theory or fails to allege sufficient facts to support a cognizable

---

[5]   The Medi-Cal program, administered by the California Department of Health Care Services, is California's implementation of the Medicaid program, a joint federal-state health care program through which the federal government provides financial assistance to states furnishing medical services to qualified indigent persons. (*See* 42 U.S.C. §§ 1396-1396v; Cal. Welf. & Inst. Code §§ 14000 et seq.; 22 C.C.R. §§ 50000 *et seq.*; *Physicians & Surgeons Laboratories, Inc. v. Department of Health Service*, 6 Cal.App.4th  968, 973 (1992)).

[6]  The Complaint also lists three examples (by patient initials, RIC physician, insurance and date range) of RIC patients with commercial insurance for whom co-payments were allegedly waived.  (TAC ¶ 179).

NELSON HARDIMAN LLP

11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

364870.1

**DEFENDANTS' MOTION TON DISMISS RELATORS' THIRD AMENDED COMPLAINT**

1 legal theory. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041

2 (9th Cir. 2010) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).

3    To survive a Rule 12(b)(6) motion, a complaint must articulate "enough

4 facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

5 *Twombly*, 550 U.S. 544, 570 (2007). Although a pleading need not contain

6 "detailed factual allegations," it must contain "more than labels and conclusions"

7 or "a formulaic recitation of the elements of a cause of action." *Id.* at 555 (citing

8 *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "A claim has facial plausibility

9 when the plaintiff pleads factual content that allows the court to draw the

10 reasonable inference that the defendant is liable for the misconduct alleged."

11 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In evaluating the sufficiency of a

12 complaint, courts must accept all factual allegations as true. *Iqbal*, 556 U.S. at 678

13 (citing *Twombly*, 550 U.S. at 555). Legal conclusions, in contrast, are not entitled

14 to the assumption of truth. *Id.*

15    Federal Rule of Civil Procedure 9(b) requires that the circumstances

16 constituting fraud be plead with particularity.  Because an FCA claim alleges

17 fraud, the Rule 9(b) heightened pleading standard applies. *Cafasso, U.S. ex rel. v.*

18 *Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011); *see Vess v.*

19 *Giba-Ceigy Corp.*, 317 F.3d 1097, 1103 (9th Cir. 2003) (Rule 9(b) also applies to

20 state-law causes of action alleging fraud). To adequately plead fraud with

21 particularity, a party must identify "the who, what, when, where, and how of the

22 misconduct charged." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir.

23 2010) (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)).

24 "[A]llegations of fraud must be 'specific enough to give defendants notice of the

25 particular misconduct which is alleged to constitute the fraud charged so that they

26 can defend against the charge and not just deny that they have done anything

27 wrong.'" *U.S. v.United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016)

28

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

364870.1

6

1   (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)). In this

2   Circuit, a relator need not "identify representative examples of false claims to

3   support every allegation." *Id.* (quoting *Ebeid*, 616 F.3d at 998). Rather, "it is

4   sufficient to allege particular details of a scheme to submit false claims paired with

5   reliable indicia that lead to a strong inference that the claims were actually

6   submitted." *Id.* (quoting *Ebeid*, 616 F.3d at 998–99).

7   **IV.   ARGUMENT**

8      **A.   THE COMPLAINT FAILS TO STATE VALID FEDERAL FCA**
       **CLAIMS BASED ON KICKBACKS TO REFERRING**
9      **PHYSICIANS, FAILURE TO DISCLOSE AN OWNERSHIP**
       **INTEREST IN SG-ASC, UNNECESSARY ICGS, AND FALSE**
10     **PQRS DATA**

11     The TAC alleges three counts for FCA violations based on Defendants (1)

12  knowingly presenting a false or fraudulent claim for payment for medical services

13  to the U.S. Government in violation of 31 U.S.C. section 3729(a)(1)(A); (2)

14  knowingly making or using a false statement material to the false or fraudulent

15  claim to the U.S. Government in violation of 31 U.S.C. section 3729(a)(1)(B); and

16  (3) knowingly concealing or improperly avoiding or decreasing an obligation to

17  pay or transmit money to the United States in violation of 31 U.S.C. section

18  3729(a)(1)(G).  TAC ¶¶ 192-199.

19     As detailed below, Relators' TAC still fails to state a valid FCA claim

20  against any of the defendants based on their alleged kickbacks to referring

21  physicians for Medicare patient referrals, their failure to disclose an ownership

22  interest in SG-ASC, their Medicare claims for unnecessary ICGs, and their

23  submission of false data to the Medicare PQRS, either as a matter of law or

24  because the alleged fraud is not pleaded with the required factual particularity.

25     **1.     Alleged FCA Claims Arising from AKS Violations**

26     As previously noted by this Court, the Anti-Kickback Statute ("AKS")

27  forbids, *inter alia*, any person or entity from knowingly and willfully offering,

28

NELSON HARDIMAN LLP

11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

364870.1

7

paying, soliciting, or receiving any remuneration to influence either the referral or the arrangement of services reimbursable by a federal healthcare program. 42 U.S.C. § 1320a-7b(b). Courts have broadly defined "remuneration," interpreting it to mean "anything of value." *U.S. ex rel. McDonough v. Symphony Diagnostic Servs., Inc.*, 36 F. Supp. 3d 773, 777 (S.D. Ohio 2014) (quoting *Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622 (N.D. Ill. 2006)); *see also Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995) ("Congress introduced the broad term 'remuneration' . . . to clarify the types of financial arrangements and conduct to be classified as illegal under Medicare and Medicaid. The phrase 'any remuneration' was intended to broaden the reach of the law which previously referred only to kickbacks, bribes, and rebates." (citation omitted)); Medicare & State Health Care Programs: Fraud & Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952-01, 35958 (July 29, 1991) (codified at 42 C.F.R. pt. 1001) ("Congress's intent in placing the term 'remuneration' in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever.").

