Kolin C. Tang (SBN 279834)
Shepherd, Finkelman, Miller & Shah, LLP
1401 Dove Street, Suite 540
Newport Beach, CA 92660
Phone: (323) 510-4060
Fax: (866) 300-7367
Email: ktang@sfmslaw.com

*Attorney for Plaintiffs-Relators*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and STATE OF CALIFORNIA, *ex rel* BOBBETTE A. SMITH and SUSAN C. ROGERS,<br><br>Plaintiffs,<br><br>v.<br><br>TOM S. CHANG, M.D., TOM S. CHANG, M.D., INC., MICHAEL A. SAMUEL, M.D., MICHAEL J. DAVIS, M.D., RETINA INSTITUTE OF CALIFORNIA MEDICAL GROUP, CALIFORNIA EYE AND EAR SPECIALISTS, BRETT BRAUN and SAN GABRIEL AMBULATORY SURGERY CENTER LP,<br><br>Defendants. | CASE NO.: 2:13-cv-3772-DMG (MRWx)<br><br>**DECLARATION OF PLAINTIFF-RELATOR SUSAN C. ROGERS IN SUPPORT OF PLAINTIFFS-RELATORS' MOTION FOR ISSUE, EVIDENTIARY AND MONETARY SANCTIONS** |

I, SUSAN C. ROGERS, declare that:

1. I am a Plaintiff-Relator in the above-captioned matter.

2. I have personal knowledge of the facts set forth herein and, if called as a witness, could testify competently as to those matters stated in this Declaration. I submit this Declaration in support of Plaintiffs-Relators' Motion for Issue, Evidentiary and Monetary Sanctions.

3. I worked at Defendant, the Retina Institute of California ("RIC"), from June 2012 until January 2013, and held the position of Billing Department Manager. During that time, I worked directly with Defendants, Dr. Tom S. Chang ("Dr. Chang"), Dr. Michael A. Samuel ("Dr. Samuel"), Dr. Michael J. Davis ("Dr. Davis") (Drs. Chang, Samuel, and Davis, collectively, "RIC Partners") and Mr. Brett Braun ("Mr. Braun") (collectively with the RIC Partners, "Defendants").

4. I have more than twenty years of experience in the area of medical billing and coding, including for federal-funded and state-funded healthcare programs in multi-physician offices, and have received numerous certifications in CPT Coding and Billing and Ophthalmic Coding and Reimbursement.

5. I have personal knowledge of Defendants' routine waiver of Medicare co-payments, and estimate that Defendants waived Medicare co-payments for at least 30-35% of patients without collecting the required documentation regarding financial hardship and that Defendants did so to encourage repeat business from such patients. At the time that Defendants engaged in such waivers of co-payments, they knew that Medicare would not reimburse for the services provided if Medicare became aware of their policy of waiving co-payments to encourage repeat business from patients.

6. I also have personal knowledge of Defendants' routine waiver of commercial insurance co-payments, and estimate that Defendants waived commercial co-payments for at least 30-35% of patients without collecting any

- 2 -
ROGERS DECL. ISO PLTFS-RELATORS' MOTION FOR ISSUE, EVIDENTIARY AND MONETARY SANCTIONS
CASE NO.: 2:13-cv-3772-DMG (MRWx)

required documentation and know that they did so to encourage repeat business from such patients, in violation of their obligations to the commercial insurers to collect these co-payments. At the time that Defendants engaged in such waivers of co-payments, they knew that commercial insurers would not reimburse for the services provided if these private insurers became aware of their policy of waiving co-payments to encourage repeat business from patients.

7. My knowledge regarding waivers for both Medicare and commercial insurance patients is based on the following:

a. On a daily basis, during my time as Billing Department Manager, I would receive emails from RIC doctors instructing the Billing Department to waive co-payments and deductibles for patients. The instruction to waive a particular patient's co-payment or deductible was never accompanied by any financial hardship form or other documentation of the patient's financial hardship or inability to pay.

b. Patients frequently came into the RIC offices and told the front desk staff that they could not or did not want to pay their co-payment or deductible, either for that visit or in response to a bill they had received in the mail. Instead of requiring that that patient complete a financial hardship form or otherwise demonstrate an inability to pay, the treating physicians would simply instruct the Billing Department to write off the co-payment or deductible in order to keep the patient.

c. I was told by all of the RIC doctors, including the RIC Partners Drs. Chang, Samuel, and Davis, to write off co-payments and deductibles whenever the treating physician so instructed me. I do not recall ever being provided any documentation supporting any alleged financial hardship for any patient for which I was instructed to waive a co-payment or deductible.