Any Medicare claim that includes services delivered in violation of the AKS constitutes a false claim within the meaning of the FCA. 42 U.S.C. § 1320a-7b(g). In this case, Relators argue that Defendants violated AKS, and thus the FCA, by marketing their routine waiver of co-payments and otherwise providing illegal remuneration to physicians in exchange for Medicare patient referrals, and by failing to disclose the RIC Partners' ownership interest in SG-ASC.

a.     **Rule 9(b) Failure to Allege Kickbacks to Physicians.**

In its July 25, 2017 order, the Court ruled that Relators had adequately alleged FCA violations based on Defendants' routine waivers of copayments or deductibles as remuneration to *patients*, but dismissed their related FCA claim that such waivers were also remuneration to referring *physicians* because the benefit of such waiver accrued to the patients, not the physician. 7/25/17 Order at 12. In

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

364870.1

8

**DEFENDANTS' MOTION TON DISMISS RELATORS' THIRD AMENDED COMPLAINT**

finding that "Relators have not sufficiently alleged the referring physicians' receipt of payment or other remuneration in exchange for referrals," the Court also observed that Relators' mention of "monthly dinners and lunches and a large continuing education program" failed to support to state a claim under the AKS and FCA because "there are no allegations as to who paid for those meals or whether the education program was free for all attendees." *Id*.

Initially, the TAC continues to allege that "the Medicare co-payment waivers" were "one of the inducements" "for possible patient referral." (*See* TAC ¶ 80; *id*. ¶ 74 ["Defendants knowingly and routinely waived co-payments...to attract new Medicare patients and receive referrals from other eye care physicians"), but contains no new allegations explaining how such waivers constituted remuneration to the physicians.  Accordingly, Defendants' motion to dismiss should be granted as to this FCA theory of liability based on this Court's prior determination that such waivers did not constitute remuneration to the referring physicians.

In addition, the TAC now alleges that Defendants provided remuneration to induce patient referrals from physicians and others in the form of "free" lunches and dinners (TAC ¶ 76), drinks and tickets to events and other gifts (*id*. ¶ 77), dinners paid for by third party biotechnology companies and other vendors (*id*. ¶ 78), and a continuing medical education program called Okularfest, in which certain gifts or prizes, including free services from RIC-DX for one month, were allegedly offered to "targets for possible patient referral." (*Id*. ¶ 80).   While Relators now detail various categories of alleged remuneration to physicians, the allegations fall far short of meeting the "who, what, when and how" requirements of Rule 9(b) with respect to an alleged scheme to illegally pay or reward physicians for patient referrals.

In particular, the AKS does not prohibit RIC from marketing its services to physicians and other referral sources, or spending money to do so. While RIC's

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

free dinners, drinks, event tickets or other unspecified gifts for potential referral sources certainly constitute remuneration, the TAC contains no factual allegations plausibly establishing that such remuneration was illegally intended to "induce" physicians or others to refer their patients to RIC.  In this Circuit, RIC can "encourage" physicians to refer patients through free marketing dinners and events without crossing the line into illegal inducement.  *See Hanlester Network*, 51 F.3d at 1398 ("mere encouragement" does not violate the AKS.)   As a matter of plausibility, Defendants' payment for a single dinner and drinks with a potential referral source is insufficient by itself to constitute an illegal inducement, that is, evidencing Defendants' "intent to exercise influence over the reason or judgment of another in an effort to cause the referral of program-related business." *Id.*[7]

In this case, other than providing a laundry list of non-monetary remuneration allegedly provided by Defendants as part of RIC's marketing to potential referral sources, the TAC otherwise contains no factual allegations establishing that such remuneration did, or was intended to, induce patient referrals.  Instead, Relators' allegations at best suggest that RIC's marketing plan targeted physicians broadly without any connection between the remuneration provided and whether any patient referrals actually occurred.   For example, Relators fail to allege that physicians only received free dinners and drinks or a free "Okularfest" program invitation if they referred patients to RIC, or that such

---

[7] For example, under the Stark Act, which generally prohibits a physician from referring Medicare patients to entities in which the physician has a financial interest, *see* 42 U.S.C. § 1395nn(a)(1), an exception allows an entity to provide up to $300 (adjusted for inflation) a year in non-monetary compensation to a referring physician without violating that statute so long as such compensation is not solicited by the physician, does not take into account the volume or value of any referrals, and does not otherwise violate the AKS.  *See* 42 C.F.R. § 411.357(k). This statutory exception reflects CMS's view that "such compensation is unlikely to cause overutilization, if held within reasonable limits."  66 Fed. Reg 856, 920 (Jan 4, 2001).

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

364870.1

10

**DEFENDANTS' MOTION TON DISMISS RELATORS' THIRD AMENDED COMPLAINT**

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

1   remuneration was in any way based on the volume or value of such referrals.