8. I know (because the RIC Partners told me) that the reason the treating physicians were instructed to write off co-payments and deductibles was to ensure that patients would continue to return to RIC instead of choosing a different medical practice. In addition, patients who had had co-payments or deductibles waived in the past expected that their co-payments and deductibles would always be waived. Because of this, the treating physicians would routinely instruct the Billing Department to waive the co-payment or deductible without any demonstration of financial hardship or ability to pay. These patients were often told to simply ignore their bills.

9. I specifically recall having a conversation with Dr. Kevin Suk ("Dr. Suk") at the Garden Grove office regarding his routine waiver of co-payments. Dr. Suk asked me if he could write off certain commercial co-payments at the Garden Grove office. When I told him he could not, he told me that the RIC Partners had told him that he could do so in order to maintain patients and encourage return visits.

10. In or about September 2012, I attended an Executive Committee meeting with Drs. Chang, Samuel, and Davis, Mr. Braun, and Plaintiff-Relator Bobbette Smith ("Plaintiff-Relator Smith"), among other attendees. At that meeting, I brought up this co-payment waiver issue. I told the RIC Partners that RIC physicians must stop routinely writing off co-payments and deductibles, especially since there was no supporting documentation regarding financial hardship or inability to pay being collected by Defendants. I warned the RIC Partners of the consequences of these routine write-offs, especially if the practice or the doctors were audited by Medicare or investigated by the commercial insurers with which they had contracted. In response to this concern, Dr. Chang simply laughed. He then said not to worry about any kind of audit and that, if

Medicare audited the practice, he would rather pay the fines than stop waiving co-payments and deductibles.

11. On another occasion, I approached Dr. Chang and asked if the Billing Department could start collecting old balances from patients who had never paid. Dr. Chang said that the Billing Department could not collect old balances from current patients because he wanted to ensure that the practice would retain the patients.

12. I know that this routine behavior of writing off patient co-payments and deductibles had been happening long before I arrived at RIC. I worked with a woman in the Billing Department named Jennifer Garcia, who worked at RIC for years before I started. She often commented to me on how amazing it was that RIC would write off so many co-payments and deductibles without any supporting documentation.

13. I understand that Plaintiff-Relator Smith ran a report while she was still working at RIC in order to capture an estimate of how many Medicare patients had their co-payments and deductibles waived. I understand that based on that report, she estimated that RIC waived co-payments and/or deductibles for at least 30-35% of Medicare patients. Based on my experience at RIC with waiving co-payments and deductibles, as well as the reliability of the data, I agree with Plaintiff-Relator Smith's estimate.

14. For purposes of co-payment and deductible waivers, RIC physicians treated Medicare patients and commercially-insured patients the same. I understand that, because of this, Plaintiff-Relator Smith estimates that RIC waived co-payments and/or deductibles for at least 30-35% of commercially-insured patients. Based on my experience at RIC with waiving co-payments and deductibles, as well as the reliability of the data, I agree with Plaintiff-Relator Smith's estimate.

15. I also have personal knowledge of Defendants double-billing for the services of Dr. Rizwan Bhatti ("Dr. Bhatti"). My knowledge is based on the following: Dr. Bhatti had a capitated agreement in place with Dr. Kislinger. I recall a meeting where I asked the RIC Partners how Dr. Bhatti could have such an agreement in place when his services were also being billed at RIC. I recall explaining that Medicare would not pay for one patient to have two visits, per day, per doctor, and that the double-billing was an issue. I recall explaining that we needed to stop the double-billing from Dr. Kislinger's office, and offering to look further into the issue to resolve the double-billing issue. The RIC Partners knew that Medicare would not pay for double-billing but ignored my requests to resolve this issue.

16. I also have personal knowledge of Defendants identifying Dr. Lily Lee ("Dr. Lee") as assisting in surgeries when she was not present for such surgeries, and billing for her services as an assistant surgeon, even though she was not present. While I was working at RIC, I was told by a RIC manager that Dr. Lee was not even in the operating room when Defendants were billing for her services for assisting surgery.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 3rd day of May 2019, in Yuma, Arizona.

Susan C. Rogers