2   Indeed, the TAC does not identify a single patient referral by a specific doctor that

3   was illegally induced by Defendants' marketing efforts, let alone describe the

4   amount of remuneration received by any particular physician. *See* TAC ¶ 76-77,

5   80. Nor do Relators provide any factual support for their bald and implausible

6   allegation that Defendants somehow "arranged" for unidentified biotechnology

7   companies and "other venders" to pay for meals and training for physicians in an

8   effort to induce referrals to RIC, rather to the vendors themselves. (TAC ¶ 78).

9        In sum, while Relators' allegations regarding remuneration are quite

10   specific, they do not satisfy Rule 9(b)'s requirement for an FCA claim premised on

11   an AKS violation because they do describe which specific physicians were the

12   subject of illegal inducement or whether any illegal Medicare patient referrals

13   actually occurred as a result of RIC's marketing efforts. See *U.S. ex rel. Parikh v.*

14   *Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 674-5 (S.D. Tex. 2013) (relator's

15   allegations that physicians received free conference trips, discounted rent and free

16   space, and free computers, EKG machines, flat screen televisions, and furniture

17   insufficient under Rule 9(b) absent any explanation of how alleged kickback

18   scheme worked).

19        **b.   Rule 9(b) Failure to Allege that Medicare Claims**
20        **Resulted From Illegal Referrals to SG-ASC Or That**
             **RIC and CEES Physicians Were Offered Anything of**
21        **Value to Refer Patients to the Center.**

22        This Court's July 25, 2017 order also found that that Relators had adequately

23   alleged an FCA theory of liability based on the RIC Partners' failure to disclose

24   their ownership interest in SG-ASC to Medicare patients that they referred to the

25   center, but dismissed the claim on the ground that Relators had provided

26   insufficient information regarding such patient referrals and any resulting Medicare

27   claims. 7/25/17 Order at 15. This Court also dismissed the FCA claim as it related

28

364870.1

**DEFENDANTS' MOTION TON DISMISS RELATORS' THIRD AMENDED COMPLAINT**

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

1    to other RIC and CEES physicians who referred patients to the center on the

2    ground that there were no "allegations that the RIC Defendants offered or paid RIC

3    and CEES referring physicians anything of value in exchange for referrals to SG-

4    ASC, or as a condition of employment." *Id.*

5          The TAC again fails to include sufficient factual allegations regarding the

6    identity of Medicare patients illegally referred to SG-ASC and the resulting

7    submission of Medicare claims for center services that they received.  Relators'

8    only new allegations are that "the financial records of SG-ASC reflect that a

9    significant percentage of patients referred to SG-ASC (over 25%) were Medicare

10   patients" and "a number of claims were submitted for reimbursement to Medicare

11   …for services provided at SG-ASC."  TAC ¶ 107.  However, these allegations fail

12   to logically or plausibly tie SG-ASC's treatment of Medicare patients to allegedly

13   illegal referrals made by the RIC partners or other RIC or CEES physicians.  In

14   particular, the TAC does not allege that SG-ASC only treated patients referred by

15   RIC or CEES physicians.  Unless this was the case, the fact that over 25% of SG-

16   ASC's patients were Medicare beneficiaries for whom Medicare claims were

17   submitted does not support any reasonable inference that some of them must have

18   been illegally referred by RIC or CEES physicians, as opposed to other referral

19   sources.  Instead, as before, the TAC contains "simply too little information about

20   the [Medicare] referrals made and the [Medicare] claims submitted to comply with

21   the particularity requirements of the Federal Rules of Civil Procedure."  7/25/15

22   Order at 15.  Accordingly, this FCA claim must be dismissed pursuant to Rule

23   9(b).

24         The TAC also seeks to resurrect this FCA claim as to other RIC and CEES

25   physicians by simply parroting the Court's order and adding an allegation those

26   physicians were "required to refer patients to SG-ASC as a condition of their

27   continuing employment."  TAC ¶ 102.  However, under Rule 9(b), something more

28

364870.1

**DEFENDANTS' MOTION TON DISMISS RELATORS' THIRD AMENDED COMPLAINT**

1    than this bald factual conclusion is required to state a valid FCA claim.  Here, the

2    TAC contains no factual allegations explaining how RIC and CEES were

3    "required" to refer patients to SG-ASC, whether as "a condition of their continuing

4    employment" or otherwise.   In particular, Relators do not identify any written or

5    oral communications by Defendants to these physicians regarding this alleged

6    referral requirement.   Nor does the TAC identify a specific instance where a RIC

7    or CEES physician referred a patient to SG-ASC as a result of this supposed

8    employment requirement or was disciplined or reprimanded for failing to do so.

9    Relators' failure to plead anything beyond the naked conclusion that referring

10   cases to SG-ASC was a "condition" of employment does not satisfy Rule 9(b)'s

11   particularity requirement.  Thus, this FCA claim must again be dismissed.

## 2.   Rule 9(b) Failure to Allege Medicare Claims For Medically Unnecessary and Worthless ICGs.

In its July 25, 2017 order, this Court also dismissed Relators' FCA claim based on RIC's Medicare claims for ICG tests (CPT Code 92240) that were allegedly medically unnecessary because of Relators' failure "to allege a critical component of this type of FCA claims*:  why the ICG tests are medically unnecessary* - as opposed to that they are more lucrative, riskier, or not the normal standard of care." 7/25/17 Order at 17.

The TAC re-pleads this FCA claim by now characterizing RIC's claimed ICGs as being both unnecessary and worthless.  TAC ¶¶ 135-136, 140.   As previously noted by this Court, Medicare claims for medically unnecessary services can be actionable under the FCA, but must be based on something more than an alleged failure to abide by a particular standard of care.  *See* 7/25/17 order at 17-18, citing *Frazier ex rel. U.S. v. Iasis Healthcare Corp.*, 392 F. App'x 535, 537 (9th Cir. 2010); *Maa v. Ostroff*, No. 12-cv-00200-JCS, 2013 WL 1703377, at *20 (N.D. Cal. April 19, 2013).   In addition, FCA liability may arise if a Medicare provider submits claims for "medically worthless tests," *see U.S. ex rel. Lee v.*

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

364870.1

**DEFENDANTS' MOTION TON DISMISS RELATORS' THIRD AMENDED COMPLAINT**

*SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001), but this theory requires a relator to allege not merely that a service was of poor quality or could have been performed better, but that "the performance of the service is so deficient that for all practical purposes it is the equivalent of no performance at all." *Mikes v. Straus*, 274 F.3d 687, 697 (2nd Cir. 2001) *abrogated on other grounds*, *Universal Health Services v. U.S. ex rel. Escobar*, 136 S. Ct. 1989 (2016); *U.S. ex rel. Absher v. Momence Meadows Nursing Center, Inc.*, 764 F.3d 699, 709-710 (7th Cir. 2014); *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468-469 (6th Cir. 2011).

In this case, the TAC's effort to explain why RIC's ICGs were medically unnecessary is again predicated on Relators' primary allegation that RIC's use of ICGs to diagnose and treat AMD does not conform to the applicable standard of care annunciated by American Academy of Ophthalmology – which allegedly recommends Optical Coherence Tomography ("OCT"), and, if indicated, Fluorescein Angiography ("FA") – including because "the routine use of ICG in evaluating and treating AMD is not supported by scientific studies" and "provides no medically necessary data for the AMD treatment method."   TAC ¶¶ 135-136, 140.   Thus, based on an allegation that ICGs provide no medical data needed to treat AMD, Relators conclude that the ICGs performed on Medicare AMD patients were not used by RIC physicians to diagnose and treat such patients and were therefore medically unnecessary and worthless.  TAC ¶¶ 135-136, 141.

However, in an FCA case premised on Medicare claims, the issue of whether ICGs are covered by the Medicare program as a medically necessary test to diagnose and treat AMD is determined by the Centers for Medicare and Medicaid Services ("CMS"), not Relators.  In particular, Medicare administrative contractors ("MAC"), tasked with processing and reviewing Medicare claims, are authorized to issue Local Coverage Determinations ("LCDs") specifying "under what clinical circumstances an item or service is considered to be reasonable and

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

364870.1

**DEFENDANTS' MOTION TON DISMISS RELATORS' THIRD AMENDED COMPLAINT**

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

necessary." *See* Medicare Program Integrity Manual ("MPIM") Pub. 100-08, Ch. 13, § 13.1.3; [8]  *see also US. ex rel. Modglin v. DJO Global Inc.*, 48 F.Supp.3d 1362, 1372-1373 (C.D. Cal 2014); *U.S. ex rel. Ryan v. Lederman*, 2014 WL 1910096, at *4 (E.D.N.Y. May 13, 2014) (LCDs are mandatory, not merely advisory); *U.S. v. Space Coast Medical Associates, L.L.P.*, 2015 WL 1456122, at *7 (M.D. Fla. Feb. 6, 2015) ("LCDs - issued by private local entities contracting with the government - set forth and govern the conditions of coverage and reimbursement under Medicare."); 42 U.S.C. § 1395ff(f)(2)(B).   Further, the "Medicare statute unambiguously vests final authority in the Secretary [of Health & Human Services], and no one else, to determine whether a service is reasonable and necessary, and thus whether reimbursement should be made." *State of NY. on Behalf of Bodnar v. Secretary of Health and Human Services*, 903 F.2d 122, 125 (2d Cir. 1990).

In this case, Noridian Healthcare Solution, LLC ("NHS"), the MAC for Jurisdiction E (including California) responsible for processing RIC's Medicare Part B ICG claims, issued an LCD (L33327) regarding coverage of ophthalmic angiography, including FAs and ICGs, effective for services performed after August 26, 2013.   NHS LCD, *Ophthalmic Angiography (Fluorescein and Indocyanine Green)* (LCD 33327) (effective 8/26/13, revised 9/1/2014).[9] Medicare LCD L33327 expressly covers ICGs as a medically necessary test (in addition to FAs) because they are "effective in the diagnosis and treatment of it ill-defined choroidal neovascularization (e.g., **associated with age related macular**

---

[8] The MPIM is available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs.html.

[9] *See* Defendants' Request for Judicial Notice in Support of Motion to Dismiss Third Amended Complaint ("RJN"), Exhibit A, filed concurrently herewith; *U.S., ex rel. Modglin v. DJO Global Inc.*, 114 F.Supp.3d 993, 1002 n.36  (C.D. Cal. 2015) (on motion to dismiss FCA complaint, taking judicial notice of LCD); *U.S ex rel. Groat v. Boston Heart Diagnostics Corp.*, 2017 WL 2533341 *6 fn. 7 (D.D.C. June 9, 2017) (same).

**DEFENDANTS' MOTION TON DISMISS RELATORS' THIRD AMENDED COMPLAINT**

**degeneration**)" and are "also useful in the evaluation of feeder vessels, choroidal leakages in the late phase, and ruptures of the pigment epithelium." LCD L33327 (emphasis added).   More specifically, Medicare covers ICGs as a "valuable diagnostic adjunct to fluorescein angiography" in the evaluation and treatment of retinal neovascularization, choroid neovascularization, serous detachment of retinal pigment epithelium, hemorrhagic detachment of retinal pigment epithelium, and retinal hemorrhage. *Id*. Further, this LCD provides that ICGs may be billed up to nine (9) times per eye each year, with claims exceeding this frequency being suspended and reviewed for medical necessity. *Id*.[10]   NHS's Medicare LCD coverage of ICGs in Southern California is largely identical with MAC coverage of such angiography in other Medicare jurisdictions.[11]   None of these Medicare LCDs exclude ICGs from coverage on the ground that this test is medically unnecessary and of no medical value in the diagnosis, treatment, and management of patients with wet AMD.

Given the Medicare program's coverage of ICGs as a medically necessary test to manage and treat symptoms of wet AMD (i.e., retinal and choroid neovascularization), Relators' allegations fail to state a valid FCA claim for the simple reason that their central allegation – ICGs have no medical value in treating Medicare patients with AMD – is conclusively refuted by  Medicare coverage of this test.   *Space Coast Medical Associates, L.L.P.,* 2015 WL 1456122 at *7-8 (relators failed to allege FCA violation where claimed radiation treatment

---

[10] LCD L33327 was "retired" effective September 30, 2015 due to the transition to ICD-10 diagnostic codes.  *See* RJN, Exhibit A. However, as noted by the MAC, "retirement does not mean that medical necessity has changed or that the LCD no longer reflects appropriate criteria. The guidance in the retired LCD may be helpful in assessing medical necessity."  RJN, Exhibit B.

[11] *See* CGS Administrators, LLC, *Ophthalmic Angiography (Fluorescein and Jndocyanine Green* (L31882) (updated on 5/8/2014); National Government Services, Inc., *Ophthalmic Angiography (Fluorescein and Indocyanine Green)* (L25347),  See RJN, Exhibits C and D.  All LCDs and LCAs are available at http://www.cms.gov/medicare-coveragedatabase/.

**DEFENDANTS' MOTION TON DISMISS RELATORS' THIRD AMENDED COMPLAINT**

NELSON HARDIMAN LLP

11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

364870.1

complied with cited LCDs and Medicare regulations). For the same reason, Relators' recitation of a DOJ expert's findings that 90.8% of RIC's CPT Code 99240 charges were "medically unnecessary" and that test results were not "used" by RIC physicians are simply unsupported conclusions absent any allegations anchoring these expert opinions to the LCD's relevant coverage criteria for ICGs. *See Frazier ex rel. U S. v. Iasis Healthcare Corp.,* 392 Fed. Appx. 535, 2010 WL 3190641, at *1 (9th Cir. 2010) (FCA complaint properly dismissed where relator's "allegations regarding medically unnecessary procedures were conclusory at best"); *US. ex rel. Thompson v. Columbia/ HCA Healthcare Corp.,* 125 F.3d 899, 903 (5th Cir. 1997) (FCA claim properly dismissed where relator failed to provide factual basis for allegation that hospital chain submitted claims for medically unnecessary services).[12]

In an effort to fill in the absence of any factual allegations establishing that the RIC were medically unnecessary under Medicare coverage standards, Relators variously allege that RIC physicians viewed ICGs as financially lucrative, cut back their costs by using a non-FDA approved "Brilliant Blue dye," disagreed with other physicians' views about the clinical utility of ICGs, and did not order ICGs for HMO patients. *See* TAC ¶¶ 137, 142-143, 144-145.[13] None of these allegations

---

[12] *See also Advanced Rehabilitation, LLC v. UnitedHealthgroup, Inc.,* 498 Fed. Appx. 173, 177 (3d Cir. 2012) (complaint dismissed where plaintiffs alleged no facts to demonstrate that therapy procedures were "medically necessary" for the particular patients who received them); *Illinois Farmers Ins. Co. v. Mobile Diagnostic Imaging, Inc.,* 2014 WL 4104789, at *12 (D. Minn. Aug. 19, 2014) ("Of course, the conclusory statement that the [MRI] scans were medically unnecessary is not entitled to the assumption of truth.")

[13] The TAC also refers to a Florida case in which a physician "listed those diagnoses (such as pigment epithelial detachment) with undue frequency, so he could repeatedly bill for the ICGs." TAC ¶ 146. In this case, other than alleging in conclusory fashion that the DOJ expert found that "the diagnoses used by the RIC Defendants to justify the ICG tests were falsified," TAC ¶ 141, Relators have failed to identify a single instance where Defendants used a false diagnosis to justify ICG testing. This is a significant omission given Relators' allegation that ICGs were used by RIC for Medicare patients with AMD, an LCD coverage condition that would appear to obviate the need for any false diagnoses as a medical justification.

NELSON HARDIMAN LLP

11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

364870.1

**DEFENDANTS' MOTION TON DISMISS RELATORS' THIRD AMENDED COMPLAINT**

NELSON HARDIMAN LLP

11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

1   establish that the RIC ICGs billed to the Medicare program were medically

2   unnecessary or worthless under the Medicare LCD coverage criteria.  In summary,

3   Relators' challenge to Defendants' ICG testing remains "a standard of care claim

4   in disguise, which the Ninth Circuit has held is not actionable." *Maa v. Ostroff*,

5   2013 WL 1703377, at *11 (N.D. Cal. Apr. 19, 2013).  Accordingly, this FCA

6   claim should be dismissed pursuant to Rule 9(b).

7           **3.**     **Rule 9(b) Failure to Allege Submission of False PQRS Data.**

8         In its July 25, 2017 order, the Court dismissed Relator's FCA claim based

9   on Defendants' submission of allegedly false PQRS data on several grounds. First,

10  the Court found that the "SAC does not establish that the RIC Defendants

11  submitted partial data but certified that such data reflected the 12-month period,"

12  because "if Defendants only had four months of data to submit, and they certified

13  that the information was complete, it is not clear to the court how such a

14  certification can amount to fraud." 7/25/17 Order at 20.  The Court also found that

15  Relators' allegation that the RIC Defendants unlawfully retained a $60,000 PQRS

16  payment was similarly deficient because it  was "not clear from the SAC that the

17  $60,0000 was an overpayment, as opposed to a reduced payment sent in light of

18  the reduced reporting months." *Id*.  Lastly, the Court found that "[t]he only factual

19  allegation related to the allegedly fraudulent 2012 submission is that 'certain of the

20  information reported was for activities that had not actually occurred,'" and this

21  allegation was too "vague and conclusory" to satisfy Rule 9(b). *Id*.

22        With respect to the 2012 PQRS submission, the TAC adds no new

23  allegations to cure Relators' prior failure to satisfy Rule 9(b) and this FCA claim

24  should therefore be dismissed without leave to amend.  As for RIC's 2011 PQRS

25  submission, the TAC now includes the conclusory statements that RIC falsely

26  "represented that it was for a full year (even though it was not) and falsely certified

27  that, for each of the reporting RIC Physicians, 80% of the Medicare cases had been

28

**DEFENDANTS' MOTION TON DISMISS RELATORS' THIRD AMENDED COMPLAINT**

364870.1

NELSON HARDIMAN LLP

11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

entered when they had not been entered." TAC ¶ 164. Relators also allege that the $60,000 received from Medicare was a result of these allegedly fraudulent 2011 PQRS representations. *Id.* at ¶ 165. However, these additional allegations are still insufficient to satisfy Rule 9(b)'s particularity requirement.

Critically, Relators fail to explain how these false representations were actually made. The details matter because the PQRS program submission requirements vary. For example, CMS guidance for the PQRS program in 2011 indicates that providers actually had the option to submit eligible data within "reporting periods" of 12 months or six months.[14] Further, data could be reported via Claims-Based Reporting, Registry-Based Reporting, EHR-based reporting, GPRO I-Based Reporting, and GRPO II-Based Reporting depending on the circumstances.[15] Relators make no mention of these reporting periods or which submission option applied here, leaving Defendants and the Court to speculate as to how the 2011 PQRS data was fraudulently represented.

Moreover, Relators' vague and simplistic allegations about the "data" applicable to a reporting period appear to confuse the PQRS concept of "reporting frequency" with the applicable reporting period, which is defined as "[t]he number of times QDCs [Quality-Data Code] specified for a quality measure must be submitted on claims during the reporting period."[16] This distinction is important because "[i]nstructions for some measures limit the frequency of reporting

---

[14] "The period during which Physician Quality Reporting measures are to be reported for covered professional services provided. 6-month (July 1, 2011 through December 31, 2011) or 12-month (January 1, 2011 through December 31, 2011) time periods are available depending upon the 2011 reporting option the eligible professional selects for submitting Physician Quality Reporting quality data." CMS 2011 *Physician Quality Reporting System (Physician Quality Reporting) Implementation Guide*, Definitions, at 13, available at https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/PQRS/Downloads/2011_PhysQualRptg_ImplementationGuide_03312011.pdf.

[15] *See id.*, Appendix C: 2011, *Physician Quality Reporting Participation Decision Tree*, p. 18.

[16] *Id.*, p. 12.

**DEFENDANTS' MOTION TON DISMISS RELATORS' THIRD AMENDED COMPLAINT**

364870.1

NELSON HARDIMAN LLP

11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

1    necessary in certain circumstances, such as for patients with chronic illness for
2    whom a particular process of care is provided only periodically."[17]    Again,
3    Relators do not begin to explain whether four months of data may have satisfied
4    Defendants' reporting requirements for "chronic illness."

5         Also tossed into the TAC without any discussion, context or detail is
6    Relators' new allegation that RIC falsely represented that "80% of the Medicare
7    cases" had been entered into PQRS system.   TAC ¶¶ 164-165.   However, like their
8    other allegations, Relators fail to explain how the 80% requirement works, when it
9    applies, how it is material to PQRS payments, and what actual percentage (if not
10   80%) of Medicare cases was falsely reported by RIC. Defendants and this Court
11   should not be left to speculate.  Relators' PQRS allegations do not satisfy Rule 9(b)
12   and should be dismissed without leave to amend.

13   **B.    THE COMPLAINT FAILS TO STATE A VALID CA-FCA
14          CLAIM BASED ON ALLEGED VIOLATIONS OF THE MEDI-
           CAL DISCRIMINATORY BILLING RULE.**

15        As previously noted by the Court, the California False Claims Act states that
16   it is a violation to knowingly present or cause to be presented, and/or knowingly
17   make, use, or cause to be made or used, false claims for payment or approval of
18   claims for Medi-Cal reimbursement.  *See* Cal. Gov't Code § 12651(a).  In its July
19   25, 2017 order, this Court dismissed Relators' CA-FCA claim based on
20   Defendants' alleged violation of the Medi-Cal discriminatory billing rule which
21   provides that "[n]o provider shall bill or submit a claim for reimbursement for the
22   rendering of health care services to a Medi-Cal beneficiary in any amount greater
23   or higher than the usual fee charged by the provider to the general public for the
24   same service." 22 Cal. Code Regs. § 51480(a).  Specifically, the Court ruled that
25   Relators' allegations that Defendants charged patients without insurance (who paid

26

27   _____

28   [17] *Id.*, p. 9.

364870.1

**DEFENDANTS' MOTION TON DISMISS RELATORS' THIRD AMENDED COMPLAINT**

1    for services in cash) fees that were lower than those charged to Medi-Cal patients

2    for the same services failed as a matter of law to establish a violation of the Medi-

3    Cal discriminatory billing rule because  "California law 'expressly authorize[s]'

4    health care providers to provide services at lower rate for, *inter alia*, uninsured

5    patients that would not be entitled to an insurance reimbursement."  7/25/17 Order

6    at 21, citing Cal. Bus. & Prof. Code § 657(c).

7        In the TAC, Relators largely abandon the theory that Defendants violated the

8    Medi-Cal discriminatory billing rule by charging uninsured patients fees less than

9    fees charged to Medi-Cal patients.   Instead, Relators substitute a new and

10   convoluted theory that Defendants violated this billing rule by calculating its

11   "usual charge" to the public in a manner that would **not** violate the rule.

12       Initially, Relators allege that RIC typically calculated its usual

13   "chargemaster" charges to the public for services as being approximately 200% of

14   the Medicare rate for such services, but then complain that RIC really only charges

15   80% of the Medicare reimbursement rate to Medicare (as a result of the alleged

16   waiver of copayments and deductibles), 120% of the Medicare rate to private

17   insurance plans or the amount paid under the plan fee schedules, and less than 80%

18   of their purported "usual charge" to cash paying patients.  (TAC ¶ 172).  These

19   allegations do not establish a violation of the Medi-Cal discriminatory billing rule

20   because California law permits RIC to charge lower rates to the uninsured and

21   what Medicare and private plans are willing to pay does not determine RIC's

22   "usual fee" charged to the "general public" for that service within the meaning of

23   the billing rule.  Further, even if true, Relators fail to identify a single service for

24   which RIC billed a higher fee to the Medi-Cal program than the fee billed to

25   Medicare or private plans for the same service.

26       On the contrary, Relators' only specific example involves an allegation that

27   RIC "manipulated" the calculation of its "usual charge" for a particular procedure

28

NELSON HARDIMAN LLP
11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

364870.1

**DEFENDANTS' MOTION TON DISMISS RELATORS' THIRD AMENDED COMPLAINT**

in order to avoid violating the Medi-Cal discriminatory rule by allegedly establishing a "usual charge" for CPT code 67028 of $370.00, just over Medi-Cal's $364.11 reimbursement rate, even though RIC typically calculated its usual charge at 200% of the Medicare reimbursement rate, which, according to Relators, would have been $250 for this code.  TAC ¶ 172.  However, there is nothing in the Medi-Cal discriminatory billing rule that mandates that a provider calculate its "usual charge" to the "general public" for a particular service in a particular way so long as the charge is not lower than the fee charged to the Medi-Cal program.  Since Relators concede that RIC's "usual charge," however calculated, to the public for CPT 67028 was higher than the Medi-Cal reimbursement rate ($370 to $364.11), Relators' claim that Defendants' facial compliance with the Medi-Cal discriminatory billing rule can support CA-FCA liability fails as a matter of law.

Accordingly, Relators' CA-FCA claim based on alleged violations of the Medi-Cal discriminatory rule again fails both as a matter of law and because their allegation that Defendants "were, in fact, charging far lower fees to the general public (meaning Medicare patients, privately insured patients and cash paying patients) than the amounts they claimed for reimbursement for the rendering of the same services to Medi-Cal beneficiaries," TAC ¶ 173, is unsupported by any factual allegations identifying a single instance where such a violation occurred.

## C.   THE COMPLAINT FAILS TO STATE A VALID CA-IFPA CLAIM BASED ON ALLEGED WAIVERS OF COMMERCIAL PLAN CO-PAYMENTS AND DEDUCTIBLES.

In its July 25, 2017 order, this Court also dismissed Relators' claim under the CA-IFPA, a statute that imposes civil liability and provides a *qui tam* cause of action for, *inter alia*, violations of California Penal Code section 550.  Cal. Ins. § 1871.7(b), (e).  Pursuant to section 550, it is unlawful to submit a false or fraudulent claim for payment to an insurer, or make false or fraudulent statements in connection with such claims.  *See* Cal. Penal Code § 550(a)(1), (6), (9), (b)(1)–

NELSON HARDIMAN LLP

11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

364870.1

**DEFENDANTS' MOTION TON DISMISS RELATORS' THIRD AMENDED COMPLAINT**

NELSON HARDIMAN LLP

11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

(2).   Specifically, this Court found that Relators' CA-IFPA claim based on Defendants' alleged practice of routinely waiving co-payments and deductibles for patients covered by commercial health plans, and then, in violation of section 550, misrepresenting the actual charge to these health plans, failed to satisfy Rule 9(b) because Relators did not "identify either specific instances or a time range in which RIC improperly waived a commercial plan patient's co-payment or deductible, as opposed to that of a Medicare patient." 7/25/17 Order at 23.

In an effort to cure their deficient CA-IFPA claim, the TAC simply adds the following allegation regarding Defendants' alleged waivers of co-payments and deductibles for commercial plan patients:

> For example, for patient, NP, 3 HealthNet copayments were waived by Dr. Chang between April, 2011 and October, 2012; for patient, KL, 3 Blue Cross insurance co-payments were waived by an RIC Physician between May and October, 2012; and for patient MH, Dr, Chang waived two Pacific & Regal co-payments between March, 2011 and August, 2012.

TAC ¶ 173.   This additional allegation simply establishes that RIC waived copayments for certain commercial plan patients, but does nothing to plausibly and specifically allege that such waivers constituted insurance fraud.

In particular, unlike Relators' claims with respect to Defendants' alleged routine waivers of Medicare copayments, Relators do not allege that such waivers were specifically barred by a state law equivalent to the AKS or by any other law regulating commercial health plan claims.  *Compare* 42 U.S.C. § 1320a-7a(i)(6) (under Medicare program, term "remuneration" includes waiver of coinsurance and deductible amounts); 42 C.F.R. § 1003.110 (same).  Nor do Relators allege that Defendants waived commercial plan copayments without any documentation of financial hardship or other justification.  Instead, Relators' CA-IFPA claim

**DEFENDANTS' MOTION TON DISMISS RELATORS' THIRD AMENDED COMPLAINT**

364870.1

proceeds on the legal theory that a healthcare provider's submission of a claim without disclosing a waiver of the commercial plan patient's copayment constitutes a fraudulent misrepresentation of the provider's "usual charge" that violates Penal Code § 550. *See* TAC ¶ 180. That is not the state of California law.

Instead, as early as 1981, the California Attorney General opined that where a health insurance plan provides it will pay a fixed percentage of a provider's "usual fee," a provider who charges "a 'usual fee' that does not account for the fact that he has waived the patient's copayment does not violate California laws against misrepresentation and fraud." 64 Ops. Cal. Atty. Gen. 782, 1981 WL 126814, at *1 (1981).[18] Instead, because the term "usual charge" is ambiguous and can reasonably be interpreted to not include the provider's waiver of a copayment, the Attorney General concluded that a provider who submits a claim for his "usual charge" which does "not take into consideration the fact that he has, is, or will be waiving the patient's copayment under an insurance plan which provides that the insurance company will pay a fixed percentage of his 'usual fee,' the patient paying the remainder, does not violate the aforementioned California laws relating to the making of false and fraudulent statements." *Id.* at *2-3.[19]

Putting aside the lack of supporting California law, Relators' CA-IFPA claim also fails to satisfy Rule 9(b) because it does not specifically describe the

---

[18] In particular, the California Attorney rejected the very fraud theory advanced by Relators here whereby "the certification by a [provider] to an insurance company for payment that his 'usual fee' for a service is $100 when in fact he only expects to be paid the $80 that the company will pay as its 80 percent share of that amount (the $20 or 20 percent patient copayment being waived) is false and fraudulent in that under those circumstances the [provider's] 'usual fee' is really the $80 expected and not the $100 claimed." 1981 WL 126814, at *2.

[19] Among the California laws cited by the Attorney General were then Insurance Code sections 556(a)(1) (unlawful to present a false or fraudulent claim for the payment of loss under a contract of insurance) and 556(a)(3) (unlawful to prepare or subscribe a writing to use in support of such a false and fraudulent insurance claim), and section 532 of the Penal Code (knowingly and designedly defrauding another of money by any false and fraudulent representations or pretense). 1981 WL 126814, at *2.

NELSON HARDIMAN LLP

11835 WEST OLYMPIC BOULEVARD, SUITE 900
LOS ANGELES, CALIFORNIA 90064

364870.1

**DEFENDANTS' MOTION TON DISMISS RELATORS' THIRD AMENDED COMPLAINT**

specific healthcare plan contract provisions governing RIC's alleged contractual duty to collect copayments or defining a provider's "usual charge" (instead lumping all such contracts into one bucket, "including but not limited to Empire Blue Cross/Blue Shield, Cigna and United Healthcare"), does not allege that such commercial plans barred any waivers of copayments, including for financial hardship, and fails to include any factual allegations establishing that RIC's claims for "usual charges" that did not include co-payment waivers were material to the amounts paid by the plans under their own methodologies of calculating the "reasonable and customary" rate of reimbursement for RIC's services. *See Children's Hospital Central California v. Blue Cross of California*, 226 Cal.App.4th 1260, 1275 (2014) ("reasonable and customary amount that the health care service plan has a duty to pay 'might be the bill the [medical provider] submits, or the amount the [health care service plan] chooses to pay, or some amount in between.'") (citation omitted).

Because Relators' CA-IFPA claim does not allege fraud based on a cognizable legal theory or with the requisite factual particularity, it should be again dismissed, but without leave to amend.

## V. <u>CONCLUSION</u>

For the foregoing reasons, Relators' Third Amended Complaint should be dismissed pursuant to Rules 12(b)(6) and 9(b) for failure to state a claim  and to allege fraud with particularity.

Dated:  September 5, 2017          Respectfully submitted,

NELSON HARDIMAN LLP


By: */s/ Mark Hardiman*
             Mark Hardiman

Attorneys for Defendants

364870.1